UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-80136-CR-ROSENBERG/REINHART

UNITED STATES OF AMERICA

v.

BRIAN MATTHEW SIGOUIN
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTIONS TO SUPPRESS STATEMENTS (DE 21)**

The United States of America submits this response to Defendant's Motion to Suppress Statements (DE 21). The Defendant's motion asserts that he made two (2) separate alleged invocations of his *Miranda* rights. First, Sigouin cannot assert his *Miranda* rights, as he was not in custody during law enforcement's questioning of him. Second, even if he could avail himself of his *Miranda* rights, Sigouin failed to make an unequivocal request for counsel or invocation of his right to remain silent during the two alleged instances in his motion. Finally, if he did properly request counsel or invoke his right to remain silent, only those statements should be suppressed. Regardless, the evidence seized from the safe should not be suppressed as it would have inevitably been discovered. For the reasons below, the motions should be denied.

I.   **PROCEDURAL HISTORY**

On July 30, 2019, a federal Grand Jury returned an indictment charging Brian Matthew Sigouin (hereinafter "Defendant" or "Sigouin") with one (1) count of receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) & (b)(1) and three (3) counts of possession of child pornography in violation 18 U.S.C. § 2252(a)(4)(B) & (b)(2). Sigouin's indictment followed a May 15, 2018 signed, and May 17, 2018 executed, federal magistrate judge-authorized search of his residence pursuant to which electronic devices were seized by the Federal Bureau of

Investigation (FBI).[1] Sigouin provided three (3) separate consensual, voluntary statements while outside his residence to FBI agents. A subsequent forensic examination revealed child pornography on three devices, two found inside a locked safe in the defendant's bedroom.

## II.   FACTS

On May 17, 2018, at just after 6:00am, FBI agents executed a search warrant at the defendant's home in Boca Raton, Florida in conjunction with his use of "The Network."[2] The defendant's father answered the door. Sigouin, 32 years' old, was home, along with his mother and father during the execution of the search warrant. Two FBI agents, SA Steinmetz and SA Alfin asked to speak with Sigouin in a minivan parked in driveway of the defendant's home. Sigouin sat in the front passenger seat and was never handcuffed. The minivan remained unlocked during the entire time the agents spoke to Sigouin. It was raining that morning and Sigouin wore pajama pants and a t-shirt. Sigouin inquired if he was under arrest, to which the agents advised he was not and was free to leave at any time.

### A. *First Interview of Sigouin - recorded*

At approximately 6:30am, the FBI began a recorded, non-custodial, interview of Sigouin (Government's Exhibit 1) that lasted less than 23 minutes. The first words on the recording are the defendant saying to the agents, "feel free to let me know what's going on." The agents introduced themselves, obtained biographical information and told Sigouin that the least of their concerns were the guns in his house, of which Sigouin had made mention. The agents advised Sigouin that they would read him his *Miranda* rights so they could speak with him. Sigouin asked

---

[1] The basis for the search warrant is explained in detail, in the government's response to the defendant's motions to suppress the search warrant (DE 20 & 22), and are hereby incorporated by reference.
[2] Throughout this response, as well as the motion filed by the defendant (DE 21), the internet network in question will be referred to as "The Network," as a redacted substitution for the real name of the internet network in question.

if he was under arrest, and the agents responded, "no sir you are not" and "you have not been charged with a crime, you are not under arrest, we are sitting in a car right now for privacy…but we can get out of the car if you want to." Sigouin reverted to talking again about his firearms and the fact that he had a locked safe in his bedroom. The agents then read Sigouin his *Miranda* rights, slowly and clearly. Sigouin then signed the *Miranda* rights form and was re-advised he could stop talking at any moment. After a conversation about Sigouin's dog, the agents directed the conversation to the use of the Internet, approximately nine (9) minutes into the interview. The entirely of the conversation remained calm.

