**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NUMBER: 19-CR-80136-ROSENBERG**

UNITED STATES OF AMERICA
*Plaintiff*,

vs.

BRIAN SIGOUIN
*Defendant*.

## DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS DEFENDANT'S STATEMENT AND PHYSICAL EVIDENCE OBTAINED PURSUANT TO DEFENDANT'S STATEMENT

COMES NOW the Defendant, BRIAN SIGOUIN, by and through undersigned counsel, and replies to the Government's response to the Defendant's motion to suppress the Defendant's statement and physical evidence obtained pursuant to the Defendant's statement. The Defendant relies on the argument advanced in his original motion but replies to specific statements in the Government's response as follows:

I.   The Defendant was in custody because under the totality of the circumstances a reasonable person in the Defendant's position would feel his freedom of action was restrained in a significant way

1. The Defendant was clearly in custody when the FBI agents questioned the Defendant inside the FBI van in order to procure evidence of a crime. The FBI agents deprived the Defendant of his freedom of action in a significant way. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)

2. At 6:00 AM on May 17, 2018 approximately eight Palm Beach County Sheriff Officers and approximately 20 FBI agents entered the Defendant's property, the home where he lived with his mother and father.

1

3. At the time law enforcement entered the Defendant's property and approached his home, some officers had their weapons drawn.

4. While the sheriffs and agents entered the Defendant's home, SA Alfin and SA Steinmetz asked to speak to the Defendant inside their FBI van.

5. The Defendant did not ask to speak to the agents. Nor did the Defendant ask to go inside the FBI van.

6. The Defendant acquiesced to the request of the FBI agents and to the robust show of authority of approximately 30 law enforcement officers entering his property and his home.

7. The FBI agents knew the Defendant was in custody, which is why the agents told the Defendant that they had to read the Defendant his *Miranda* rights, so that they could speak with the Defendant. (DE 27 Government Exhibit #1)

8. As the Government noted in FN 4 of its response, the 11th Circuit recognized that reading *Miranda* rights may be considered as some evidence by a reasonable person that he is in custody. (DE 27 at 11 FN 4 citing *United States v. Moreno*, No. 1:10-CR-251-TWT-AJB, 2012 WL 1068, at *9 (N.D. Ga. Mar. 8, 2012), report and recommendation adopted, No. 1:10-CR-251-TWT-AJB, 2012 WL 1068, at *9 (N.D. Ga. Mar. 29, 2012) (DE 27 at 11 FN 4)

9. When the Defendant asked if he was under arrest, the agents responded, "No sir, you are not. You are not charged with a crime; you are not under arrest; **we are in the car for privacy because of the questions we want to ask you**. **We** can get out of the car if you want."

10. This is hardly the equivalent of the agents telling the Defendant "that he was free to leave at any time," which the Government claimed in their response. (DE 27 at 2) At another

2

point in their response, the Government reiterated that, "the FBI agents read [the Defendant] his *Miranda* rights, but told him that he was not under arrest and was free to leave." This is incorrect. The agents did not tell the Defendant he was "free to leave." The agents merely informed the Defendant why the agents wanted to question him inside the van. This was evinced by the agents stating, "*We* can get out of the car want." The implication was that the FBI agents would ask the Defendant questions outside the van, if the Defendant did not want to remain inside the van. As the Government noted in their response, it was raining that morning. (DE 27 at 2)

11. Moreover, while the FBI agents and the Defendant were inside the van, the Defendant knew that approximately 30 law enforcement officers were on his property and inside his home.