Sigouin provided that he, his mother, father, and a former co-worker, have had access to the computers in the garage where the family has a business. Sigouin advised the former co-worker, whom he stated was last in the house approximately two months' prior to the search warrant, went to school for computer engineering. Sigouin also advised his father is "good with computers." When the agents began to question him about his own computer savvy, Sigouin responded in hyper-technical terms about his computer usage, including the fact that he runs his own personal encrypted "Linux" computer. Sigouin advised he did not believe the former co-worker knew about this computer. Sigouin admitted streaming movies illegally over the Internet using "proxy servers" and that he considered himself computer savvy. He provided the Wi-Fi and computer password. The agents then advised Sigouin that they wree with the Crimes Against Children Unit and investigating child pornography. Sigouin suggested the FBI should investigate his neighbors as they might be using his Wi-Fi. Sigouin ended the conversation at 6:51am when the agents accused Sigouin of only looking at pictures of children and not physically hurting children. The agents immediately terminated the interview. Sigouin did not leave, nor did he ask to leave, the car.

### B. Second Interview of Sigouin

Sigouin then reinitiated the conversation with the agents, approximately forty (40) minutes later at 7:28am, requesting to speak with them (Government's Exhibit 2). In this second audio-recorded interview, which lasted just over 7 minutes, the agents begin by telling Sigouin that he should not tell them anything if he (Sigouin) thinks a "deal" could be worked out. Sigouin does not respond to this and immediately asks the agents where they are looking for child pornography. The agents then clarified that Sigouin initiated this second conversation with the agents. Sigouin offered that anyone involved in child pornography was using a Linux device, accessing the web via "the onion router," using the "dark net" or "The Network." Sigouin then proceeded to explain "Tor," the "Darknet," and "The Network." The agents asked Sigouin if he has experience with these software programs. Sigouin responded: **"I don't think I should say that it's in my interest if we were ever make a deal, but I would be happy to help you."** [3] The agents again reminded him that they were not in a position to make a deal, to which Sigouin agreed. Sigouin then began a diatribe explaining these networks and how law enforcement and criminals are in a constant "cat and mouse game." Sigouin described the "soft" warrant execution by the FBI. Sigouin then ended the interview saying, "can we shut off that recorder off again please?" The interview terminated at 7:35am.

### C. Third Interview of Sigouin

SA Steinmetz left the vehicle and SA Fowler entered. Sigouin reinitiated with the agents a third time, about 10-15 minutes after the second interview ended, asking to speak with them. This interview <u>was not recorded</u> because Sigouin requested that it not be recorded. The agents wrote an FBI 302 report that is stated verbatim, as follows:

---

[3] Items in bold are believed to be the statements that the defendant identifies as either an invocation of his right to remain silent or his request for counsel.

> Sigouin asked if he would receive any benefit from cooperating with the FBI. SA Alfin advised Sigouin that, if he was eventually convicted of a crime and sentenced to prison, he could potentially receive a reduced sentence if he cooperated and accepted responsibility for his actions. SA Alfin emphasized that such a reduction was not a guarantee and would be entirely up to the sentencing judge and that the FBI was not and could not make any promises or cut any deals with Sigouin.
>
> Sigouin stated that he had been "dicking you guys around" in reference to the contents of the smaller safe in his room. Sigouin stated that he knew the combination for the safe but he knew it would "be all over" when the FBI opened the safe. **SA Alfin asked Sigouin for the combination to the safe. Sigouin asked if the interviewing agents thought it would be in Sigouin's best interest to speak to a lawyer before providing the combination to the safe. SA Alfin advised Sigouin that he did not have to provide the combination to the safe and that he could speak with a lawyer if he wanted to.**
>
> **Sigouin asked if a lawyer would be able to prevent the FBI from executing the search warrant at his residence. SA Alfin advised Sigouin that a lawyer could not force the FBI to halt execution of the warrant but advised that Sigouin could still speak with a lawyer if he wanted to before providing any further statements.** Sigouin then provided the safe combination "90 49 22".
>
> Sigouin stated that he looked at child pornography because he could not have children of his own. Sigouin was not sure why looking at child pornography helped him cope with his inability to have children.
>
> Sigouin stated that he had never spoken to anyone about his child pornography viewing habits. He said that he wanted to speak to a therapist if they could help him figure out why he felt the need to look at child pornography but did not feel like it was a conversation he could have with a therapist. Sigouin later stated that he may be able to discuss the topic with a therapist now that he had discussed it openly for the first time in his life.
>
> Sigouin stated multiple times during the course of the interview that he had never harmed or sexually abused a child and that he would not be able to live with himself if he had ever harmed a child. Sigouin also denied ever having produced child pornography.