12. The agents and the Defendant referenced the number of law enforcement officers that were present several times during the interviews. The Defendant stated, "I see the amount of officers you had this morning; you must be looking for someone," and "you have a lot of manpower here." (DE 27 Exhibit #1) Speaking about the Defendant's dog, the agents stated, "I think everybody has pet her once or twice." (DE 27 Exhibit #1) The agents stated, "What do you think we are here for, along with the rest of people we brought here?" (DE 27 Exhibit #1) Towards the end of the second interview, the agents stated that they didn't "bring the rest of the swat team." (DE 27 Exhibit #2)

13. When the Defendant stated, "this conversation is over," the FBI agents stated that they would stop asking questions and stated, "Brian, we can't let you back into the house at the moment; um like we said before you are not under arrest, but if there are medications you need to take let us know and we can grab them for you. But we can't let you back in right

3

now, just because we have people in there for safety reasons." (DE 27 Exhibit #1)

14. When the Defendant asked to terminate the questioning, the agents did not tell the Defendant that he was free to leave. The agents did not tell the Defendant he was free to exit the van. The agents stayed inside the van with the Defendant.

15. In its response, the Government claimed that after the Defendant ended the conversation, the agents terminated the interview, and the Defendant "did not leave, nor did he ask to leave, the car." This is a mischaracterization. The Defendant did not ask to leave the car, but this possibility was foreclosed by the agents and irrelevant to a determination of whether the Defendant's freedom of movement was restrained. The FBI agents specifically told  the Defendant that they could not let him back inside his home.

16. Under the totality of these circumstances, a reasonable man in the Defendant's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave. *United States v. Brown*, 441 F.3d 1330, 1337 (2006). The agents told the Defendant more than once that he could not enter his own home. The Defendant was inside the van at the agents' request. The only "freedom" offered by the agents was at the very beginning of the interview, when the agents told the Defendant that Defendant *and* the agents could step outside the van into the rain. Approximately 30 law enforcement officers entered the Defendant's property, and law enforcement officers entered the Defendant's home. The agents read the Defendant his *Miranda* rights. The agents initiated the questioning. By the end of the first interview, the Defendant knew that the FBI believed he was in possession of child pornography and that law enforcement was searching his home for evidence of that crime.

17. As the Government noted, in *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966) the Court

defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." It strains credulity that when FBI agents and other law enforcement officers entered the Defendant's property and went inside the Defendant's home; requested that the Defendant step inside the FBI van; told the Defendant he could exit the van with the agents; and told the Defendant that he could not cannot enter his own home, that a reasonable person in the Defendant's position would not feel his freedom of action was deprived in any significant way.

18. The Defendant's freedom of movement was clearly restrained during entire interaction with the agents. Not only were his choices, at best, to remain inside the van with the agents or stand outside the van with the agents, but the Defendant was restrained from entering his own home. Moreover, the Defendant knew that law enforcement officers were inside his home. Further, by the end of the first recorded interview, the Defendant knew that FBI believed that he was in possession of child pornography; that there were law enforcement officers inside his home and searching his home; and that he was not allowed to go back inside his home.

19. In its response the Government cited to *Montejo v. Louisiana*, 129 S.Ct 2079, 2090 (2009) in which the Court stated, "When a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering." Here, the Defendant was theoretically in control of the interrogation because had had the right to remain silent and the right to have an attorney, as evidenced by the agents reading *Miranda* warnings. Although, as the Defendant argued in his original motion, the FBI agents did not honor the Defendant's invocation of his right to silence or his right an attorney. However, the

Defendant was clearly in custody and did not have the right to "shut his door or walk away" from the FBI agents. The Defendant was prohibited from entering his home to shut the door on the agents. Law enforcement officers had breached the sanctity of the Defendant's home and were searching his home. At one point, the Defendant was given the option to step outside the van with the agents. The Defendant never had to option, nor was he told, that he could exit the FBI van and start walking away from the agents.

II.     <u>The Defendant made, at least, an equivocal request for counsel and an equivocal invocation of his right to remain silent during custodial interrogation and SA Alfin, SA Steinmetz, and SA Fowler did not scrupulously honor the Defendant's request by immediately narrowing the interrogation to clarify the request</u>

20. In its response, the Government argued that none of the Defendant's statements were "unequivocal requests for counsel or to remain silent." (DE 27 at 12)

21. However, the Government ignored that the Defendant argued that his statements were at least, and "equivocal" invocations of the right to counsel and the right to remain silent.

22. Consequently, every case cited by the Government regarding this issue discusses law enforcement's obligation when a defendant unequivocally invokes his rights.