(Government Exhibit 3). The interview terminated. No child pornography was uncovered on scene, therefore Sigouin was not arrested that day.

### III.  LEGAL ANALYSIS

This Court should deny Sigouin's motion to suppress his statements.  First, despite being read and acknowledging his *Miranda* warnings, Sigouin was not in custody.  Despite the FBI's interrogation of Sigouin, he was not in custody, and thus *Miranda* did not apply.  Therefore, Sigouin could not assert his right to an attorney and remain silent, such that the agents would have to stop any and all questioning.  Second, whether he was in custody or not, neither of Sigouin's statements were an unequivocal request for a lawyer or remain silent, such that questioning should have stopped or that subsequent statements or evidence should be suppressed.  Third, even if one or both of the statements raised by Sigouin violated his *Miranda* rights, they should be excised out of the testimony such that the rest of the defendant's statements were voluntarily made.  Finally, should the statement regarding the combination to the safe be suppressed, the contents therein should not be suppressed as fruit of the poisonous tree as it would have inevitably been discovered.

#### A. *Despite Being Read His Miranda Rights, Sigouin Was Not In Custody And Therefore Could Not Assert The Same.*

"Whether a person is 'in custody' and entitled to *Miranda* warnings is a mixed question of law and fact.  The court reviews the district court's factual findings on the matter for clear error and its legal conclusions *de novo*." *United States v. Moya*, 74 F.3d 1117 (11th Cir. 1996); *United States v. Jayyousi*, 657 F.3d 1085, 1109 (11th Cir. 2011).  "The issue is whether under the totality of the circumstances a reasonable man in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave." *United States v. Brown*, 441 F.3d 1330, 1347 (2006).  "The test is objective; the actual, subjective beliefs of the defendant and the interviewing officer about whether the defendant was free to leave are irrelevant." *Berkemer v. McCarty*, 468 U.S. 420 (1984).

The Supreme Court has held that the Fifth Amendment's prohibition against compelled

self-incrimination requires that a person taken into custody must be advised of his right to remain silent and his right to counsel prior to an interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444. In determining whether an individual is subject to a custodial interrogation, the court looks to "whether 'under the totality of the circumstances, a reasonable man in [his] position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave.'" *United States v. McDowell*, 250 F.3d 1354, 1361 (11th Cir. 2001) (*quoting Moya*, 74 F.3d at 1119). The test is objective; neither the suspect's nor the agent's actual, subjective view is relevant. *Peoples v. Campbell*, 377 F.3d 1208, 1228-29 (11th Cir. 2004). The Eleventh Circuit has instructed that courts should consider circumstances including whether and how the officers brandished weapons, touched the suspect, or used language or tone that indicated that compliance with the officers could be compelled, as well as the location and duration of the search. *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010); *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006). A suspect "needs to establish 'extensive' restraints in order to overcome a finding that under these circumstances a reasonable person would have understood he was free to leave or terminate the interview at any time." *United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006) (citing *United States v. Muegge*, 225 F.3d 1267, 1269 (11th Cir. 2000)).