23. The Government ignored that, "[w]henever even an equivocal request for an attorney is made by a suspect during a custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified…And no statement taken after that request is made can clear the *Miranda* bar." *Thompson v. Wainwright*, 601 F.2d 768, 771-72 (5th Cir. 1979) (emphasis in original)

24. Likewise, the Government ignored that, "it well settled that even an equivocal invocation

6

by the suspect of the right to cut off questioning requires that the interrogation cease, and further questions are limited to clarifying whether the subject in fact desires to terminate the interrogation." *Delap v. Dugger*, 890 F.2d 285, 290 (11th Cir. 1989) citing *Owen*, at 539 and *Christopher v. State of Florida*, 824 F.2d 836 841-42 (11th Cir. 1987)

25. In in response, the Government misstated the interaction between the FBI agents and the Defendant during the second recorded interview.

26. As the Defendant argued in his motion, during the second interview, the Defendant at least equivocally invoked his right to silence when he answered a question from the FBI agents by stating, "I don't think it's in my interest to say, if we were ever to make a deal, but I would be happy to help you." (DE 27 Exhibit #2)

27. In its response, the Government stated that the agents then "reminded [the Defendant] that they could not make any deals, which [the Defendant] acknowledged. [The Defendant] then proceeded into a detailed explanation of these networks and how law enforcement and criminals are in a constant 'cat and mouse game.''

28. This is incorrect. After the FBI agents stated that they could not make the Defendant a deal, the FBI agents (not the Defendant) then continued, and asked the Defendant, "So, you were saying…Tor, Freenet, Darknet?" (DE 27 Exhibit #2) The Defendant responded that he didn't mention Tor. The agents then asked the Defendant, "What is the difference between Tor and Onion?" (DE 27 Exhibit #2)

29. In its response, the Government reiterated that "the agents reminded [the Defendant] that they could not make any deal with him, and [the Defendant] continues to speak." (DE 27 at 13) (emphasis supplied)

30. This is incorrect. As discussed, after the agents told the Defendant they could not make a

deal with him, the FBI agents continued to interrogate the Defendant.

31. In its response, the Government stated that, "the agents did exactly as the Eleventh Circuit and this Court would have them do: clarify the statement." (DE 27 at 13) This is incorrect.

32. The obligation of law enforcement is not merely to "clarify the statement." (DE 27 at 13) However, it is worth noting that in the Defendant's case the FBI agents did not "clarify the statement." Instead, they told the Defendant they could not make him a deal and continued with the interrogation.

33. The 11th Circuit requires that the interrogation of the Defendant cease, and that law enforcement limit any further questioning to clarifying whether the subject in fact desires to terminate the interrogation." *Delap v. Dugger*, 890 F.2d 285, 290 (11th Cir. 1989) citing *Owen*, at 539 and *Christopher v. State of Florida*, 824 F.2d 836 841-42 (11th Cir. 1987) (emphasis supplied)

34.  Contrary to the Government's response, after the FBI agents told the Defendant they could not make him a deal, the Defendant did not acknowledge that the FBI could not make a deal with him; "continue to speak;" or "proceed into a detailed explanation of the networks…" (DE 27 at 12, 13)

35. Rather, it was the FBI agents who continued the interrogation. Immediately after stating they could not make the Defendant a deal, the FBI agents resumed questioning of the Defendant, and asked, "So, you were saying Tor, Onion, Darknet…" (DE 27 Exhibit #2)

   III.   <u>All of the Defendant's statements after the FBI agents failed to scrupulously honor the Defendant's equivocal requests to invoke his right to silence and right to counsel must be suppressed</u>

36. In its response, the Government argued that "if the Defendant's statements were

8

unequivocal requests for counsel or to remain silent, only those statements should be prohibited at trial." (DE 27 at 16)

37. Again, the Government ignored that the Defendant argued that his statements were equivocal requests for counsel and to end the interrogation. Those requests were not scrupulously honored by the FBI agents.