Applying these guiding principles, Sigouin's interview was not a custodial interrogation as defined by *Miranda* and its progeny. There is no evidence that Sigouin was handcuffed or physically secured at any time during any of the interviews, that law enforcement brandished their weapons, that he was forced to accompany the agents, or that the encounter was confrontational in

any way. "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005). None of those factors were present here. To that end, Sigouin, throughout his motion to suppress (DE 21), does not assert at any time that he was in custody.

Here, the agents asked if Sigouin would speak with them. Sigouin then accompanied two agents into one unmarked minivan in front of his own house. Sigouin sat in the passenger seat. The tone throughout the entire interview remained casual with the special agents explaining why they were there and asking questions; it was in no way confrontational (Gov't Ex. 1). Sigouin was never handcuffed. *United States v. Delancy*, 502 F.3d 1297, 1307 (11th Cir. 2007) (affirming finding of voluntary consent in part because defendant "was not handcuffed or in police custody"). The agents made it clear that Sigouin was not under arrest. *United States v. Zapata*, 180 F.3d 1237 (11th Cir. 1999) (knowledge of right to refuse consent is an important factor militating against involuntariness). This factor is of "substantial importance in determining whether a reasonable person would have felt free to leave." *Muegge*, 225 F.3d at 1271*; see also Peoples*, 377 F.3d at 1228-29. In the absence of evidence to the contrary, a suspect who is "unambiguously advised" that he is free to go is not in custody. *Muegge*, 225 F.3d at 1271. Even if a reasonable person in the defendant's position felt constrained not to leave the scene at a particular moment, he is not necessarily in custody for Fifth Amendment purposes. *Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010). The "free-to-leave inquiry" reveals only that a person was seized and while seizure is a prerequisite to *Miranda*, the Court must also inquire whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. *Id.* The obviousness of the consensual encounter can be seen in Sigouin's control of the interview,

such that he terminated the first interview when the subject changed to the topic of child pornography. The agents immediately obliged his request and did not try to change his mind.

After sitting in the minivan for about 40 minutes, the second recorded interview, (Gov't Ex. 2) began with the agents clarifying that they were not making any deals with the defendant and that the initiation of this second interview was at Sigouin's request; Sigouin acknowledged and agreed with both points. This interview lasted only about 7 minutes and was terminated, once again, by the defendant. Then only 10-15 minutes later, a third interview ensues, once again initiated by the defendant. These were consensual encounters, not a custodial interrogations.

A defendant who alleges a violation of *Miranda* bears the initial burden of proof of showing that he was subjected to a custodial interrogation that triggers the necessity of *Miranda* warnings. *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). All of the relevant factors on the record indicate that a reasonable person would not have felt that their freedom was restrained to a degree associated with a formal arrest. Given the facts and the totality of the circumstances as outlined above, it is clear that the period of time the defendant was questioned by law enforcement was reasonable, that the defendant was never formally arrested, that he was not restrained in his movement. He was not in custody.

Because he was not in custody, the agents were not obligated to read Sigouin his *Miranda* rights. The reading of *Miranda* was a cautionary step, but not necessary, as Sigouin was not in custody. The reading of *Miranda* does not turn an otherwise consensual setting into a custodial one. Sigouin cannot avail himself of *Miranda* rights when he was not entitled to receive them because he was not in custody. As such, any argument that Signouin's statements *could* be considered an invocation of *Miranda* rights is irrelevant because he was not in custody.

In *United States v. Grant*, 689 Fed. Appx. 935 (11th Cir. 2017) (unpublished), for example,

the court held that a defendant, despite being read *Miranda* rights, was not "in custody" for *Miranda* purposes because the facts did not suggest that "he felt his freedom of action was curtailed," as he was told he was not under arrest and was free to leave at any time. Though unpublished, the case is instructive. Here the FBI agents read Sigouin his *Miranda* rights, but told him that he was not under arrest free to leave. The Supreme Court has at least implied that officers are free to continue questioning a suspect after he attempts to invoke his right to remain silent or right to counsel in a noncustodial interrogation. *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.3 (1991) ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'… "). As the Court has observed, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *California v. Beheler*, 463 U.S. 1121, 1124 (1983). Nevertheless, "[w]hen a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering." *See Montejo v. Louisiana*, 129 S. Ct. 2079, 2090 (2009). Sigouin was availed that opportunity.