38. However, regardless of whether the statements were equivocal or unequivocal, if this Court finds that the requests were not scrupulously honored by the FBI agents, every statement following the Defendant's request must be suppressed.

39. The law is clear that when an individual makes a equivocal request for counsel or an equivocal invocation of his right to cut off questioning, further questioning must be limited to clarifying that request until it is clarified, "[a]nd no statement taken after that request is made can clear the *Miranda* bar." *Thompson v. Wainwright*, 601 F.2d 768, 771-72 (5th Cir. 1979)

40. To support its contention that only the Defendant's requests themselves should be suppressed, the Government cited to *Michigan v. Mosely*, 423 U.S. 96 (1975)

41. In *Mosely*, a detective read the Defendant *Miranda* rights and the Defendant waived his rights. *Id*. at 104 The detective questioned the Defendant regarding robberies and the Defendant stated he did not want to discuss the robberies. *Id*. The detective immediately ceased questioning. *Id*. Approximately two hours later, at another location, a different detective read the defendant *Miranda* warnings and questioned the defendant about a completely different crime, a murder. *Id*.

42. The Court held that the questions by the second detective did not undercut the defendant's previous decision to stop answering the first detective's questions. *Id*. at 105 The

9

defendant's right to cut off questioning was honored; a substantial amount of time passed; the defendant was re-advised of his *Miranda* rights the second time he was questioned; and the second interrogation was restricted to a subject that was not discussed during the first interrogation. *Id.* at 107

43. The facts in *Mosely* are fundamentally different from the facts in the Defendant's case. In its response, the Government cited to *Mosely*, for the proposition that law enforcement can resume questioning of a defendant after the defendant invokes his right to silence under certain circumstances. (DE 27 at 16)

44. No such circumstances were present in the Defendant's case. More importantly, the Defendant's request to cut off questioning and his request for counsel were never honored in the first place by the FBI agents. Thus, the FBI agents could not properly reinitiate questioning when they had never properly respected the Defendant's right to cut off questioning.

45. The Government also cited to *Gore v. Sec'y of Corr.*, 492 F.3d 1273 (11th Cir. 2007). Similar to *Mosely*, in *Gore* FBI agents read the defendant *Miranda* warnings; the defendant invoked his right to remain silent; and the agents immediately ceased questioning him. *Id.* at 1296 Seven days later, state officers read the defendant *Miranda* warning and questioned the defendant about the same subject matter.

46. The Court held that it was not objectively unreasonable for the Florida Supreme Court to hold that the defendant's right to remain silent was scrupulously honored, despite the fact that the state officers questioned the defendant about the same subject matter – in contrast with *Mosely*. *Id.* at 1298-99

47. Again, the facts in *Gore* are markedly different from the facts in the Defendant's case. The

FBI agents failed to scrupulously honor the Defendant's equivocal invocation of his rights. This failure precluded the agents from continuing to question the Defendant, and certainly precluded the agents from reinitiating questioning with the Defendant.

48. In its response, the Government stated that "in both instances the conversation between the agents and [the Defendant] was continued by [the Defendant] after his statements in question."  (DE 27 at 16) This is incorrect.

49. As discussed, after the Defendant equivocally invoked his right to cut off questioning by stating, "I don't think it's in my best interest to say, if ever make a deal, but I would be happy to help you," the FBI agents told the Defendant they could not make him a deal and then proceeded to ask the  Defendant questions. The agents did not scrupulously honor the request and continued to question the Defendant.

50. Because the FBI agents did not clarify whether the Defendant wanted to cut off questioning and invoke his right to silence, none of the Defendant's statements after his equivocal request to terminate questioning are admissible. See *Thompson v. Wainwright*, 601 F.2d 768, 771-72 (5th Cir. 1979)

51. Likewise, after the Defendant equivocally requested counsel by, according to the report, asking the agents if they thought it would be in his best interest to speak to a lawyer before providing the combination to the safe, the FBI agents did not scrupulously honor the request by narrowing the inquiry to determine if the Defendant in fact wanted to speak to a lawyer.