No binding precedent exists which mandates that an officer must cease questioning in a noncustodial interrogation after a suspect attempts to invoke *Miranda* rights which were previously read to him. *See United States v. Akin*, 435 F.2d 1011, 1013 (5th Cir. 1970)(in complete absence of evidence of significant restraint, and where agent testified no force was used nor promises made in questioning defendant, defendant was not in custody and not entitled to *Miranda* warnings, despite the fact that Miranda warnings were given); *see also United States v. Lewis*, 556 F.2d 446, 449 (6th Cir. 1977)("[t]he precaution of giving *Miranda* rights in what is thought could be a non-custodial interview should not be deterred by interpreting the giving of such rights as a

restraint on the suspect, converting a non-custodial interview into a custodial interrogation for *Miranda* purposes"); *Robinson v. Trast*, 128 F. Supp. 2d 710 (D. Kan. 2001)("One cannot effectively invoke one's right to remain silent in advance of a custodial interrogation. It is not an anticipatory right"); *United States v. Hunter*, 13 F. Supp. 2d 586, 593 (D. Vt. 1998)("If a suspect is not in custody, it is immaterial whether he was advised of his *Miranda* rights, and consequently immaterial whether he validly waived those rights, or whether government agents questioned him in spite of his invocation of those rights"); *Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985) ("To hold that the giving of *Miranda* warnings automatically disables police from further questioning upon a suspect's slightest indication to discontinue a dialogue would operate as a substantial disincentive to police to inform suspects of their constitutional protections. It would convert admirable precautionary measures on the part of officers into an investigatory obstruction.").[4]  Thus, any attempt to argue that Sigouin invoked his "rights" is moot, because he was no eligible to avail himself of rights when he was not in custody.

---

[4] The undersigned is aware of arguments to the contrary. *See United States v. Moreno*, No. 1:10-CR-251-TWT-AJB, 2012 WL 1068638, at *9 (N.D. Ga. Mar. 8, 2012), report and recommendation adopted, No. 1:10-CR-251-6-TWT, 2012 WL 1068532 (N.D. Ga. Mar. 29, 2012) (nothing that the Eleventh Circuit has recognized that the reading of Miranda rights may be considered as some evidence by a reasonable person that he is in custody; *see United States v. Obasa, 15 F.3d 603, 608* (6th Cir.1994) (the court held that a police officer knew that *Miranda* rights were required to be given only to individuals who are in custody, and "[a]lthough giving *Miranda* warnings to a detainee may not automatically convert a Terry stop into an arrest, it is evidence that the nature of the detention has grown more serious"). In *Tukes v. Dugger*, 911 F.2d 508, 516 n. 11 (11th Cir.1990), the court held, in dicta through a footnote, that "[w]e feel constrained to address an argument raised by the state at oral argument regarding the result of giving Miranda warnings.…The state contends that because Tukes was not in custody when he was read his *Miranda* warnings, had he invoked his right to counsel the police would have been free to ignore that invocation. The state's position is without merit. If the state were free to tell a suspect that he had the right to an appointed lawyer, but could, while continuing to interrogate, refuse to provide the lawyer on the ground that the suspect was not actually in custody, the suspect would be led to believe that no request for counsel would be honored. The coercive effect of continued interrogation would thus be greatly increased because the suspect would believe that the police "promises" to provide the suspect's constitutional rights were untrustworthy, and that the police would continue to violate those rights as they wished, regardless of assurances to the contrary."  As a reminder, there were no valid invocations of right to counsel or silence, as will be discussed below. *See infra,* Section III.B.