52. After the Defendant again, according to the report, asked if a lawyer would be able to prevent the FBI from executing the search warrant at his residence, the FBI did not honor the Defendant's equivocal request and did not narrow the inquiry to determine if in fact the

Defendant wanted to speak to an attorney.

53. Because the FBI agents did not clarify whether the Defendant wanted to speak to an attorney, none of the Defendant's statements after his first equivocal request for counsel are admissible. See *Thompson v. Wainwright*, 601 F.2d 768, 771-72 (5th Cir. 1979)

IV.     The physical evidence found in the safe must be suppressed

54. In its response, the Government argued that, even if the Defendant's statements regarding the safe and the combination to the safe are suppressed, the contents of safe should not be suppressed. (DE 27 at 17) The Government stated that the contents of the safe fall under the inevitable discovery doctrine because of the search warrant. (DE 27 at 17)

55. Under the inevitable discovery doctrine, the Government must establish there was a "reasonable probability that the evidence in question would have been discovered by lawful means." *Jefferson v. Fountain*, 382, F.3d 1286, 1296 (11th Cir. 2004) The Government must also establish that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *Id.*

56.  The Government has not met these requirements.

57. Specifically, the Government has not established that the search warrant authorized law enforcement officers to breach a locked safe in the Defendant's bedroom.

58. In the search warrant, the "description of the premise to be searched" is "the target residence, a single-family home with a detached garage." (DE 26 Exhibit #1)

59. The search warrant authorizes law enforcement to seize computers, storage media, records, etc. (DE 26 Exhibit #1)

60. The search warrant does not specifically mention a safe or any locked container. (DE 26 Exhibit #1)

61. In *United States v. Chadwick*, 433 U.S. 1, 11 (1977) the Court held that even though law enforcement had lawfully seized a locked footlocker and had probable cause to believe the foot locker contained contraband, law enforcement was still required to obtain a search warrant which authorized them to open the footlocker.  The Court held that important 4th Amendment privacy concerns were at stake. *Id*. By placing personal effects inside a locked container, the defendants manifested an expectation of privacy that the contents would remain free from public examination. *Id.*

62. In the Defendant's case, there was search warrant for the target residence. However, the holding in *Chadwick* indicates that an individual has a heightened and separate privacy interest in effects he places in a locked container.

63. Typically, when law enforcement lawfully seizes an item, for example a purse, and there is probable cause to believe the item contains contraband, law enforcement may search the item without a warrant. There is no 4th Amendment violation.

64. However, pursuant to the holding in *Chadwick*, a locked safe is unlike a typical item or object.

65. In the Defendant's case, the search warrant authorized law enforcement to search the target residence for digital devices.  Therefore, law enforcement was authorized to open drawers, closets, cabinets, boxes, or bags in the target residence where a digital device could reasonably be found.

66. However, breaking open a locked safe, unlike opening a cabinet or drawer, cannot be presumed to be authorized by the search warrant. Thus, the inevitable discovery doctrine does not apply to the contents of the locked safe.

**WHEREFORE**, for the reasons stated in the Defendant's original motion to suppress and the

Defendant' reply to the Government's response, the  Defendant requests this Honorable Court suppress the statements made by the Defendant after his equivocal request to cut off questioning and invoke his right to remain silent and after his equivocal request for counsel. Further, the Defendant requests that this Court suppress any physical evidence found in the Defendant's safe which was located because the Defendant provided the safe combination.

      **I HEREBY CERTIFY** that on November 18, 2019 I electronically filed the foregoing document with the Clerk of Court using CM/ECF and that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

*/s/Kevin J. Kulik*
**KEVIN J. KULIK**
Attorney for the Defendant
Florida Bar Number: 475841
500 SW Third Avenue
Ft. Lauderdale, FL 33315
Telephone: (954) 761-9411
Fax: (954) 767-4750

*/s/Ashley D. Kay*
**ASHLEY D. KAY**
Attorney for the Defendant
Florida Bar Number: 78991
500 SW Third Avenue
Ft. Lauderdale, FL 33315
Telephone: (954) 761-9411
Fax: (954) 767-4750