### B. *Neither Of His Statements Were Unequivocal Requests For Counsel Or To Remain Silent and Any Later Statements Were Voluntary.*

If Sigouin had the privilege to avail himself of his *Miranda* rights, despite not being in custody, he asserts two instances in which he either invoked his right to counsel or his right to remain silent. Neither assertion amounts to an invocation of his *Miranda* rights and none of Sigouin's statements should be suppressed.

To stop an interrogation or demand the presence of counsel, a suspect must affirmatively and unequivocally invoke his Fifth or Sixth Amendment rights. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Davis v. United States*, 512 U.S. 452, 459 (1994); *Edwards v. Arizona*, 451 U.S. 477, 478 (1981). In other words, the suspect "must articulate his desire to have counsel present" or his decision to remain silent "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" or to cease further questioning. *Davis*, 512 U.S. at 459. "If the suspect's statement is not an unambiguous or unequivocal request . . ., the officers have no obligation to stop questioning him." *Id*. at 461-62. The assessment of whether a suspect's request is clear or ambiguous depends upon the totality of the circumstances, including "events preceding the request or nuances inherent in the [statement] itself." *Medina v. Singletary*, 59 F.3d 1095, 1101 (11th Cir. 1995) (internal quotation marks omitted).

During the second recorded interview (Gov't. Ex. 2), Sigouin, sua sponte, proceeded to explain "Tor," the "Darknet," and "The Network." The agents asked if Sigouin was experienced with these software programs. Sigouin responded: **"I don't think I should say that it's in my interest if we were ever make a deal, but I would be happy to help you."** The agents then, again, as they had done during the initial part of this second interview, reminded him that they could not make any deals, which Sigouin acknowledged. Sigouin then proceeded into a detailed

explanation of these networks and how law enforcement and criminals are in a constant "cat and mouse game." *Id*.

The context is important. Sigouin began the discussion about "The Network" and other parts of the Internet. Sigouin then mentioned the idea of making a deal with the agents. Upon beginning this second recorded interview, the agents made very clear that they were not in a position to make a deal. Nothing in this statement suggested that Sigouin wanted to terminate questioning. The agents reminded Sigouin that they could not make any deal with him, and he continues to speak. *See Medina*, 59 F.3d at 1105 (holding that it was appropriate for an officer to repeat the question about the suspect's waiver when circumstances rendered the meaning of his response ambiguous or unclear). In fact, Sigouin's statement was ambiguous and equivocal. When he said, "I don't think I should say that it's in my interest if we were ever make a deal, but I would be happy to help you," it is clear that the agents took this to mean that he would speak if the agents could make some deal with him. What that deal entailed could only possibly be interpreted (as it can only be assumed) to be regarding the legal ramifications or working as a confidential source. The agents did exactly as the Eleventh Circuit and this Court would have them do: clarify the statement. The defendant then, on his own, continued to speak. This cannot be considered an unequivocal invocation of his right to remain silent.

During the third interview, which, at Sigouin's request was not recorded, the following conversation takes place, where Sigouin allegedly asserts is his request for counsel:

> Sigouin stated that he had been "dicking you guys around" in reference to the contents of the smaller safe in his room. Sigouin stated that he knew the combination for the safe but he knew it would "be all over" when the FBI opened the safe. **SA Alfin asked Sigouin for the combination to the safe. Sigouin asked if the interviewing agents thought it would be in Sigouin's best interest to speak to a lawyer before providing the combination to the safe. SA Alfin advised Sigouin that he did not have to provide the combination to the safe and that he could speak with a lawyer if he wanted to.**

**Sigouin asked if a lawyer would be able to prevent the FBI from executing the search warrant at his residence. SA Alfin advised Sigouin that a lawyer could not force the FBI to halt execution of the warrant but advised that Sigouin could still speak with a lawyer if he wanted to before providing any further statements.** Sigouin then provided the safe combination "90 49 22".

As to the first statement, Sigouin did not invoke his right to counsel. Sigouin merely asked for SA Alfin's advice about needing counsel, because of his previous statement that "it would 'be all over'" if the FBI got into his safe. SA Alfin answered the defendant's request for advise by reasserting Sigouin's ability to speak with a lawyer if he wanted.

As to the second part of the statement, once again, Sigouin did not invoke his right to counsel. He specifically asked if a lawyer could stop the FBI from executing the search warrant. SA Alfin answered honestly and appropriately. Immediately thereafter, in an abundance of caution, SA Alfin followed it up with, yet again, a restatement of Sigouin's right to counsel if that was his choosing. Sigouin responds by providing the combination to the safe. Neither of these stateemtns were a clear and unambiguous request for counsel, especially when the agents remind Sigouin he can have a lawyer and Sigouin continues speaking.

In the Supreme Court's decision in *Davis v. United States*, the Court held that police questioning of a suspect need not cease until the suspect clearly invokes his right to counsel. An ambiguous request for counsel, such as "maybe I should talk to a lawyer," is not a clear invocation of the right and there is no necessity for the police to clarify the suspect's request. *Davis, 512 U.S.* at 461-62. Instead, a suspect must "articulate his desire to have counsel present sufficiently clearly [so] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards [v. Arizona*, 451 U.S. at 485], does not require that the officers stop questioning the suspect." *Davis*, 512 U.S. at 459. *See United States v. Propst*, 369 F. App'x 42, 46 (11th Cir. 2010) (defendant's statement "I'd rather have a lawyer around to talk" was ambiguous and did not require officers to

terminate questioning).

In *United States v. Ochoa*, No. 16-17609, 2019 WL 5491336, at *1 (11th Cir. Oct. 25, 2019), the Court denied the defendant's motion to suppress and held his post-*Miranda* statements admissible. During the last sentence of the reading of his *Miranda* rights, the officers read to Ochoa, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present". *Id.* at *2. After asking the officer to read the statement again, Ochoa insisted that he did not "really agree with that one" and "you're asking me at this time [if] I'm willing to answer questions without a lawyer. I don't agree with that." *Id.* The officer explained what the statement meant and Ochoa agreed to speak. *Id.* The Court noted that the parties did not dispute the fact that the defendant "did not explressly state that he wished to consult an attorney or remain silent." *Id*. at *17. The Court held that "it was appropriate for [the officer] to ask follow-up questions to clarify what Ochoa meant by his ambiguous statements." (*Id*., *citing Medina*, 59 F.3d at 1105). The Court then justified and affirmed the officer's further clarifications to Ochoa: "Once [the officer] offered a brief explanation of the waiver provision, Ochoa quickly assented, further indicating he ahd only been confused previously and had not invoked his right to counsel or to remain silent." *Id*.

Nothing stated by Sigouin or the FBI agents in this case, comes close to the statement debated in *Ochoa*. Sigouin made two ambiguous statements and each time the agents clarified his requests. Both times Sigouin continued speaking to the agents. The back and forth that was noteworthy to the Eleventh Circuit in *Ochoa*, was not found in the case at bar. Sigouin did not unambiguously and unequivocally request counsel or remain silent. His statements were ambiguous and appeared to express his desire to try to sway the agents, rather than an unequivocal desire to end the interaction. *See Lumpkins v. Sec'y, Dep't of Corrs.*, 449 F. App'x 879, 885 (11th

Cir. 2011) (finding that suspect's statement that he was "through with this" was ambiguous); *United States v. Tran*, 171 F. App'x 758, 761 (11th Cir. 2006) (holding that a suspect's request for his bankruptcy lawyer's business card was not an unequivocal request for counsel); *United States v. Acosta*, 363 F.3d 1141, 1154 (11th Cir. 2004) ("[A]n arrestee's refusal to sign a waiver of rights form is not enough to constitute an invocation of rights.").

It is also worth noting that Sigouin is not moving to suppress the second or third interviews despite terminating the first and second interviews himself and requesting the second and third interviews to begin. Cleary Sigouin did not consider *these* acts to be invocations of his silence, or the FBI agent's violation of any such right, such that the successive interviews should be suppressed.

### C. *If Sigouin's Statements Were Unequivocal Requests For Counsel Or To Remain Silent, Only Those Statements Should Be Prohibited In Trial*

Should this Court find that either or both of these statements were in fact unequivocal invocations of his right to remain silent or request for counsel, only those particular parts of the interview should be excluded from use at trial. In *Michigan v. Mosely*, 423 U.S. 96, 99-100 (1975), the Supreme Court explained that, after a defendant invokes his right to remain silent, a resumption of law enforcement questioning of that defendant can be permissible. 423 U.S. at 101; *see also Gore v. Sec'y Dept. of Corr.*, 492 F.3d 1273, 1296 (11th Cir. 2007) (explaining that an invocation of the right to remain silent does not preclude all future law enforcement questioning of a suspect). Here, in both instances the conversation between the agents and Sigouin was continued by Sigouin after the statements in question. Moreover, Sigouin's statements in question dealt with specific issues and not the entirety of the conversation. Thus, the future questioning was permissible and admissible.

### D. *No Suppression of Physical Evidence as Fruit of the Poisonous Tree*

The defendant requests that this Court suppress the contents of the safe, if it finds that the combination of the safe was elicited by the agents in violation of *Miranda*. Should the Court grant the defendant's motion to suppress the statements noted above and the combination to the safe, the contents therein should not be suppressed. "When there is a reasonable probably that the law enforcement officers would have inevitably discovered the challenged evidence, the evidence will not be excluded solely because it was the tainted fruit of an unconstitutional inquiry." *United States v. Kroesser*, 731 F.2d 1509, 1519 (11th Cir. 1984) (law enforcement's finding of the defendant's Winnebago was inevitable, without the defendant's illegally obtained statement, because it was large and moved to a location the police would have looked). In *United States v. Johnson*, 777 F.3d 1270 (11th Cir. 2015), for example, the court held that a gun found in the defendant's car during an illegal search would have inevitably been found during an inventory search when the car was towed.

The agents executed a lawful search warrant at Sigouin's residence, which entitled them to search the entire residence for digital devices. They knew of the location of the safe during the search and from Sigouin's initial interview (*see* Gov't Ex. 1). The FBI would have been able to breach the safe and recover the items within it, which after forensic examination revealed child pornography. *Id*. The defendant does not contest this point in his motion to suppress. The contents of the safe should thus not be suppressed as they fall under the inevitable discovery doctrine.

### IV.   CONCLUSION

The defendant's motion to suppress his statements based upon his argument that he invoked his rights to silence and counsel should be denied. Sigouin was never in custody and thusly not able to take advantage of those rights. Even if he was in custody or could avail himself of his

*Miranda* rights, they were not violated by the police. Certainly none of the physical evidence should be suppressed as a result thereof.

                Respectfully submitted,

                ARIANA FAJARDO ORSHAN
                UNITED STATES ATTORNEY

BY:   _s/Gregory Schiller_____
        GREGORY SCHILLER
        ASSISTANT UNITED STATES ATTORNEY
        Florida Bar No. 0648477
        500 S. Australian Ave.,
        West Palm Beach, FL 33401
        (561) 209-1045
        Gregory.Schiller@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing were filed with the Clerk of Court through the CMECF system and thus noticed to all parties attached thereto on November 8, 2019. Exhibits 1 – 3 as referenced therein, were delivered conventionally to the Court and defense counsel on a DVD on November 8, 2019.

BY: \_s/Gregory Schiller_____
Gregory schiller
Assistant United States Attorney