```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
                Case No. 19-CR-80136-ROSENBERG/REINHART
 3

 4   UNITED STATES OF AMERICA,)
                              )
 5           Plaintiff,       )
                              )
 6       -v-                  )
                              )
 7   BRIAN MATTHEW SIGOUIN,   )
                              )
 8           Defendant.       )   West Palm Beach, Florida
                              )   December 9, 2019
 9   _____)    9:05 a.m.

10

11

12              TRANSCRIPT OF SUPPRESSION HEARING

13          BEFORE THE HONORABLE BRUCE E. REINHART

14                  U.S. MAGISTRATE JUDGE

15

16   Appearances:

17
     For the Government:        GREGORY SCHILLER
18                              Assistant United States Attorney
                                500 Australian Avenue, Suite 400
19                              West Palm Beach, Florida  33401

20   For the Defendant:         ASHLEY D. KAY, ESQ.
                                KEVIN J. KULIK, ESQ.
21                              500 SW 3rd Avenue
                                Fort Lauderdale, Florida  33315
22

23
     Reporter:                  Karl Shires, RMR, FCRR
24   (954) 769-5496             Official Court Reporter
                                299 East Broward Boulevard, # 203G
25                              Fort Lauderdale, Florida  33301
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1                          I N D E X

 2     WITNESS                                          PAGE

 3     BRIAN NEIL LEVINE, GOVERNMENT'S WITNESS, SWORN ............5
       DIRECT EXAMINATION BY MR. SCHILLER .......................6
 4     CROSS-EXAMINATION BY MS. KAY ............................82

 5     DANIEL ALFIN, GOVERNMENT'S WITNESS, SWORN ...............129
       DIRECT EXAMINATION BY MR. SCHILLER ......................129

 6

 7

 8     EXHIBITS                                      RECEIVED

 9     GOVERNMENT'S EXHIBIT(S) 1 ...............................10
       GOVERNMENT'S EXHIBIT(S) 2 ...............................14
10     GOVERNMENT'S EXHIBIT(S) 3 ...............................21
       GOVERNMENT'S EXHIBIT(S) 4 ...............................42
11     GOVERNMENT'S EXHIBIT(S) 5 ..............................132
       GOVERNMENT'S EXHIBIT(S) 6 ..............................142
12     GOVERNMENT'S EXHIBIT(S) 12 .............................147
       GOVERNMENT'S EXHIBIT(S) 7, 8 AND 9 .....................156
13     GOVERNMENT'S EXHIBIT(S) 11 .............................158
       GOVERNMENT'S EXHIBIT(S) 13 AND 14 ......................171
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Call to Order of the Court.)

 2          THE COURT:  Good morning, everyone.  Have a seat,

 3    please.

 4          We are here this morning on Case Number 19-80136,

 5    United States of America versus Brian -- is it Sigouin?

 6          THE DEFENDANT:  Yes, sir.

 7          THE COURT:  Good morning.  We are here this morning on

 8    the motions to suppress, at least to begin the hearing on the

 9    motion to suppress.  I understand you're not going to finish

10    today because some witness are not available, and also I told

11    the parties I have a hard stop at 2:30 this afternoon because I

12    have to catch a flight.  But other than that, let me start with

13    appearances.  Let me start with counsel for the government,

14    please.

15          MR. SCHILLER:  Good morning, Your Honor.  Greg

16    Schiller on behalf of the United States.  With me is Special

17    Agents Dan Alfin from the Federal Bureau of Investigation.

18          THE COURT:  Good morning, gentlemen.

19          And for the defense?

20          MS. KAY:  Good morning, Your Honor.  Ashley Kay for

21    Brian Sigouin, and along with Kevin Kulik, co-counsel, for the

22    defendant.

23          THE COURT:  Ms. Kay, Mr. Kulik, good morning.

24          All right.  Any preliminary matters before we start

25    with the hearing, Mr. Schiller?
```

```
1              MR. SCHILLER:  Judge, I think just by way of summary,
2    the way we plan on handling things today, we have Professor
3    Levine here who we would like to put on the stand first and
4    move forward with "The Network" motion to suppress.  He has a
5    flight out of here as well today.  So we want to make sure that
6    we get him done.  Counsel for the defense and I have stipulated
7    to the majority of the items we're going to introduce into
8    evidence.  So that should speed things along.
9              After that, the FBI agents will then testify in
10   regards to the statement issues that have been raised by the
11   defense.
12             So just by way of summary, I think that's the way
13   we'll proceed, and I've spoken with defense counsel and I think
14   that they would agree with that process.
15             THE COURT:  Ms. Kay, is that correct?
16             MS. KAY:  Yes, Your Honor.
17             THE COURT:  Okay.  Great.  Mr. Schiller, there is no
18   issue of standing in this case, is there?  Mr. Sigouin --
19             I guess I should to turn defense.  That's okay if you
20   need to speak with co-counsel.  Go ahead.
21             I assume for standing purposes only and for purposes
22   of this hearing only Mr. Sigouin concedes that whatever was
23   recovered from the computer is his.
24             MS. KAY:  That's exactly correct, for purposes of this
25   hearing we are alleging standing.
```

```
 1              THE COURT:  All right.  Only for this hearing --
 2              MS. KAY:  That's correct.
 3              THE COURT:  -- obviously.
 4              Okay.  So then we've got standing alleged.
 5              So we're going to take some witnesses out of order.  I
 6    guess the government is calling Professor Levine as their
 7    witness --
 8              MR. SCHILLER:  Yes, Your Honor.
 9              THE COURT:  -- so I'll allow you to do that out of
10    order.
11              MR. SCHILLER:  Thank you very much, Judge.  The
12    government calls Professor, Dr. Brian Levine.
13              THE COURT:  Dr. Levine, please come forward.
14              BRIAN NEIL LEVINE, GOVERNMENT'S WITNESS, SWORN
15              THE COURTROOM DEPUTY:  State your full name.
16              THE WITNESS:  Brian Neil Levine, L-E-V-I-N-E.
17              THE COURT:  Have a seat, Dr. Levine.
18              THE WITNESS:  Thank you.
19              THE COURT:  That little bar in front of you is
20    actually the microphone.
21              And Dr. Levine, I'll tell you, the most important
22    person in the room is the court reporter sitting here next to
23    you.  So just speak clearly and loudly and toward the
24    microphone, and we'll be good.
25              THE WITNESS:  Okay.
```

Direct - Levine                                          6

```
 1              THE COURT:  Mr. Schiller, you may proceed.
 2              MR. SCHILLER:  Thank you very much, Judge.
 3                      DIRECT EXAMINATION
 4  BY MR. SCHILLER:
 5  Q.  Good morning, sir.
 6  A.  Good morning.
 7  Q.  Would you please state your full name for the record.
 8  A.  Brian Neil Levine.  L-E-V-I-N-E is my last name.
 9  Q.  Thank you.  And do you have any titles that go with your
10  name?
11  A.  I'm currently a professor at the University of
12  Massachusetts Amherst in the College of Information and
13  Computer Sciences where I'm also the director of the Cyber
14  Security Institute.
15  Q.  And you have a doctorate?
16  A.  I do.  I have a Ph.D. in computer engineering.
17  Q.  Do you prefer to be referred to as Professor Levine or
18  Dr. Levine for the purposes here today?
19  A.  Either's fine.  Professor is just as good.
20  Q.  All right.  How long have you been teaching at the
21  University of Massachusetts?
22  A.  I was first hired there as an assistant professor in
23  September of 1999.
24  Q.  And you've been teaching there for 20 years now?
25  A.  That's correct.  Over 20 years.  Well, yeah.
```

1    Q.  When did you receive tenure?

2    A.  Six years after I started, which would be 2005, I received

3    tenure and promotion to associate, and then several years

4    later, five years later I was promoted to professor or

5    sometimes it's called full professor to distinguish it from the

6    other titles.

7         THE COURT:  Hold on a second.  Dr. Levine, I

8    appreciate you keep turning to me, but just face Mr. Schiller.

9    It will be uncomfortable for you to keep turning your head like

10   that.  I can hear you just fine.

11        THE WITNESS:  Okay, Your Honor.

12   BY MR. SCHILLER:

13   Q.  Thank you, professor.  And you've maintained your

14   tenure-ship to this day?

15   A.  That's correct.

16   Q.  You mentioned you're the director of the Cyber Security

17   Institute.  What is that?

18   A.  So the institute was put together to coordinate activities

19   of other faculty on our campus, other colleagues on our campus

20   who work in fields -- well, in the security field and fields

21   that touch upon security -- it seems to touch everything these

22   days -- to coordinate the research efforts, the classes they

23   teach, the service that we do, and so on.

24   Q.  All right.  And you were the initial director of that

25   program?

1    A.   Founding and only director since its inception.

2    Q.   Which was when?

3    A.   That's a good question.  I think 2014.  I forget exactly.

4    Q.   Okay.  That's fine.  You teach specifically, though, in the

5    College of Information and Computer Sciences at U Mass; is that

6    right?

7    A.   That's right.

8    Q.   And what kind of classes do you teach?

9    A.   I've taught a variety of classes over the years.  Most

10   recently I've taught classes on secured distributed systems.  I

11   don't teach -- well, secured distributed systems, which

12   includes a variety of topics about the Internet and how

13   applications can conduct activities securely.  I've taught a

14   seminar recently on adversarial machine learning.  Over the

15   years I've taught classes on introduction to computer network

16   security, mobile computing, networking on the Internet, and

17   that's probably most of it.

18   Q.   A lot of Internet-based classes though?

19   A.   That's correct.

20   Q.   And do you teach only undergraduates, graduates, doctorial

21   students?

22   A.   The classes I teach are both typically for undergrads and

23   grads, depending on the class.  The class I taught most

24   recently had one section for really juniors and seniors at the

25   undergrad level and then a separate section for graduate

```
 1   students; largely MS, but also Ph.D.  And then personally I

 2   feel my -- the teaching I do at U Mass is not just classroom

 3   teaching, but the Ph.D. students and master's students as well

 4   as undergrads.  But the Ph.D. students that I advise

 5   individually one-on-one so that they can obtain their Ph.D.

 6   Q.  So you do advise Ph.D. students?

 7   A.  That's correct.

 8            MR. SCHILLER:  All right.  Judge, I don't know if the

 9   Court has access to turn on the monitors?  I wanted to roll

10   through a couple of pieces of evidence.

11            THE COURT:  Sure.

12            MR. SCHILLER:  Thank you.  My laptop should be

13   connected.

14            THE COURT:  Okay.  So let me see.  All right.  Now

15   we're good.

16            Mr. Kulik, Ms. Kay, you can see?

17            MS. KAY:  Yes.

18            MR. KULIK:  Got it.

19            MR. SCHILLER:  Judge, if I can approach the witness?

20            THE COURT:  You may.

21            MR. SCHILLER:  And, Your Honor, just to speed things

22   along, if I could just have a standing order to approach the

23   witness?

24            THE COURT:  Absolutely.

25            MR. SCHILLER:  Thank you.
```

```
 1   BY MR. SCHILLER:

 2   Q.  Dr. Levine, I'm showing you Government's Exhibit 1, which I

 3   believe is stipulated into evidence.

 4            MS. KAY:  That's correct, Your Honor.

 5            THE COURT:  All right.  Exhibit 1 will be admitted

 6   without objection.

 7       (Received in evidence Government's Exhibit(s) 1.)

 8   BY MR. SCHILLER:

 9   Q.  Is this -- this is your CV?

10   A.  It is.

11   Q.  And it contains all of your work experience, your

12   publications, your teaching experience, cases you've testified

13   in, things like that?

14   A.  That's correct.

15   Q.  Is it complete and up-to-date?

16   A.  Uhm, it's up-to-date.  I mean, it's not complete in that

17   I've done other things and so on.  But, yeah, it's

18   representative of the work that I've done.

19   Q.  Great.  Thank you very much.

20            MR. SCHILLER:  Judge, that will be moved in as

21   Government's Exhibit 1?

22            THE COURT:  Yes, it's been admitted without objection.

23            MR. SCHILLER:  Thank you.

24            Your Honor, with Professor Levine's qualifications

25   that he's already listed, plus his CV, at this point -- well,
```

Direct - Levine                     11

```
1    before I do that.
2    BY MR. SCHILLER:
3    Q.  Professor, could you tell us what kind of education you
4    have that led you to where you are today?
5    A.  I'm a -- well, as we said, I'm a professor at the
6    University of Massachusetts Amhurst, and I'm there because
7    largely I have a Ph.D. in computer engineering from the
8    University of California, Santa Cruz, which I received in I
9    think it was May of 1999.  I received a master's degree from
10   the same institution before that in computer engineering, and
11   then before that I received a related degree, applied math and
12   computer science, from the State University of New York at
13   Albany in 1994.
14   Q.  Thank you very much.  You did a grad school dissertation?
15   A.  That's correct.
16   Q.  And what was the focus of that dissertation?
17   A.  The focus was on -- it was called "Network Support for
18   Group Communication."  The focus was on allowing -- this was
19   the late '90s, and so the focus was on allowing -- so at the
20   late '90s is really when people started to get high bandwidth
21   communications into their homes, what we now think of as cable
22   modem and things like that.  So that allowed for people to
23   really do things in an interesting way.  It allowed them to
24   communicate directly as endpoints of the Internet rather than
25   as highly resourced servers run by say companies and similar
```

Direct - Levine                              12

1   things like that.

2          So my thesis was on allowing that kind of

3   communication through something called multicast, which isn't

4   quite readily used well anymore, to be frank, but what replaced

5   it -- part of the reason it's not well used anymore is what

6   replaced it was a technology broadly called peer-to-peer

7   networking, which is where rather than having this network

8   support called multicast for this kind of communication, the

9   peers would do things end to end in various ways that -- I'll

10  stop there.

11  Q.  Okay.

12  A.  It's complicated.

13  Q.  That's all right.  But you did mention something called

14  peer-to-peer.

15  A.  That's correct.

16  Q.  Have you published articles in relation to peer-to-peer

17  networking?

18  A.  Yes.  As soon as I started working at the University of

19  Massachusetts or U Mass, as it's called, I started looking into

20  peer-to-peer networking because everyone could see it was

21  quickly replacing this other technology that was being deployed

22  to support group communication, and I started looking at a

23  variety of ways of how peer-to-peer networking could help drive

24  new applications on the Internet.  And I still really do that

25  today.  It's sort of a fundamental way of doing things on the

Direct - Levine                          13

1    Internet and allows for a lot of new services and applications.

2    Q.  So you published articles in relation to peer-to-peer

3    networking?

4    A.  Many.

5    Q.  And the focus of today's hearing is about a particular

6    network.  We're not going to mention the name of the network

7    because all of the documents have the name of the network

8    redated.  So we're going to refer to it as "The Network."  And

9    if I am correct, I believe that the Court and defense counsel

10   know exactly which network we're referring to.

11          MS. KAY:  Yes, that's correct.

12          THE COURT:  That's correct.

13   BY MR. SCHILLER:

14   Q.  So in regards to that particular network, have you written

15   articles on that as well?

16   A.  Yes, one article.

17   Q.  All right.  I'm going to show you --

18          MR. SCHILLER:  And, Judge, this is also, I believe,

19   stipulated into evidence as Government's Exhibit 2.

20   BY MR. SCHILLER:

21   Q.  Is this an article that you wrote about "The Network"?

22   A.  Yes, it is.

23          MR. SCHILLER:  All right.  Judge, I would like to move

24   this in, Government's Exhibit 2.

25          THE COURT:  Okay.  Any objection to Government's 2?

1          MS. KAY:  No, Your Honor.

2          THE COURT:  Admitted without objection.

3        (Received in evidence Government's Exhibit(s) 2.)

4   BY MR. SCHILLER:

5   Q.  And that article, it's been peer-reviewed?

6   A.  Yes.

7   Q.  Okay.  And what does that mean, when something's been

8   peer-reviewed?

9   A.  So peer-review is a process put together in many scientific

10  communities.  In this particular case it was for a particular

11  workshop where there was what's called a technical program

12  committee.  It's a group of scientists, typically professors,

13  but generally people with Ph.D.s or -- generally people with

14  Ph.D.s who have been doing research and have publications in

15  the focus of the particular workshop.  So this was in a -- it's

16  called a privacy engineering workshop.

17          So this group of individuals are organized, and then

18  they solicit new research, they solicit papers on new research.

19          Sorry.  There's a little bit of feedback, so I'm just

20  going to move over here a little bit.

21          So they solicit research papers with novel research in

22  it, and then they -- so in this particular case, it was

23  double-blind, which means that I submitted the paper without my

24  name on it or my coauthors' names.  I don't know who reviewed

25  it other than it was -- I think it was four people who were

1    listed on here.  Well, some four of the people that were on

2    this program committee.  They wrote -- a review of this

3    occurred, decided whether it was among the papers that would be

4    published.  In this case it was.

5           In this case also the paper went through a process

6    that's called Shepherding.  Shepherding refers to that even if

7    your paper is accepted, there's a member of the technical

8    program committee who looks at your revised paper and says,

9    okay, you did a good job responding to any criticisms of the

10   reviewers, and so now we're ready to publish it.

11          So in my personal opinion, I would consider that a --

12   you might call it a highly reviewed process.  It was done

13   carefully, in other words.

14   Q.  And this was done back in 2017; is that correct?

15   A.  That's correct.

16   Q.  You've also testified as an expert regarding "The Network"

17   in different federal court districts other than the Southern

18   District; is that right?

19   A.  I have.

20   Q.  I believe the Eastern District of Pennsylvania?

21   A.  That's correct.

22   Q.  The Northern District of -- I'm sorry.  The Eastern

23   District of Missouri?

24   A.  That's correct.

25   Q.  And Northern District of Maryland?

Direct - Levine                    16

```
1    A.  That's correct.

2              THE COURT:  There's only one district in Maryland.

3              MR. SCHILLER:  Thank you, Judge.  I apologize.

4              THE WITNESS:  I may not remember the eastern or

5    northern designations, but those are the correct states.

6    BY MR. SCHILLER:

7    Q.  You were qualified as an expert in those cases and spoke

8    about "The Network"?

9    A.  I was qualified in different ways.  In each case, if I was

10   qualified, the exact phrasing appears on my CV.

11             MR. SCHILLER:  Okay.  And, Judge, based on the

12   witness's qualifications and his experience, at this point we

13   would ask the Court to recognize him as an expert in

14   peer-to-peer networking and networking security.

15             THE COURT:  Specific peer-to-peer networking and

16   network security.  Any objection from the defense?

17             MS. KAY:  No, Your Honor.

18             THE COURT:  All right.  He will be accepted as an

19   expert in those two, peer-to-peer networking and network

20   security.

21             MR. SCHILLER:  Thank you, sir.

22   BY MR. SCHILLER:

23   Q.  So Professor Levine, let's start with peer-to-peer

24   networking.  Now, I'm sure you could go on for several hours

25   discussing the intricacies of peer-to-peer networking, but
```

```
 1  let's, from a 10,000-foot view, just so we have it for the
 2  record and everyone's aware of where we're starting from, what
 3  is peer-to-peer networking essentially?
 4  A.  So from that high level, peer-to-peer networking refers to
 5  people running computers that they have, let's say, at their
 6  homes with a reasonable network connection, which is pretty
 7  common these days, and they're working together as a group to
 8  provide some service.  And one way to think of this is in
 9  contrast to a lot of the ways that we all interact on the
10  Internet currently.  So major providers will put up servers or,
11  at least a group of computers that appear to be a single
12  server, and each client will connect to the single server to
13  gain access to some service.
14          So, for example, Google provides many server-based
15  operations.  I may go to Google to search.  I may go to Google
16  to check my email.  In all of those cases, I'm connecting to
17  this server, this centralized location in order to check my
18  email or search the Internet and things like that.
19          In contrast, in peer-to-peer networking, there's
20  hybrids, but for the purposes of this explanation, I'm really
21  asking other people, not some major company, for something that
22  I need, be it a file, some other content, an image, things
23  likes that.
24          And so there's many different advantages
25  performance-wise or security-wise that can happen.  Cost-wise,
```

Direct - Levine                    18

1    and so on.  And so those are two broad architectures that run

2    the Internet.

3    Q.  I suppose one of the of greatest advantages of peer-to-peer

4    networks is that if one of the computers on "The Network" goes

5    down, "The Network" doesn't shut down, the other users continue

6    to operate?

7    A.  That's correct.  That's one of the main advantages

8    performance-wise or resiliency-wise, that although it can be

9    more complex to put together a protocol, a piece of software

10   that runs on the Internet in this peer-to-peer fashion, it can

11   survive -- if designed well, it can survive the -- what's

12   sometimes called the churn.  Some nodes will go off "The

13   Network" and come back on, and you have to survive that churn.

14          Now, it turns out for server-based computing there's

15   really the same thing going on, but it's one entity in charge

16   and they're able to deal with it more easily because there's

17   only one of them.

18   Q.  Understood.  One of these particular peer-to-peer networks

19   we're referring today as "The Network;" is that correct?

20   A.  That's correct.

21   Q.  And you're familiar with "The Network"?

22   A.  I am.

23   Q.  How did you first become morning familiar with "The

24   Network"?

25   A.  To my recollection, I was aware of it when it was first --

Direct - Levine                    19

1    it was also a published paper in a peer-reviewed conference way

2    back when, I believe in 2001, and it was one of the first

3    peer-to-peer file sharing networks that came out.  So I recall

4    being aware of it then.  I've known that it has been in use

5    since that time.  It's hard to design something like this and

6    it's hard separately to keep a user community going, and

7    they've done that since that time.  So I think people that

8    study this field generally are aware of it.

9    Q.  Now, "The Network" itself, you mentioned it started as a

10   peer-reviewed paper and has continued on since 2001.  Can you

11   explain -- essentially, "The Network" itself, is it something

12   that only a few people have access to or is it something that

13   anyone with a good enough Internet connection could attach

14   themselves to?

15   A.  The latter.  If you can obtain the software, which is

16   available for free and easily located by say Google, then, yes.

17   If you have a reasonable network connection at home, then you

18   can download the software.  You know, if you install it, you'd

19   be executing it, and you can run it and become part of "The

20   Network."

21   Q.  If you access and acquire "The Network" for your own use,

22   do you have to pay for it?

23   A.  No, it's completely free.

24   Q.  You mentioned something earlier about the codes that are

25   written for these kinds of programs.  Is that referred to as

Direct - Levine                              20

 1  source code?

 2  A.  That's correct.

 3  Q.  Is the source code for "The Network" free and available for

 4  people to access?

 5  A.  Yes.  It's what's called open source.  It's available on a

 6  site -- currently it's available on a site called GitHub.

 7  GitHub is the main place, the main site that people who code,

 8  developers, whether professional or amateur, go to release

 9  their code, download the code of others.  It's a

10  well-established location for storing source code.  And in this

11  case, it's open source code that's available for anyone to

12  download and make use of or modify as they please.

13  Q.  How long have you been studying "The Network" such that you

14  have become very familiar with it and, in fact, written and

15  published a paper about it?

16  A.  Well, as I said, I've been aware of it for a long time, but

17  I think our studies really began in earnest sometime around

18  2014, 2015.  I think the paper, you know, really began just

19  before 2017 as a culmination of those efforts.

20  Q.  All right.  So now let's talk specifically about "The.

21  Network."  How does an individual sitting at their home

22  computer get access to "The Network"?

23  A.  Well, once they've located the software and installed it on

24  their computer, they have to -- well, as I said, they have to

25  install it, and there's -- sometimes it's called a wizard.

```
 1    You've seen people who have used computers, you know, there's a
 2    typical series of install screens that guide you in the
 3    process, ask you certain questions, try to give you a default
 4    configuration.
 5          And then once it's up and running, it's a program that
 6    runs on your computer, but the way you access it is through
 7    your browser.  So although it may appear to you that -- it's
 8    not like going to Google where you're using your browser to
 9    access some remote site.  You're actually interacting locally
10    with the program through your browser.  And then, confusingly
11    perhaps, when you're using the program to get content elsewhere
12    on the Internet, it's still also within your browser.
13    Q.  But it is a program that you have to download onto your
14    computer?
15    A.  That's correct.  You're running it locally.
16    Q.  I'm going to show you Government's Exhibit 3.
17          MR. SCHILLER:  I believe this is also going to be
18    stipulated into evidence.
19          MS. KAY:  Yes, that's correct.
20          THE COURT:  Okay.  Government 3 will be admitted
21    without objection.
22      (Received in evidence Government's Exhibit(s) 3.)
23    BY MR. SCHILLER:
24    Q.  So, professor, on the screen we have Page 1 of Government's
25    Exhibit 3.  And could you explain to us what we're looking at
```

1  here?

2  A.  So this appears to be the website of the project, of "The

3  Network."  Sorry.  It's a little cumbersome to talk about it as

4  "The Network."  So this is their website where you can go to

5  download a copy of the source code, in addition to the GitHub

6  site that I mentioned before.

7  Q.  All right.  If we can go to the next slide please, Page 2.

8        And what do we see here?

9  A.  So this is where someone has clicked on the download tab,

10  you might call it, within the website.  You can see the

11  download is underlined at the top and that's the title of the

12  screen.  And so here we can see some friendly help for how to

13  download and install the program.

14  Q.  Okay.  And if we look at the bottom of that page, you see

15  where it says the word "windows" third line up from the bottom?

16  A.  I do.

17  Q.  And right above that it says, what would be "The Network,"

18  is free and open source software available under GVLV2.  And

19  then it gives a link to the source code; is that right?

20  A.  That's right.

21  Q.  Is that what you discussed before?

22  A.  That's exactly what I discussed before.

23  Q.  Next slide, please.

24        What are we looking at here on Page 3?

25  A.  So at this point this is a case where someone has actually

Direct - Levine                                    23

1   taken the time to download the program and run the installer.

2   And this is eventually what you'll get to, is one of the first

3   things that you will see.  You can actually see -- although --

4   well, I don't know how it looks in evidence, but at least here

5   today in the courtroom the screen is a little washed out.  But

6   I can tell that this is a browser, and it looks like at the

7   top, you know, it says 127.0.0.1.  If you're in the know, that

8   means you're actually talking to your own computer.

9           So here we are talking to our -- a program running on

10  our own computer, and it's asking us about setting up "The

11  Network."  And there's some options here.  We could, on the

12  left, connect with low security mode; in the middle, connect

13  with high security mode; and on the right there's an option to

14  choose your security in a custom fashion.

15  Q.  And under "low security," if you could please read what

16  that says.

17  A.  On the left?

18  Q.  Yes, sir.

19  A.  If you live in relatively free country where running "The

20  Network" is legal, you can choose this option.  It is much

21  safer than traditional P2P, or peer-to-peer.  It's much safer

22  than traditional P2P software like Bittorrent or Gnutella, but

23  an attacher with moderate resources may be able to trace your

24  activity on "The Network" back to you.  If you have friends who

25  also run "The Network," you can improve security by adding them

Direct - Levine                        24

1   as friends and then connecting only to them.

2   Q.  Now, that's one option when setting up "The Network" on

3   your computer?

4   A.  That's correct.

5   Q.  There's also a way to do it through high security; is that

6   right?

7   A.  That's correct.

8   Q.  All right.  Could we go to the next slide, please.

9          What are we looking at here on Page 4 of Government's

10  Exhibit 3?

11  A.  So this is further explanation of the security modes that

12  "The Network" offers.  In general, there's a lot of details to

13  this network, and I'm going to speak at a high level today --

14  Q.  I appreciate that.

15  A.  -- because it's a lot of details and hard to follow.  So if

16  there's further clarification, let me mow.

17         But, in general, there are two modes.  There's what's

18  listed as open net mode, and then below that you can see

19  there's a dark net mode.  And in general, these correspond to

20  the two options that we saw in the previous page.  Here we can

21  see someone has chosen the open net mode and the low

22  configuration, but there's this other high security or dark net

23  mode available.

24  Q.  And within the open net mode it says, as a description,

25  connect to strangers and friends.  I don't know anyone who

Direct - Levine                                25

1   already uses "The Network."  Connect to other network nodes

2   automatically.  Then you have the option for low and normal; is

3   that right?

4   A.  That's correct.

5   Q.  Low says, I do not care about monitoring and want maximum

6   performance.  Normal says, I live in a relatively free country,

7   but I would like to make it more difficult for others to

8   monitor my communications.

9          What is the difference between low and normal within

10  the open net mode?

11  A.  So in general, within open net mode, the low and normal are

12  the same in terms of what you do on "The Network."  But in

13  general, the normal mode will take -- the computer will be a

14  little bit more careful about what it stores locally on your

15  computer.

16         So in the operation of "The Network," your computer

17  and the software it's running has to keep track of various

18  events that are going on or that have happened or that it's

19  waiting to occur.  And so in normal mode, many more of those

20  events will be encrypted as they're stored on your computer so

21  that if you didn't want -- if someone were to examine your

22  computer while it was in normal mode, it would be a little bit

23  harder for them to do that because some of things they're

24  looking at would be encrypted in comparison to low.

25         The reason, if I wanted to speculate -- in fact, it

1    says right here.  I don't need to speculate.  The reason you

2    would choose low in comparison to the other modes, in

3    particular normal, is because it's a little bit faster to not

4    encrypt things.  And this network, in my opinion, in general is

5    pretty slows to begin with.  So you can see it says, I do not

6    care about monitoring and want maximum performance.

7    Q.  Okay.  We kind of jumped ahead a little bit when you said

8    what your computer stores.  But is it fair to say that "The

9    Network" pretty much operates with two major functions; the

10   ability for users to go and seek out files, and then the user's

11   computer being an anonymous repository for files that others

12   can seek out?

13   A.  Yes.

14   Q.  And it seems like the only difference between low and

15   normal is the security level of what your computer is storing

16   itself?

17   A.  Of what it's storing locally.  In general, yes.

18   Q.  I'm sorry.  What it's storing locally?

19   A.  Yes.

20   Q.  But as far as a user's ability to search on "The Network,"

21   low and normal really doesn't have an effectuation as far as

22   speed and what information you're sharing on "The Network"?

23   A.  That's correct.

24   Q.  Okay.  These warnings that we see up here, were they up

25   here in 2018, in 2017, 2016 when you were examining this

Direct - Levine                           27

1   network?

2   A.  Yes, according to my recollection of examining the history

3   of the project on GitHub.  So what's special about GitHub is it

4   restores -- I'm sorry, it stores revisions that the developers

5   have elected to make public.  And so my recollection of

6   examining GitHub is that these exact warnings were in place.

7   Q.  And certainly in early 2018 they were in place?

8   A.  I believe so, yes.

9   Q.  So let's focus on this open net mode with low or normal

10  security.  Can you describe for us when a user downloads the

11  software and wants to use "The Network," they're seeking out

12  files, correct?

13  A.  Correct.

14  Q.  Okay.  When a user is seeking out files and looking for

15  things, are they sharing any information about themselves when

16  they're using the open net mode?

17  A.  Well, when you're a user of open net network and you're

18  seeking particulars content, you're asking your -- so as we

19  discussed, open net is a peer-to-peer network.  So that

20  implies -- the reason it's called that is that you're connected

21  to other computers running the same software if they are other

22  peers in the system.  So the other peers that you're directly

23  connected with, let's call them your neighbors.

24          So when you have a particular piece of content that

25  you're searching for, you will ask your neighbors directly if

1   they have the content.  And in general they don't, and they

2   will ask their neighbors, the neighbors of your neighbors if

3   those peers have the content.  And so you're revealing to them

4   what you're searching for, for example --

5   Q.  Okay.

6   A.  -- among other things.

7   Q.  And we'll get into that in just a minute.

8   A.  Okay.

9   Q.  But the point is, you are sharing information about what

10  you're searching for and things about your actual activity,

11  maybe IP address and other things, with those on "The Network"?

12  A.  Yeah, they're the intended recipients.

13  Q.  All right.  And we'll talk about that in just a moment.

14          We kind of touched on this before, but because it's a

15  peer-to-peer network, let's say the ten people in this

16  courtroom are all part of "The Network."  Does that mean we

17  always stay attached to "The Network"?

18  A.  Well, if you're computer is running and you're running the

19  software correctly then, yes, you'll be attached.  But if at

20  any point you were to shut down the software or shut down your

21  computer, you would detach from "The Network."

22  Q.  And than other users could join "The Network" attached to

23  you?

24  A.  That's correct.

25  Q.  As far as using the open net mode, would you say that it's

1   open to the public such that anyone that was going to connect

2   to you could connect to you if they chose to or were randomly

3   assigned to you?

4   A.   Yes.  If they're randomly assigned to you, then they can

5   connect to you.  Any stranger, as it says.

6   Q.   And that's what it says on the slide; is that right?

7   A.   That's what I'm referring to.

8   Q.   All right.  We've said that "The Network" really has two

9   functions.  One is requesting files and the other is storing

10  files.

11  A.   Yes, inserting files.

12  Q.   Let's talk about inserting files.  How does one go about

13  doing that on "The Network"?

14  A.   So again, speaking at a high level, you would presumably

15  have some content that you would like to insert into "The

16  Network."

17       If I can just back up for a minute.  One thing I

18  wanted to distinguish about this network compared to other

19  things you may do on the Internet is that when you insert

20  content to share with others, it is stored only on the

21  computers of those who are also running the software.  And what

22  I mean by that in particular is, it's not a conduit to the rest

23  of the Internet.  You're not able to get to Google via this

24  network.  You're only able to insert things that will be stored

25  with people that run it.  And then, of course, you can only

Direct - Levine                    30

1    retrieve things that have been previously stored on this

2    particular network.  So that's the context of the question

3    you're asking me, just to clarify.

4    Q.  And for one further point of clarification, other

5    peer-to-peer networks, aside from this one -- for example, the

6    Gnutella network.  If I want to upload a file, it's stored

7    locally on my computer; is that right?

8    A.  You mean after -- well, if you would -- if I could rephrase

9    your question.  On Gnutella if you would like to share a file

10   for others to download, they're actually downloading it from

11   you.  Whereas, in the case of this network, they're -- the

12   people that would subsequently download something you've

13   inserted, they're not directly downloading it from you.  If I

14   could explain more.

15   Q.  Please.

16   A.  Okay.  So the process -- to answer your original question

17   of how would one go about inserting content into this network.

18   Let's say you have some content that you would like to enter.

19   You'd start there.  And again, this is all at a high level.

20   This answer is going to be a mixture of what you do in the

21   interface and what the software is doing behind the scenes.

22   Q.  So it's understood it's with that caveat.

23   A.  Okay.  So, at a high level, there's some content that you

24   would like to insert.  You point your software towards that

25   content.  It will be roughly -- well, so it will be divided up

Direct - Levine                    31

1    into what are called blocks that are relatively small, 32

2    kilobytes each.  Each of these blocks will be essentially

3    dispersed around "The Network" of peers that's out there.  So

4    if I had a large enough file, say it might be cut up into,

5    let's say, a thousand blocks.  If there are a thousand peers

6    that are running "The Network," then on average each of them

7    will get about one of the blocks that I've inserted.

8          And there's a lot of detail here.  Actually, that's

9    just a broad, high-level take on things.  Maybe we'll get into

10   some of the details there.

11         But once that's been inserted, your computer will work

12   behind the scenes to give you back what's called a manifest.

13   And the reason it's called that, you can think of it as a table

14   of contents.  But I think manifest is an appropriate word.

15   It's like a manifest of a ship.  It's the list of the blocks

16   that you have inserted.

17         That manifest itself is then in way a block that is

18   inserted into "The Network."  And the location of where that

19   manifest was stored in "The Network" is returned to you as kind

20   of a receipt or you could think of it as a password for getting

21   back the content that you've inserted.  Or my favorite ways to

22   refer to it, because it's pretty much the same thing, is to

23   call it a URL, like an address for anything else you would on

24   the regular Internet go to with your browser.  In fact, that's

25   appropriate.  Because if you're running ████Net, which is

```
 1    again -- the way you run ███Net is through your browser.  You

 2    could put that URL into ███Net and retrieve content that's

 3    inserted.  So stepping back --

 4    Q.  I just want to pause you for a second.

 5    A.  Yes, there's a lot here.

 6    Q.  No.  That's okay.  We're referring to "The Network" as "The

 7    Network."

 8    A.  I'm sorry if I didn't.

 9    Q.  That's okay.  That's okay.  You may have accidently said

10    another name.

11             MR. SCHILLER:  I would just ask the court reporter to

12    redact, with the Court's permission, the name so it refers to

13    the ███Net.

14             THE COURT:  Any objection?

15             THE WITNESS:  To "The Network."

16             MS. KAY:  No objection.  And also, counsel just

17    accidently said the word as well.  So we will redact that.

18             THE COURT:  Let's have a standing agreement that to

19    the extent any witness or counsel or the Court makes reference

20    to the actual name of "The Network," that the court reporter,

21    when he prepares the transcript, will redact that information.

22             MR. SCHILLER:  Thank you.

23             THE COURT:  We can't redact it from the tape, but we

24    can redact it from the written transcript.

25
```

BY MR. SCHILLER:

Q.  Go ahead and continue, sir.

A.  Okay.  So stepping back.  The process is we find some content, we hand it to the software.  Broadly speaking, the software divides it into these blocks.  The blocks are dispersed very randomly across "The Network."  It's actually encrypted before -- each block is encrypted before it's dispersed.  Any peer running the software will get about an even number of those blocks that have been inserted and then will store them.  A manifest is created, which is itself inserted.  And then a URL is returned to the user who inserted it.

At that point the user can share that URL with other people.  They can share it any way they like.  They can email it on the regular Internet.  They can post it to message boards on the regular Internet.  There are message boards that appear in this network as well.  It's actually pretty complicated in the sense that -- well, I'll just say, if you think about it, files are files, but websites are really just a collection of files, and message boards are really just a collection of files.  So, in fact, this network supports message boards and a version of websites that you can visit or at least download and browse through.

So if you were to post this URL that was returned to you, then other people could take that URL and begin the

Direct - Levine                        34

1    download process, which is another explanation altogether.

2    Q.   Which we'll get to in a minute.

3    A.   Okay.

4    Q.   So if all the users of this network were to upload their

5    files to "The Network" and not share that URL which gives

6    access to the manifest, would anyone be able to access any

7    files?

8    A.   No, they would not.

9    Q.   So that information has to be made publicly available?

10   A.   That's correct.

11   Q.   And I think you said it could be emailed from one user to

12   another, it could be posted on message boards?

13   A.   Yeah, however you like.

14   Q.   Okay.  So since the files are being broken down into blocks

15   and being stored on other users' or nodes' computers, do they

16   know what's being stored on their computers?

17   A.   Not exactly.  So no in the sense that there's no -- there's

18   very little notice to the user that certain blocks that have

19   been inserted by other people are being stored locally in your

20   own computer, number one.  But even so, when you receive these

21   blocks, they're generally encrypted.

22          But it's also the case that because -- the more

23   complicated answer is you can know.  And the reason is is that

24   if I were to insert content into this network and then release

25   the URL for what I've inserted, anyone can, of course, download

Direct - Levine                                    35

1    the manifest.  I mean, that's the first step.

2              So from there you can look at the names of each of

3    these blocks, and you would know whether someone's requesting

4    something that is part of this URL or maybe even whether you

5    stored it.

6              But in, general, the answer is no because you've been

7    given something that's encrypted.  So you would have to do that

8    extra step.

9    Q.  Can we go to the next slide, please.

10             When the user is downloading the software to use "The

11   Network," they see a page that says datastore size.  And what

12   is this telling the user?

13   A.  So the way peer-to-peer networks work in general is

14   everyone is contributing a little bit, and then the summation

15   of what everyone contributes makes things run a little bit

16   smoother.  So one of the things you need to contribute is your

17   network bandwidth, and one of the other things you need to

18   contribute is storage on your own computer.

19             So when I insert content into "The Network," that

20   content will be, as I said, dispersed throughout.  But

21   additionally -- and that's part of what's being talked about

22   here in general.  But also when I request content that's been

23   inserted in others, I will -- well, when I request that

24   content, my request may pass through -- as I said, it's a

25   request directed to my neighbors, and that request may go their

Direct - Levine                    36

1    neighbors.  And when the reply comes back with the content that

2    I'm looking for, they, depending on the size of this datastore

3    here, will cache -- and other factors, will cache that

4    response.  And the reason is, if something's being requested

5    that's popular, then we can make use of the fact that it's been

6    cached to cut down on the amount of traffic that's required to

7    retrieve files that have been previously inserted.

8    Q.  And really this tries to help with the speed of "The

9    Network"?

10   A.  That's right.  Not only the speed, but the resources

11   involved.

12   Q.  Next slide, please.

13        You mentioned bandwidth.  So when the user is setting

14   up their network on their computer, they have the option to

15   select what their transfer rate will be as far as how fast

16   files come and go?

17   A.  That's correct.

18   Q.  And that is a user-manipulated option in the setup?

19   A.  That's correct.

20   Q.  Okay.  Next slide.

21        And then finally, in the setup it talks about the

22   quote/unquote untrusted peers that you're connecting to.  So

23   what are we looking at on this slide?

24   A.  Okay.  So after "The Network" is up and running after some

25   initialization steps, one of the main things that the software

Direct - Levine                                    37

1  will do is look for these other neighbors, look for these other

2  strangers or untrusted peers, as the software itself calls it.

3         So depending on the way you configured the software,

4  you will need to connect to at least a few peers, possibly

5  many.  In fact, in my observations on average -- it goes up and

6  down over time, but on average people who run the software

7  connected to about 30 peers.

8         So in this case on this screen we can -- the slide is

9  redacted, but we can see these are actually IP addresses of

10 neighbors of this currently running piece of the software.  So

11 we can see we're connected to, what, five neighbors for more

12 than a few minutes.  There's a sixth neighbor that's currently

13 busy with other work, it's told our computer, and there's a

14 bunch of other nodes that it has not yet connected to, although

15 is trying, perhaps connected in the past.

16 Q.  And I think you said before, the more connections, the

17 faster "The Network" goes?

18 A.  Yeah.  I mean, it's limited by your bandwidth.  You know,

19 you can't go faster than the connection you have to the

20 Internet.  But, on the other hand, each time you're trying to

21 retrieve content that's been inserted by others with the URL

22 you've been given -- we haven't gotten to how that works yet,

23 but you're going to rely on each of these neighbors to do a

24 little bit of work on your behalf.

25        So things can be faster when you can do more at once.

Direct - Levine                        38

1   So you can hand out requests looking for content that you're

2   trying to download from six neighbors, but it might go a little

3   bit faster if you're connected to 30 neighbors.  Because each

4   one of them is going to take varying amount of times to get

5   what you need.  This will be clearer when we talk about, if we

6   talk about how to download.

7   Q.  Well, and that's where I was going to next.

8   A.  Okay.

9   Q.  So now that -- you've given us an understanding of how

10  users get access to "The Network" and how they share files with

11  "The Network" and receive a key that they can share with others

12  who can then search for it.  What the crux of this case is

13  about, and from the motion to suppress, is the actually

14  searching for and acquiring of files.

15  A.  Uh-huh.

16  Q.  So let's talk about that.  And if you want to use me as an

17  example or yourself as an example.  How does a user sitting in

18  front of their computer with "The Network" on, up and running

19  successfully, go out and search for files?

20  A.  Okay.  So I'm going to -- so I'll use myself as the

21  example.  What I would need is this -- what you referred to as

22  a key or I previously referred to as a URL of something that's

23  been previously inserted.  If I had that URL, I would give it

24  to the software that's running in my browser.

25          And then let's talk about what the computer would do

1    from there.  It would look at these neighbors that we see

2    listed for the user right here, and it would ask each one of

3    them for some number of blocks that are listed in the manifest.

4           So maybe I should back up.  This is a long process.

5           So I get the URL.  I give it to my running -- the

6    software that's running.  The first thing that URL enables my

7    computer to do is retrieve the manifest from "The Network."

8    And let's recall that the manifest is the list of blocks that

9    are required to reassemble the file that's been inserted.

10   There are some additional details here that I'm going to try to

11   leave out for now for clarity.

12   Q.  Professor, if I could, the manifest doesn't tell us where

13   those blocks are, does it?

14   A.  That's right.  It just tells us -- well, it tells us the

15   names of the blocks that we would like to retrieve.  Now, the

16   way that this network works -- what's interesting about those

17   blocks is the names is a little bit of a hint as to how to get

18   them.

19          So the best analogy I've come up with is:  If I were

20   to tell you my home phone number, at least -- I mean -- well,

21   if I was to tell you my hone phone number and you learned the

22   area code, that actually gives you some indication of -- well,

23   first of all, before the area code, you would know I'm in the

24   United States.  The second part of my phone number, the area

25   code, will tell you which state I'm in, maybe even which part

1   of the state that I'm in.  And the next three digits tell

2   you -- sometimes it's called the prefix -- will tell even a

3   little bit closer perhaps where I am and so on.

4           So the names of the blocks actually give us a hint as

5   to where we might go.  And by "where" I mean that each of my

6   neighbors also has one of these -- so this is called the

7   location intranet.  So the blocks I'm looking for have a

8   location and my neighbors have a location.  Again, akin to a

9   phone number.

10          So I look at the manifest.  There's a series of blocks

11  I want.  I look at my, let's say, ten neighbors, and I'm able

12  to make a very good guess as to which one is the best one to

13  ask directly for the content that I'm looking for.

14  Q.  Now, pause there for a one second.  When you say, I have a

15  good guess, it's your computer that's doing it?

16  A.  It's the computer that has the good guess.

17  Q.  Okay.

18  A.  Yes.  And so I send them a message, I send them a request

19  saying, do you have this block?  It's really more of a signal.

20  They will examine whether they are storing the block.  And if

21  they don't, they will ask their neighbors.  Now, this will go

22  on for a limited amount of time.  It will go hop by hop.

23  Eventually, the block that you've requested, someone will have

24  it and will return it to you back along the same path, or it

25  might fail and you will have to try again.

1           So if I were to be looking -- if I need 1,000 blocks

2    to reassemble a file that's been inserted and I have ten

3    neighbors, you would expect -- I can tell you from my

4    examination of "The Network" that, in general, we ask each of

5    them for about an even share of those needed blocks.  I will

6    make those requests.  Some requests will fail, some will not.

7    But, in general, if the file exists in "The Network," again

8    dispersed everywhere, then I will be able to reassemble things

9    back to the way it was.  And then I can -- when I say "I," then

10   the computer can display it to the user as it was originally

11   inserted.

12           Again, there's -- it's complicated and there's a lot

13   of details, but at the highest level that's what's going on.

14   Q.  And we're going to talk just about a few of those details.

15   But just so we're clear, if the file is divided into a thousand

16   blocks and you have ten neighbors or peers attached to you,

17   generally speaking you're asking each of your peers for about a

18   hundred blocks?

19   A.  On average, yeah.

20   Q.  On average.

21   A.  About.

22   Q.  Might be 995 -- I'm sorry.  95 or 105, but it's pretty

23   close to that average?

24   A.  In general.

25   Q.  Okay.  I don't want to skip over something that we've kind

```
 1    of glazed over, so I want to just take one step back before we

 2    continue.

 3          You mentioned about where we could find these keys,

 4    and you said when a user uploads a file, those keys or URLs, as

 5    you've described them, are posted somewhere or emailed

 6    somewhere, right?

 7    A.  Or have to be in order for someone else to download it.

 8          MR. SCHILLER:  Judge, I would like to move into

 9    evidence Government's Exhibit 4, which is a three-page example

10    of where these URLs or keys are posted.

11          THE COURT:  Any objection?

12          MS. KAY:  No, Your Honor.

13          THE COURT:  Government's 4 is admitted without

14    objection.

15          MR. SCHILLER:  Thank you.

16       (Received in evidence Government's Exhibit(s) 4.)

17    BY MR. SCHILLER:

18    Q.  So, professor, up on the screen is a heavily redacted page.

19          If we can move all the way to the top, please.  Thank

20    you.

21          And is this what you were describing before about

22    where individuals would go and find these keys?

23    A.  So this is an example of one place that's very easy to find

24    right after you've installed the software.

25    Q.  Why is it so easy?
```

1    A.  I believe, at least at some point -- I don't know if it's

2    true now, but at some point this was directly linked as --

3    right when you install -- after you've gone through the install

4    process and things are up and running, on one of the tabs for

5    the running software there's some examples of what you can do.

6    And so at least at one time this was one of the places that

7    they directed you towards with a warning about what you might

8    find, I believe.  And certainly there's a warning on this page.

9    Q.  And what does the warning say?

10   A.  So right at the top -- well, so we can see on the left it's

11   called yet another network index.  There's -- well, so there's

12   a lot here.  So I'm skipping down to where it says, very

13   offense content will likely end up in the index so take care

14   while browsing.

15         And then we can see on the right side with the

16   background a list of different sites.  And again, these are not

17   sites on the Internet.  These are sites that are only available

18   on this network.

19         So at the top there we can see there's a description

20   of a site that says "my favorite porn teen stuff."  There's

21   some blog entries of some of the developers, for example.

22         If you can scroll down a little bit more.

23         And there at the bottom we can see two sites where the

24   description is "photo of nude minors."

25         So that's what the warning is referring to when it

1   says "very offensive content."

2   Q.  All right.  And if we can go to the next page, please.

3         What is this page?  It looks like it's entitled, with

4   a graphic that says, "Lolita's Heaven."

5   A.  Yeah, so right at the top in the browser, you can see that

6   there's an example of the type of URL that this network will

7   return to users.  So from that -- I've never visited this site,

8   but from the presentation it seems this is a site that's

9   available on "The Network," and then there's redacted images of

10  minors.

11  Q.  So when somebody goes to this particular site to look for

12  keys, on this particular one, anyway, that's what shows up?

13  A.  That's, I assume, what would show up from this key, yes.

14  Q.  All right.  If you can scroll down to the third page.

15        At the bottom of that website there's a whole list

16  of -- all the way down, please -- there's a whole list of what

17  looks like letters and numbers in a very long sequence.  What

18  are those?

19  A.  Yes.  So I explained before at the top of the slide we saw

20  a portion of a URL for this network, but it was cut off by the

21  browser itself.  So down here we can see that whoever put this

22  site together has, I guess for convenience, listed URLs of

23  content that has been previously inserted.

24        So I can tell by the way that the URLs appear that

25  it's part of this network.  Some of this is censored or

Direct - Levine                                45

```
1   obfuscated in the slide with the white rectangle.  But you can

2   see the letters USK av or, more importantly, below it says CHK.

3   So these are individual URLs that have been inserted.

4        There's various information used by a computer to

5   decrypt the content -- to retrieve the manifest and then

6   decrypt the content that's -- as I said I mentioned before.

7        At the end here you can see actually there's some

8   human information, human readable information as part of that

9   network URL.  For example, the first one, it says, Lolita's

10  Haven abigail.rar.

11       An rar file is some -- people are more familiar with

12  zip files.  It's a version of that.  It's a collection of files

13  that can be expanded into individual images.

14  Q.  So would this tell the user that if you take that

15  particular URL and plug it into your network to search for it,

16  that will regenerate for you a almost zip file containing

17  multiple files, whatever's in there but presumably related to

18  something with Lolita?

19  A.  Exactly.  And, you know, if you could scroll up a little

20  bit to the very top.  I'm sorry.  To the previous slide, in

21  fact.  Oh, not that one.

22  Q.  So Page 2?

23  A.  Page 2, and then go down and then stop.  So there you can

24  see the name Abigail and Alexa and Ali.

25       And if you can go down to the bottom again.
```

Direct - Levine                    46

1    Q.  The bottom of Page 3?

2    A.  Yeah.  So there you can see Abigail, Alexa, Ali on the

3    right-hand side for each of those URL.

4           So again, I haven't visited this and I haven't

5    downloaded this content, but I would expect that these are

6    the -- for convenience for the user, the URLs that you can

7    paste into the software to retrieve -- probably because it's an

8    rar file, I would expect a kind of series of images or a

9    gallery of images for that particular minor.

10   Q.  Okay.  So now that we have an understanding of how a user

11   contributes files to "The Network" and how a user searches for

12   file for "The Network," when the user -- and if you want to use

13   yourself as an example again, that's fine.  When you search for

14   a file and you are connecting with your other nodes, whether

15   it's six, ten, or thirty, as you said is common, what

16   information about yourself and your request are you sharing

17   with the other users?

18   A.  Well, so as we saw, we can expect that our -- the IP

19   address of our computer is available to the other users.  In

20   fact, displayed to them as part of the correctly operating

21   software.  You're sharing with them the exact name of the block

22   that you're searching for.  And with that block if they have

23   these URLs and the manifest associated with these, for example,

24   these URLs, they'll know, and it's no secret, that somebody is

25   requesting the blocks associated with that key.

1    Q.  So the node that's attached to you, let's say, for example,

2    me, I'll know that you're actually requesting something, I'll

3    see it?

4    A.  That's right.  I mean, I'm literally -- you know, the

5    signal that my computer sent to yours is addressed to you.

6    It's asking your computer if it has that block.

7    Q.  Does your request also include how many peers you're

8    connected to?

9    A.  Well, as part of the normal operation of the software --

10   this is some of the details that was hard to fit in before -- I

11   will tell, I will tell each of my neighbors the number of

12   neighbors that I have and more.  But let's leave it at that.

13   Q.  Well, let's talk about some of the more, actually.

14   A.  Okay.

15   Q.  Now is a good time to do that, because the question relates

16   to what information you're sharing as a requestor with the

17   people that you're requesting files of.

18   A.  Yeah.  So -- okay.  So they know -- they know your IP

19   address for each request that you send out addressed to them.

20   They know the name of the block that you're looking for.  And

21   each request that goes out, as we said before -- as I said

22   before, when that request goes out and if I were to send it to

23   you and you didn't have it, you might pass it to your neighbor.

24   Now, that can't go on forever.  It would -- we need the request

25   to die at some point.  So each request that goes out only goes

 1    a limited number of hops.  So there's a field in each request

 2    called the hops to live.  So this gets into a little

 3    complicated subject.

 4    Q.  Pause right there.  I just want to make sure.  So it's

 5    hops, H-O-P-S, to live, L-I-V-E?

 6    A.  That's correct.

 7    Q.  Okay.  So explain that to us.

 8    A.  Okay.  So there's two things going on here.  The first is

 9    that "The Network" -- one of the goals of "The Network" is to

10    make it unclear who is actually requesting each of these

11    blocks.  The second is to control the amount of traffic that is

12    being sent.  So let's just put aside the notion of anonymizing

13    who's making the request for a minute and just talk about how

14    do we control this traffic.

15         So what happens is, in general, when I make a request

16    to you, if I'm the original requestor, I'll set that request to

17    only go 18 hops.  So I'll hand it to you.  And you'll say, oh,

18    I don't have this block you're looking for.  I'll send it to my

19    neighbor.  And it will go down to 17, 16, 15, and so on.  And

20    eventually this hops to live or HTL, as it's called sometimes,

21    counter, eventually it will go down to zero and the request

22    will fail.  So that's how the traffic is able to be propagated

23    across "The Network" of peers but not go on forever.  Now --

24    Q.  As the requests go from one node to the next, if they don't

25    have it and they have to pass it on, does the hops to live

1  counter travel with that request showing that it's decreasing

2  at each node?

3  A.  With the exception of what I'm going to say, yes, in

4  general, yes, it decrements.

5  Q.  Okay.  Go ahead.

6  A.  So now there's this problem that one of the goals of "The

7  Network" is to make it a little hard to figure out who's making

8  that request.  So the way that works is, if I were to send a

9  request to you and always start at 18, well, then it would be

10  very trivial for you to turn around and say Brian must be the

11  requestor here because I received a request with an HTL of 18.

12          So there's a little method they use, and that's for --

13  before I do anything, I look at the connection I have to you on

14  "The Network" and each one of my peers.  And for each one of

15  those I flip a fair coin, heads or tails.  And if it comes up

16  one way, I decide that I will always decrement 18s before I

17  send them to you.  And if the coin comes up the other way, I

18  decide that I'll never decrement them.

19          So what's interesting about that is let's say I never

20  decrement my request to you and I'm the original requestor.

21  Then I will send you an 18, a request with a hops to live of

22  18.  If you don't have that block, which is likely, you'll turn

23  around and send it to the person that you're connected to, and

24  you will have your own coin flip with them.  But at that point

25  they may receive an 18 from you.  So when they make -- we can

Direct - Levine                          50

1    probably all see here.  Just because you receive an 18 doesn't

2    mean that you've received it from the requestor.  It may be

3    someone who has received something that doesn't get decremented

4    and they have decided not to decrement things that they send to

5    you.

6           Similarly, if you receive a request with a 17, you

7    can't conclude anything.  Receiving an 18 or receiving a 17 are

8    essentially equivalent because it may be that I'm the requestor

9    but I have started by decrementing things.  The only thing you

10   know for sure, if everyone is running the software as designed,

11   is that if you receive a 16, a 15, and so on or lower, that

12   they're definitely not the requestor.

13          One thing I might add, though, is that for everything

14   I request of you, I will always send 18s.  Or if I chose to

15   decrement, I will always send 17s.  This choice stays the same

16   for the different files I may request from you.  So as you

17   observe things from me, things you get from me that are 17 are

18   definitely not -- whoever requested those is definitely -- if I

19   requested the 17s, I definitely didn't request the 18s from

20   you.  And if I requested 18s, I definitely didn't request the

21   17s from you.

22   Q.  Okay.  That remains stable?

23   A.  Yeah, that remains stable for as long as we have our

24   connection.

25   Q.  Okay.  And if you go off "The Network" and come back on,

1    that coin flip happens again?

2    A.  That I'm not sure about, but I would expect it stays the

3    same if they cached the connection.

4    Q.  All right.  There's a particular nuance with "The Network"

5    called no cache mode.  Could you explain what that is in

6    reference to what we've been speaking about?

7    A.  So I'm not sure it's necessary to get into because, in

8    general, when I send requests to you and they are a 17 or an

9    18, you won't cache them regardless.

10   Q.  What do you mean?

11   A.  If I send you a request with a 17 and you retrieve -- if I

12   send you a request and I'm the -- okay.  Sorry.  Let me start

13   again.

14          If I send you a request with a 17 or 18 and you're

15   able to retrieve that block for me, you will not cache it

16   because the developers and other people have discovered that

17   leads towards a way to de-anonymize "The Network."  If I send

18   you a request with a 16, then, yeah, you will cache it.  So the

19   no cache mode I don't think is really relevant.

20   Q.  Because, as we'll get to later, we're only focusing on

21   individuals that are showing a 17 or 18?

22   A.  That's correct.

23   Q.  Okay.  And we're going to get into now some of your

24   algorithms and things that are referenced in your paper.  But

25   before we do, and I guess the reason why, have you noticed in

Direct - Levine                    52

1   your work and study of "The Network" whether or not there is a

2   lot of interest in "The Network" on searching for or trying to

3   recover files of child pornography?

4   A.  Well, so as I mentioned before, when you look to a neighbor

5   and try to download something that's been inserted previously,

6   you'll make a request, you'll send them a signal for a

7   particular block.  And if they have themselves already

8   downloaded the manifest that that block comes from, then they

9   know for sure that that's the same content.  I mean, it's

10  cryptographically hashed.  There's, you know, zero chance

11  essentially that it could be different content.  So they know

12  that the request you're making for that particular block is one

13  that's associated, if they have it, with a known manifest.

14          So, I'm sorry, what was -- I got lost in the question.

15  Q.  No, that's okay.  And then connecting that to the idea that

16  based on your knowledge and experience of "The Network" and

17  what you've spoken to with law enforcement as far as whether or

18  not there is child pornography across this network and whether

19  it's a small amount or a large amount.

20  A.  Okay.  Okay.  I'm sorry.  So as we talked about, whenever

21  anyone inserts anything into "The Network," they have to email

22  it or post it to someone else in the world if they want anyone

23  else to be able to download it.  So as I also mentioned, there

24  are -- well, as we saw, there's sites that share content here

25  and there are message boards where people post content related

Direct - Levine                          53

1    to child exploitation.  They're text-based message boards.

2    They're very explicitly named.  They have names such as

3    "Toddler CP" is one I know of.  They're very explicitly named.

4    Maybe there is an exhibit.

5    Q.   No.

6    A.   So law enforcement have -- because they're public, have

7    visited these message boards, because anyone can, and they've

8    noted the URLs that have been posted to these message boards

9    that are dedicated to exploitation of children, and then

10   they've downloaded those manifests.

11        So once you have a peer that's on there, anyone that's

12   sending traffic to you -- again, you may not know without other

13   work whether they're actually requesting it, but you know that

14   somebody is requesting a block related to child exploitation.

15        So working with law enforcement to go through this

16   process, what we published, what we wrote about in the

17   peer-reviewed published paper, that "The Network" was, I

18   believe, 35 percent -- let's say about a third of it, of "The

19   Network" requests -- of the requests that were coming through

20   nodes, about one-third of those requests were for known images

21   of child -- content known to be related to child exploitation.

22   Q.   Pause there for one second.  That's based on information

23   you received and tabulated from law enforcement, correct?

24   A.   Yes.

25   Q.   And that's only information that law enforcement was able

```
1    to identify as related to that?

2    A.  Yeah, there could other files.  There could be requests for

3    other URLs that are also related to child exploitation.  So

4    this is, in a sense, a lower bound, you might call it, on a

5    fraction of requests that are passed through nodes.

6    Q.  That percentage would then be a conservative percentage,

7    you would think?

8    A.  I would think so.

9    Q.  Okay.  So let's talk about how you and your team at the

10   University of Massachusetts got involved with your knowledge of

11   "The Network" to assist law enforcement in trying to deter

12   individuals from using it to access child pornography or

13   stopping individuals from using child pornography.  When did

14   that happen?

15   A.  So that happened a number of years ago, and there was law

16   enforcement that took it upon themselves to come up with

17   methods to try to do some sort of forensic investigation of

18   events related to child exploitation on "The Network."

19        I work a lot with law enforcement.  I have a history

20   of working and designing network forensic techniques.  And so

21   this seemed like another opportunity to try to contribute in

22   some scientific way.

23        And so we -- although, as I said, I knew about "The

24   Network," we started taking a closer look into it, and then we

25   started to develop a sound forensics technique to attribute
```

1  requests to a particular neighbor.  Because, as I said, there's

2  this whole method of the 17 and 18, you really can't be sure.

3  So we wanted a technique that was forensically sound that would

4  enable an investigator to attribute the request to a particular

5  neighbor.

6  Q.  And just as a 10,000-foot view, you really did two things,

7  if I'm correct.  You helped develop a modified version of "The

8  Network" for law enforcement to use to then effectuate an

9  algorithm that you and your department created?

10  A.  Me and my coauthors, yes.

11  Q.  Is that kind of what your assistance was and your

12  department's assistance?  Sorry.  Let me rephrase that.  You

13  and your cocreators' assistance to law enforcement in this

14  case?

15  A.  Yeah, those would be the two primary activities.

16  Q.  So let's talk about this modified versus of "The Network"

17  that you all helped with.  You said before that the source code

18  for "The Network" is open, it's available?

19  A.  That's correct.

20  Q.  Under what platform was the source code created?

21  A.  I think what you're asking me is -- it's -- Java is the

22  programming language.  And Java's special in that you can

23  basically run it on, you know, pretty much any computer that's

24  available.

25  Q.  And is Java a pretty normal computer programming language

Direct - Levine                    56

1  that's used?

2  A.  It's extremely popular, along with one other.  I would say

3  it's the language computer science college students learn,

4  probably a lot of high school teaches as well.  It's well

5  accepted as one of the most prominent languages, computer

6  languages.

7  Q.  So now, if you could, explain for us what the modified

8  version was that your team created to assist law enforcement.

9  A.  Well, in particular, it's not modified in terms of how it

10 operates on "The Network."  It doesn't do anything differently

11 than anyone else who has download the standard software.  The

12 only way it's modified is really to log things that are already

13 available in a way that allows investigations to proceed with

14 as little error as possible.

15        So the information that it logs, most of it is

16 available.  As we saw, for example, it might log the IP address

17 of your neighbors.  And we saw that that's available to the

18 user.

19        We didn't really go through it, but in the software

20 there's different configuration settings.  The software itself

21 will log information for the user.  One of the modes -- there's

22 different levels of verbosity.  That's the term.  I mean,

23 there's different levels of detail that the log can be written

24 to that the developers put into the normal software, not the

25 law enforcement version.

1          The developers have a debug mode for logging that they

2     put in, and that's extremely verbose.  It's much more

3     information than we would log.  It's everything you can

4     possibly do.  And I think it's so much it probably slows down

5     the software in an annoying way, but it might be necessary to

6     debug.

7          My recollection is that there's nothing that the law

8     enforcement version writes to a log that isn't available in

9     some way to a user who, for example, didn't, you know, first

10    turn on debugging mode for the software.

11         So in sum, it's not modified in that it acts

12    diffidently on "The Network."  It just logs information in a

13    helpful, clear way.

14    Q.  So the law enforcement version isn't given some superpower

15    that it can somehow identify the original requestor outside of

16    the normal information being transferred across users of "The

17    Network"?

18    A.  No.  If I understand your question correctly, it doesn't

19    send extra packets or not send extra packets or probe or do

20    anything special.  It's just logging.

21    Q.  Okay.  And how does law enforcement get access to that?

22    A.  They have to receive training first.  And then once they've

23    completed the training and is satisfactory manner, then they're

24    given access to this special version.

25    Q.  So what information is the -- let me back up for a second.

1              We're referring to it as at modified version with the

2     caveat that it doesn't modify anything in "The Network;" is

3     that right?

4     A.   That's correct.

5     Q.   It's only modified because of what it's doing on the law

6     enforcement end as they are attached to someone else on "The

7     Network"?

8     A.   That's correct.

9     Q.   And so for the law enforcement version, what information is

10    being provided to the law enforcement officer that's already

11    publically available so that they can try to identify who the

12    original requestors of a file are?

13    A.   So it will log -- again, speaking at a high level, it will

14    log the IP address of your neighbor, it will log the number of

15    requests received from that neighbor, it will log the time that

16    that request was received, the HTL of that request, and the

17    block that was requested as the name of it.

18    Q.   Now --

19    A.   I think that's everything.

20    Q.   -- let's fast-forward to the end.

21    A.   Oh, I'm sorry.  And what type of request it was; whether it

22    was a request -- that it was a request.  Let's put it that way.

23    Q.   That it was a request?

24    A.   Yeah.

25    Q.   Okay.  So let's fast-forward now to what law enforcement

1   will do with that data, and then we'll talk about how that all

2   works in a mathematical formula you put together.

3   A.  Okay.

4   Q.  So when law enforcement gets all of this information, they

5   can't just look at a request, the manifest key, the blocks, and

6   go, oh, yeah, that's child pornography?  They couldn't do that

7   just by looking that individually, correct?

8   A.  No, they would have to line it up with other information.

9   Q.  So presumably law enforcement has some kind of database or

10  the accessibility to take all that information and say, yep,

11  that in fact is a request for a child pornography file?

12  A.  There's a list of blocks that are known to be associated

13  with URLs, keys, however you want to call it, but manifests of

14  what law enforcement have known -- for which law enforcement

15  have determined that they're associated with child

16  exploitation.

17          One thing I forgot to mention before.  As a part of a

18  request, part of the information is the number of neighbors

19  that the peer had at the time.

20  Q.  Why is that important?

21  A.  When we get into the algorithm for how law enforcement

22  might begin to attribute a series of requests towards a

23  neighbor to get around the 17, 18 problem, that number will

24  become important.

25  Q.  Okay.

Direct - Levine                          60

```
 1                THE COURT:  I'm sorry, doctor.  You say it's the
 2      number.  So this is something that the software tracks, is the
 3      number of neighbors of the requestor?
 4                THE WITNESS:  That's correct.
 5                THE COURT:  Of your neighbor.
 6                THE WITNESS:  Yes.  I'm sorry, Your Honor.
 7                THE COURT:  I'm just trying to make sure I'm following
 8      along with you.  So the law enforcement computer is a node on
 9      this large network.
10                THE WITNESS:  That's correct.
11                THE COURT:  And what you're saying is as information
12      flows through that node, certain information is logged.
13                THE WITNESS:  That's correct.
14                THE COURT:  And I think you said that one of the
15      things that's logged is the IP address of the neighbor sending
16      the request.
17                THE WITNESS:  That's correct.
18                THE COURT:  And the number of requests that have been
19      received from that neighbor or the time of the request, the HTL
20      of that request, the identification of a block that's been
21      requested.  I'm just going through my notes here.  And the type
22      of request, as to whether it was really a request or not.
23                THE WITNESS:  Yes.
24                THE COURT:  And it just seemed to me you add one other
25      thing.  I just want to make sure I'm following you.  You said
```

Direct - Levine                61

1    the number of neighbors.  Are you saying the number of

2    neighbors of the law enforcement node or the number of

3    neighbors of the first generation neighbor node?

4              THE WITNESS:  The latter, Your Honor.  When your

5    neighbor makes the request, they're also going to tell you the

6    number of neighbors they have at the time.

7              THE COURT:  So the number of second generation

8    neighbors.

9              THE WITNESS:  That's correct.

10             THE COURT:  Okay.  Thank you.

11   BY MR. SCHILLER:

12   Q.  And before we get into the algorithm as to what you all did

13   with this information to try to identify the original

14   requestor, this modification given to law enforcement so that

15   they can specifically recover and look at this level of detail,

16   is that something that only you and your coworkers at U Mass

17   are able to do and give to law enforcement or is that something

18   anyone with enough computer knowledge, if they chose to, could

19   figure out?

20   A.  Well, the paper that the -- the reason we're collecting --

21   the reason that information is logged is so that it can be put

22   to use by the algorithm that we haven't yet described.  That

23   algorithm is in the paper that I think already put into -- gave

24   to the Court as an exhibit.

25   Q.  We did.

1   A.   And that paper is public and available on not even my

2   website.  It's somebody else's website.  It's been public since

3   I believe May, but definitely 2017.  I believe it was May 2017.

4   So anyone who reads the paper would be able to do exactly what

5   we did.

6   Q.   Okay.  So there's no secrete formula here?

7   A.   No.

8   Q.   All right.  Let's talks about, then, the algorithm and how

9   it works.

10  A.   Okay.

11  Q.   So was this your bread and butter?  You came up with all

12  the math and this is all you, or did you have a team?

13  A.   We had a team.

14  Q.   And approximately how many people worked together to put

15  this algorithm together?

16  A.   Well, there's, I think, four of us on the paper.  Probably

17  up here on the stand I'm forgetting someone obnoxiously.  But

18  also, we work with law enforcement and validate that what we

19  were doing seemed to work.

20          As you can imagine, I have no special authority to

21  download anything contraband.  But you can test the algorithm

22  on non-contraband.  And then also, you know, there's a process

23  in place by which you carefully roll things out.  So there's a

24  larger team, but the coauthors of the paper and so on.

25  Q.   And you are fully versed in understanding the algorithm

1   such that you can speak to it today?

2   A.   Yes.

3   Q.   In Government's Exhibit 2, which is your paper on the

4   algorithm, there is a lot of mathematical formulas in there.

5   Agreed?

6   A.   Agreed.

7   Q.   Okay.  And it really gets into the weeds and into very

8   technical detail as to how this algorithm works?

9   A.   Correct.

10  Q.   Is the paper the best explanation of it?

11  A.   It's the most complete explanation.

12  Q.   And that's a fair answer.  I appreciate that.

13           So if you could -- again, we don't need to get into

14  every single minute detail of the algorithm, but give us an

15  idea of what this algorithm does mathematically so that it

16  takes the information you've discussed and gives law

17  enforcement an opportunity to understand who the original

18  requestor of a file is.

19  A.   Okay.  So stepping back and at a high level, the general

20  idea of the algorithm is that we -- as an investigator we'll be

21  randomly assigned some number of neighbors to us on "The

22  Network."  So let's say you're my neighbor.  And at some point

23  after sitting around for awhile you'll decide -- I'll receive a

24  series of requests from you.  So when I receive those requests,

25  I can sort of collate them together.  As I said, I can ignore

Direct - Levine                              64

1    requests that I receive from you that are 16s, and I can look

2    at a series of requests that I've received from you in some

3    window of time that are, let's say, 18s.

4    Q.   Now pause there.

5    A.   Okay.

6    Q.   We're assuming in this hypothetical you're a law

7    enforcement node on "The Network"?

8    A.   Yeah, I'm the investigator and you're a subject, you're a

9    neighbor of mine.

10   Q.   Thank you.

11   A.   So the question I need to answer -- so the first thing I'll

12   note, as law enforcement I'll say that -- I'll see these

13   requests from you, I'll note that they have -- when I say

14   "18s," I'm always referring to the hops to live, so the HTL.

15   So I'm ignoring 16s because, as I discussed before, those --

16   you could never be the requestor for that.  But what I noticed

17   when you make these requests to me, that they're for blocks

18   that are known to be associated with child exploitation.

19        So as an investigator, I would take an interest in

20   that.  And I would start to take a series of requests of a

21   certain number, you know, not just one or two, but a high

22   enough number that appear in a relatively window, small window

23   of time, and I would say I've received all these requests from

24   you, now I need to make a decision.  Do I think you're just

25   relaying those for someone else?  Because again, the 18 doesn't

 1    tell me information enough.  Or do I think you're actually the

 2    original requestor?  I just have to decide between those

 3    scenarios.

 4              So if you think about it, one of the -- well, one of

 5    the things I said before is if I have ten neighbors -- ███ Net

 6    is very complicated.  But if you observe it, you can see that

 7    on average I give each of my neighbors an even split, an even

 8    share of all the requests that I'm going to make in order to

 9    reassemble this file.

10              So to give you an example.  If I have a file that has

11    a thousand blocks that I'm trying to reassemble and I have

12    about ten neighbors, then on average I will give each of them a

13    tenth of the requests that I will make.  So if I need to make a

14    thousand requests for blocks to reassemble things, I would

15    expect to give you about a hundred of those requests.  I'm

16    sorry.  I think in my example I switched law enforcement.

17    Q.  That's okay.  I'll be the law enforcement node.

18    A.  You can be the law enforcement node.

19    Q.  Okay.

20    A.  Okay.  So I will send, you would expect, about a hundred of

21    my attempts, a hundred of the thousand requests that I'm going

22    to make.  Now, you, of course, are not the requestor.  And you,

23    in general, don't have the blocks I'm looking for because

24    they're evenly spread everywhere.  So you will turn around and

25    look at -- let's say you have ten other neighbors.  You will

1    take the 100 requests you got from me and you will split that

2    up into a tenth.  So you will send about ten to your neighbor.

3         Now the question is, I'm not trying to estimate the

4    number of requests somebody will make.  The law enforcement

5    node is not trying to estimate the number of requests.  They

6    have a good sense of that because they know the blocks you're

7    requesting, they know that it's related to child exploitation,

8    and in particular they know the manifest that you're looking

9    at.  So they know how many -- you know, about how many

10   requests -- whoever the original requestor is, they know how

11   many they're going to make.  In this case, in my example, a

12   thousand.

13        So the question is really, you know, as someone

14   receiving these requests, as law enforcement receiving these

15   requests, you look at the number of requests you get and you

16   say given the number of requests that I've received and the

17   number that I expect someone who's original to make, am I more

18   likely to be right next to them or two hops away from they.

19        So if you received 95, 100, 105, that's a very likely

20   scenario if you're directly connected to the original

21   requestor.  If, on the other hand, as law enforcement you

22   receive 5, 10, or 15, I mean, really any small number like

23   that, it's just extremely unlikely that, you know, just a small

24   number would come from the original requestor.

25        You know, the thing to realize about this network is

Direct - Levine                          67

1    that when I talk about you have ten neighbors and you expect to

2    give a tenth to each one of them, it is a somewhat -- it is

3    literally a randomized process to a large degree.  So in order

4    to break a randomized algorithm, you really need a randomized

5    technique.  So everything is a little bit -- you know, that's

6    why I say, I don't know whether you're going to get 95, 100, or

7    105.  But I look at what you got and then I make a reasonable

8    determination as to between these two scenarios what's more

9    likely to happen.

10            One way you can think of this, if you're not pinned,

11   is if I have a -- if I come to a class with a bag of M&Ms and I

12   have a thousand M&Ms in this bag and I'm going to distribute

13   them to the class and I give, you know, based on the color

14   ten -- you know, I pick a red, I give it to this student.  I

15   pick a green, I give it to this student.  You know, M&Ms come

16   largely about even number of colors in the bag.

17            So if I hand a tenth of the M&Ms to the first row of

18   students and they turn around, you know, to help me distribute

19   the M&Ms to the class, if the first row of students takes their

20   about 100 M&Ms and distributes that to their ten friends, and

21   then you come into the class as the investigator and you ask

22   someone how many M&Ms did you get, based on the number that

23   they got, if it was 95, 100, or 105 M&Ms or whether they got 5,

24   10, or 15, you could guess whether they were directly next to

25   the person holding the bag or whether they were one or two rows

Direct - Levine                                    68

1   back from them.  And that's the basis of the idea.

2   Q.  And with this algorithm, law enforcement is trying to find

3   out if the person they're sitting next to is holding the bag of

4   M&Ms?

5   A.  Exactly.

6   Q.  So the algorithm, as it's fully described in the paper, how

7   did you go about seeing if it works so that we could then

8   unleash it to law enforcement?

9   A.  Okay.  So the most important thing for this -- the most

10  important evacuation for this algorithm is -- when you say

11  seeing how it works, most importantly we want to make sure we

12  don't have any false positives.  That's what makes it most --

13  that's one of the important properties for something that

14  you're going to introduce in a forensic context.

15  Q.  And what's a false positive by definition?

16  A.  So a false positive is where -- a positive is referring to

17  the idea that we believe, the law enforcement investigator

18  believe that this is the original requestor of child

19  exploitation-related material.  It's a false positive in the

20  sense that you're wrong about it.  You don't want a false

21  positive.  You don't want to falsely accuse someone of doing

22  something that's illegal.

23  Q.  Now, this whole algorithm is based on statistical metrics,

24  correct?

25  A.  Correct.

1    Q.  And would you agree with me as an expert in this area, as a

2    professor, as doctor, a Ph.D., that there is no statistic that

3    is absolutely 100 percent correct?

4    A.  Certainly not in this case.

5    Q.  Okay.  And so the statistical evaluation that you would

6    create with this algorithm would almost necessarily have to

7    have false positives?

8    A.  I think so.

9    Q.  Okay.  So with that as a backdrop, explain to us how the

10   false positives take into effect your ability to know that this

11   algorithm works properly.

12   A.  Are you asking me your original question of how did we go

13   about measuring the false positive read?

14   Q.  Yes, unless there was something you needed to discuss

15   before that.

16   A.  No.  So we did a number of things to evaluate the false

17   positive rate.  It could be difficult to evaluate real

18   algorithms in the sense that you want to do it along a

19   spectrum.  So on one side of the spectrum you want to analyze

20   things very carefully, let's say, in a mathematical way where

21   you can control all of the parameters and look at how different

22   parameters change the false positive rate.

23        What's difficult about that is you may not know how to

24   set the parameters in a way that reflects real life.

25   Additionally, you may not know that your very carefully

1    constructed mathematical model is exactly the right model.  But

2    then, on the other hand of the spectrum, you want to look at

3    what the happens in real life.

4         Now, what's great about real life is the parameters

5    are real.  Everything's exactly how it appears to be in real

6    life.  But you may not get to test every scenario because it

7    may not have happened in real life.  So we try to do a whole

8    spectrum of tests.

9         So on the one side we have a mathematical model, which

10   is very -- it gives us a certain result for the false positive

11   rate, and then we step towards -- along the spectrum.  The next

12   step is we step away from the model and we construct a computer

13   simulation, which is -- which allows us to evaluate things that

14   are hard to write down mathematically but are more correct

15   according to how the program actually operates.  We evaluate

16   the false positive rate for that.

17        We can also take another step towards reality but away

18   from mathematical formalism, and we can look at traces of

19   events that have happened on "The Network."  And these things

20   all appear in the peer-reviewed paper.

21        Since the peer-reviewed paper was published, we took a

22   further step in the spectrum and we set up nodes -- there are

23   nodes in "The Network" that are running the protocol just as

24   anyone else would.  They're not making any requests for

25   anything.  Certainly not any child exploitation materials.  I

```
1    mean, they're just there as passive participants.  And

2    occasionally it happens that someone who is requesting a file

3    will relay their request through these nodes, these passive

4    nodes that are there.

5              Sometimes law enforcement connect to these passive

6    test nodes that are there, and they will have an occasion,

7    because they will receive enough requests in a limited window

8    of 17 or 18, to evaluate whether this passive node might be the

9    requestor of a file.  Now, keep in mind that we've not told law

10   enforcement which of the nodes on "The Network" are these,

11   these passive test nodes.

12   Q.  It's almost like a true double-blind?

13   A.  It's a double -- it's a blind test.

14   Q.  Blind test.

15   A.  So law enforcement will say, ah-ha, I have an occasion to

16   evaluate whether someone is downloading known images of child

17   exploitation.  They will run the test as they would for anyone

18   us because they don't know not to, of course.

19             So since we started running this live test, there have

20   been 516 instances where an investigator has had occasion to

21   run the algorithm as they would for anyone else, and to date

22   one time it has come up as a false positive.

23             So the false positive rate appears to be one of -- you

24   know, in this -- it's been two years that we've been running

25   this, and we've had 516 tests.  So the false positive rate is
```

1    one over 516.

2          If you want to be a little bit more complicated,

3    there's a hedge, you might call it, but what I'm referring to

4    is a confidence interval on that false positive rate.  And

5    suffice to say that when you do all that math, what we

6    observed -- what we wrote in the peer-reviewed paper that you

7    referred to before, we did a series of tests, and what we

8    concluded was that the false positive rate was likely no more

9    than 2.3 percent.  If you look at the live tests that we've

10   done since then, that false positive rate is under 1 percent.

11   So those numbers are aligned with one another.  That's what I

12   would expect.

13   Q.  So at a worst-case scenario when law enforcement is running

14   the algorithm trying to identify an original requestor, there

15   is a greater that 97 percent chance that they are correct, but

16   probably much more than 99 percent chance they are correct?

17   A.  I would state it the other way, rather than inverting the

18   numbers.  I would say it's more correct to say there's -- as we

19   said in the paper, one evaluation shows a false positive rate

20   of 2.3 percent or below, and then the live test that I referred

21   to before, it has a false positive rate of something less than

22   1 percent.

23   Q.  Okay.  Thank you for clarifying that.

24          THE COURT:  Doctor, what was the confidence interval

25   you said?

1          THE WITNESS:  It was a 95 percent confidence interval,

2    Your Honor.

3          THE COURT:  Okay.

4    BY MR. SCHILLER:

5    Q.  So if we go back before you did the live test for the

6    simulations that you ran, how many simulations did you run on

7    the algorithm?

8    A.  Well, it's easy to run simulations.  That's why we run

9    them.  So we -- one of the parameters that we have to give the

10   simulation is exactly what the -- what's called "The Network"

11   topology looks likes.  And what I'm referring to is the peers

12   that are on "The Network," they have a certain numbers of

13   neighbors as we talked about.  When you install the software,

14   you get to pick the number of neighbors that you have.

15         So we ran in the peer-reviewed paper four different

16   types of topologies.  A topology where neighbors have -- where

17   peers have few neighbors, another topology where they have

18   slightly more, and so on.  And we set that topology up in a way

19   that -- I haven't talked about this, but there's a particular

20   way that ███Net assigns neighbors to each other, a particular

21   topology.  It's called a small world topology.

22   Q.  Say that one more time.

23   A.  It's called a small world topology.

24         So we set up a topology and simulation to look like

25   that.  For each one of those network sizes we ran 5,000

Direct - Levine                                    74

1    simulations.  Each of those simulations -- it's not just a

2    simple roll of the dice.  It's a series of computations.  But

3    at the highest level we can say we ran, let's say, 20,000

4    simulations.

5    Q.  And what was the result of that?

6    A.  So the result of that was a false positive rate that was

7    lower than the 2.3 percent that I quoted before.  So very low.

8    Q.  So based on the mathematical algorithm and the data that's

9    able to be collected, you're able to identify who original

10   requestors of files are?

11   A.  I believe we can do that with great confidence or great

12   forensic soundness.

13   Q.  Say that one more time.

14   A.  I believe we can do that with a high degree of forensic

15   soundness.  It's forensically sound.

16   Q.  And that is the standard used in statistics?

17   A.  I'm using that word because I followed -- you know, I did a

18   rigorous test of the false positive rate, I did it in a

19   peer-reviewed venue, and I used techniques that are well known.

20   You know, we used very standard statistical techniques and

21   computer science methods for evaluating the false positive

22   rate, and the fact that we did a spectrum of tests, both

23   ranging from the simulations to the live test that I talked

24   about before.

25   Q.  Understood.  I want to just touch on --

Direct - Levine                    75

1          THE COURT:  I'm sorry, doctor.  What did you say was

2     the false positive rate on the 20,000 simulations that you ran?

3          THE WITNESS:  I can't quote the exact number to you,

4     Your Honor, but I know it's below the 2.3.

5          THE COURT:  It was less than 2.5 percent.

6          THE WITNESS:  2.3 percent, Your Honor.

7          THE COURT:  With a 95 percent confidence interval.

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  Thank you.

10          THE WITNESS:  The details are laid out in the paper

11     that's submitted.

12          THE COURT:  Okay.

13     BY MR. SCHILLER:

14     Q.  I want to touch on a few particular areas regarding whether

15     the algorithm itself or the use of it based on some issues that

16     were raised by defense in their motion to suppress.

17     A.  Okay.

18     Q.  You mentioned earlier about no cache mode and we discussed

19     that.  If somebody is running no cache mode or not running no

20     cache mode, if they know how to turn it on or off, does that

21     have any affect on law enforcement's use of the algorithm?

22     A.  No.

23     Q.  In regards to the algorithm itself, to your knowledge is

24     there any negative criticism about how it works or that it's

25     not right or law enforcement is using it wrong or things like

1    that?

2    A.   From academics, no.

3    Q.   I'm guessing --

4    A.   Well, the defense filed a motion.  So that's what I'm

5    referring to.

6    Q.   Oh, I see.  Okay.

7         So other than defense attorneys in criminal cases, has

8    there ever been any criticism of it?

9    A.   No.

10   Q.   Okay.  Let's talk about the timing of the request.  You

11   mentioned that earlier.  Is the timing of when these requests

12   come in important for determining who an original requestor is?

13   A.   Well, for example, it's not timing -- it's timing in the

14   sense of I wouldn't want to, as law enforcement, use, apply

15   this technique, on January 1 observed a request, and then

16   March 1 observed a second request, and then October 1 observed

17   a third, and somehow put those together as three requests.  So

18   that's what I'm -- when you say timing, it's a window of

19   requests that are in a small -- a reasonable, you know, hours

20   of the day.

21   Q.   But the algorithm doesn't depend on that timing to work

22   properly?

23   A.   The algorithm assumes that the requests have already

24   been -- that that -- that the -- so the algorithm considers the

25   number of requests that were received.  And so the step that

1   the paper talks about that must happen first is that you're

2   only giving it a count of request within a reasonably sized

3   window.

4   Q.  Okay.  Thank you.

5         As far as law enforcement's use of the algorithm, are

6   they shown data on every requestor -- I'm sorry, every node

7   that attaches to them or only the ones that actually pass the

8   algorithm appropriately?

9   A.  Well --

10  Q.  If you know.

11  A.  So only, only nodes -- so for their neighbors who have --

12  for a given neighbor -- for a given IP address -- there's a lit

13  of requests that law enforcement received from that IP address

14  at a given time, but other -- you know, some -- you know, all

15  the requests that you might --

16        So, for example, if I'm law enforcement and I'm

17  connected to you and there's a series of requests that you send

18  me, and there's a -- you know, let's just say it's noon.  So at

19  noon you send me a series of requests over a certain amount of

20  time, and that series of requests trip the algorithm in the

21  sense it says, okay, I think I found someone that according to

22  this method appears to be the requestor of the file.  If during

23  that window other requests are sent -- for example, maybe the

24  ones I'm concerned about with you are 18.  If there's a 17

25  that's sent, then that will be shown to the investigator as

1    well.

2    Q.  Understood.  One of the issues raised by defense in their

3    motion is the idea that an individual can alter their hops to

4    live, their HTL such that the randomization of being a 17 or 18

5    is kind of taken out of play and you make yourself as a

6    requestor look like you're a 20 or a 40 or just some number

7    other than 17 or 18.  Is that taken into account by the

8    algorithm or "The Network" itself?

9    A.  So the first thing to say is that if I were to modify the

10   ██ Net source code to make that change -- you would have to

11   know how to do that.  But let's just say that I did that.  It's

12   not something that's presented on the GUI, for example.  So you

13   would have to be pretty skilled.  But anyway, let's assume that

14   you did it or I did it in particular.  And let's say I set it

15   to 40.  Well, you're my neighbor and you're running the

16   software in an unmodified way.  In the source code as it's

17   delivered to everyone, the normal source code, it looks at any

18   HTL that's above an 18 and immediately sets it to an 18.  So if

19   you're connected -- if you modify the software in that way and

20   then you're connected to people who have not, these mod -- it's

21   not like it goes 40, 39, 38.  It will to 40, 18.  So that would

22   only survive one hop essentially, you know, if you're connected

23   to only people that use the unmodified software.

24        The algorithm just wants a count of request that go

25   together.  So as I said, if there was a series -- so, actually,

Direct - Levine                                                    79

1   also I want to say, it would be pretty dumb to modify the

2   software to be 40 because I would know you're the requestor,

3   right?  I mean, that's the whole reason for the 17s, 18s.  So

4   there's really little motivation for anyone to change the

5   software.  I personally don't recommend it.  It's a giveaway.

6   Q.  Right.  So if that would happen, would you know it was an

7   original requestor?

8   A.  Yeah, because everyone they're connected to would

9   immediately modify it down to 18.

10          But putting that aside, the algorithm that's described

11  in the paper does not rely on the fact that it's particularly

12  18.  For example, it could be all 17s, you know.  So all that

13  matters is that there's a count of request that the law

14  enforcement investigator believes go together by the same

15  requestor.

16  Q.  This 17 or 18 is really just that starting point?  It's

17  what divides that group from everyone else on "The Network"?

18  A.  Yeah.  Right.  16s are definitely not requestors.  That's

19  what this is really about.

20  Q.  Okay.

21  A.  16 and below.

22  Q.  As far as your knowledge of the use of the algorithm by law

23  enforcement, it hasn't been modified or changed by officers who

24  are using it; is that correct?

25  A.  No.

Direct - Levine                    80

1   Q.  And I think we touched on this earlier, but on one of the

2   slides we saw that there was low security mode and normal

3   security mode within the open net?

4   A.  Uh-huh.

5   Q.  Is that a "yes"?

6   A.  That's a yes.  I'm sorry.

7   Q.  That's okay.  First time you did that all day.  You're

8   doing great.

9          Is if fair to say that the algorithm works on a

10  requestor whether they're using the low security mode or the

11  normal secured mode within the open net?

12  A.  That's right.  The only thing that's important is that they

13  happen to be connected to an investigator.

14          MR. SCHILLER:  Judge, if I can have one moment,

15  please.

16          THE COURT:  Of course.

17          THE WITNESS:  May I ask, is it --

18          THE COURT:  We're going to take a comfort break in

19  just a second.

20          MR. SCHILLER:  Judge, thank you.  I don't have any

21  more questions.

22          THE COURT:  So here's what we're going to do.

23  Dr. Levine's been testifying for about an hour and a half.

24  It's 10:40.  Let's take a break until 10:55, and then we'll

25  come back for cross-examination.  So we will be in recess until

```
 1    10:55.

 2         (Recess at 10:43 a.m.)

 3         (Call to Order of the Court.)

 4              THE COURT:  Have a seat, everyone.

 5              All right.  Dr. Levine's still on the stand.  You're

 6    still oath.

 7              Dr. Levine, I have one follow-up question.  I

 8    apologize.  You testified that it was -- as to the false

 9    positive rates, you said it was approximately 2. -- less than

10    2.5 or 2.3 percent with a 95 percent confidence interval.

11              What was the margin of error at the 95 percent

12    confidence interval?

13              THE WITNESS:  So there were several tests in the

14    paper, and the 2.3 percent number I'm quoting has to deal

15    with --

16              THE COURT:  No, I understand that.  But it's 2.3

17    percent plus or minus what at the 95 confidence interval?

18              THE WITNESS:  That basically includes the confidence

19    interval.

20              THE COURT:  It does.  Okay.  Thank you.

21              THE WITNESS:  So it's no higher than.

22              THE COURT:  I'm sorry?

23              THE WITNESS:  So it's no higher than.

24              THE COURT:  No higher than.  Okay.  Thank you.  That's

25    an upper bound?
```

1              THE WITNESS:  That's an upper bound --

2              THE COURT:  Okay.

3              THE WITNESS:  -- statistically speaking.

4              THE COURT:  Understood.

5              Okay.  Ms. Kay, whenever you're ready.

6              MS. KAY:  Thank you, Your Honor.

7                          CROSS-EXAMINATION

8    BY MS. KAY:

9    Q.  Good morning, Dr. Levine.

10   A.  Good morning.

11   Q.  Dr. Levine, did you in any way prepare the affidavit for

12   the search warrant in Mr. Sigouin's case?

13   A.  No, not at all.

14   Q.  Okay.  So you did not assist with law enforcement preparing

15   it and you have -- other than possibly reviewing it for the

16   purpose of this motion, you never saw the affidavit?

17   A.  Well, so maybe I -- let me clarify, just in case I

18   misunderstood some legal term here.

19              The search warrant may have, and I don't know that it

20   was, been based upon a template that was put together by a

21   prosecutor, and I talked with that prosecutor about that

22   template.  Now, whether this case used that template or not, I

23   can't be sure.  But I didn't directly work with the

24   investigators on this case on preparing the exact document, any

25   document that was submitted to the Court, if I understand your

1    question correctly.

2    Q.  Yes.  So if we distinguish between the search warrant,

3    which a judge would sign allowing officers to go into a home,

4    and an affidavit, which is a sworn document presented to the

5    judge by a police officer stating their investigation and why

6    they believe evidence will be found at a target residence, and

7    so it sounds like when you were speaking about -- I was asking

8    about the affidavit, and you're saying you did not have

9    anything to do directly with the affidavit in Mr. Sigouin's

10   case, correct?

11   A.  That's correct.

12   Q.  But just to clarify, what you did say -- I think you had

13   called it a search warrant.  But I think what you meant was you

14   did work with law enforcement at some point in composing a

15   template affidavit; is that correct?

16   A.  I gave them some advice, yes.  But I, myself, am not

17   legally trained.

18   Q.  When did you do that?

19   A.  I wish I could tell you an exact date.

20   Q.  A year.

21   A.  More than a year ago.

22   Q.  More than a year ago.

23        Was is it law enforcement here in the Southern

24   District of Florida?

25   A.  No, it was not.

Cross - Levine                     84

1   Q.  Okay.  It was in another state?

2   A.  Yes.

3   Q.  What state was it in, if you remember?

4   A.  Like federally.  Not a state.  I mean, the Department of

5   Justice.

6   Q.  Oh, you just worked with the Department of Justice in

7   general --

8   A.  Yes.

9   Q.  -- in coming up with a template for an affidavit that law

10  enforcement may use when applying for a search warrant in these

11  cases?

12  A.  Yes.

13  Q.  Okay.

14  A.  I didn't write the warrant.  I'm not a lawyer.

15  Q.  Understood.  But you helped prepare a template?

16  A.  Yes.

17  Q.  But you don't know whether that template was used at all in

18  this particular case?

19  A.  I don't know for sure.

20  Q.  Okay.  So you're not familiar with the investigation into

21  Mr. Sigouin other than just preparing for this hearing?

22  A.  Exactly right.

23  Q.  Okay.  You said that "The Network" is a peer-to-peer

24  network; is that correct?

25  A.  I'm sure I did.

```
1   Q.  Okay.  And it's a little bit different than typical
2   peer-to-peer networks in the sense that in other peer-to-peer
3   networks, such as -- are you familiar with LimeWire?
4   A.  Gnutella, yes.
5   Q.  -- and Gnutella?
6        In those peer-to-peer networks, the files of the
7   information are all shared in a folder that everyone has access
8   to; is that right?
9   A.  That's correct.  That's not really what happens here.
10  Q.  Okay.  And that's what you just said --
11  A.  Yes.
12  Q.  -- that's not what happens in "The Network"?
13       So in a peer-to-peer network, such as LimeWire,
14  Gnutella, not what we're dealing with here, a file is placed in
15  a shared folder and it's made publicly available to every peer
16  that would try to access that file, correct?
17  A.  Generally speaking, yes.
18  Q.  Okay.  And in the files -- in the other types of
19  peer-to-peer networks, such as we gave the example of LimeWire
20  and Gnutella, the user may be presumably aware of the content
21  because the user, along with everyone else, possesses a
22  readable, complete copy of the content, correct?
23  A.  The user that's sharing the file?
24  Q.  Correct.
25  A.  If they looked at it, yes.
```

1  Q.  Okay.  You said that you sort of work with law enforcement

2  in how to investigate the users that are using "The Network,"

3  correct?

4  A.  Yes.

5  Q.  Okay.  And so those investigations aren't focused on

6  content that -- to your knowledge, those investigations are not

7  focused on content already possessed by the user, for example

8  in a shared file, but rather those investigations are focusing

9  on a user's attempt to get the file, correct?

10  A.  Correct.

11  Q.  You wrote the peer-reviewed article that was admitted into

12  evidence?

13  A.  I'm one of the coauthors.

14  Q.  You're one of the four coauthors.  Have you authored any

15  other paper about "The Network" specifically?

16  A.  Uhm, I don't believe so.  But I should clarify that

17  we're -- we put together a revision of the same paper.  But

18  there's no other, no other peer-reviewed paper, I don't

19  believe, that coauthored any other document other than

20  internal, you know, internal reports and things like that.

21  Q.  Are there other peer-reviewed papers about "The Network"

22  not authored or coauthored by you that you're aware of?

23  A.  Yes.

24  Q.  Okay.  You noted that you testified I believe three other

25  times; is that correct?

1   A.  I think so.  St. Louis, Philadelphia, and Baltimore.

2   Q.  And were those three times that you testified, were they

3   also specifically about this peer-reviewed paper and "The

4   Network"?

5   A.  Yes.

6   Q.  Okay.

7   A.  I've testified -- just to be complete, as my resume shows,

8   I testified in an unrelated case as well.

9   Q.  Understood.

10  A.  I think you're asking about this network.

11  Q.  That's correct.

12  A.  Okay.

13  Q.  You were just qualified as an expert in -- and I just want

14  to make sure -- in peer-to-peer networking as well as network

15  security; is that correct?

16  A.  That's what I recollect.

17  Q.  Okay.  I just -- for my own clarification, because we're

18  calling this particular peer-to-peer network "The Network,"

19  when you're qualified as an expert in network security, is that

20  in general or are you specifically focusing the expertise on

21  "The Network"?

22  A.  Well, I consider network security to be a term that's

23  broader than just this network.

24  Q.  Okay.  That's what I thought.

25  A.  Okay.

Cross - Levine                                                88

1   Q.  Okay.  Just making sure.

2            "The Network," the focus of our hearing today, you had

3   said is something that anyone can access presuming they have a

4   computer and a strong enough Internet connection, correct?

5   A.  Yes.

6   Q.  Okay.  And that's similar to anyone being -- "The Network"

7   is on the dark web, correct?

8   A.  Well, I consider the term dark web to be pretty vague.  I

9   think this is an instance of a dark web or dark net network

10  application.

11  Q.  Okay.  So when you say that anyone can access "The Network"

12  as long as they have a computer and they have a strong enough

13  Internet connection, it's similar to how anyone can just access

14  the Internet if they have a computer and a strong enough

15  connection?

16  A.  That's correct.

17  Q.  Okay.  And just like being on Google or some other search

18  engine and accessing the Internet, if you're on "The Network,"

19  you have access to infinite subject matters just like the

20  regular Internet, correct?

21  A.  I don't agree that it's infinite.  It's -- anything can be

22  inserted, if that's what you mean.

23  Q.  Yes.

24  A.  There's no restriction on the content that can be inserted.

25  I agree with that.

Cross - Levine                                89

1    Q.  And so you're also -- just like the -- when we're talking

2    about Google or the Internet, you can download movies and watch

3    them, music, other medium?

4    A.  If someone has inserted it already, yes.

5    Q.  And I think you had said there's no limit on what can be

6    uploaded to "The Network"?

7    A.  That's correct.  There's no filter.

8    Q.  Okay.  Would you be able to or would anyone be able to name

9    all the different types of contents, subject matters that are

10   available on "The Network"?

11   A.  I don't think so, but there's a lot of content that's

12   published to public exchange boards.  So to the extent that

13   someone had the time and the program, they could enumerate all

14   of the content that's been published publicly.

15   Q.  Okay.  But it would take some time because you can upload

16   any type of content across a wide variety of subject matters,

17   correct?

18   A.  Yeah.  I just want to distinguish, if you don't mind, the

19   variety of topic versus the amount of content.  That's why I

20   keep hesitating.

21   Q.  I see.

22   A.  When you say "infinite," there's infinite topics but

23   there's finite content.

24   Q.  I see.  When we looked at Government Exhibit No. 3, which I

25   believe took us through some -- an example of someone going to

1  "The Network" page, selecting a security option, et cetera --

2  you remember doing that a few moments ago?

3  A.  I do.

4  Q.  I know that we had said -- you had already said that you

5  had nothing to do with preparing the affidavit.  So you're

6  unaware if those exhibits were included in this particular case

7  in the affidavit, correct?

8  A.  I'm only aware of them in that they were presented today as

9  part of this trial --

10  Q.  Okay.

11  A.  -- or this hearing, I should say.  I'm sorry.

12  Q.  Yes.  We talked about low security mode versus normal

13  security mode in terms of being able to be monitored by others,

14  correct?

15  A.  Correct.

16  Q.  In general, one who uses "The Network," that system takes

17  greater pains to protect the privacy and anonymity of the

18  particular user than say someone just accessing the Internet

19  regularly, correct?

20  A.  I think it takes greater pains to warn the user about what

21  they're making available to others and that they may be

22  connected to strangers.  I don't know -- I think there's a

23  distinction between privacy and anonymity.  But I agree that

24  there's more warnings than normal and that "The Network" is

25  designed in part to obfuscate who is requesting blocks.

Cross - Levine                        91

1   Q.  When you say designed to obfuscate who is requesting

2   blocks, you mean designed to hide who the original requestor is

3   that's trying to obtain the file from the holder of the

4   manifest key?

5   A.  Yeah, it's trying to make it hard to distinguish between

6   someone who's relaying requests, a neighbor who's relaying

7   requests to you and a neighbor who is the originator of those

8   requests.

9   Q.  "The Network" itself is software that intentionally hides

10  the communications transmitted from the requestor to the person

11  who's holding the manifest key and it does that by encrypting

12  the information, correct?

13  A.  No, I don't agree.  When you're -- if I understand your

14  question correctly, if you're my neighbor and I request

15  something of you, there's no encryption involved.  I request a

16  particular block which is named by the hash of its content.

17  You know, that name is publicly available.  Well, that name is

18  available on a manifest that may be publically available.  So

19  there's no -- the request itself is pretty plain.

20  Q.  So the manifest keys are not encrypted or are encrypted?

21  A.  So to be precise, the blocks themselves are encrypted.

22  Q.  The block themselves are encrypted.

23  A.  But the hash of those blocks is a unique name.  So let's

24  call it the fingerprint of the block.  The fingerprint of the

25  block is part of a manifest that's public.  And when I make a

1    request to you, it's obvious what I'm requesting.  I'm

2    requesting something that is part of that public manifest.  So

3    in one way, it's true people, people who store those blocks may

4    not know what they're storing, but anyone who has the manifest,

5    especially if it's a public manifest, knows exactly what's

6    going on in there if they take the time to compare.

7    Q.  The manifest key, for example, does not necessarily contain

8    any content clues as to the file, correct?

9    A.  Not necessarily.  But we saw in the exhibit that the keys

10   that were part of that web page were pretty explicit.

11   Q.  Well, that was on a site, correct?

12   A.  Right, the site that we saw.

13   Q.  And that's when you see the key and then next to it it

14   describes it?

15   A.  No.  Those English words were part of the key itself.

16   Q.  Oh, were part of the key itself.

17   A.  Yes.

18   Q.  And that's if you're going to a message board?

19   A.  Yeah.  Yes.  And in my experience, the keys that are

20   published publicly often have those moderately descriptive

21   words as part of the key name itself.  I mean, the whole goal

22   of "The Network" is to share things that have been inserted,

23   and it doesn't quite make sense to obfuscate completely what

24   you're sharing.  The whole goal is to share it.

25           THE COURT:  I guess, doctor, maybe a follow-up

1    question would be, I understand there may be pragmatic reasons

2    why the manifest or the descriptor would contain some evidence

3    of what the content is.  That's not necessary to the operation

4    of "The Network;" is that correct?

5              THE WITNESS:  That's correct, Your Honor.

6              THE COURT:  Okay.  Thank you.

7    BY MS. KAY:

8    Q.  The user who is trying to obtain the file is requesting the

9    file from the holder of the manifest key, correct?

10   A.  The user is requesting blocks that are listed in the

11   manifest, and those blocks are distributed around "The

12   Network."

13   Q.  And in the example where someone is requesting the file, it

14   goes into blocks, and one of the peers of the person is a law

15   enforcement computer, correct, in the example we were talking

16   about?

17   A.  It could be.

18   Q.  And every computer that the user is connected to is called

19   a node or a peer, correct?

20   A.  Correct.

21   Q.  In other words --

22   A.  Those are synonyms.

23   Q.  And the peer is -- is it fair to say that the peer is

24   merely routing another peer's request?

25   A.  No, because if they contain -- if they themselves have the

1  block, then they will answer the request directly.

2  Q.  Okay.  So that statement, if that was described somewhere,

3  for example, in an affidavit, or if someone was trying to

4  explain, you would say that that statement is wrong?

5  A.  I would say that "The Network" is not a conduit, but "The

6  Network" is relaying requests, and sometimes who you relay it

7  to has the request and sometimes their neighbor has it or their

8  neighbor's neighbor and so on.

9  Q.  So it's incorrect to say the peer is merely routing another

10  peer's request?

11  A.  I think the statement is incomplete, but it's not -- I

12  think the full statement is it's routing other -- can you say

13  the statement again?

14  Q.  A peer merely routing another peer's request.

15  A.  Routing another request that they may answer themselves or

16  give to another peer is the full statement.  That's more

17  correct.

18  Q.  When you say that a manifest must be made publicly

19  available, is there a distinction between when you say the

20  manifest and the manifest key, or is that the same thing?

21  A.  They're different.  So the manifest key is the -- there's a

22  lot of terms here, and it's sometimes -- I think we're all

23  using different terms to make it -- to add clarity.  But I

24  think we should distinguish between the list of blocks that are

25  required -- the list of blocks that have been inserted, some of

 1    which you must download to assemble the file.  Let's refer to

 2    that as the manifest.  And then that list itself is inserted.

 3    And so you'll be returned that key we've been talking about

 4    that we saw on the web page.

 5           So the first step, if you would like to download

 6    something, is to get the manifest so you know what to do next.

 7    So let's call the reference to the manifest the manifest key or

 8    the URL.  And then there's the manifest itself, which is the

 9    list of blocks that have been inserted.

10    Q.  And in order to make a request for a file, one needs to

11    have the manifest key, correct?

12    A.  Uh-huh.  Yes.

13    Q.  Is it the manifest key that you were saying must be made

14    publicly available?

15    A.  It doesn't have to be made publicly available.

16    Q.  Okay.

17    A.  But certainly you have to give it to someone if they want

18    to download, and that may be publicly or not.

19    Q.  So when you had testified that it must be made publicly

20    available, you didn't mean that it had to be available on some

21    public forum, you would mean someone would need to tell someone

22    what the manifest key was in some way?

23    A.  That's right.

24    Q.  So theoretically I could call you up on the phone and say

25    this is what the manifest key is?

1   A.   That's correct.

2   Q.   All right.   I could also send you a private -- an email

3   from just me to you on any type of instant messaging or

4   anything and tell you what a manifest key is and give it to you

5   that way?

6   A.   Correct.

7   Q.   And then, of course, it could also be available on a

8   message board or a website, correct?

9   A.   Correct.

10  Q.   Okay.  You had also testified, I believe, that a request

11  may pass through neighbors; is that correct?

12  A.   Testified today?

13  Q.   Yes.

14  A.   Well, a request -- if I'm given a request and I don't have

15  what's being requested, then I will pass it through to my

16  neighbors.

17  Q.   Okay.

18        THE COURT:  So whether you testified to that earlier

19  today or not, that is a fact?

20        THE WITNESS:  Correct.

21        THE COURT:  Okay.

22  BY MS. KAY:

23  Q.   You had testified that each -- you believe that each person

24  connects to about 30 peers on average that's using "The

25  Network;" is that correct?

1    A.  I've observed that.

2    Q.  You've observed that?

3    A.  Yes.

4    Q.  And you had also stated that the number of peers -- is

5    number of peers -- let me ask you, does the number of peers

6    someone have matters for the algorithm, correct?

7    A.  It does.

8    Q.  Okay.  Would someone that is more new to "The Network" have

9    less peers?

10   A.  Well, when you say "new," I'm going to interpret that to

11   mean you just started your computer up --

12   Q.  Correct.

13   A.  -- and you installed the software for the first time, and

14   then let's say you configured it to connect to let's say 30

15   peers.  Then, yes, it will take time for your computer to find

16   those peers and connect to them.

17        And when I talk about actually the -- you know, what

18   I've observed is about 30 peers, in fact, I've observed a

19   distribution there.  I've observed not just the average, but I

20   have statistics on -- if what you say is true, sometimes it's

21   the case that people have fewer.  But let's say 99.9 percent of

22   the time it's about 15, if not 20.

23   Q.  And is that the same every time you start up your computer?

24   You need to search -- your computer then searches for the peers

25   or once you've established your peers the first time you start

Cross - Levine                              98

1    up the computer --

2    A.  Well, when you start up your computer, again after some

3    time has past, the peers you were connected to before

4    themselves may not be online.  So, yes, it would take some

5    time.  But the software works hard to -- you know, there's some

6    number of peers that your particular software is configured to

7    find.  And if you fall below that, then it will work hard to

8    get back up to that number.  So that's why the number of peers

9    is, in fact, not just about 30.  Pretty close to it.  You know,

10   certainly above 10 or 15 or 20, as I said.

11   Q.  You had testified that, as the prosecutor has said, the

12   crux of this case is searching for and acquiring files, and you

13   had gone through what someone needs to search for a file.

14        When we're saying "search for a file," is that

15   synonymous with requesting a file, correct?

16   A.  Yes, I agree.

17   Q.  Okay.  And that's requesting a file from the person who has

18   the key to the file, has the file?

19   A.  Well, again, the files are divided up into blocks, and

20   those blocks are distributed around "The Network."  And in

21   addition, any other user who has previously requested the same

22   file will have caused copies of the blocks to be replicated as

23   part of that process.  So the blocks can be in more than one

24   place.  So I wouldn't quite agree that you're downloading it

25   from someone in particular.  You're downloading it with the

1  help of your neighbors.

2  Q.  And in order to -- we had previously said search for files,

3  but I'm going to say in order to request a file.

4  A.  Understood.

5  Q.  And you think that's the correct way to say it?

6  A.  I think both are clear.

7  Q.  Okay.  So in order to request a file, you had stated that

8  you need the key which you were calling similar to a URL,

9  correct?

10  A.  Correct.

11  Q.  And we had just discussed that how one would get the key is

12  not necessarily known; there's a number of ways that one could

13  acquire a key?

14  A.  That's correct.

15  Q.  You also need to get the manifest; is that correct?

16  A.  The manifest key, the first thing that it does is get you

17  the manifest from "The Network."

18  Q.  And then you said that you are then saying -- in a sense

19  you're saying do you have -- I think you testified that you

20  said, do you have this block is what you're asking, correct?

21  A.  Yes, this block that comprises the --

22  Q.  You're not really -- when you're doing this, it's obviously

23  all through your computer?

24  A.  Correct.

25  Q.  And you're not typing out "do you have anything?"  You're

1   not -- these are not readable English commands, correct?

2   A.  These are signals passed to your neighbor.

3   Q.  But the way that -- but what they mean, the signals passed

4   to your neighbor, is an attempt to request a file, and I think

5   you had said the phrase "do you have this block," correct?

6   A.  Correct.

7   Q.  The exhibits we've looked at, I believe, in Government 3

8   where it was a list of keys, that was from June 18, 2016?

9   A.  I'm not aware of when it was put together.

10  Q.  Okay.  But that was just an example.  Your testimony is not

11  that that's available right now on "The Network"?

12  A.  You're talking about the slide with the green background?

13  Q.  Correct.

14  A.  I haven't checked recently whether that's available.  I try

15  not to go to that page.  But it's -- I've observed that it's

16  been available in the past.  I don't know whether it's

17  available currently or not.

18  Q.  What we were looking at was a -- when there was some

19  discussion of what -- you know, my favorite teen porn site, my

20  favorite teen porn or Lolita, that was a message board or a

21  site, a website on "The Network" site?

22  A.  That was a site.

23  Q.  Okay.  So another way to do it would be -- to look for keys

24  would be on a message board, correct?

25  A.  A message board outside of "The Network" or there's a

1    particular message board inside of "The Network."

2    Q.  Okay.  When you say "outside of 'The Network,'" you mean

3    we're talking about "The Network," the -- what we're

4    investigating?

5    A.  Yeah, outside of "The Network" we're talking today on the

6    regular.

7    Q.  Got it.  Or, you just said, as part of "The Network"?

8    A.  "The Network" that we're talking about today.

9    Q.  Those two mechanisms, message boards or sites, are -- if

10   you know, are ways that law enforcement tries to obtain the

11   known keys?

12   A.  I would expect that.

13   Q.  If you don't know.

14   A.  They do.

15   Q.  Okay.  Because you said you work with law enforcement,

16   correct?

17   A.  I do.

18   Q.  Was your paper written -- it was written to assist law

19   enforcement, correct?

20   A.  That was my intent.

21   Q.  Okay.  And did you confer with law enforcement when writing

22   the paper with your coauthors?

23   A.  Yes.

24   Q.  Okay.  The site we saw did give some content clues, as you

25   testified, as to what the files would be.  But message boards

1  and sites don't necessarily describe the content of files for

2  which the manifest keys are provided, correct?

3  A.  They don't necessarily, but I've observed that a lot of

4  them do.

5  Q.  Okay.  Some of them -- some message boards or some sites

6  would just consist of a list of manifest keys and they might

7  not have an individual description?

8  A.  I've not seen any that do that.

9  Q.  Okay.  But you agree that they don't -- so, but you just

10 did agree that some massage boards and network sites, "The

11 Network" sites don't necessarily describe the content of the

12 file?

13 A.  I agree that they could, but I've never observed that.

14 Q.  Okay.  We already talked about the fact that keys may be

15 shared by direct communication between users, correct?

16 A.  We did talk about that.

17 Q.  And, therefore, a user can share a key without describing

18 the content?

19 A.  Correct.

20 Q.  Even if we see that there's a content description along

21 with the key, it may not accurately be labeled or described?

22 A.  Anything is possible.

23 Q.  One of the goals -- and I think you talked about this in

24 relation to the hops to live, the HTL.  One of the goals of

25 "The Network" is to make it unclear who is requesting the

Cross - Levine                    103

1   block, correct?

2   A.  That's the goal of the 18, 17 confusion or method.

3   Q.  Okay.  You said if every -- I think one of the things you

4   said is if everyone is running the software as designed, a 16,

5   a 15, or a 14 is never going to be the original requestor; is

6   that correct?

7   A.  I believe I said that.

8   Q.  What does that mean?  Is it able -- if you're running the

9   software not as designed, is that an example of someone who is

10  adjusting the HTL?

11  A.  That's what I meant in that case.

12  Q.  Because it is possible for an individual to adjust the hops

13  to live, correct?

14  A.  If they know what they're doing.  It's not available on the

15  GUI.  You would have to modify the source code.

16  Q.  And is there -- was there anything else you were referring

17  to when you said if everyone is running the software as

18  designed, 16, 15, or 14 is never going to be an original

19  requestor?  Would the -- would it be because someone could, if

20  they knew how, adjust the HTL, or was there another example of

21  that where you're not running the software as designed, or is

22  that the only thing that you meant?

23  A.  I think in what we were talking about earlier today, at the

24  high level I was talking about, it was really just to

25  differentiate 17s and 18s and explain the notion that this coin

Cross - Levine

1   flip of whether you decrement or not doesn't apply to 16s, 15s,

2   and so on.  So in the context of that explanation, that's what

3   I was referring to.

4   Q.  Speaking about the modified version of "The Network" that

5   law enforcement runs on a computer so that they can end up

6   being a peer to a user who may be requesting a file, you said

7   that the law enforcement computers are designed or the modified

8   version is designed to log things in a way that -- they log the

9   things -- the things are available, you said, to other people

10  that would be a peer, but the difference is the way the -- the

11  fact that law enforcement is able to log them in a certain way.

12       I think you had mentioned that in a regular

13  non-modified version there's -- because of the debugging and

14  other things, it just is more of a -- you didn't say this, but

15  I'm saying more of an avalanche of infirmarian so it would be

16  more difficult to log the information?  Is that what you meant

17  by it, or what did you mean by there being the debugging thing?

18  A.  The debugging would have information that's not relevant to

19  this type of investigation.

20  Q.  Right.

21  A.  And so I think, you know, avalanche could be a word there.

22  It could be distracting or confusing.

23  Q.  So the debugging function provides a lot of information

24  that law enforcement would not need to log or would not be

25  interested in in your opinion?

1  A.  I think so.

2  Q.  And because the modified version, for example, doesn't

3  include that debugging, it then gives law enforcement access to

4  more information that they're interested in?

5  A.  I wouldn't say it's more information.  It's easier for them

6  to identify the information that they want.

7  Q.  Because it wouldn't necessarily get lost in the other

8  information?

9  A.  The distractions.

10  Q.  Okay.  Is it easier to log something when the distractions

11  are not there so you can clearly see the information, grab it,

12  and log it?

13  A.  Well, the computer's doing the logging.

14  Q.  Does the computer have the easier job?  I mean, there must

15  be a reason -- there's a reason why they don't use the

16  debugging thing, correct?

17  A.  Sure.  I mean, the debugging is -- you know, the software

18  itself, obviously, takes up resources on your computer.  And so

19  having the software take up even more resources to log things

20  that the user doesn't care about because they're not a

21  developer makes the software even less appealing.

22        I mean, the way these systems work, it's kind of a

23  crowd sourcing.  That's what peer-to-peer means.  And so if you

24  install something that takes a lot of your CPU and runs in the

25  background and makes it hard for you to do other things, then

1  you're going to un-install it.  So I think that's one of the

2  reasons to not run in debugged mode.

3  Q.  And I think you had said there's just -- when you have the

4  debugging function on a normal non-modified computer, I think

5  you had said there's just so much information and without it

6  it's easier to find and log the information; is that a fair

7  statement?

8  A.  Sure.  Wouldn't that make sense?

9  Q.  Okay.  And that's what you said previously, correct?

10 A.  Yes.

11 Q.  Okay.  I think you had testified that law enforcement, once

12 they complete their training in a satisfactory manner, that's

13 when they can begin running this modify version.

14 A.  Uh-huh.

15 Q.  Did you have anything to do with deciding what that

16 training is or --

17 A.  Not directly.

18 Q.  Okay.

19 A.  I wasn't the person that taught the training.  You know, of

20 course, indirectly because the training is based upon the

21 peer-reviewed paper.  So -- but I haven't taught those classes.

22 Q.  Okay.  So you haven't taught it, but have you come up with

23 the training -- have you contributed into what the training for

24 law enforcement should be, what type of training they should

25 undergo or no?

Cross - Levine                          107

```
 1   A.  Not directly.

 2   Q.  Okay.

 3   A.  But I talked with the people who run it.  But I never had,

 4   for example, a meeting where we sat down and talked about what

 5   should be in there.

 6   Q.  One of the topics we went back to a few times, and I think

 7   the prosecutor was asking you, in terms of trying to -- one of

 8   the goals of law enforcement, of course, is to identify

 9   original requestors.  And you had said that the information

10   that the law enforcement computer would log in order to

11   determine that one thing would be the IP address, correct?

12   A.  Correct.

13   Q.  Okay.  The IP address, that's just the -- the IP address is

14   just the numerical value assigned to the person -- a connection

15   at a place, like a residence or a business, correct?

16   A.  It's an endpoint for a network communication.  So much like

17   you might have an address to your home for a letter, that's

18   where that letter is destined to.  The IP address is where

19   our -- if we were to send packets, network packets to, that's

20   where they arrive.

21   Q.  So if a particular residence has an IP address, that means

22   that any device that's either at the residence -- depending --

23   is either at the residence or in range of the residence that

24   has that password, for example, the Wi-Fi password, would come

25   up as that IP address?
```

Cross - Levine                    108

 1          MR. SCHILLER:  Objection.  Outside the scope of

 2   direct.

 3          THE COURT:  He can answer if he can answer it.  He's

 4   an expert in networks.

 5          THE WITNESS:  As you described, yes, if they have a

 6   Wi-Fi access point and the Wi-Fi access point is running, for

 7   example, something called NAT, then anyone who has access with,

 8   as you said, the password.  If the NAT is operating correctly,

 9   then they would also have the same external IP address.

10   Q.  So when it comes to information that a law enforcement

11   computer logs to determine if someone is the original

12   requestor, the IP address doesn't necessarily determine if the

13   person's an original requestor, the IP address is to link to a

14   certain location so that law enforcement can determine maybe

15   where that original requestor is or where that device is

16   located?

17   A.  The IP address links to the router, the cable modem that in

18   your example might be attached to this Wi-Fi point.  So it

19   links to a computer that's at the location associated with the

20   IP address that say the Internet Service Provider has assigned,

21   you know, due to payment.

22   Q.  And so that's so when law enforcement is presumably

23   gathering this information, the IP address would be where they

24   would go to look to find either a device or an individual?

25   A.  The IP address might lead them to a record that would give

Cross - Levine

1    them, say, a residence that would led them to look for a device

2    that's associated with the activity they observed.

3    Q.   Okay.  So if I entered someone's home and I was able --

4    with my own cell phone or my own tablet or my own computer, if

5    I connected to their network either with or without their

6    permission, if I was able to connect to their network and I

7    requested a file, it would show that I was using their IP

8    address?

9    A.   It would show correctly the activity was within that

10   residence.

11   Q.   So you would know the activity was coming from that place,

12   correct?

13   A.   Correct.

14   Q.   Okay.  You also said that law enforcement logs the number

15   of requests that they received, correct?

16   A.   Well, they get a list of requests that they've received and

17   so, of course, you could count them.

18   Q.   Do you mean -- when you say number of requests received, do

19   you mean from that one particular user?

20   A.   That's what the method requires, yes, from that IP address

21   at that location --

22   Q.   Correct.

23   A.   -- network location.

24   Q.   Does the number of requests received that would be --

25   that's when you go to the hops to live?  So you would receive

1  18 requests or 17 requests, and that's when they would know to

2  zero in on you, or is the number of requests received something

3  different?

4  A.  So the hops to live is -- no.  What they would -- so if I

5  received --

6  Q.  I'm sorry.  I think I just clarified it for myself.  Go

7  ahead.

8  A.  Maybe you can rephrase the question.

9  Q.  So the number doesn't mean the number of times the person

10 is asking for that particular file?

11 A.  The number of blocks they've requested where all the blocks

12 go together with a particular manifest such that the request

13 they're receiving all have the same hops to live value and are

14 within a time frame that's reasonable and there's enough of

15 them.  For example, it can't just be three of them.  So if you

16 were to make -- if you are a requestor -- well, I'll just leave

17 it at that.

18 Q.  Thank you.  And then you also said that law enforcement

19 notes the time of the request.

20 A.  The computer logs the time.

21 Q.  The computer logs the time.

22 A.  Yes.

23 Q.  The law enforcement modified version?

24 A.  That's correct.

25 Q.  And that means the times -- I think you had said later that

1   it must be in a reasonably sized window, and you had given an

2   example of January -- what if one was in January, one was in

3   March, and one was in October.  In your opinion, that's not a

4   reasonably sized window?

5   A.  That's correct.

6   Q.  And is the reason because it wouldn't show that there would

7   likely to be evidence of the files at that particular target

8   residence?

9   A.  So there's a number of parameters in the method, in the

10  paper and so on.  And so all of the parameters have been

11  selected in a way that hedges towards not having a false

12  positive.  So although it's possible that someone would take

13  from January to October, or whatever month I said later in the

14  year, to download a single file, we suggest that you ignore

15  that possibility because it helps them remove some potential

16  false positives.  So that's where that suggestion comes from.

17  Q.  So when you're saying the time, you mean the time that it

18  takes for someone to request one particular file?

19  A.  All the blocks that are associated with the one manifest,

20  which I think we're calling collectively a file.

21  Q.  Okay.

22  A.  Yeah.

23  Q.  When you said that you look for what type of request and

24  then you clarified --

25  A.  What was I referring to?  Sorry.  Go ahead.

Q.   And then you sort of stepped back and said or just

clarifying that it was a request.

A.   What was I referring to?

Q.   Correct.

A.   So during the normal operation of The "Network" if I'm

requestor, I will -- so I have to step back a little.

         When a file gets inserted -- let's say there's a

thousand blocks that get inserted, and I give one to you, and

you take that, and you're willing to answer a request for that

block, and then you go off-line.  Well, now we've lost that

block.

         So blocks get lost occasionally as people go off-line.

Maybe they never even come back.  Maybe they come back in a

month.  So to account for that, there's a number of things that

"The Network" does.  One of the things that it does is as

I'm -- as part of the normal operation if I'm just downloading

requests for a particular file I'm trying to recover for a

series of blocks that go together, occasionally, very

occasionally I will reinsert that block into "The Network" as

if I was the uploader.  And so that's a different kind of

request.  That's kind of an insert request, you might call it.

         But, in any case, the law enforcement version takes

note of the fact that that's happening and actually decrements

the count of total requests to take that into account.  And

again, it's a way of sort of hedging towards -- we reduce the

1   true positive rate.  We sort of -- the method lets -- it hedges

2   towards letting some people go who probably are requesting so

3   as to keep down the false positive rate.  So that's what I was

4   referring to.  It counts inserts as well.

5   Q.  And it's important that, at least in your opinion, law

6   enforcement makes that distinction?

7   A.  Yes.

8   Q.  Okay.  And also the number of peers that are requestor had,

9   that -- and we talked about the fact that that's very important

10  in determine whether someone is the original requestor?

11  A.  It is.

12  Q.  Okay.  You said that you can never be an original requestor

13  if you have the 16 hops to live; is that correct?

14  A.  If you're operating the software in an unmodified way.

15  Q.  Okay.  So you could modify it and be an original requestor?

16  A.  Yes.

17  Q.  Okay.  The number of requests depends on how many peers a

18  user has, correct?

19  A.  The number of requests received by a neighbor is dependent

20  on the number of neighbors that the requestor has or -- yeah.

21  Q.  The prosecutor had noted when you -- I guess asking when

22  you were ready to, I think you said, unleash the algorithm to

23  law enforcement.  Did law enforcement help you come up with the

24  algorithm or was that something completely separate?

25  A.  I want to say completely separate.  I mean, to my

1  recollection completely separate.  I mean, it's hard to

2  separate these things in reality.

3          You have to -- you know, when you're involved in

4  forensics, you can't just do things as a scientist.  Forensic

5  science implies that your ultimate destination is to inform a

6  forum, the Court.  So you can't just -- you can't approach

7  things just scientifically.  You have to be aware of how

8  investigators operate and what the law is.  So certainly they

9  helped us define -- in the very least they helped us come up

10 with a method that would be acceptable in that context.  You

11 know, for example -- well, so you can imagine there's things

12 that wouldn't be acceptable to a Court but you can still do

13 scientifically.

14 Q.  I understand.

15 A.  But the method itself I think we came up with.

16 Q.  I think you had stated that there was -- when talking about

17 the error rate, there was a 95 percent of confidence interval,

18 correct?

19 A.  Correct.

20 Q.  And that's at one standard deviation; is that correct?

21 A.  I don't know if I would introduce that term here.

22 Q.  Okay.

23 A.  The 95 percent confidence interval refers to -- so what I'm

24 referring to there is there's -- for example, when we talk

25 about the one over -- when we refer to the 516 tests that were

Cross - Levine                    115

1    done and I said there was one over 516 chance of a false

2    positive rate, and then I said -- well, in any case, whether I

3    said it or not, there's a 95 percent confidence interval on

4    that.

5            And so you can use a test called the proportion test.

6    And so the 95 percent confidence interval refers to --

7            THE COURT REPORTER:  I'm sorry.  The 95 percent what?

8            THE WITNESS:  Confidence interval.

9            So from memory -- I apologize if I'm getting this

10   wrong -- you would take -- there's a value P.  P in this case

11   is one over 1516.  Sorry, one over 516.  So you would do the

12   square root of P times one minus P over the number of tests,

13   which in this case is 516.  That whole value times 1.96.  So

14   that 1.96 value comes from a particular distribution or lookup

15   table, it's referred to often in textbooks, and that value 1.96

16   refers to the fact that we've chosen a 95 percent confidence

17   interval.  So you would take that proportion and then plus or

18   minus the quantity I described before.  So that's where those

19   values come from.  I'm not going to do the math up here in my

20   head, but it comes down to something below 1 percent, including

21   the 95 percent confidence interval.

22           THE COURT:  Dr. Levine, as I understand the 95 percent

23   confidence interval, another way to look at it is -- I want to

24   see if my understanding comports with yours.

25           If you ran the same test 100 times, 95 percent of the

1    time you would get less than 2 1/2 percent of false positive

2    rate?

3              THE WITNESS:  Yeah.  It's not the case that there's a

4    95 percent change that you're right.  It's that if you ran the

5    same thing 100 times, you'd expect 95 percent -- 95 times to

6    get the same answer.

7              THE COURT:  Okay.

8              THE WITNESS:  Yes.

9              THE COURT:  That's why I asked you about the margin of

10   error.  Because usually it's 95 times you would get within some

11   margin of error of that number.

12             THE WITNESS:  Yes.  In my experience, I think often

13   margin of error is used where they add the 95 percent

14   confidence interval or some confidence interval to the number

15   that you observed to get in a way the --

16             THE COURT:  95 percent of the time the number would be

17   between 2.3 and 2.7.

18             THE WITNESS:  Yeah.

19             THE COURT:  It would be 2.5 plus or minus .2 with a 95

20   confidence.

21             THE WITNESS:  Yes, Your Honor.  But also in the case

22   of the 2.3 number that I'm reporting, that is the result of a

23   kind of worst-case analysis that was done as well.  So that's

24   why I say that is a -- it already -- I mean, there's several

25   tests that we did, and that 2.3 number is trace driven.  And in

1    the trace driven test, we had to make certain assumptions, and

2    then we applied the worst-case scenario of our assumption to

3    get to 2.3.  In fact, the false positive rate we got -- I'm

4    doing this from memory, but I believe it was closer to 1.2.

5    And then we do sort of a hedging or a worst-case scenario to

6    get to 2.3.

7            So there's no exact 95 percent confidence interval on

8    the 2.3 result, but it includes this worst case.

9            Then, separate from the paper -- also, remember in our

10   simulations the false positive rate is closer to near zero.

11   But the exact numbers are in the paper.  I might be

12   misremembering.  So that's one test.  The 2.3 includes this

13   worst case.

14           And then the one -- the test that I keep referring to

15   beyond the peer-reviewed result, Your Honor, is -- has a

16   proportion of one over 516.  And then you can do the standard

17   95 percent confidence interval.  And at that point you would

18   end up with something below 1 percent, Your Honor.

19           THE COURT:  Understood.  Thank you.

20           THE WITNESS:  Sorry for all of the details.  I

21   apologize.

22           THE COURT:  Details are helpful.  Thank you.

23           THE WITNESS:  Okay.

24   BY MS. KAY:

25   Q.  The 516 tests, I believe you said those are live tests that

1   occurred over a two-year period?

2   A.   Two-year period.   About.

3   Q.   If a peer doesn't have the requested file pieces, we talked

4   about that peer will then send a request out to its peers,

5   correct?

6   A.   Correct.

7   Q.   Okay.   And if a file -- let's say a file is no longer

8   available.   That would -- on "The Network."   That would result

9   in a greater number of forwarded requests being sent, correct?

10  A.   That's correct.   If I may add, in the method that we

11  suggest to law enforcement, after they download -- after they

12  run the test, they, themselves, can -- we recommend they

13  download the same file to confirm that, in fact, it's available

14  on "The Network."

15  Q.   And you recommend that they do that close in time to

16  receiving the request?

17  A.   Well, in some sense if it's farther in time, it's even

18  better.   I mean, how did it get there?

19  Q.   But at some point you recommend to see if that file is

20  still there?

21  A.   I do recommend that.

22  Q.   And if a file is not there, it could result in duplicate

23  requests being sent, correct?

24  A.   Duplicate requests might be sent, but, in fact, that's also

25  logged as part of the investigative technique.   And when

1    duplicate requests are received, that reduces the count by not

2    just the number of duplicates but a multiple number of the

3    duplicates.  And again, this is part of the design to hedge

4    towards having what you would call a false negative rather than

5    a false positive.

6    Q.  And that's because it might -- when the duplicates are

7    being sent, it might appear that a peer is requesting a larger

8    portion of the file than one would expect from a peer who's

9    just relaying the request?

10   A.  Right, that's why decrement the total count based on the

11   number of duplicates as well.

12   Q.  Okay.

13        THE COURT:  Dr. Levine, on this case, checking my

14   notes, I want to see if I could reconcile two concepts.  I want

15   to make sure I understand.

16        You said a second -- a little while ago that one of

17   the things that the algorithm looks for is whether there are

18   multiple -- I want to make sure I get this right -- multiple

19   requests from a single neighbor for multiple blocks from the

20   same manifest and with the same HTL value and within some

21   reasonably close period of time.  Is that -- did I get that

22   right?

23        THE WITNESS:  I think so.

24        THE COURT:  Requests from a neighbor for multiple

25   blocks roughly at the same time with the same HTL number --

Cross - Levine                          120

1              THE WITNESS:  Yes.

2              THE COURT:  -- and those blocks track back to the same

3    manifest.

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  That last part was the part I wasn't clear

6    on.  Because when you talked way back when about what it is

7    that the law enforcement version of the software tracks, I

8    think you said it tracks the block that was requested.

9              Does it also do some sort of crosscheck to see if the

10   block is -- multiple blocks are coming from the same ultimate

11   manifest?

12             THE WITNESS:  Yes, that's largely the point.  So when

13   we -- when the method considers the count of requests that are

14   received from a neighbor, they have to all be a part of the

15   same manifest.

16             THE COURT:  I see.

17             THE WITNESS:  So if one -- so if one person -- one

18   computer were requesting two files at the same time, the law

19   enforcement -- the test would require that law enforcement

20   separate the two.  But it's easy to do, because all the

21   requests are for, you know, cryptographic hashes essentially.

22   It's easy to separate them if you have the two manifests, Your

23   Honor.

24             THE COURT:  I understand.  Then I guess my other

25   question is, does part of the algorithm then check to see --

1   let me get this number right -- essentially the proportion of

2   the overall manifest that the request reflects?  I'm thinking

3   back to your M&M example.

4           THE WITNESS:  Yes.

5           THE COURT:  It would seem to me it would be material

6   that if the overall manifest contained a thousand blocks and

7   the neighbor's request was for five blocks, that's a very small

8   percentage of the overall, as opposed to if the neighbor's

9   request was for 500 blocks, that would suggest a much tighter

10  connection.  So does the algorithm check for that?

11          THE WITNESS:  Yes, Your Honor.  That's exactly right.

12  So it -- the main parameters are the number of blocks that you

13  would expect someone to download for this particular manifest.

14  You have to have the actual manifest to get that number.

15          THE COURT:  So before the algorithm can even run, law

16  enforcement has to somehow take the block request and track

17  back and figure out what manifest that connects to.

18          THE WITNESS:  Exactly right.  In fact, typically they

19  have the manifest ahead of time, Your Honor.

20          THE COURT:  Okay.  And then you measure essentially --

21  the algorithm is going to now measure certain parameters

22  against the overall manifest and reach certain circumstantial

23  conclusions; that if a person is requesting a sufficiently

24  large percentage of the manifest, that suggests they're closer

25  to the requestor if it's all in the same time for the same

Cross - Levine                                122

1    manifest to suggest the same requestor, et cetera.

2              THE WITNESS:  Yes, Your Honor.  And also, as you might

3    guess already, we're talking at a high level about you expect

4    this and expect that.  But, in fact, the paper talks about the

5    binomial distribution and it is much more careful about things.

6              THE COURT:  Understood.

7              THE WITNESS:  Okay.

8              THE COURT:  I'm sorry, Ms. Kay.  Feel free to ask any

9    question based on the Court's questions.

10   BY MS. KAY:

11   Q.  So when the Court was saying about the number of pieces

12   that's in the manifest, that's another way to say that it would

13   be the total number of file pieces required to assemble the

14   file?

15   A.  Yes.

16   Q.  Okay.  And so that is something that's of importance and

17   that law enforcement needs to know before they begin?

18   A.  To execute the method they would need to know that.

19   Q.  So in addition to needing to know the number of requested

20   file pieces, the number of requests they received from this

21   user, they also need to know the total number of file pieces

22   required to assemble the file?

23   A.  To come to their conclusion they need that.

24   Q.  And they also -- we talked about this.  They also need to

25   know the number of peers that the user had?

1  A.  Yes, to come to that conclusion.

2  Q.  All right.  And all of that is to try to get to the

3  conclusion, to confirm or deny, I guess, whether the user in

4  this -- the particular user is requesting a larger portion of

5  the pieces of the file than you would expect from someone who's

6  merely forwarding the request?

7  A.  Yes.  At a high level, yes.

8  Q.  Okay.  Some of the explanations and the examples you gave

9  today through your testimony not -- are all of those discussed

10  in the peer-reviewed paper or are there some things that you

11  explained, like the M&M example or something, that you were

12  using for purposes of this hearing that might not be stated

13  that same way?

14  A.  I think the paper is -- the paper doesn't include the M&Ms

15  example.

16  Q.  It was helpful.

17  A.  But there are -- you know, there are similar broad

18  explanations.  Certainly the introduction has a broad

19  explanation of how things work.

20          Sometimes I refer to writing a paper like an Ikea

21  piece of furniture that you buy.  You want to give everyone a

22  picture of what they're going to eventually build in the

23  introduction, give them the gory details, and then tell them

24  what they should have at the end.  So we do our best.

25  Q.  And safe to say that everything that we talked about today,

1  there's much more in the paper that we did not discuss?

2  A.  Uh-huh.  Yes.

3  Q.  Okay.  And the paper -- we've been talking at a high level.

4  So the paper goes into greater detail than the broad way we've

5  been discussing everything?

6  A.  I would say the introduction is the broader way, and then

7  the details of the paper give you the finer details.

8          MS. KAY:  May I have one moment to confer?

9          THE COURT:  Of course.

10          MS. KAY:  I don't have any other questions.  Thank

11  you.

12          THE WITNESS:  Thank you.

13          THE COURT:  Mr. Schiller, any redirect?

14          MR. SCHILLER:  One question, Judge.

15          THE COURT:  Just one?

16          MR. SCHILLER:  Just one.

17          THE COURT:  I'm going to hold you to that.

18          MR. SCHILLER:  Well, it's more of a summary larger

19  question that might break down after that.

20  BY MR. SCHILLER:

21  Q.  Professor, earlier on cross-examination when you were being

22  questioned about generally the number of peers an individual

23  has, and I believe you said something to the effect of there is

24  a 99.9 percent chance based on your observations that a peer

25  has more than 15 to 20 peers they're connected to?

1    A.  Yeah, I apologize if I'm -- I'm referring there to my
2    memory about an experiment that I ran that I didn't bring my
3    notes for here today.  So I apologize if I'm off by a node or
4    two.  But peers really have something much higher than 15 in
5    general, or 20.
6    Q.  And when you were running your tests on your algorithm in
7    your lab, how many nodes did you contemplate being connected to
8    your -- in your experiment so we could figure out who the
9    original requestor was?  Does that make sense?
10   A.  Well, we did a number of experiments.  So, for example, in
11   the peer-reviewed paper it talks about simulations where every
12   peer in "The Network" in this particular what's called -- I
13   mentioned before -- small world topology, so it looks like "The
14   Network."  So some peers have -- I think it was -- I'm doing
15   this from memory.  But some peers have, let's say, 18
16   neighbors, and then there's another run of simulations where
17   they have something closer to 30, another run where they have
18   something closer to, I don't know, 70.  There's a series of
19   plots toward the end of the paper that shows examples of that.
20   Q.  Okay.  Did you run one simulation where you were only
21   testing against the possibility of having eight peers?
22   A.  I don't think -- if we did, we didn't report that in the
23   paper.
24   Q.  Okay.  But you tried to make your testing as accurate to
25   real-word scenarios as possible?

1   A.   That's correct.  And then I would add that the last test

2   that doesn't appear in the paper, the 516 that I'm testifying

3   to here, that is the real scenario.  Like, whatever could

4   happen -- you know, that series of 516 tests with one false

5   positive reflects what does happen.  I mean, there's lots of

6   possibilities, but that reflects what real users actually do.

7            MR. SCHILLER:  Thank you, Judge.  I have nothing

8   further.

9            THE COURT:  May Dr. Levine be excused?

10            MR. SCHILLER:  He may.

11            THE COURT:  Dr. Levine, I hope you make your flight.

12            THE WITNESS:  Thank you, Your Honor.

13            THE COURT:  Thank you.

14        (Witness was excused.)

15            THE COURT:  Mr. Schiller, next witness.  Or it's

16   12:05.  What's your pleasure?

17            MR. SCHILLER:  I'll leave it at the Court's

18   discretion, Judge.  Special Agent Alfin would testify next.

19            THE COURT:  Let's just do a little housekeeping then.

20   Is he the only other witness for today?

21            MR. SCHILLER:  No.  Agent Steinmetz also needs to

22   testify, but extremely briefly.  But it doesn't make sense to

23   have his testimony before Agent Alfin's.

24            THE WITNESS:  Okay.  Let me just work backwards.  As I

25   said, I need to get off the bench at 2:30 so I can make my

1    flight.  I do want to give everyone a chance for a lunch break.

2    How long do you think Special Agent Alfin's testimony will be?

3         MR. SCHILLER:  Direct, less than an hour.

4         THE COURT:  Okay.

5         MR. SCHILLER:  Maybe 45 minutes.

6         THE COURT:  Okay.  Ms. Kay, not holding you to this,

7    but best guess on cross-examination on Agent Alfin?

8         MS. KAY:  Whatever the prosecutor has their direct,

9    mine would usually be less on cross, typically speaking.

10        And he's only testifying now about the search warrant

11   motions, right, or are you having him testify about anything?

12        MR. SCHILLER:  Presumably it would be about

13   everything.

14        MS. KAY:  Oh, okay.

15        MR. SCHILLER:  Because I really don't want to have to

16   bring him back.

17        To be honest with the Court, his testimony about the

18   motions about the search warrant is going to be exceptionally

19   short.

20        MS. KAY:  Right.  Okay.

21        MR. SCHILLER:  And then --

22        THE COURT:  I assume he's also going to testify

23   about -- did he take the statement?  Was he present for the

24   statement from Mr. Sigouin?

25        MR. SCHILLER:  Yes, and that's going to be the

1    majority of his direct examination.

2         THE COURT:  And that's the same for Agent Steinmetz,

3    that he's going to testify to statements that -- was he a part

4    of the taking of the statement from Mr. Sigouin?

5         MR. SCHILLER:  He was, but I'm only going to address

6    certain points because Special Agent Alfin will have addressed

7    most of those already.

8         THE COURT:  Okay.  Let's do this then.  I don't want

9    to start Special Agent Alfin's testimony if it's going to

10   really be a continuous flow of mostly the statement.  Why don't

11   we break until 1 o'clock.  I'll give you 55 minutes.  Sorry, a

12   little, short lunch.  But let's come back at 1 o'clock, and

13   we'll go until 2:30.  That should hopefully give us enough time

14   to get Special Agent Alfin on and off and get Special Agent

15   Steinmetz on and off, and then everybody can make their

16   flights.  All right?

17        MR. SCHILLER:  All right.

18        THE COURT:  All right.  Thank you all.  We will be in

19   recess.

20     (Recess at 12:08 p.m.)

21     (Call to Order of the Court.)

22        THE COURT:  Good afternoon, everyone.  Have a seat,

23   please.

24        Government may call its next witness.

25        Before you do that, Mr. Schiller, let me just ask, if

1    we get through those two witnesses that you already mentioned,

2    are we done or do we still need to reconvene next week for

3    additional testimony?

4              MR. SCHILLER:  We only need to reconvene because

5    defense has a witness, they have a doctor.

6              THE COURT:  I forgot that.

7              MR. SCHILLER:  The government presumably will be done,

8    depending on what they testifies to next week.

9              THE COURT:  Okay.  Very well.  I just wanted to make

10   sure I scheduled enough time.

11             All right.  The government may call its next witness.

12             MR. SCHILLER:  Thank you, Judge.  The government calls

13   Special Agent Dan Alfin.

14             THE COURT:  Special Agent Alfin, please come forward.

15             DANIEL ALFIN, GOVERNMENT'S WITNESS, SWORN

16             THE COURTROOM DEPUTY:  Please state your full name,

17   spell your last name for the record.

18             THE WITNESS:  Daniel Alfin, A-L-F-I-N.

19             THE COURT:  You may proceed when you're ready.

20             MR. SCHILLER:  Thank you, Judge.

21                      DIRECT EXAMINATION

22   BY MR. SCHILLER:

23   Q.  Good afternoon, Special Agent Alfin.

24   A.  Good afternoon, sir.

25   Q.  Could you please introduce yourself to the Court, letting

Direct - Alfin                        130

1    us know who you work for and for how long?

2    A.  My name is Dan Alfin.  I'm a special agent with the Federal

3    Bureau of Investigation.  I'm currently assigned to the FBI

4    Miami Child Exploitation and Human Trafficking Task Force.

5    I've been assigned to that task force for a little over two

6    years now.  I've been an FBI agent for a little over ten years.

7            Prior to my current assignment, I spent three years at

8    the FBI's Criminal Investigative Division, Violent Crimes

9    Against Children Section, Major Case Coordination Unit located

10   in Maryland.  Prior to that, I spent about five years in

11   Albany, New York.

12   Q.  And during your ten years as an FBI agent, has the majority

13   of that been investigating crimes against children,

14   specifically related to the Internet?

15   A.  Yes, that's been my primary focus for the last five years

16   of my career.  My first five years of my career I did

17   investigate these matters, but I also spent a significant

18   amount of time investigating other matters, such as computer

19   intrusions, both of a criminal and national security nature.

20   Q.  And I wanted to actually get into that.  What is your

21   background prior to the FBI when it comes to computers and

22   networks and things like that?

23   A.  I have a bachelor's degree in information technology from

24   Florida State University.  I am I believe two or three classes

25   away from completing my master's degree in information

Direct - Alfin                    131

1    assurance and cyber security from the Florida Institute of

2    Technology.  Prior to working at the FBI, I was employed at the

3    Navel Undersea Warfare Center in Keyport, Washington.  I worked

4    there as a field engineer on computers and computer networks.

5    Q.  Okay.  So fair to say you have a good familiarity with

6    computers and computer networks?

7    A.  I do.

8    Q.  All right.  And are you familiar with what we're describing

9    in this hearing as "The Network"?

10   A.  I am.

11   Q.  Earlier we had testimony from Dr./Professor Brian Levine.

12   Are you familiar with him through your work of investigating

13   "The Network"?

14   A.  Yes.

15   Q.  Have you ever --

16        THE COURT:  I'm sorry, Mr. Schiller.  Before you

17   proceed, I just want the record to be clear that Dr. Levine is

18   still in the courtroom.

19        Ms. Kay, any objection to Dr. Levine remaining in the

20   courtroom during the testimony?

21        MS. KAY:  No objection.

22        THE COURT:  Okay.  Just wanted to make sure.

23        MR. SCHILLER:  Judge, we have no intention of him

24   testifying again.  He's just waiting for his flight.

25        THE COURT:  Very well.  Please proceed.

1           MR. SCHILLER:  Sure.

2  BY MR. SCHILLER:

3  Q.  Have you ever received training specifically from

4  Professor Levine?

5  A.  Uhm, I've known Dr. Levine for about four or five years

6  now.  He hasn't formally instructed any courses that I've been

7  to, but I have had numerous conversations with him related to

8  "The Network" and other unrelated matters.

9  Q.  Okay.  I want to get right into things.

10          MR. SCHILLER:  Judge, I would like to move into

11  evidence Government's Exhibit 5.  It is a redacted version of

12  the search warrant affidavit, application for search warrant,

13  and attachments?

14          THE COURT:  Any objection?

15          MS. KAY:  No, Your Honor.

16          THE COURT:  Exhibit 5 will be admitted without

17  objection.

18      (Received in evidence Government's Exhibit(s) 5.)

19  BY MR. SCHILLER:

20  Q.  Agent Alfin, did you --

21          MS. KAY:  I'm sorry.  Can I see the attachments for

22  one moment?

23          MR. SCHILLER:  Oh, sure.

24          MS. KAY:  No objection.  Thank you.

25          THE COURT:  Thank you.

Direct - Alfin                    133

1    BY MR. SCHILLER:

2    Q.  Special Agent Alfin, did you author the affidavit and

3    supporting documentation?

4    A.  Yes.

5    Q.  Okay.  You've had a chance to review that application, did

6    you not?

7    A.  Yes.

8    Q.  And when that search warrant application was signed, which

9    magistrate judge signed that application?

10   A.  Judge Reinhart did.

11   Q.  And since providing that search warrant to Judge Reinhart,

12   have you gone back to see whether or not you made any material

13   false or misleading information in the search warrant that you

14   knew to be such to the judge?

15   A.  I've reviewed the affidavit again.  It is true and

16   accurate.

17   Q.  All right.  Thank you very much.

18          And nothing false or misleading in there; is that

19   correct?

20   A.  That's correct.

21          MR. SCHILLER:  Judge, if I can approach the witness?

22          THE COURT:  You may.  And also, I should just make

23   clear for the record, I understand Exhibit 5 is the

24   documentation you've identified, but I think I made this clear

25   in the docket, that I also did review what is now Exhibit 2

1    before signing this affidavit -- before signing the warrant.

2          MR. SCHILLER:  Yes, Judge.  I was just going to get

3    there.

4          THE COURT:  Okay.

5          MR. SCHILLER:  In fact, I'll do that now just for

6    clarification purposes.

7    BY MR. SCHILLER:

8    Q.  Special Agent, are you aware that when you submitted the

9    affidavit for search warrant to Judge Reinhart, whether or not

10   the underlying paper written by Professor Levine was also

11   provided to Judge Reinhart?

12   A.  I'm aware that it was.

13   Q.  And is it your knowledge and belief that he did receive it

14   and would have reviewed it?

15   A.  Yes.

16          MR. SCHILLER:  Okay.  And, Judge, for the record, I

17   would like the Court to take judicial notice of its own filing

18   in Case Number 18-MJ-2819, whereas in Docket Entry 2 Your Honor

19   sua sponte included the paper written by Professor Levine at

20   Government's Exhibit 2 in this case as part of that search

21   warrant affidavit.

22          THE COURT:  Yes.  Any objection?

23          MS. KAY:  No, Your Honor.

24          THE COURT:  All right.  Again, I'll make clear in the

25   record as I tried to make clear in that sealed filing that I

Direct - Alfin                                135

1  did review what is now marked as Exhibit 2 in addition to the

2  affidavit submitted by Special Agent Alfin.

3          MR. SCHILLER:  Thank you, Judge.  And to that end, I

4  have the email that was part of that transmission of the

5  document, but I don't think we need to deal with that because

6  of the Court's finding just now.

7          THE COURT:  It's your record.  You can make it however

8  you want to make it.

9          MR. SCHILLER:  All right, Judge.

10          THE COURT:  I've taken judicial notice without

11  objection.

12          MR. SCHILLER:  Thank you, sir.

13  BY MR. SCHILLER:

14  Q.  Now, Special Agent Alfin, if we can go into the affidavit,

15  I just want to ask you about one particular point.  And if we

16  go down to Page 11, do you see it's entitled "Investigation of

17  IP Address" and then it lists a particular IP address?

18  A.  Yes, I see it.

19  Q.  Was that the IP address you were investigating in this

20  case?

21  A.  Yes.

22  Q.  And then a little bit farther down, I believe in the next

23  paragraph, beginning on Paragraph 26, so Paragraph 26, 27, and

24  28, you specifically list three files of interest; is that

25  correct?

Direct - Alfin                    136

1    A.  Yes.

2    Q.  How was it that you uncovered that these files of interest

3    were files that you were using to support your belief that a

4    person living or having access to that IP address was in fact

5    an original requestor of files?

6    A.  So I, in addition to other law enforcement officers,

7    operate nodes on "The Network," and I obtained that information

8    from another law enforcement node.

9    Q.  You heard earlier Professor Levine talk about the algorithm

10   that was used and the modified law enforcement version that's

11   been created and provided to law enforcement?

12   A.  Yes.

13   Q.  Is that what you used in this case?

14   A.  That algorithm gets applied to the data that I received,

15   yes.

16   Q.  But the modified law enforcement version of "The Network"

17   is what you were using?

18   A.  Yes.

19   Q.  Okay.  And you said the algorithm gets applied within that?

20   A.  Not directly within the software that operates on my

21   computer, but as the data gets observed and analyzed, yes.

22   Q.  Okay.  And the only data being observed and analyzed are

23   those individuals who seem to be requesting files that are

24   known to law enforcement to have previously been identified as

25   child pornography; is that correct?

Direct - Alfin                              137

1   A.  Yes, that's correct.

2   Q.  So when you discovered that a particular IP address is

3   believed to be an original requestor, are you crunching all of

4   the numbers and running the algorithm yourself?

5   A.  No, I'm not.

6   Q.  Can you explain to the Court how that happens on the law

7   enforcement end?

8   A.  That process has already occurred before I get a lead on a

9   particular IP address.  So the information that I receive from

10  another law enforcement node, that data has already been

11  analyzed, and what I'm presented with is a possible target.

12  And then I take that same information and I add it into a

13  spreadsheet that applies the formula again, just to verify the

14  results that I've already seen, to verify that the IP address

15  in question was almost certainly the node that was requesting a

16  particular file.

17  Q.  Thank you.

18          MR. SCHILLER:  Judge, if I can approach the witness?

19          THE COURT:  You may.

20  BY MR. SCHILLER:

21  Q.  I'm showing you Government's Exhibit 6.  Do you recognize

22  that document?

23  A.  I do.

24  Q.  What is that?

25  A.  This is the -- a printout of the spreadsheet that I

Direct - Alfin                                    138

1   referenced earlier where I took that information from another

2   law enforcement node that had already been analyzed and then

3   analyzed it within the spreadsheet again.

4   Q.   Now, when it came to this IP address, the search warrant

5   references three specific files that were being, for lack of a

6   better term, targeted by you law enforcement.  Would you agree?

7   A.   Three files that were known to law enforcement, yes.

8   Q.   Okay.  And were the subject of this investigation?

9   A.   Yes.

10  Q.   When it came to files being requested from the node with

11  that IP address that's in the search warrant, were these the

12  only three files?

13  A.   No, I believe there were six or seven different files that

14  this IP address was determined to likely be the original

15  requestor of.

16  Q.   And were all of those files run through the algorithm to

17  determine whether or not the requestor of those files was in

18  fact believed to be an original requestor?

19  A.   Yes.

20  Q.   And were they?

21  A.   Yes.

22  Q.   So in the search warrant you only mentioned three files,

23  correct?

24  A.   Yes.

25  Q.   Okay.  Are those the same three files that are on the data

1   sheet that I've shown you, Government's Exhibit 6?

2   A.   No, there is one file that is different.

3   Q.   Okay.  So let's take a look that so we can understand the

4   difference.  So I have up on the screen here --

5           THE COURT:  I'm sorry.  Are you offering in 6?

6           MR. SCHILLER:  Not yet, Judge.

7           THE COURT:  Okay.

8           MR. SCHILLER:  Not yet.

9   BY MR. SCHILLER:

10  Q.   I have up on the screen here Paragraphs 26, 27, and 28 of

11  the search warrant.  Do you see that on the screen?

12  A.   I do.

13  Q.   In Paragraph 26 it mentions a file by the name of

14  loving_family.mp4.  Do you see that?

15  A.   I do.

16  Q.   Is that file referenced on the datasheet?

17  A.   On Exhibit 6, no, it is not.

18  Q.   Okay.  And for that particular file, can you tell us why it

19  wasn't listed on the datasheet of the three?

20  A.   When I applied the calculation to the six or seven files

21  that the target IP address was requesting, I ran each of them

22  through the spreadsheet, and then when I saved the spreadsheet,

23  that wasn't one of the ones that -- it wasn't one of the last

24  three that I had run, so it was not saved in the spreadsheet

25  that I created.

1  Q.  But was that file one of the ones that was actually part of

2  the group that was requested by someone using that IP address?

3  A.  Yes.

4  Q.  And did you in fact confirm what that file was?

5  A.  Yes.

6  Q.  As you did with the other two files listed in Paragraphs 27

7  and 28?

8  A.  Yes.

9  Q.  And so you actually personally reviewed that file as well?

10  A.  Yes.

11  Q.  So it's in the search warrant, it was one of the requested

12  files, it just is not in the datasheet?

13  A.  That's correct.

14  Q.  Does the datasheet fairly and accurately represent the data

15  and the running of the algorithm on three files that were

16  actually within that group of six or seven that were requested?

17  A.  Based on my training and experience and my -- the course

18  that I went to with respect to "The Network," yes.

19  Q.  If we go back to the search warrant affidavit, at the

20  bottom of Page 11, Paragraph 27, there's a title -- there's a

21  document entitled Moscow-10-1, and then a parenthesis, the word

22  Moscow, end parenthesis .edi.  Do you see that?

23  A.  I do.

24  Q.  That's one of the files on the datasheet, correct?

25  A.  It is.  It's the first file on the datasheet.

1  Q.  And then Paragraph 28, the file listed in there which

2  begins with the name Grace, G-R-A-C-E, that file is also on the

3  datasheet, I believe it's the last one; is that right?

4  A.  Correct, it's the third file on the datasheet.

5  Q.  But the datasheet also has a third file referenced on here?

6  A.  Yes.  And for clarification, that's the second listed file

7  on the datasheet.

8  Q.  And that file is not included in the search warrant?

9  A.  Correct.

10  Q.  How would that information get onto this datasheet then?

11  A.  Again, it was one of those six or seven files that this IP

12  address was determined to be the original requestor of, and so

13  even though I ran the checks against multiple files, only three

14  of them are referenced in the search warrant affidavit and only

15  three are saved in this datasheet.

16  Q.  Okay.  And on Government's Exhibit 6 that you have in front

17  of you, you'll notice there's some black lines put on it; is

18  that right?

19  A.  Yes.

20  Q.  The black lines either redact the name of "The Network,"

21  correct --

22  A.  Yes.

23  Q.  -- or a part of the manifest key for that particular file?

24  A.  Yes.

25            MR. SCHILLER:  Judge, at this time I would like to

1    move the document in evidence as Government's Exhibit 6.

2              THE COURT:  Any objection to the admission of

3    Government's Exhibit 6?

4              MS. KAY:  No objection.

5              THE COURT:  All right.  Admitted without objection.

6         (Received in evidence Government's Exhibit(s) 6.)

7    BY MR. SCHILLER:

8    Q.   And Special Agent Alfin, just so we know exactly the main

9    point of Government's Exhibit 6, there are three separate

10   blocks on this document, correct?

11   A.   I'm sorry.  Could you clarify the question?

12   Q.   There are three blocks representing the three files of

13   interest on this particular document; is that correct?

14   A.   Yes.

15   Q.   Okay.  Let's just take a look at the first one, and I'm

16   going to zoom in on it.  Do you see at the bottom of the block

17   there it says "percent of even share of min blocks" and then

18   the word "pass"?

19   A.   Yes.

20   Q.   So what do we know from this document?

21   A.   So that's one of the very few important pieces of

22   information on this document that is saying that for the

23   information observed by the law enforcement node, the IP

24   address in question listed at the top of the spreadsheet passed

25   these statistical tests.  It was determined that it was likely

Direct - Alfin                                          143

1   to be the original requestor of the file listed there.

2   Q.  So it applied the algorithm and it passed the algorithm

3   provided from Professor Levine earlier this morning?

4   A.  Yes.

5   Q.  Okay.  Now -- and just as a point of clarification, we'll

6   note that -- I don't think I can write on there.  But do you

7   see on the exhibit in the middle there's a yellow highlighted

8   line running horizontally across the middle?

9   A.  Yes.

10  Q.  And at one -- it begins overall totals and then filtered,

11  700.  And then the next two blocks say the letters LE, a

12  number, and then a four digit number after that.

13  A.  Yes.

14  Q.  Can you tell us what's those two LE numbers represent?

15  A.  Those represent two different law enforcement nodes that

16  are operating "The Network's" software.

17  Q.  Okay.  And although both of them are up here, for your

18  calculation when it came to deciding whether the algorithm was

19  a pass-fail and for purposes here today as well, which law

20  enforcement node were you relying on; the 1791 or the 1911?

21  A.  So the algorithm relied on, in this case, the first listed

22  one, node 1791.

23  Q.  Okay.  And that's the one you went with?

24  A.  Correct.  The other information for node 1911 is also

25  listed here, but it doesn't factor into the pass or fail.

Direct - Alfin                    144

1    Q.  Okay.  And the other information we see on here is

2    information that is summarized for law enforcement in a

3    collection of the log data; is that right?

4    A.  Yes.

5    Q.  And that's to what Professor Levine spoke about earlier?

6    A.  Yes, this is based on his work.

7    Q.  Okay.  Thank you very much.

8           Now, the search warrant affidavit was signed on

9    May 15th, is that right, of 2018?

10   A.  That sounds accurate.

11   Q.  It was executed two days later on May 17, 2018?

12   A.  Yes.

13   Q.  Let's talk about the execution of the search warrant.

14   Approximately what time did law enforcement get to the house of

15   the Defendant Brian Sigouin?

16   A.  I believe it was sometime shortly after 6:00 a.m. on that

17   day.

18   Q.  It was still dark that morning?

19   A.  It was a little bit, yes.

20   Q.  All right.  And how did you make entry into the house to

21   effectuate the search warrant?

22   A.  So myself and the other agents, we approached the residence

23   and then we knocked on the front door to the residence,

24   announced ourselves as law enforcement, and called the

25   residents out of the house purporting to be investigating a

1   series of break-ins or robberies in the neighborhood.

2   Q.  And is that a normal course of action you take when

3   executing a search warrant, to use a little bit of a ruse to

4   have the residents come out peacefully?

5   A.  Yes, it's done for our safety and for the safety of the

6   individuals inside.  If we're knocking at the door saying, hey,

7   come on outside, we think someone might be trying to break in

8   or break into your vehicles, things of that nature, it kind of

9   puts people at ease.  If some people may be, you know, worried

10  about law enforcement coming for them one day, hopefully that's

11  not the thought that pops into their head.  So it's safer for

12  everyone.

13  Q.  And to that end, you said that you knocked on the

14  residence; is that right?

15  A.  Sorry.  I did not personally knock.  A member of the team

16  did.

17  Q.  Were you present at the door when the knock happened?

18  A.  I was, yes.

19  Q.  Did law enforcement have to use any more extreme measures

20  to access the residence, whether a battering ram or flash bangs

21  or anything like that?

22  A.  No, the residents responded to the door, they all came

23  outside peacefully.  There was no incident at the door.

24  Q.  Were any of the agents having to yell, raise their voices,

25  you know, order people to the ground when the residents came

1    out?

2    A.   No.

3    Q.   None of those things?

4    A.   No.

5    Q.   How many FBI agents were present that morning?

6    A.   FBI agents and task force officers, local police officers

7    who worked with us full-time, there were approximately a dozen

8    of us.  And then after the site was secured, there were also, I

9    believe, four or five, excuse me, unarmed FBI personnel who

10   participated in the search, and then I believe there were two

11   marked units from the local police department with somewhere

12   between three and four officers.  They stayed in their

13   vehicles, though, during the day.

14   Q.   So aside from the dozen or so agents you first described,

15   that next group of FBI employees would have been, what,

16   forensic examiners?

17   A.   Forensic examiners, support staff, people who work full

18   time for the FBI but are not law enforcement officers.

19   Q.   So they wouldn't have been at the house when the

20   knock-and-announce was happening?

21   A.   That's correct.

22   Q.   And where were the PBSO deputies when the

23   knock-and-announce was happening?

24   A.   In their vehicles.

25   Q.   Stationed right in front of the house?

Direct - Alfin                147

1   A.  Yes, in the driveway, around that area, in front of the

2   house.

3   Q.  Let's talk about the house itself.

4        MR. SCHILLER:  Judge, I would like to move into

5   evidence a photograph, Government's Exhibit 12.

6        THE COURT:  Any objection to Government's Exhibit 12?

7        MS. KAY:  No, Your Honor.

8        THE COURT:  Government 12 admitted without objection.

9      (Received in evidence Government's Exhibit(s) 12.)

10        MR. SCHILLER:  Thank you, Judge.

11  BY MR. SCHILLER:

12  Q.  Up on the screen we have Government's 12.  Can you see it?

13  A.  Yes.

14  Q.  What are we looking at here?

15  A.  So this is the detached driveway of the -- or, excuse me,

16  the detached garage of the residence is what is directly in

17  front of us.

18  Q.  Okay.  And so we see a two-car garage there?

19  A.  Yes.

20  Q.  Actually, it might be more than that, but there's two

21  garage doors?

22  A.  Yes, that's fair.

23  Q.  Okay.  And what's that building to the left?

24  A.  That is the residence.

25  Q.  Okay.  How about the cars in the driveway, do you know who

1  those are?

2  A.  Some of those appear to be law enforcement vehicles.  I

3  don't recall if they're all law enforcement vehicles or if one

4  of those might have been -- might belong to the residents.

5  Q.  And there's a van parked in a different direction than all

6  of the other cars.  Do you see that van?

7  A.  Yes, to the right side of the image.

8  Q.  Can you tell us what that van is?

9  A.  That -- at the time that was the government vehicle

10  assigned to Special Agent Drew Steinmetz.

11  Q.  Is that where the interviews would take place of the

12  Defendant Mr. Sigouin?

13  A.  Yes.

14  Q.  Which direction is the van facing?

15  A.  It's facing towards the residence.

16  Q.  And is it also facing towards the front door of the

17  residence?

18  A.  Yes.

19  Q.  When the knock-and-announce was effectuated at the

20  residence, who did come to the door?

21  A.  Uhm, three residents came to the door.  The defendant and

22  both of his parents.

23  Q.  Okay.  Do you see the defendant in the courtroom here

24  today?

25  A.  I do.  He is seated at the defense table wearing a red

1    sweatshirt or hoodie.

2    Q.   And do you happen to see his father in the courtroom?

3    A.   I do.  He's sitting in the back of the courtroom.

4    Q.   Okay.  The defendant, approximately 32 years old at the

5    time?

6    A.   Yes, I believe that's accurate.

7    Q.   Okay.  And when they came to the door, can you tell us what

8    happened?

9    A.   They came -- they all came out to the door.  At that point

10   we had told hem, hey, we think someone is either breaking into

11   your vehicles or into the house, we're law enforcement.  They

12   came outside.  None of them were handcuffed.  And then after

13   they were outside, they confirmed that there were no other

14   residents inside the house, and at that point law enforcement

15   officers entered the residence and cleared it.

16   Q.   Okay.  Who was the first one to have any direct

17   conversation with the Defendant Mr. Sigouin?

18   A.   At the door?

19   Q.   Yes.

20   A.   I, I don't recall who, who was the first one to speak with

21   him.  I believe Special Agent Steinmetz was the one who was up

22   at the front who had knocked and announced.  So I believe it

23   was him, but I don't specifically recall.

24   Q.   Did you have any conversation before any recorded interview

25   took place with the defendant outside of his residence?

Direct - Alfin                150

1    A.   Nothing of substance.  Only to introduce myself and ask him

2    if he would be willing to speak with myself and Special Agent

3    Steinmetz.

4    Q.   I assume the response was yes?

5    A.   Yes.

6    Q.   Did you or Special Agent Steinmetz have your firearms drawn

7    when you were speaking with the defendant?

8    A.   No.

9    Q.   Did you put him in handcuffs?

10   A.   No.

11   Q.   Did you threaten him in any mean or manner?

12   A.   No.

13   Q.   So the van is sitting there in the driveway.  Why go into

14   the van?

15   A.   For privacy.  It was raining a little bit outside.  When we

16   started the interview, I believe his parents were still

17   standing on the porch of the residence and, as we explained to

18   Mr. Sigouin, the questions that we were going to ask him were

19   personal in nature and thought it would be best for everyone if

20   we could have that conversation in private.

21   Q.   Okay.  And why not do the interview inside of the house?

22   A.   The house was not a -- even though law enforcement officers

23   had gone through the residence and secured it, there are a

24   number of unknowns inside of an individual's residence.  There

25   could be weapons hidden anywhere.  It's safer for everyone to

Direct - Alfin                          151

1    do these things in a more controlled environment.

2    Q.  And not germane to the charge in this case, but was it

3    later discovered that the defendant did have armed weapons

4    inside of the home?

5    A.  He did have actual weapons inside of the home, yes.

6    Q.  If fact, some that were not even known to his parents?

7    A.  That's what he told us, yes.

8    Q.  At any point in your encounter with the defendant outside

9    of his home or in the vehicle was he ever handcuffed?

10   A.  No.

11   Q.  Was he ever threatened by law enforcement in any way?

12   A.  No.

13   Q.  Did any law enforcement officers use any show of force or

14   authority over him at any point?

15   A.  No.

16   Q.  You had a long opportunity to speak with the defendant,

17   correct?

18   A.  Yes, we spoke at length.

19   Q.  Okay.  There were several recorded interviews and then a

20   non-recorded interview; is that right?

21   A.  Yes.

22   Q.  And prior to and during those interviews with the

23   defendant, was there anything based on your lengthy law

24   enforcement training and experience that suggested to you that

25   the defendant was not well?

1   A.  No.

2   Q.  That he needed any kind of medication of any kind?

3   A.  No.

4   Q.  Did he ever request to take any medication?

5   A.  No.  In fact, I offered during one of the recorded

6   interviews, and he advised that he did not need to take any

7   medication.

8   Q.  Okay.  Did you know he was on medication?

9   A.  No.  I always make that offer.

10  Q.  Every interview you do?

11  A.  To the best of my knowledge, yes, that is a standard offer

12  that I make during an interview.

13  Q.  Okay.  Have individuals in the past taken you up on that?

14  A.  I don't recall specifically for medications.  Some have

15  asked for water that I have provided or, you know, food from

16  the house, things of that nature.

17  Q.  The interviews began around 6:30 in the morning, correct?

18  A.  Yes.

19  Q.  How was the defendant's demeanor and appearance?

20  A.  I don't recall exactly what he was wearing, but he told us

21  when we began the conversation that he would be happy to speak

22  with us.  He said he was supportive of law enforcement and that

23  he would be happy to tell us anything that he could to help us.

24  Q.  How was his speech?  Slurred at all?

25  A.  No.

Direct - Alfin                    153

1    Q.  How was his gait when he walked?

2    A.  He seemed like a healthy adult male to me.

3    Q.  Anything about his appearance, his speech, his walk, any

4    interaction you had with him at all that suggested that he

5    might not be well enough to speak with you?

6    A.  No.

7    Q.  You mentioned that you offered him if there was any

8    medication he needed to take at the end of the first interview,

9    you would help him get it, right?

10   A.  Yes.

11   Q.  Did he ever bring up to you the fact that he was on any

12   kind of medication or had any injuries he was suffering from?

13   A.  At some point, I don't recall if it's recorded or if it was

14   during the third interview, I believe he mentioned that he had

15   surgery at some point in time, but he did not give me any

16   indication that that was causing him any immediate problems or

17   that he need any kind of assistance.

18   Q.  Okay.  Let's talk about the van where the interviews took

19   place in Government's Exhibit 12.  You said it's facing towards

20   the front of the house, correct?

21   A.  Yes.

22   Q.  What was the positioning of agents and Mr. Sigouin inside

23   of the vehicle?

24   A.  So Mr. Sigouin was seated in the passenger seat of the

25   vehicle, the front passenger seat.  I was sitting behind him.

1   And Special Agent Steinmetz was sitting in the driver's seat.

2   Q.   Now, this is a minivan, right?

3   A.   Yes.

4   Q.   Would you agree or disagree that the spacing inside of this

5   car for where you all were sitting is substantially roomy?

6   A.   It's a large vehicle that we have had at least eight people

7   in before.

8   Q.   Okay.  And there is seating for eight inside of the

9   minivan?

10  A.   There can be if you make it work.

11  Q.   Okay.  But this isn't a small compact car like a Honda

12  Civic or Toyota Corolla?

13  A.   No, this is a large, quite comfortable vehicle.

14  Q.   When you all entered the vehicle, do you remember how

15  everyone entered?

16  A.   I'm not sure what you're asking.

17  Q.   In other words, did you all enter from your own individual

18  doors --

19  A.   Yes.

20  Q.   -- where you were sitting?

21  A.   Yes.

22  Q.   And when you went into the vehicle, did the doors remain

23  unlocked?

24  A.   Yes.

25  Q.   During the course of the interviews -- we'll get into them,

1    but I want to just kind of know if this is true for all of the

2    interviews that took place of Mr. Sigouin.  Would you describe

3    the conversation between the agents, yourself, and others and

4    Mr. Sigouin as kind?

5    A.   Yes.

6    Q.   Calm?

7    A.   Yes.

8    Q.   Even tempered?

9    A.   Yes.

10   Q.   Was the defendant free to leave at any time?

11   A.   Yes.

12   Q.   In fact, was he arrested that day?

13   A.   No.

14   Q.   Was he ever put in handcuffs that day?

15   A.   No.

16   Q.   You mentioned it was slightly raining?

17   A.   At the beginning of the day.  It may have cleared up at

18   some point, but it was drizzling a little bit when we started.

19        MR. SCHILLER:  Okay.  Your Honor, at this time the

20   government would like to pause one second on that.

21   BY MR. SCHILLER:

22   Q.   We discussed that there were basically three separate

23   interviews that took place of Mr. Sigouin, correct?

24   A.   Yes.

25   Q.   The first one was audio-taped?

1    A.  Yes.

2    Q.  The second one was audio-taped?

3    A.  Yes.

4    Q.  For the third one you wrote an FBI 302 narrative; is that

5    correct?

6    A.  Yes.

7         MR. SCHILLER:  Judge, at this time I would like to

8    admit into evidence the recording of the first interview on CD

9    as Government's Exhibit 8, the recording of the second --

10   strike that.  The recording of the first interview as

11   Government's Exhibit 7, recording of the second interview as

12   Government's Exhibit 8, and the FBI 302 narrative as

13   Government's Exhibit 3 -- the third interview as Government's

14   Exhibit 9.

15        THE COURT:  Any objection to Government's 7, 8, or 9?

16        MS. KAY:  No, Your Honor.

17        THE COURT:  Without objection, all three will be

18   admitted into evidence.

19      (Received in evidence Government's Exhibit(s) 7, 8 and 9.)

20        MR. SCHILLER:  Thank you, Judge.

21        Obviously, because these are digital files, I'll take

22   care of the appropriate filing mechanism after the hearing.

23        THE COURT:  Okay.

24   BY MR. SCHILLER:

25   Q.  Special Agent Alfin, have you had the opportunity to review

1    both audio interviews as well as your 302 from the third

2    interview?

3    A.   Yes.

4    Q.   Do they fairly and accurately depict what happened during

5    the course of those interviews?

6    A.   Yes.

7    Q.   You said the only conversation before the first interview

8    was what happened outside the door where you asked Mr. Sigouin

9    if you could ask him a couple of questions and because they

10   would be personal in nature to do so away from the house?

11   A.   Yes.  And for clarification, I believe it was Special Agent

12   Steinmetz who proffered those questions.  I was there when he

13   did it.

14   Q.   At the beginning of the first interview did you all read

15   the defendant his Miranda rights?

16   A.   Yes.

17   Q.   Okay.  He wasn't in custody, was he?

18   A.   No.

19          MS. KAY:  Objection.  Calls for a legal conclusion.

20          MR. SCHILLER:  Withdrawn.  I'll rephrase.

21          THE COURT:  I'll sustain the objection.

22   BY MR. SCHILLER:

23   Q.   Was he under arrest?

24   A.   No.

25   Q.   Was he free to leave?

```
 1    A.  Yes.

 2    Q.  Why did you read him his Miranda rights?

 3    A.  We typically do in these cases.  It's just easier and

 4    cleaner.

 5    Q.  Okay.  And did the defendant sign a copy of his Miranda

 6    rights?

 7    A.  He did.

 8         MR. SCHILLER:  Judge, I would like to move into

 9    evidence Government's Exhibit 11, the signed Miranda form in

10    this case.

11         THE COURT:  Any objection to Government's 11?

12         MS. KAY:  No, Your Honor.

13         THE COURT:  Admitted without objection.

14      (Received in evidence Government's Exhibit(s) 11.)

15    BY MR. SCHILLER:

16    Q.  Special Agent Alfin, that Miranda rights card, which I'm

17    putting on the screen now, it's dated May 17 at 6:33 a.m.; is

18    that right?

19    A.  Yes.

20    Q.  And it lists all of the rights?

21    A.  It does.

22    Q.  And it is signed by Mr. Sigouin?

23    A.  It is.

24    Q.  It was signed in your presence?

25    A.  Yes.
```

1   Q.  And it's witnessed at the bottom.  Whose signatures are

2   those?

3   A.  The first witness line is Special Agent Drew Steinmetz.

4   The second witness line is myself.

5   Q.  And it's timed at 6:35 a.m.; is that right?

6   A.  Yes.

7   Q.  Okay.  These rights were not only given to the defendant to

8   sign but it was also read to him?

9   A.  Yes.

10  Q.  And that's on Government's Exhibit 7, the first audio

11  interview, correct?

12  A.  Yes, the first audio interview.

13  Q.  At the end of that first interview -- actually, let me

14  withdraw.

15          MR. SCHILLER:  Judge, I want just a clarification.  We

16  supplied these audio-taped interviews and the third interview

17  to the Court as exhibits to our response to defendant's motion.

18          THE COURT:  Correct.

19          MR. SCHILLER:  Has the Court previously listened to

20  them?

21          THE COURT:  No, but I will.  I mean, there's -- no, I

22  have not.  You can proceed however you want to proceed.  I

23  promise you before I rule I will listen to them, but I have not

24  listened to them yet.

25          MR. SCHILLER:  Okay.  I think for purposes of the

1    first interview we don't need to play it, but I think the Court

2    should listen to it.  But for brevity sake, I will play the

3    second one, and it's short.

4            THE COURT:  Again, it's your record.  Play whatever

5    you want to play.  Ms. Kay is free to play whatever she wants

6    to play.  That's why I don't listen to them before the hearing.

7    I'll give the parties their chance to put whatever spin they

8    want to put on the evidence before I listen to it.

9            MR. SCHILLER:  I think that it's important that we

10   play them at this point.

11           THE COURT:  That's fine.

12           MR. SCHILLER:  Thank you, sir.

13           THE COURT:  Whatever you want to do.

14           So which one are you publishing now, Mr. Schiller?

15   Government 7?

16           MR. SCHILLER:  Government's 7.

17           THE COURT:  Okay.  Very good.  How long?

18      (CD now being played in open court.)

19           MR. SCHILLER:  That's the completion of Government's

20   Exhibit 7.

21           THE COURT:  Okay.

22   BY MR. SCHILLER:

23   Q.  So, Special Agent Alfin, after the interview is done, does

24   the defendant ask you to leave the car?

25   A.  No.

Direct - Alfin                    161

1   Q.  Does he inquire further of going into the house or going

2   anywhere except the car?

3   A.  No.

4   Q.  And did you offer him to leave the car?

5   A.  Yes.

6   Q.  That interview ends at 6:52.  The next one we know begins

7   around 7:25 or so; is that right?

8   A.  Yes, that's accurate.

9   Q.  During that time period the defendant remained in the car,

10  in the minivan?

11  A.  Yes.

12  Q.  And Agent Steinmetz remained in the minivan?

13  A.  Yes.

14  Q.  Did you remain in the minivan the entire time?

15  A.  I believe I stepped out briefly.  I don't recall exactly

16  for how long.  Just for a couple minutes to go talk to other

17  people is my recollection.  But I was in there for most of that

18  time.

19  Q.  And if you did step out, Agent Steinmetz was in there the

20  entire time?

21  A.  Yes.

22  Q.  Between that end of the recording and the beginning of the

23  next recording, was there any conversation between either you,

24  Agent Steinmetz with the defendant?

25  A.  Shortly before the second recording began when the

Direct - Alfin                    162

1  defendant engaged us again, there was -- prior to that

2  Agent Steinmetz and myself had unrelated conversations.

3  Q.  What kind of things were you talking about that were

4  unrelated?

5  A.  Sports, weather, things of that nature.  Nothing related to

6  the defendant.

7  Q.  And again, if the defendant wanted to leave the car, he

8  could have?

9  A.  Yes.

10 Q.  The doors were unlocked?

11 A.  Correct.

12 Q.  There was no FBI or sheriff's deputy standing guard outside

13 of his door?

14 A.  No.

15 Q.  You mentioned that before the second recording begins,

16 Government's Exhibit 8, the defendant made a statement to you

17 to reinitiate the conversation?

18 A.  Yes.

19 Q.  What did he say?

20 A.  I don't recall his exact words, but he inquired about

21 whether or not some kind of deal could be made if he was to

22 provide additional information.  We turned the recorder back on

23 shortly thereafter and explained to him that we absolutely

24 cannot make him any kind of deal regardless of what he tells

25 us.

1    Q.  So other than the defendant's initial statement asking if

2    he could somehow make some deal with you guys, any conversation

3    after that is unrecorded?

4    A.  Yes.

5    Q.  All right.

6           MR. SCHILLER:  Judge, at this time we'll publish

7    Government's Exhibit 8.

8           THE COURT:  All right.  Thank you.

9        (CD now being played in open court.)

10          MR. SCHILLER:  That completes the publication of

11   Government Exhibit 8.

12   BY MR. SCHILLER:

13   Q.  Agent, before that second interview began, in the time that

14   you and Agent Steinmetz were sitting with the defendant in the

15   minivan, we saw in the photograph of Government's 12 that the

16   minivan was facing the house, correct?

17   A.  Yes.

18   Q.  What was going on in between these two interviews that was

19   in the direction of the front of the car if you were just

20   looking straight ahead?

21   A.  You would have seen other FBI personnel bringing computers,

22   things like that, in and out of the house --

23   Q.  Okay.

24   A.  -- evidence that was being seized.

25   Q.  Okay.  Is that really the only thing that was going on that

Direct - Alfin                           164

1    was new and different between the first and second interview

2    that wasn't going on before the first interview started?

3    A.  There may have also been people hanging out, you know,

4    standing around talking, things of that nature, but that's the

5    only thing of significance.

6    Q.  Okay.  After the second interview ended, did the defendant

7    ask to get out of the car?

8    A.  No.

9    Q.  Would you have let him out if he wanted to?

10   A.  Absolutely.

11   Q.  Were the doors locked?

12   A.  No.

13   Q.  Was there anybody standing guard at the door preventing him

14   from getting out?

15   A.  No.

16   Q.  At some point then Agent Steinmetz leaves the car?

17   A.  Yes.

18   Q.  And does someone replace him?

19   A.  Yes.

20   Q.  Who?

21   A.  Special Agent Matt Fowler.

22   Q.  Is he working in Miami still?

23   A.  No.

24   Q.  Where did he transfer to?

25   A.  He is a supervisory special agent assigned to the

1   Behavioral Analysis Unit.

2   Q.  In Washington, DC?

3   A.  I believe somewhere in Virginia.

4   Q.  Okay.  In the Washington metro area?

5   A.  Yes.

6   Q.  All right.  And how much time passed -- well, strike that.

7           While sitting in the car, it's -- you're still sitting

8   in the back behind the defendant, correct?

9   A.  Yes.

10  Q.  And he's in the front passenger seat?

11  A.  The defendant is, yes.

12  Q.  And now Agent Fowler has replaced Agent Steinmetz in the

13  driver's seat?

14  A.  Yes.

15  Q.  When Agent Fowler gets in, does he say anything to the

16  defendant?

17  A.  He introduces himself.  He doesn't say anything else of

18  significance.

19  Q.  At some point does the defendant say something to

20  Agent Fowler?

21  A.  Yes.

22  Q.  What does he say?

23  A.  He looks at Matt and says, you look like your father.

24  Q.  Okay.  Does Matt or Agent Fowler respond?

25  A.  He did.  He said, I actually am a father.

Direct - Alfin                          166

1   Q.  And what does the defendant say, if anything?

2   A.  Nothing of significance that I recall.  Eventually the

3   defendant started speaking with us again on his own accord.

4   Q.  Between the first and second interview, other than Agent

5   Fowler's response to the defendant's comment about him being a

6   father, was there any communication to the defendant?

7   A.  To clarify, you're talking about between the second and

8   third interview?

9   Q.  Yes.  I'm sorry.  Thank you.

10  A.  No.

11  Q.  All right.  Presumably you and Agent Steinmetz were having

12  your own conversation having nothing to do with the defendant

13  or the case?

14  A.  Myself and Agent Fowler.

15  Q.  I'm sorry.  Because now Agent Fowler is in the car?

16  A.  Yes, sir.

17  Q.  Okay.  How much time passed between the end of the second

18  interview and then when the defendant begins to talk to you all

19  again?

20  A.  Not long.  I would estimate approximately 10 to 15 minutes.

21  Q.  And the length of time that he spoke to you at this point,

22  how long did that go on?

23  A.  That conversation probably lasted for about ten minutes or

24  so.

25          MR. SCHILLER:  Judge, we've already moved into

1    evidence Government's Exhibit 9, which is the FBI report

2    summarizing that conversation.

3    BY MR. SCHILLER:

4    Q.   Agent Fowler (sic), you've reviewed this report?

5    A.   I have.

6    Q.   Did you help author this report?

7    A.   Yes.

8    Q.   And does it fairly and accurately describe the comments

9    that happened during that interview?

10   A.   It does.

11   Q.   Okay.  This is the only interview of the three that's not

12   recorded?

13   A.   That's correct.

14   Q.   Why is that?

15   A.   The defendant didn't ask us to turn the recorder back on.

16   That was one reason.  Another reason is I didn't have my own

17   recorder to turn it back on if I wanted to have one on.

18   Q.   Okay.  I mean, presumably maybe you or Agent Fowler had a

19   phone on you or something that you could have surreptitiously

20   recorded, right?

21   A.   Well, I wouldn't be able to use my phone.  That would be a

22   policy violation.  But it also would have been a policy

23   violation -- not a legal violation, but an FBI policy violation

24   to surreptitiously record the interview without prior approval.

25   I did not have that approval.

Direct - Alfin                    168

1    Q.  When he starts talking to you all, there's no time to go to

2    a supervisor to get approval and come back?

3    A.  That's correct.

4    Q.  Okay.  He starts talking, you start engaging back with him?

5    A.  Yes.

6    Q.  Okay.  I want to just bring up two parts of that interview.

7    In the second paragraph it says, Sigouin asked if he would

8    receive any benefit from cooperating with the FBI.  You advised

9    Sigouin that if he was eventually convicted of a crime and

10   sentenced to prison, he could potentially receive a reduced

11   sentence if he cooperated and accept responsibility for his

12   actions.  You emphasize that such a reduction was not a

13   guarantee and would be entirely up to the sentencing judge, and

14   the FBI was not and could not make any promises or cut any

15   deals with Sigouin.

16           Did you say those words to the defendant?

17   A.  Yes.

18   Q.  Okay.  And after that did he continue speaking to you?

19   A.  He did.

20   Q.  Did he question what you told him?

21   A.  No.

22   Q.  The next paragraph begins, that Sigouin stated that he had

23   been, quote, dicking you guys around, end quote, in reference

24   to the contents of the smaller safe in his room.

25   A.  Yes.

Direct - Alfin                      169

1   Q.  Was there some conversation about the safe?

2   A.  At some point in time -- I don't recall who asked the

3   question, either myself or Agent Steinmetz.  We had been

4   advised of the presence of a safe in the defendant's room.  In

5   fact, I believe we discussed it during the first interview.  We

6   couldn't find a key to it.  The defendant had advised us while

7   the recording was off that the key was I think on a key chain

8   somewhere or -- he provided the purported location for that

9   key.

10  Q.  Okay.

11  A.  We couldn't find it.  And then when he told us that he had

12  been dicking us around, he advised that there was no key.

13  There's actually a combination.

14  Q.  That was during the content of this interview?

15  A.  Yes.

16  Q.  And then at some point he says to you, this is the next

17  sentence, that he knew the combination for the safe but knew it

18  would be, quote, all over when the FBI opened the safe.  You

19  responded by asking him for the combination of the safe, and he

20  asked if the interviewing agents thought it would be in his

21  best interest to speak to a lawyer before providing the

22  combination of the safe.

23          Do you remember that?

24  A.  Yes.

25  Q.  And did you answer his question yes or no or did you try to

1   clarify his question?

2   A.   I made it very clear to him that if he wanted to talk to a

3   lawyer, he should talk to a lawyer.  Again, I -- we told him

4   several times throughout the day and at the beginning of this

5   third interview that we're not making any deals, we're not

6   cutting him any promises.

7   Q.   And the next paragraph goes on to say that Sigouin asked if

8   a lawyer would be able to prevent the FBI from executing the

9   search warrant at his residence.  And you -- it says here that

10  you advised him that that could not happen but he could speak

11  with a lawyer if he wanted to.

12  A.   Yes.

13  Q.   Okay.  At that point Sigouin provided the combination to

14  the safe?

15  A.   Correct.

16  Q.   All right.  Let's talk very briefly about the safe in his

17  room.  What kind of safe was it?

18  A.   It was a relatively small safe with a spin dial on it.

19  Q.   All right.  If you didn't have the combination to it and no

20  regular way to get into it the way anyone else would with a

21  combination or a key, would the FBI have been able to access

22  that safe?

23  A.   Yes.

24  Q.   How?

25  A.   Through a number of methods.  If we didn't have, you know,

1    some kind of master key, if it was a, you know, crappy

2    off-brand safe, we could just use standard breaching tools to

3    get into it; a ram and haligin would work well.

4    Q.  You put in a fulcrum, you crack it, and pop the door open?

5    A.  Basically.

6    Q.  Okay.  And have you had situations, not in this case but in

7    other cases, where that needed to be done?

8    A.  I've done it to doors.  I have not done it to a safe.

9    Q.  Okay.  Do you know that it's been done to a safe, though?

10   A.  Yes.

11   Q.  All right.  I'm going to show you Government's Exhibit 13

12   and 14.

13          MR. SCHILLER:  Judge, if I can move these into

14   evidence.

15          THE COURT:  Any objection to 13 or 14?

16          MS. KAY:  No objection.

17          THE COURT:  Without objection, 13 and 14 will admitted

18   into evidence.

19      (Received in evidence Government's Exhibit(s) 13 and 14.)

20   BY MR. SCHILLER:

21   Q.  Showing you Government's Exhibit 13.  Is that a photograph

22   of the safe?

23   A.  Yes, after it was opened.

24   Q.  Okay.  And that was opened with the pass code from the

25   defendant?

Direct - Alfin                    172

1    A.  Yes.

2    Q.  All right.  The search warrant you had allowed you to

3    search for all digital devices in the residence, correct?

4    A.  Yes.

5    Q.  Have you ever had a search warrant specify the things in

6    the house before you got there?

7           MS. KAY:  Objection.  Relevance.

8           THE COURT:  Sustained.  You asked the question, you

9    gotta live with it.  Sustained.

10   BY MR. SCHILLER:

11   Q.  This is the safe that was opened, though?

12   A.  Yes.

13   Q.  Okay.  And inside that safe was found a thumb drive and an

14   external hard drive that were later discovered to contain child

15   pornography; is that right?

16   A.  That's correct.

17   Q.  And then there's also some medicine bottles in there as

18   well?

19   A.  Yes.

20   Q.  Government's Exhibit 14, is this the defendant's bedroom?

21   A.  Yes.

22   Q.  And presumably his belongings?

23   A.  Presumably, yes.

24   Q.  Okay.  And some medicine bottles on the little end table

25   there?

Direct - Alfin                    173

1    A.  Yes.

2    Q.  Okay.  Prior to executing the search warrant on this house

3    or even getting it signed by Judge Reinhart, did you know that

4    there was a business in the residence?

5    A.  I don't believe I did.

6    Q.  Did you know whether or not the Wi-Fi was secured or not

7    secured?

8    A.  I didn't.

9    Q.  You didn't know?

10   A.  I didn't know.

11   Q.  Okay.  So those two points you were not aware of before you

12   executed the search warrant?

13   A.  Correct.

14   Q.  All right.

15        MR. SCHILLER:  Judge, I have nothing further at this

16   time.  Thank you.

17        THE COURT:  All right.  Ms. Kay, it's 2:25.  And as I

18   said, I have to stop in five minutes.  So I don't know if you

19   want to start this morning or you just want to reserve all of

20   your cross until next week.

21        MS. KAY:  If it's all right with the Court, I would

22   just assume start it all on Monday.

23        THE COURT:  I think that makes sense.

24        Okay.  So you'll cross-examine Special Agent Alfin.

25        Does the government -- and Special Agent Steinmetz

1    still has to testify.

2          Any other witnesses other than those two?

3          MR. SCHILLER:  I don't believe so, Judge.  If the

4    defense produces any kind of report from the doctor, that may.

5    But at this point, no.

6          THE COURT:  Okay.  In terms of your case in chief, no.

7          MR. SCHILLER:  Yes.

8          THE COURT:  And Ms. Kay, other than the doctor, do you

9    anticipate calling any other witnesses of your own?

10         MS. KAY:  Not at this time, no.

11         THE COURT:  Okay.  Great.  So if I set aside, which I

12   have already, four hours next Monday, do we think that should

13   be enough time to get through everything we need to get

14   through?

15         MR. SCHILLER:  I don't know how long direct and cross

16   of their witness is going to take, but presumably it's not more

17   than a half hour.  Then I think even with argument we should be

18   good.

19         MS. KAY:  I agree.

20         THE COURT:  Okay.  I don't know if you all saw, Judge

21   Rosenberg entered an order denying your motion to continue.  So

22   I need to get this order out.

23         So we'll be in recess until next Monday.  We'll start

24   at 9:00 a.m.

25         I know -- well, let me ask Ms. Kay and Mr. Kulik.  I

1  know you're coming up from Miami.  Is 9:00 a.m. okay?

2        MS. KAY:  Yes.

3        MR. KULIK:  Yes.

4        THE COURT:  Okay.  Great.  So we will be in recess

5  until next Monday, 9:00 a.m.  We'll continue the hearing at

6  that time and conclude at that time.

7        Agent Alfin, you are in the middle of your examination

8  so, obviously, you can talk to Mr. Schiller about other aspects

9  of the case, but you shouldn't discuss your testimony with him.

10        Do you understand?

11        THE WITNESS:  I understand, Your Honor.

12        THE COURT:  All right.  Thank you very much.  We'll in

13  recess, and we'll see everybody next week.

14      (Proceedings concluded at 2:26 p.m.)

15

16                  C E R T I F I C A T E

17    I, Karl Shires, Registered Merit Reporter and Federal

18  Certified Realtime Reporter, certify that the foregoing is a

19  correct transcript from the record of proceedings in the

20  above-entitled matter.

21      Dated this 15th day of December, 2019.

22

23  _____
    Karl Shires, RMR FCRR

24

25

**BY MR. SCHILLER:**
**[36]** 6/3 7/11 9/25 10/7 11/1 13/12 13/19 14/3 16/5 16/21 21/22 32/24 42/16 61/10 73/3 75/12 124/19 129/21 132/1 132/18 132/25 134/6 135/12 137/19 139/8 142/6 147/10 155/20 156/23 157/21 158/14 160/21 163/11 167/2 171/19 172/9

**BY MS. KAY: [5]** 82/7 93/6 96/21 117/23 122/9

**MR. KULIK: [2]** 9/17 175/2

**MR. SCHILLER: [81]** 3/14 3/25 5/7 5/10 6/1 9/7 9/11 9/18 9/20 9/24 10/19 10/22 13/17 13/22 16/2 16/10 16/20 21/16 32/10 32/21 42/7 42/14 80/13 80/19 107/25 124/13 124/15 124/17 126/6 126/9 126/16 126/20 127/2 127/4 127/11 127/14 127/20 127/24 128/4 128/16 129/3 129/6 129/11 129/19 131/22 131/25 132/9 132/22 133/20 134/1 134/4 134/15 135/2 135/8 135/11 137/17 139/5 139/7 141/24 147/3 147/9 155/18 156/6 156/19 157/19 158/7 159/14 159/18 159/24 160/8 160/11 160/15 160/18 163/5 163/9 166/24 171/12 173/14 174/2 174/6 174/14 174/18 175/1

**MS. KAY: [34]** 3/19 4/15 4/23 5/1 9/16 10/3 13/10 13/25 16/16 21/18 32/15 42/11 82/5 124/7 124/9 127/7 127/13 127/19 131/20 132/14 132/20 132/23 134/22 142/3 147/6 156/15 157/18 158/11 171/15 172/6 173/20 174/9 174/18 175/1

**THE COURT REPORTER: [1]** 115/6
**THE COURT: [145]** 3/1 3/6 3/17 3/22 4/14 4/16 4/25 5/2 5/8 5/12 5/16 5/18 5/25 7/6 9/10 9/13 9/19 9/23 10/4 10/21 13/11

13/24 14/1 16/1 16/14 16/17 21/19 32/13 32/17 32/22 42/10 42/12 59/25 60/4 60/6 60/10 60/13 60/17 60/23 61/6 61/9 72/23 73/2 74/25 75/4 75/6 75/8 75/11 80/15 80/17 80/21 81/3 81/15 81/19 81/21 81/23 82/1 82/3 92/24 93/5 96/17 96/20 108/2 115/21 116/6 116/8 116/15 116/18 117/18 117/21 119/12 119/23 120/1 120/4 120/15 120/23 121/4 121/14 121/19 122/5 122/7 124/8 124/12 124/14 124/16 126/8 126/10 126/12 126/14 126/18 127/3 127/5 127/21 128/1 128/7 128/17 128/21 129/5 129/8 129/13 129/18 131/15 131/21 131/24 132/13 132/15 132/24 133/21 134/3 134/21 134/23 135/6 135/9 137/18 139/4 139/6 142/1 142/4 147/5 147/7 156/14 156/16 156/22 157/20 158/10 158/12 159/17 159/20 160/3 160/10 160/12 160/16 160/20 163/7 171/14 171/16 172/7 173/16 173/22 174/5 174/7 174/10 174/19 175/3 175/11

**THE COURTROOM DEPUTY: [2]** 5/14 129/15

**THE DEFENDANT: [1]** 3/5

**THE WITNESS: [52]** 5/15 5/17 5/24 7/10 16/3 32/14 60/3 60/5 60/9 60/12 60/16 60/22 61/3 61/8 72/25 75/2 75/5 75/7 75/9 80/16 81/12 81/17 81/20 81/22 81/25 82/2 93/4 96/19 108/4 115/7 116/2 116/7 116/11 116/17 116/20 117/19 117/22 119/22 119/25 120/3 120/11 120/16 121/3 121/10 121/17 122/1 122/6 124/11 126/11 126/23 129/17 175/10

**'**
**'90s [2]** 11/19 11/20
**'The [1]** 101/2

\03/25

**-v [1]** 1/6

**.2 [1]** 116/19
**.edi [1]** 140/22

**1**
**1 o'clock [2]** 128/11 128/12
**1 percent [1]** 72/10 72/22 115/20 117/18
**1,000 [1]** 41/1
**1.2 [1]** 117/4
**1.96 [3]** 115/13 115/14 115/15
**1/2 [1]** 116/1
**10 [4]** 66/22 67/24 98/10 166/20
**10,000-foot [2]** 17/1 55/6
**100 [8]** 66/1 66/19 67/6 67/20 67/23 69/3 115/25 116/5
**105 [4]** 41/22 66/19 67/7 67/23
**10:40 [1]** 80/24
**10:43 [1]** 81/2
**10:55 [2]** 80/24 81/1
**11 [6]** 2/13 135/16 140/20 158/9 158/11 158/14
**12 [8]** 2/12 147/5 147/6 147/8 147/9 147/12 153/19 163/15
**127.0.0.1 [1]** 23/7
**12:05 [1]** 126/16
**12:08 [1]** 128/20
**13 [6]** 2/13 171/11 171/15 171/17 171/19 171/21
**14 [8]** 2/13 103/5 103/18 111/12 171/15 171/17 171/19 172/20
**15 [11]** 48/19 50/11 66/22 67/24 97/22 98/10 103/5 103/18 124/25 125/4 166/20
**1516 [1]** 115/11
**15s [1]** 104/1
**15th [2]** 144/9 175/21
**16 [7]** 48/19 50/11 51/18 79/21 103/4 103/18 113/13
**16s [4]** 64/1 64/15 79/18 104/1
**17 [19]** 48/19 50/6 50/7 50/17 51/8 51/11 51/14 51/21 55/2 59/23 71/8 77/24 78/4 78/7 79/16 103/2 110/1 144/11 158/17
**1791 [2]** 143/20 143/22
**17s [6]** 50/15 50/19 50/21 79/3 79/12

\03/25

**18 [28]** 48/17 49/9 49/11 49/21 49/22 49/25 50/1 50/7 51/9 51/14 51/21 55/2 59/23 64/25 71/8 77/24 78/4 78/7 78/18 78/18 78/21 79/9 79/12 79/16 100/8 103/2 110/1 125/15
**18-MJ-2819 [1]** 134/18
**18s [8]** 49/16 50/14 50/19 50/20 64/3 64/14 79/3 103/25
**19-80136 [1]** 3/4
**19-CR-80136-ROSEN BERG/REINHART [1]** 1/2
**1911 [2]** 143/20 143/24
**1994 [1]** 11/13
**1999 [2]** 6/23 11/9

**2**
**2.3 [9]** 75/4 81/16 116/17 116/22 116/25 117/3 117/6 117/8 117/12
**2.3 percent [6]** 72/9 72/20 74/7 75/6 81/10 81/14
**2.5 [2]** 81/10 116/19
**2.5 percent [1]** 75/5
**2.7 [1]** 116/17
**20 [7]** 6/24 6/25 78/6 97/22 98/10 124/25 125/5
**20,000 [2]** 74/3 75/2
**2001 [2]** 19/2 19/10
**2005 [1]** 7/2
**2014 [2]** 8/3 20/18
**2015 [1]** 20/18
**2016 [2]** 26/25 100/8
**2017 [5]** 15/14 20/19 26/25 62/3 62/3
**2018 [4]** 26/25 27/7 144/9 144/11
**2019 [2]** 1/8 175/21
**203G [1]** 1/24
**26 [4]** 135/23 135/23 139/10 139/13
**27 [4]** 135/23 139/10 140/6 140/20
**28 [4]** 135/24 139/10 140/7 141/1
**2819 [1]** 134/18
**299 [1]** 1/24
**2:25 [1]** 173/17
**2:26 [1]** 175/14
**2:30 [3]** 3/11 126/25 128/13

**3**
**30 [7]** 37/7 38/3 96/24 97/14 97/18 98/9 125/17

\03/25

**302 [3]** 156/4 156/12 157/1
**32 [2]** 31/1 149/4
**33301 [1]** 1/25
**33315 [1]** 1/21
**33401 [1]** 1/19
**35 percent [1]** 53/18
**38 [1]** 78/21
**39 [1]** 78/21
**3rd [1]** 1/21

**4**
**40 [5]** 78/6 78/15 78/21 78/21 79/2
**400 [1]** 1/18
**45 [1]** 127/5

**5**
**5,000 [1]** 73/25
**500 [3]** 1/18 1/21 121/9
**516 [11]** 71/20 71/25 72/1 114/25 115/1 115/11 115/13 117/16 117/25 126/2 126/4
**5496 [1]** 1/24
**55 [1]** 128/11

**6**
**6:00 a.m [1]** 144/16
**6:30 [1]** 152/17
**6:33 a.m [1]** 158/17
**6:35 a.m [1]** 159/5
**6:52 [1]** 161/6

**7**
**70 [1]** 125/18
**700 [1]** 143/11
**769-5496 [1]** 1/24
**7:25 [1]** 161/7

**8**
**80136 [1]** 3/4

**9**
**95 [13]** 41/22 66/19 67/6 67/23 81/17 114/23 115/7 115/21 115/25 116/5 116/16 116/19 117/7
**95 percent [13]** 73/1 75/7 81/10 81/11 114/17 115/3 115/6 115/16 115/22 116/4 116/5 116/13 117/17
**95 times [1]** 116/10
**954 [1]** 1/24
**97 percent [1]** 72/15
**99 percent [1]** 72/16
**99.9 [1]** 124/24
**99.9 percent [1]** 97/21
**995 [1]** 41/22
**9:00 [1]** 175/1
**9:00 a.m [2]** 174/24 175/5
**9:05 [1]** 1/9

Case 9:19-cr-80136-RLR   Document 43   Entered on FLSD Docket 12/15/2019   Page 177 of 195

**A**

**a.m [8]** 1/9 81/2 144/16 158/17 159/5 174/24 175/1 175/5
**Abigail [2]** 45/24 46/2
**abigail.rar [1]** 45/10
**ability [3]** 26/10 26/20 69/10
**able [25]** 18/16 23/23 29/23 29/24 34/6 40/11 41/8 48/22 51/15 52/23 53/25 61/17 62/4 74/9 74/9 89/8 89/8 90/13 103/8 104/11 109/3 109/6 167/21 170/8 170/21
**above-entitled [1]** 175/20
**absolutely [4]** 9/24 69/3 162/23 164/10
**academics [1]** 76/2
**accept [1]** 168/11
**acceptable [2]** 114/10 114/12
**accepted [3]** 15/7 16/18 56/5
**access [27]** 9/9 17/13 19/12 19/21 20/4 20/22 21/6 21/9 34/6 34/6 38/10 54/12 57/21 57/24 85/7 85/16 88/3 88/11 88/13 88/19 105/3 108/6 108/6 108/7 136/4 145/20 170/21
**accessibility [1]** 59/10
**accessing [2]** 88/18 90/18
**accidently [2]** 32/9 32/17
**accord [1]** 166/3
**account [3]** 78/7 112/14 112/24
**accurate [5]** 125/24 133/16 144/10 149/6 161/8
**accurately [4]** 102/21 140/14 157/4 167/8
**accuse [1]** 68/21
**acquire [2]** 19/21 99/13
**acquiring [2]** 38/14 98/12
**action [1]** 145/2
**actions [1]** 168/12
**activities [3]** 7/18 8/13 55/15
**activity [5]** 23/24 28/10 109/2 109/9 109/11
**acts [1]** 57/11
**actual [4]** 28/10 32/20 121/14 151/5
**add [7]** 50/13 60/24 94/23 116/13 118/10 126/1 137/12

**adding [1]** 23/25
**addition [5]** 22/5 98/21 122/19 135/1 136/6
**additional [3]** 39/10 129/3 162/22
**additionally [2]** 35/21 69/25
**address [40]** 28/11 31/23 46/19 47/19 56/16 58/14 60/15 77/12 77/13 107/11 107/13 107/13 107/17 107/18 107/21 107/25 108/9 108/12 108/13 108/17 108/20 108/23 108/25 109/8 109/20 128/5 135/17 135/17 135/19 136/4 137/2 137/9 137/14 138/4 138/11 138/14 139/21 140/2 141/12 142/24
**addressed [3]** 47/5 47/19 128/6
**addresses [1]** 37/9
**adjust [2]** 103/12 103/20
**adjusting [1]** 103/10
**admission [1]** 142/2
**admit [1]** 156/8
**admitted [12]** 10/5 10/22 14/2 21/20 42/13 86/11 132/16 142/5 147/8 156/18 158/13 171/17
**adult [1]** 153/2
**advantages [3]** 17/24 18/3 18/7
**adversarial [1]** 8/14
**advice [1]** 83/16
**advise [2]** 9/4 9/6
**advised [6]** 152/6 168/8 169/4 169/6 169/12 170/10
**affect [1]** 75/21
**affidavit [21]** 82/11 82/16 83/4 83/8 83/9 83/15 84/9 90/5 90/7 94/3 132/12 133/2 133/15 134/1 134/9 134/21 135/2 135/14 140/19 141/14 144/8
**afternoon [4]** 3/11 128/22 129/23 129/24
**agent [56]** 126/18 126/21 126/23 127/2 127/7 128/2 128/6 128/9 128/14 128/14 129/13 129/14 129/23 130/2 130/6 130/12 132/20 133/2 134/8 135/2 135/14 142/8 148/10 149/21 150/2 150/6 154/1 156/25 157/11 158/16 159/3 160/23 161/12 161/19

**161/24** 162/2 163/13 163/14 164/16 164/21 164/25 165/12 165/12 165/15 165/20 165/24 166/4 166/11 166/14 166/15 167/4 167/18 169/3 173/24 173/25 175/7
**Agent Fowler [1]** 165/20
**Agent Steinmetz [1]** 162/2
**agents [10]** 3/17 4/9 144/22 145/24 146/5 146/6 146/14 153/22 155/3 169/20
**ago [5]** 54/15 83/21 83/22 90/2 119/16
**agree [14]** 4/14 69/1 88/21 88/25 90/23 91/13 98/16 98/24 102/9 102/10 102/13 138/6 154/4 174/19
**Agreed [2]** 63/5 63/6
**agreement [2]** 32/18 ah [1] 71/15
**ah-ha [1]** 71/15
**ahead [8]** 4/20 26/7 33/2 49/5 110/7 111/25 121/19 163/20
**akin [1]** 40/8
**Albany [2]** 11/13 130/11
**Alexa [2]** 45/24 46/2
**Alfin [21]** 3/17 126/18 127/7 128/6 128/14 129/13 129/14 129/15 129/18 129/23 130/2 132/20 133/2 135/2 135/14 142/8 156/25 158/16 160/23 173/24 175/7
**Alfin's [3]** 126/23 127/2 128/9
**algorithm [58]** 55/9 59/21 61/12 61/22 61/23 62/8 62/15 62/21 62/25 63/4 63/8 63/14 63/15 63/20 67/4 68/2 68/6 68/10 68/23 69/6 69/11 71/21 72/14 73/7 74/8 75/15 75/21 75/23 76/21 76/23 76/24 77/5 77/8 77/20 78/8 78/24 79/10 79/22 80/9 97/6 113/22 113/24 119/17 120/25 121/10 121/15 121/21 125/6 136/9 136/14 136/19 137/4 138/16 140/15 143/2 143/2 143/18 143/21
**algorithms [2]** 51/24 69/18
**Ali [2]** 45/24 46/2

**aligned [1]** 72/17
**alleged [1]** 5/4
**alleging [1]** 4/25
**allow [1]** 5/9
**allowed [3]** 11/22 11/23 172/2
**allowing [4]** 11/18 11/19 12/2 83/3
**allows [3]** 13/1 56/13 70/13
**alter [1]** 78/3
**altogether [1]** 34/1
**amateur [1]** 20/8
**AMERICA [2]** 1/4 3/5
**Amherst [1]** 6/12
**Amhurst [1]** 11/6
**amount [5]** 36/6 38/4 40/22 48/11 52/19 52/19 77/19 89/19 130/18
**analogy [1]** 39/19
**analogy I've [1]** 39/19
**analysis [2]** 116/23 165/1
**analyze [1]** 69/19
**analyzed [5]** 136/21 136/22 137/11 138/2 138/3
**and network [1]** 16/19
**announce [3]** 146/20 146/23 148/19
**announced [2]** 144/24 149/22
**annoying [1]** 57/5
**anonymity [2]** 90/17 90/23
**anonymize [1]** 51/17
**anonymizing [1]** 48/12
**anonymous [1]** 26/11
**answer [13]** 30/16 30/20 34/23 35/6 63/12 64/11 94/1 94/15 108/3 108/3 112/9 116/6 169/25
**anticipate [1]** 174/9
**anybody [1]** 164/13
**anymore [2]** 12/4 12/5
**anyway [2]** 44/12 78/13
**apologize [6]** 16/3 81/8 115/9 117/21 125/1 125/3
**appealing [1]** 105/21
**appear [9]** 17/11 21/7 33/16 44/24 64/22 70/20 119/7 126/2 148/2
**appearance [2]** 152/19 153/3
**appearances [2]** 1/16 3/13
**appears [5]** 16/10 22/2 70/5 71/23 77/22
**application [5]** 88/10 132/12 133/5 133/8

**133/9**
**applications [3]** 8/13 12/24 13/1
**applied [6]** 11/11 117/2 136/14 136/19 139/20 143/2
**applies [1]** 137/13
**apply [2]** 76/14 104/1
**applying [1]** 84/10
**appreciate [3]** 7/8 24/14 63/12
**approach [5]** 9/19 9/22 114/6 133/21 137/18
**approached [1]** 144/22
**appropriate [3]** 31/14 31/25 156/22
**appropriately [1]** 77/8
**approval [3]** 167/24 167/25 168/2
**approximately [6]** 62/14 81/9 144/14 146/7 149/4 166/20
**architectures [1]** 18/1
**area [6]** 39/22 39/23 39/24 69/1 147/1 165/4
**areas [1]** 75/14
**argument [1]** 174/17
**armed [1]** 151/3
**arrest [1]** 157/23
**arrested [1]** 155/12
**arrive [1]** 107/20
**article [4]** 13/16 13/21 14/5 86/11
**articles [3]** 12/16 13/2 13/15
**ASHLEY [2]** 1/20 3/20
**aside [5]** 30/5 48/12 79/10 146/14 174/11
**asked [8]** 116/9 152/15 157/8 168/7 169/2 169/20 170/7 172/8
**asking [17]** 17/21 23/10 27/18 30/3 41/17 47/6 55/21 69/12 83/7 87/10 99/20 107/7 110/10 113/21 154/16 163/1 169/19
**aspects [1]** 175/8
**assemble [1]** 95/1 122/13 122/22
**assigned [9]** 29/3 29/4 63/21 107/14 108/20 130/3 130/5 148/10 164/25
**assignment [1]** 130/7
**assigns [1]** 73/20
**assist [4]** 54/11 56/8 82/14 101/18
**assistance [4]** 55/11 55/12 55/13 153/17
**assistant [2]** 1/18

**A**

assistant... [1] 6/22
associate [1] 7/3
associated [2] 46/23
46/25 52/13 59/12
59/15 64/18 108/19
109/2 111/19
assume [6] 4/21 44/13
78/13 127/22 150/4
173/22
assumes [1] 76/23
assuming [1] 64/6
assumption [1] 117/2
assumptions [1]
117/1
assurance [1] 131/1
at one [1] 143/10
attach [1] 19/13
attached [7] 28/17
28/19 28/22 41/16
47/1 58/6 108/18
attacher [1] 23/23
attaches [1] 77/7
attachments [2]
132/13 132/21
attempt [2] 86/9 100/4
attempts [1] 65/21
Attorney [1] 1/18
attorneys [1] 76/7
attribute [3] 54/25
55/4 59/22
audio [6] 155/25
156/2 157/1 159/10
159/12 159/16
audio-taped [3]
155/25 156/2 159/16
Australian [1] 1/18
author [2] 133/2 167/6
authored [2] 86/14
86/22
authority [2] 62/20
151/14
automatically [1] 25/2
av [1] 45/2
available [40] 3/10
19/16 20/3 20/5 20/6
20/11 22/18 24/23
34/9 43/17 44/9 46/19
55/18 55/24 56/13
56/16 56/17 57/8
58/11 62/1 85/15
89/10 90/21 91/17
91/18 91/18 94/19
95/14 95/15 95/20
95/20 96/7 100/11
100/14 100/16 100/17
103/14 104/9 118/8
118/13
avalanche [2] 104/15
104/21
Avenue [2] 1/18 1/21
average [10] 31/6 37/5
37/6 41/19 41/20
41/23 65/7 65/12
96/24 97/19
aware [13] 17/2 18/25

19/4 19/8 20/16 85/20
86/22 90/8 100/9
114/7 134/8 134/12
173/11
awhile [1] 63/23

**B**

bachelor's [1] 130/23
back [41] 15/14 18/13
19/2 23/24 29/17
31/12 31/21 32/3 33/3
36/1 39/4 40/24 41/9
42/1 50/25 57/25
63/19 68/1 73/5 80/25
98/8 107/6 112/1
112/6 112/13 112/13
120/2 120/6 121/3
133/12 140/19 149/3
162/22 165/8 167/15
167/17 168/2 168/4
backdrop [1] 69/9
background [4] 43/16
100/12 105/25 130/21
backwards [1] 126/24
bag [5] 67/11 67/12
67/16 67/25 68/3
Baltimore [1] 87/1
bandwidth [4] 11/20
35/17 36/13 37/18
bangs [1] 145/20
bar [1] 5/19
based [20] 8/18 16/11
17/14 18/14 52/16
53/1 53/22 67/13
67/22 68/23 74/8
75/15 82/20 106/20
119/10 122/9 124/24
140/17 144/6 151/23
basically [4] 55/23
81/18 155/22 171/5
basis [1] 68/1
battering [1] 145/20
Beach [2] 1/8 1/19
bedroom [1] 172/20
began [6] 20/17 20/18
152/17 152/21 161/25
163/13
beginning [5] 135/23
155/17 157/14 161/22
170/4
begins [6] 141/2
143/10 161/6 162/15
166/18 168/22
behalf [2] 3/16 37/24
Behavioral [1] 165/1
belief [2] 134/13 136/3
believe [46] 10/3 13/9
13/18 15/20 19/2
21/17 27/8 43/1 43/8
53/18 62/3 62/3 68/17
68/18 74/11 74/14
83/6 86/16 86/19
86/24 89/25 96/10
96/23 100/7 103/7
117/4 117/25 124/23

136/24 138/22 138/13
141/3 144/16 146/9
146/10 149/6 149/21
149/22 150/16 153/14
157/11 161/15 165/3
169/5 173/5 174/3
believed [2] 137/3
138/18
believes [1] 79/14
belong [1] 148/4
belongings [1] 172/22
bench [1] 126/25
benefit [1] 168/8
best [8] 39/19 40/12
63/10 123/24 127/7
150/19 152/11 169/21
better [2] 118/18
138/6
beyond [1] 117/15
binomial [1] 122/5
bit [22] 14/19 14/20
25/14 25/22 26/3 26/7
35/14 35/15 37/24
38/3 39/17 40/3 43/22
45/20 67/5 72/2 85/1
135/22 144/19 145/3
150/15 155/18
Bittorrent [1] 23/22
black [2] 141/17
141/20
blind [4] 14/23 71/12
71/13 71/14
block [34] 31/17 33/7
40/19 40/20 40/23
46/21 46/22 47/6
47/20 48/18 49/22
51/15 52/7 52/8 52/12
53/14 58/17 60/20
91/16 91/22 91/24
91/25 94/1 99/20
99/21 100/5 103/1
112/10 112/11 112/19
120/8 120/10 121/16
142/16
blocks [66] 31/1 31/2
31/5 31/7 31/15 33/5
33/5 33/9 34/14 34/18
34/21 35/3 39/3 39/8
39/13 39/15 39/17
40/4 40/7 40/10 41/1
41/5 41/16 41/18
46/25 48/11 59/5
59/12 64/17 65/11
65/14 65/23 66/6
90/25 91/2 91/21
91/23 92/3 93/10
93/11 93/14 94/24
94/25 95/9 98/19
98/20 98/22 103/23
110/11 110/11 111/19
112/8 112/12 112/18
119/19 119/25 120/22
120/10 121/6 121/7
121/9 121/12 142/10
142/12 142/17 143/11
blog [1] 43/21

136/24 35/22 138/13
141/3 144/16 146/9
146/10 149/6 149/21
board [6] 92/18 96/8
100/20 100/24 100/25
101/1
boards [14] 33/15
33/16 33/20 33/21
34/12 52/25 53/1 53/7
53/8 89/12 101/9
101/25 102/5 102/10
bottles [2] 172/17
172/24
bottom [9] 22/14
22/15 43/23 44/15
45/25 46/1 140/20
142/16 159/1
Boulevard [1] 1/24
bound [5] 54/4 81/25
82/1
brand [1] 171/2
breaching [1] 171/2
bread [2] 62/11
break [9] 67/4 80/18
80/24 124/19 127/1
128/11 145/1 145/7
145/8
break-ins [1] 145/1
breaking [1] 149/10
brevity [1] 160/2
BRIAN [10] 1/7 3/5
3/21 5/12 5/14 5/16
6/8 49/10 131/11
144/15
briefly [3] 126/22
161/15 170/16
bring [4] 125/2 127/16
153/11 168/6
bringing [1] 163/21
broad [5] 18/1 31/9
123/17 123/18 124/4
broader [2] 87/23
124/6
broadly [2] 12/6 33/4
broken [1] 34/14
Broward [1] 1/24
browse [1] 33/23
browser [10] 21/7
21/8 21/10 21/12 23/6
31/24 32/1 38/24 44/5
44/21
browsing [4] 43/14
BRUCE [1] 1/13
build [1] 123/22
building [1] 147/23
bunch [1] 37/14
Bureau [2] 3/17 130/3
business [2] 107/15
173/4
busy [1] 37/13
butter [1] 62/11
buy [1] 123/21

**C**

cable [2] 11/21 108/17
cache [10] 36/3 36/3
51/5 51/9 51/15 51/18
51/19 75/18 75/19
75/20

cached [2] 36/6 51/3
calculation [2] 139/20
143/18
California [1] 11/8
call [17] 3/1 15/12
22/10 27/23 31/23
54/4 59/13 72/3 81/3
91/24 95/7 95/24
112/21 119/4 128/21
128/24 129/11
called [33] 7/5 11/17
12/3 12/6 12/8 12/13
12/19 14/11 14/16
15/6 18/12 20/5 20/6
20/25 27/20 31/1
31/12 31/13 40/2 40/6
43/11 48/2 48/20 51/5
73/10 73/21 73/23
83/13 93/18 108/7
115/5 125/12 144/24
calling [5] 5/6 87/18
99/8 111/20 174/9
calls [4] 5/12 37/2
129/12 157/19
Calm [1] 155/6
campus [2] 7/19 7/19
car [13] 147/18 154/5
154/11 160/24 161/2
161/4 161/9 162/7
163/19 164/7 164/16
165/7 166/15
card [1] 158/16
care [5] 25/5 26/6
43/13 105/20 156/22
career [2] 130/16
130/16
careful [2] 25/14
122/5
carefully [4] 15/13
62/23 69/20 69/25
cars [2] 147/25 148/6
case [53] 1/2 3/4 4/18
14/10 14/22 15/4 15/5
16/9 20/11 22/25
30/11 34/22 37/8
38/12 55/14 66/11
69/4 72/13 82/12
82/17 82/22 82/24
83/10 84/18 87/8 90/6
97/21 98/12 103/11
112/22 115/2 115/10
115/13 116/3 116/21
116/23 117/2 117/5
117/8 117/13 119/13
130/9 134/18 134/20
135/20 136/13 143/21
151/2 158/10 166/13
171/6 174/6 175/9
cases [7] 10/12 16/7
17/16 76/7 84/11
158/3 171/7
catch [1] 3/12
caused [1] 98/22
causing [1] 153/16
caveat [2] 30/22 58/2
CD [3] 156/8 160/18

**C**

CD... [1] 163/9
cell [1] 109/4
censored [1] 44/25
Center [1] 131/3
centralized [1] 17/17
certain [13] 21/3
34/18 60/12 64/21
70/10 73/12 77/19
104/11 108/14 117/1
121/21 121/22 128/6
certainly [9] 27/7 43/8
69/4 70/25 95/17
98/10 114/8 123/18
137/15
Certified [1] 175/18
certify [1] 175/18
cetera [2] 90/1 122/1
chain [1] 169/7
chance [8] 52/10
72/15 72/16 115/1
124/24 127/1 133/5
160/7
change [4] 69/22
78/10 79/4 116/4
changed [1] 79/23
charge [2] 18/15
151/2
check [4] 17/16 17/17
120/25 121/10
checked [1] 100/14
checking [1] 119/13
checks [1] 141/13
chief [1] 174/6
child [21] 52/3 52/18
53/1 53/14 53/21
53/21 54/3 54/12
54/13 54/18 59/6
59/11 59/15 64/18
66/7 68/18 70/25
71/16 130/4 136/25
172/14
children [3] 53/9
130/9 130/13
CHK [1] 45/2
choice [1] 50/15
choose [3] 23/14
23/20 26/2
chose [3] 29/2 50/14
61/18
chosen [2] 24/21
115/16
churn [2] 18/12 18/13
circumstantial [1]
121/22
Civic [1] 154/12
clarification [8] 24/16
30/4 87/17 134/6
141/6 143/5 157/11
159/15
clarified [2] 110/6
111/24
clarify [7] 30/3 82/17
83/12 86/16 142/11
166/7 170/1
clarifying [2] 72/23

112/2
clarity [2] 39/11 94/23
class [6] 8/23 8/23
67/11 67/13 67/19
67/21
classes [9] 7/22 8/8
8/9 8/10 8/15 8/18
8/22 106/21 130/24
classroom [1] 9/2
cleaner [1] 158/4
clear [10] 41/15 57/13
99/6 120/5 131/17
133/23 133/24 134/24
134/25 170/2
cleared [2] 149/15
155/17
clearer [1] 38/5
clearly [2] 5/23 105/11
clicked [1] 22/9
client [1] 17/12
close [4] 41/23 98/9
118/15 119/21
closer [7] 40/3 54/24
117/4 117/10 121/24
125/17 125/18
clues [2] 92/8 101/24
co-counsel [2] 3/21
4/20
coauthored [2] 86/19
86/22
coauthors [5] 55/10
62/24 86/13 86/14
101/22
coauthors' [1] 14/24
cocreators' [1] 55/13
code [19] 20/1 20/3
20/7 20/9 20/9 20/10
20/11 22/5 22/19
39/22 39/23 39/25
55/17 55/20 78/10
78/16 78/17 103/15
171/24
codes [1] 19/24
coin [5] 49/15 49/17
49/24 51/1 103/25
collate [1] 63/25
colleagues [1] 7/19
collected [1] 74/9
collecting [1] 61/20
collection [4] 33/19
33/20 45/12 144/3
collectively [1] 111/20
college [6] 6/12 8/5
56/3
color [1] 67/13
colors [1] 67/16
combination [7]
169/13 169/17 169/19
169/22 170/13 170/19
170/21
come [28] 5/13 18/13
36/16 39/19 50/25
54/16 66/24 67/11
67/15 67/21 71/22
76/12 80/25 106/22
107/24 112/13 112/13

115/23 149/9 151/19
122/23 123/1 128/12
129/14 145/4 145/7
148/20 168/2
comes [9] 36/1 49/15
49/17 52/8 108/10
111/16 115/14 115/20
130/21
comfort [1] 80/18
comfortable [1]
154/13
coming [6] 53/19 84/9
109/11 120/10 145/10
175/1
commands [1] 100/1
comment [1] 166/5
comments [1] 167/8
committee [3] 14/12
15/2 15/8
common [2] 17/7
46/15
communicate [1]
11/24
communication [7]
11/18 12/3 12/8 12/22
102/15 107/16 166/6
communications [3]
11/21 25/8 91/10
communities [1]
14/10
community [1] 19/6
compact [1] 154/11
companies [1] 11/25
company [1] 17/21
compare [1] 92/6
compared [1] 29/18
comparison [2] 25/24
26/2
complete [6] 10/15
10/16 63/11 85/22
87/7 106/12
completed [1] 57/23
completely [5] 19/23
92/23 113/24 113/25
114/1
completes [1] 163/10
completing [1] 130/25
completion [1] 160/19
complex [1] 18/9
complicated [7] 12/12
33/17 34/23 41/12
48/3 65/6 72/2
comports [1] 115/24
composing [1] 83/14
comprises [1] 99/21
computations [1]
74/2
computer [76] 4/23
6/13 6/16 8/5 8/15
11/7 11/10 11/12
20/22 20/24 21/6
21/14 23/8 23/10 24/3
25/13 25/15 25/16
25/20 25/22 26/8
26/11 26/15 28/18
28/21 30/7 31/11

34/20 35/18 36/14
37/13 38/18 38/25
39/7 40/15 40/16
41/10 45/4 46/19 47/5
47/6 55/23 55/25 56/3
56/5 60/8 61/18 70/12
74/21 88/4 88/12
88/14 93/15 93/18
97/11 97/15 97/23
97/24 98/1 98/2 99/23
104/5 105/14 105/18
106/4 107/10 108/11
108/19 109/4 110/20
110/21 120/18 130/18
131/4 131/6 136/21
computer's [1] 105/13
computers [13] 17/5
17/11 18/4 21/1 27/21
29/21 34/15 34/16
104/7 130/21 131/4
131/6 163/21
computing [2] 8/16
18/14
concedes [1] 4/22
concepts [1] 119/14
concerned [1] 77/24
conclude [2] 50/7
175/6
concluded [2] 72/8
175/14
conclusion [4] 122/23
123/1 123/3 157/19
conclusions [1]
121/23
conduct [1] 8/13
conduit [2] 29/22 94/5
confer [2] 101/21
124/8
conference [1] 19/1
confidence [22] 72/4
72/24 73/1 74/11 75/7
81/10 81/12 81/17
81/18 114/17 114/23
115/3 115/6 115/8
115/16 115/21 115/23
116/14 116/14 116/20
117/17 117/17
configuration [3] 21/4
24/22 56/20
configured [3] 37/3
97/14 98/6
confirm [1] 118/13
123/3 140/4
confirmed [1] 149/13
confusing [1] 104/22
confusingly [1] 21/10
confusion [1] 103/2
connect [13] 17/12
23/12 23/12 24/25
25/1 29/1 29/2 29/5
37/4 71/5 97/14 97/16
109/6
connected [23] 9/13
27/20 27/23 37/7
37/11 37/14 37/15
38/3 47/8 49/23 66/20

37/17 78/19 78/20
78/22 79/8 80/13
90/22 93/18 98/3
109/5 124/25 125/7
connecting [5] 17/16
24/1 36/22 46/14
52/15
connection [12] 17/6
19/13 19/17 37/19
49/13 50/24 51/3 88/4
88/13 88/15 107/14
121/10
connections [1] 37/16
connects [2] 96/24
121/17
conservative [1] 54/6
consider [3] 15/11
87/22 88/8
considers [2] 76/24
120/13
consist [1] 102/6
construct [1] 70/12
constructed [1] 70/1
contain [4] 92/7 93/2
93/25 172/14
contained [1] 121/6
containing [1] 45/16
contains [1] 10/11
contemplate [1] 125/7
content [54] 17/22
21/11 27/18 27/24
28/1 28/3 29/15 29/20
30/17 30/18 30/23
30/25 31/21 32/2 33/4
34/24 35/19 35/20
35/22 35/24 36/1
37/21 38/1 40/13
43/13 44/1 44/23 45/5
45/6 46/5 52/9 52/11
52/24 52/25 53/21
85/20 85/22 86/6 86/7
88/24 89/11 89/14
89/16 89/19 89/23
91/16 92/8 93/3
101/24 102/1 102/11
102/18 102/20 169/14
contents [3] 31/14
89/9 168/24
context [4] 30/2 68/14
104/2 114/10
continue [6] 18/5 33/2
42/2 168/18 174/21
175/5
continued [1] 19/10
continuous [1]
128/10
contraband [2] 62/21
62/22
contrast [2] 17/9
17/19
contribute [3] 35/16
35/18 54/21
contributed [1]
106/23
contributes [2] 35/15
46/11

## C

contributing [1] 35/14
control [3] 48/11 48/14 69/21
controlled [1] 151/1
convenience [2] 44/22 46/6
conversation [13] 149/17 149/24 150/20 152/21 155/3 157/7 161/23 162/17 163/2 166/12 166/23 167/2 169/1
conversations [2] 132/7 162/2
convicted [1] 168/9
cooperated [1] 168/11
cooperating [1] 168/8
coordinate [2] 7/18 7/22
Coordination [1] 130/9
copies [1] 98/22
copy [3] 22/5 85/22 158/5
Corolla [1] 154/12
correct [178]
correctly [7] 28/19 46/20 57/18 83/1 91/14 108/8 109/9
correspond [1] 24/19
Cost [1] 17/25
Cost-wise [1] 17/25
counsel [8] 3/13 3/21 4/6 4/13 4/20 13/9 32/16 32/19
count [8] 77/2 78/24 79/13 109/17 112/24 119/1 119/10 120/13
counter [2] 48/21 49/1
country [2] 23/19 25/6
counts [1] 113/4
couple [3] 9/10 157/9 161/16
course [14] 29/25 34/25 65/22 71/18 80/16 96/7 106/20 107/8 109/17 124/9 140/17 145/2 154/25 157/5
courses [1] 132/6
court [28] 1/1 1/24 3/1 5/22 9/9 13/9 15/17 16/13 32/11 32/19 32/20 61/24 81/3 82/25 114/6 114/12 129/25 134/17 137/6 159/17 159/19 160/1 160/18 163/9 163/24
Court's [4] 32/12 122/9 126/17 135/6
courtroom [7] 23/5 28/16 131/18 131/20 148/23 149/2 149/3
coworkers [1] 61/16

CP [1] 93/3
CPU [1] 105/24
CR [1] 1/2
crack [1] 171/4
crappy [1] 171/1
create [1] 69/6
created [6] 33/10 55/9 55/20 56/8 136/11 139/25
crime [1] 168/9
crimes [2] 130/8 130/13
criminal [3] 76/7 130/8 130/19
criticism [2] 75/24 76/8
criticisms [1] 15/9
cross [9] 2/4 80/25 82/7 124/21 127/7 127/9 173/20 173/24 174/15
cross-examination [5] 2/4 80/25 82/7 124/21 127/7
cross-examine [1] 173/24
crosscheck [1] 120/9
crowd [1] 105/23
crunching [1] 137/3
crux [2] 38/12 98/12
Cruz [1] 11/8
cryptographic [1] 120/21
cryptographically [1] 52/10
culmination [1] 20/19
cumbersome [1] 22/3
current [1] 130/7
currently [7] 6/11 17/10 20/6 37/10 37/12 100/17 130/3
custody [1] 157/17
custom [1] 23/14
cut [4] 31/4 36/6 44/20 168/14
cutting [1] 170/6
CV [3] 10/9 10/25 16/10
cyber [3] 6/13 7/16 131/1

## D

Dan [3] 3/17 129/13 130/2
DANIEL [2] 129/15 129/18
dark [7] 24/19 24/22 88/7 88/8 88/9 88/9 144/18
data [10] 59/1 74/8 77/6 136/14 136/21 136/22 137/10 138/25 140/14 144/3
database [1] 59/9
datasheet [12] 139/16 139/19 140/12 140/14

146/24 140/25 141/3 141/4 141/5 141/7 141/10 141/15
datastore [2] 35/11 36/2
date [4] 10/15 10/16 71/21 83/19
dated [2] 158/17 175/21
day [11] 7/14 76/20 80/7 144/17 145/10 146/13 155/12 155/14 155/17 170/4 175/21
days [3] 7/22 17/7 144/11
DC [1] 165/2
de [1] 51/17
de-anonymize [1] 51/17
deal [6] 18/16 81/14 135/5 162/21 162/24 163/2
dealing [1] 85/14
deals [2] 168/15 170/5
debug [2] 57/1 57/6
debugged [1] 57/12
debugging [9] 57/10 104/13 104/17 104/18 104/23 105/3 105/16 105/17 106/4
December [2] 1/8 175/21
decide [4] 49/16 49/18 63/23 65/2
decided [2] 15/3 50/4
deciding [2] 106/15 143/18
decision [1] 64/24
decreasing [1] 49/1
decrement [2] 49/16 49/18 49/20 50/4 50/15 104/1 119/10
decremented [1] 50/3
decrementing [1] 50/9
decrements [2] 49/4 112/23
decrypt [2] 45/5 45/6
dedicated [1] 53/9
default [1] 21/3
defendant [42] 1/8 1/20 3/22 144/15 148/12 148/21 148/23 149/4 149/17 149/25 150/7 151/3 151/8 151/16 151/23 151/25 155/10 157/15 158/5 159/7 160/24 161/9 161/24 162/1 162/6 162/7 162/16 163/14 164/6 165/8 165/11 165/16 165/19 166/1 166/3 166/6 166/12 166/18 167/15 168/16 169/6 171/25
defendant's [6]

132/19 159/17 163/1 166/5 169/4 172/20
defense [14] 3/19 4/6 4/11 4/13 4/19 13/9 16/16 75/16 76/4 76/7 78/2 129/5 148/25 174/4
define [1] 114/9
definitely [7] 50/12 50/18 50/18 50/19 50/20 62/3 79/18
definition [1] 68/15
degree [6] 11/9 11/11 67/3 74/14 130/23 130/25
delivered [1] 78/17
demeanor [1] 152/19
deny [1] 123/3
denying [1] 174/21
department [4] 55/9 84/4 84/6 146/11
department's [1] 55/12
depend [1] 76/21
dependent [1] 113/19
depending [5] 8/23 36/2 37/3 107/22 129/8
depends [1] 113/17
depict [1] 154/4
deployed [1] 12/21
deputies [1] 146/22
deputy [1] 162/12
describe [2] 27/10 102/1 102/11 155/2 167/8
described [9] 42/5 61/22 68/6 79/10 94/2 102/21 108/5 115/18 146/14
describes [1] 92/14
describing [3] 42/21 102/17 131/8
description [5] 24/24 43/19 43/24 102/7 102/20
descriptive [1] 92/20
descriptor [1] 93/2
design [2] 19/5 119/3
designations [1] 16/5
designed [11] 18/11 50/10 90/25 91/1 91/2 103/4 103/9 103/18 103/21 104/7 104/8
designing [1] 54/20
destination [1] 114/5
destined [1] 107/18
detach [1] 28/21
detached [2] 147/15 147/16
detail [6] 31/8 56/23 61/15 63/8 63/14 124/4
details [13] 24/12 24/15 31/10 39/10 41/13 41/14 47/10

73/90 117/20 117/22 123/23 124/7 124/7
deter [1] 54/11
determination [1] 67/8
determine [6] 107/11 108/11 108/12 108/14 113/10 138/17
determined [4] 59/15 138/14 141/12 142/25
determining [1] 76/12
develop [2] 54/25 55/7
developer [1] 105/21
developers [6] 20/8 27/4 43/21 51/16 56/24 57/1
deviation [1] 114/20
device [4] 107/22 108/15 108/24 109/1
devices [1] 172/3
dial [1] 170/18
dice [1] 74/2
dicing [2] 168/23 169/12
didn't [20] 25/21 32/8 47/23 50/19 50/20 56/19 57/9 82/23 84/14 95/20 104/14 125/2 125/22 167/15 167/16 170/19 170/25 173/8 173/9 173/10
die [1] 47/25
difference [4] 25/9 26/14 104/10 139/4
different [22] 15/17 16/9 17/24 43/16 50/16 52/11 56/20 56/22 56/23 69/21 73/15 85/1 89/9 94/21 94/23 110/3 112/20 138/13 139/2 143/15 148/5 164/1
differentiate [1] 103/25
differently [1] 56/10
difficult [4] 25/7 69/17 69/23 104/16
diffidently [1] 57/12
digit [1] 143/12
digital [2] 156/21 172/3
digits [1] 40/1
direct [11] 2/3 2/5 6/3 102/15 108/2 127/3 127/8 128/1 129/21 149/16 174/15
directed [2] 35/25 43/7
direction [3] 148/5 148/14 163/19
directly [15] 11/24 27/22 27/25 30/13 40/13 43/2 66/20 67/24 82/23 83/9 94/1 106/17 107/1 136/20

**D**

**directly...** [1] 147/16
**director** [4] 6/13 7/16 7/24 8/1
**disagree** [1] 154/4
**discovered** [4] 51/16 137/2 151/3 172/14
**discretion** [1] 126/18
**discuss** [3] 69/14 124/1 175/9
**discussed** [10] 22/21 22/22 27/19 63/16 64/15 75/18 99/11 123/9 155/22 169/5
**discussing** [2] 16/25 124/5
**discussion** [1] 100/19
**dispersed** [5] 31/3 33/6 33/8 35/20 41/8
**display** [1] 41/10
**displayed** [1] 46/20
**dissertation** [2] 11/14 11/16
**distinction** [3] 90/23 94/19 113/6
**distinguish** [6] 7/5 29/18 83/2 89/18 91/5 94/24
**distracting** [1] 104/22
**distractions** [2] 105/9 105/10
**distribute** [2] 67/12 67/18
**distributed** [4] 8/10 8/11 93/11 98/20
**distributes** [1] 67/20
**distribution** [3] 97/19 115/14 122/5
**district** [9] 1/1 1/1 15/18 15/20 15/22 15/23 15/25 16/2 83/24
**districts** [1] 15/17
**divided** [3] 30/25 41/15 98/19
**divides** [2] 33/5 79/17
**Division** [1] 130/8
**docket** [2] 133/25 134/18
**doctor** [8] 60/1 69/2 72/24 75/1 92/25 129/5 174/4 174/8
**doctorate** [1] 6/15
**doctorial** [1] 8/20
**document** [12] 82/24 82/25 83/4 86/19 135/5 137/22 140/21 142/1 142/10 142/13 142/20 142/22
**documentation** [2] 133/3 133/24
**documents** [1] 13/7
**does the** [1] 97/5
**doing** [15] 12/25 14/14 29/13 30/21 40/15 58/5 62/19

68/21 80/8 90/2 99/22 103/14 105/13 117/4 125/14
**door** [15] 144/23 145/6 145/17 145/22 145/23 148/16 148/20 148/21 149/7 149/9 149/18 157/8 162/13 164/13 171/4
**doors** [6] 147/21 154/18 154/22 162/10 164/11 171/8
**double** [3] 14/23 71/12 71/13
**double-blind** [2] 14/23 71/12
**download** [29] 19/18 20/9 20/12 21/13 22/5 22/9 22/11 22/13 23/1 30/10 30/12 33/22 34/1 34/25 38/2 38/6 42/7 52/5 52/23 56/11 62/21 89/2 95/1 95/5 95/18 111/14 118/11 118/13 121/13
**downloaded** [3] 46/5 52/8 53/10
**downloading** [7] 30/10 30/13 35/10 71/16 98/24 98/25 112/16
**downloads** [1] 27/10
**dozen** [2] 146/7 146/14
**Dr** [11] 5/12 5/17 5/21 7/7 10/2 81/7 115/22 119/13 126/9 131/17 131/19
**Dr.** [9] 5/13 6/18 80/23 81/5 82/9 82/11 126/11 131/11 132/5
**Dr. Levine** [6] 5/13 6/18 82/9 82/11 126/11 132/5
**Dr. Levine's** [2] 80/23 81/5
**Dr./Professor** [1] 131/11
**drawn** [1] 150/6
**Drew** [2] 148/10 159/3
**drive** [3] 12/23 172/13 172/14
**driven** [2] 116/25 117/1
**driver's** [2] 154/1 165/13
**driveway** [4] 147/1 147/15 147/25 150/13
**drizzling** [1] 155/18
**due** [1] 108/21
**dumb** [1] 79/1
**duplicate** [3] 118/22 118/24 119/1
**duplicates** [4] 119/2 119/3 119/6 119/11

**E**

**earlier** [12] 19/24 75/18 76/11 80/1 96/18 103/23 124/21 131/11 136/9 138/1 143/3 144/5
**early** [1] 27/7
**earnest** [1] 20/17
**ease** [1] 145/9
**easier** [5] 105/5 105/10 105/14 106/6 158/3
**easily** [2] 18/16 19/16
**East** [1] 1/24
**eastern** [3] 15/20 15/22 16/4
**easy** [5] 42/23 42/25 73/8 120/20 120/22
**education** [1] 11/3
**effect** [2] 69/10 124/23
**effectuate** [2] 55/8 144/21
**effectuated** [1] 148/19
**effectuation** [1] 26/21
**efforts** [2] 7/22 20/19
**eight** [3] 125/21 154/6 154/8
**either** [8] 107/22 107/23 108/24 109/5 141/20 149/10 161/23 169/3
**Either's** [1] 6/19
**elected** [1] 27/5
**else's** [1] 6/2
**email** [6] 17/16 17/18 33/14 52/21 96/2 135/4
**emailed** [2] 34/11 42/5
**emphasize** [1] 168/12
**employed** [1] 131/2
**employees** [1] 146/15
**enable** [1] 55/4
**enables** [1] 39/6
**encounter** [1] 151/8
**encrypt** [1] 26/4
**encrypted** [10] 25/20 25/24 33/7 33/7 34/21 35/7 91/20 91/20 91/21 91/22
**encrypting** [1] 91/11
**encryption** [1] 91/15
**ended** [1] 164/6
**endpoint** [1] 107/16
**endpoints** [1] 11/24
**ends** [1] 161/6
**enforcement** [115] 52/17 53/6 53/15 53/23 53/25 54/11 54/16 54/19 55/8 55/13 56/8 56/25 57/8 57/14 57/21 58/6 58/9 58/10 58/25 59/4 59/9 59/14 59/14 59/21 60/8 61/2 61/14 61/17 62/18 63/17 64/7

64/12 65/16 65/17 65/18 66/4 66/14 66/21 68/2 68/8 68/17 71/5 71/10 71/15 72/13 75/25 76/14 77/13 77/16 79/14 79/23 82/14 83/14 83/23 84/10 86/1 93/15 101/10 101/15 101/19 101/21 104/5 104/7 104/11 104/24 105/3 106/11 106/24 107/8 107/10 108/10 108/14 108/22 109/14 110/18 110/23 112/22 113/6 113/23 113/23 118/11 120/7 120/19 120/19 121/16 122/17 136/6 136/8 136/10 136/11 136/16 136/24 137/7 137/10 138/2 138/6 138/7 142/23 143/15 143/20 144/2 144/14 144/24 145/10 145/19 146/18 148/2 148/3 149/11 149/14 150/22 151/11 151/13 151/24 152/22
**enforcement's** [2] 75/21 77/5
**engaged** [1] 162/1
**engaging** [1] 168/4
**engine** [1] 88/18
**engineer** [1] 131/4
**engineering** [4] 6/16 11/7 11/10 14/16
**English** [2] 92/15 100/1
**enter** [2] 30/18 154/17
**entered** [5] 109/3 149/15 154/14 154/15 174/21
**entire** [2] 161/14 161/20
**entirely** [1] 168/13
**entitled** [4] 44/3 135/16 140/21 175/20
**entity** [2] 18/15
**entries** [1] 43/21
**entry** [2] 134/18 144/20
**enumerate** [1] 89/13
**environment** [1] 151/1
**equivalent** [1] 50/8
**error** [6] 56/14 81/11 114/17 116/10 116/11 116/13
**especially** [1] 92/5
**ESQ** [2] 1/20 1/20
**essentially** [9] 17/3 19/11 31/2 50/8 52/11 78/22 120/21 121/1 121/20
**established** [2] 20/10 97/25

**estimate** [3] 66/3 66/5 166/20
**et** [2] 90/1 122/1
**et cetera** [2] 90/1 122/1
**evacuation** [1] 68/10
**evaluate** [6] 69/16 69/17 70/13 70/15 71/8 71/16
**evaluating** [1] 74/21
**evaluation** [2] 69/5 72/19
**evenly** [1] 65/24
**events** [4] 25/18 25/20 54/18 70/19
**eventually** [7] 23/2 40/23 48/20 48/21 123/22 166/2 168/9
**everybody** [2] 128/15 175/13
**everyone's** [1] 17/2
**Everything's** [1] 70/5
**evidence** [32] 4/8 9/10 10/3 10/7 13/19 14/3 21/18 21/22 23/4 42/9 42/16 83/6 86/12 93/2 111/7 132/11 132/18 142/1 142/6 147/5 147/9 156/8 156/18 156/19 158/9 158/14 160/8 163/24 167/1 171/14 171/18 171/19
**exact** [9] 16/10 27/6 46/21 75/3 82/24 83/19 117/7 117/11 162/20
**exactly** [18] 4/24 8/3 13/10 22/22 34/17 45/19 62/4 68/5 70/1 70/5 73/10 84/22 92/5 121/11 121/18 142/8 152/20 161/15
**examination** [12] 2/3 2/4 2/5 6/3 41/4 80/25 82/7 124/21 127/7 128/1 129/21 175/7
**examine** [3] 25/21 40/20 173/24
**examiners** [2] 146/16 146/17
**examining** [3] 26/25 27/2 27/6
**example** [47] 17/14 28/4 30/5 38/17 38/17 38/21 42/9 42/23 43/21 44/6 45/9 46/13 46/23 47/1 56/16 57/9 65/10 65/16 66/11 76/13 77/16 77/23 78/12 79/12 85/19 86/7 89/25 92/7 93/13 93/15 94/3 100/10 103/9 103/20 105/2 107/4 107/24 108/7 108/18 110/15 111/2 114/11 114/24 121/3

**E**

example... [3] 123/11
123/15 125/10
examples [3] 43/5
123/8 125/19
exception [1] 49/3
exceptionally [1]
127/18
exchange [1] 89/12
excuse [2] 146/9
147/15
excused [2] 126/9
126/14
execute [1] 122/18
executed [2] 144/11
173/12
executing [4] 19/19
145/3 170/8 173/2
execution [1] 144/13
exhibit [66] 2/9 2/9
2/10 2/10 2/11 2/11
2/12 2/12 2/13 2/13
10/2 10/5 10/7 10/21
13/19 13/24 14/3
21/16 21/22 21/25
24/10 42/9 42/16 53/4
61/24 63/3 89/24 92/9
132/11 132/16 132/18
133/23 133/25 134/20
135/1 137/21 139/1
139/17 141/16 142/1
142/3 142/6 142/9
143/7 147/5 147/6
147/9 153/19 156/9
156/11 156/12 156/13
156/14 156/19 158/9
158/14 159/10 160/20
162/16 163/7 163/11
167/1 171/11 171/19
171/21 172/20
Exhibit 11 [1] 158/9
Exhibit 12 [1] 147/6
Exhibit 13 [2] 171/11
171/21
Exhibit 14 [1] 172/20
Exhibit 2 [4] 13/19
13/24 133/25 135/1
Exhibit 3 [1] 21/16
Exhibit 5 [2] 132/16
133/23
Exhibit 6 [6] 139/1
139/17 141/16 142/1
142/3 142/9
Exhibit 7 [1] 159/10
Exhibit 8 [2] 162/16
163/7
exhibits [4] 2/8 90/6
100/7 159/17
exists [1] 41/7
expanded [1] 45/13
expect [17] 41/3 46/5
46/8 46/18 51/2 65/15
65/20 66/17 67/1
72/12 101/12 116/5
119/8 121/13 122/3
122/4 123/5

experience [8] 10/11
10/12 16/12 52/16
92/19 116/12 140/17
151/24
experiment [2] 125/2
125/8
experiments [1]
125/10
expert [8] 15/16 16/7
16/13 16/19 69/1
87/13 87/19 108/4
expertise [1] 87/20
explain [10] 19/11
21/25 30/14 48/7 51/5
56/7 69/9 94/4 103/25
137/6
explained [4] 44/19
123/11 150/17 162/23
explanation [7] 17/20
24/11 34/1 63/10
63/11 104/2 123/19
explanations [2]
123/8 123/18
explicit [1] 92/10
explicitly [2] 53/2 53/3
exploitation [13] 53/1
53/9 53/14 53/21 54/3
54/18 59/16 64/18
66/7 68/19 70/25
71/17 130/4
exploitation-related
[2] 68/19
extent [2] 32/19 89/12
external [2] 108/9
172/14
extra [3] 35/8 57/19
57/19
extreme [1] 145/19
extremely [4] 56/2
57/2 66/23 126/22

**F**

face [1] 7/8
facing [5] 148/14
148/15 148/16 153/19
163/16
fact [33] 20/14 25/25
31/24 33/21 36/5 37/5
45/21 46/20 59/11
74/22 79/11 96/19
97/18 98/9 102/14
104/11 112/23 113/9
115/16 117/3 118/13
118/24 121/18 122/4
134/5 136/4 138/18
140/4 151/6 152/5
153/11 155/12 169/5
factor [1] 143/25
factors [1] 36/3
faculty [1] 7/19
fail [5] 40/25 41/6
48/22 143/19 143/25
fair [8] 26/8 49/15
63/12 80/9 93/23
106/6 131/5 147/22
fairly [1] 140/14 157/4

fall [1] 98/7
false [37] 68/12 68/15
68/16 68/19 68/20
69/7 69/10 69/13
69/16 69/22 70/10
70/16 71/22 71/23
71/25 72/4 72/8 72/10
72/19 72/21 74/6
74/18 74/21 75/2 81/8
111/11 111/16 113/3
115/1 116/1 117/3
117/10 119/4 119/5
126/4 133/13 133/18
falsely [1] 68/21
familiar [8] 18/21
18/23 20/14 45/11
84/20 85/3 131/8
131/12
familiarity [1] 131/5
family.mp4 [1] 139/14
far [7] 26/20 26/21
28/25 36/15 52/17
77/5 79/22
farther [2] 118/17
135/22
fashion [2] 18/10
23/14
fast [1] 36/15 58/20
58/25
fast-forward [2] 58/20
58/25
faster [5] 26/3 37/17
37/19 37/25 38/3
father [4] 149/2
165/23 165/25 166/6
favorite [4] 31/21
43/20 100/19 100/20
FBI [22] 4/9 130/3
130/6 130/12 130/21
131/2 146/5 146/6
146/9 146/15 146/18
156/4 156/12 162/12
163/21 167/1 167/23
168/8 168/14 169/18
170/8 170/21
FBI's [1] 130/8
FCRR [2] 1/23 175/23
federal [4] 3/17 15/17
130/2 175/17
federally [1] 84/4
feedback [1] 14/19
feel [2] 9/2 122/8
fewer [1] 97/21
Fi [5] 107/24 108/6
108/6 108/18 173/6
field [4] 7/20 19/8 48/1
131/4
fields [2] 7/20 7/20
figure [4] 49/7 61/19
121/17 125/8
file [84] 17/22 19/3
30/6 30/9 31/4 39/9
41/2 41/7 41/15 42/4
45/11 45/16 46/8
46/12 46/14 58/12

59/11 65/18 65/9
65/10 71/2 71/9 77/22
85/14 85/16 85/23
86/8 86/9 91/3 92/8
93/8 93/9 93/13 95/1
95/10 98/13 98/14
98/15 98/17 98/18
98/18 98/22 99/3 99/7
100/4 102/12 104/6
109/7 110/10 111/14
111/18 111/20 112/7
112/17 118/3 118/7
118/7 118/13 118/19
118/22 119/8 122/13
122/14 122/20 122/21
122/22 123/5 137/16
139/2 139/13 139/16
139/18 140/1 140/4
140/9 140/25 141/1
141/2 141/4 141/5
141/6 141/8 141/23
143/1
filed [1] 76/4
files [61] 26/10 26/11
27/12 27/14 29/9
29/10 29/11 29/12
33/19 33/19 33/20
33/21 34/5 34/7 34/14
36/7 36/16 38/10
38/14 38/19 45/12
45/12 45/17 46/11
47/17 50/16 52/3 54/2
74/10 85/6 85/18
98/12 98/19 99/2
101/25 102/1 111/7
120/18 135/24 136/2
136/3 136/5 136/23
138/5 138/7 138/10
138/12 138/13 138/16
138/17 138/22 138/25
139/20 140/6 140/12
140/15 140/24 141/11
141/13 142/12 156/21
filing [1] 134/17
134/25 156/22
filter [1] 89/7
filtered [1] 143/10
finally [1] 36/21
find [12] 33/3 42/3
42/22 42/23 43/8 68/2
97/15 98/7 106/6
108/24 169/6 169/11
finding [1] 135/6
fine [5] 6/19 7/10 8/4
46/13 160/11
finer [1] 124/7
fingerprint [2] 91/24
91/24
finish [1] 3/9
finite [1] 89/23
firearms [1] 150/6
first [46] 4/3 6/22
18/23 18/25 19/2 23/2
35/1 39/6 39/23 45/9
48/8 57/9 57/22 61/3
64/11 67/17 67/19

77/9 78/9 80/7 95/5
97/13 97/25 99/16
130/16 140/25 142/15
143/21 146/14 149/16
149/20 153/8 155/25
156/8 156/10 157/7
157/14 159/3 159/10
159/12 159/13 160/1
164/1 164/2 166/4
169/5
fit [1] 47/10
five [7] 7/4 37/11
121/7 130/10 130/15
130/16 132/5 146/9
173/18
flash [1] 145/20
flight [5] 3/12 4/5
126/11 127/1 131/24
flights [1] 128/16
flip [4] 49/15 49/24
51/1 104/1
FLORIDA [8] 1/1 1/8
1/19 1/21 1/25 83/24
130/24 131/1
flow [1] 128/10
flows [1] 87/2
focus [9] 11/16 11/17
11/18 11/19 13/5
14/15 27/9 88/2
130/15
focused [2] 86/5 86/7
focusing [3] 51/20
86/8 87/20
folder [2] 85/7 85/15
follow [3] 24/15 81/7
92/25
follow-up [2] 81/7
92/25
followed [1] 74/17
following [2] 60/7
60/25
food [1] 152/15
foot [2] 17/1 55/6
force [4] 130/4 130/5
146/6 151/13
foregoing [1] 175/18
forensic [8] 54/17
54/20 68/14 74/12
74/14 114/4 146/16
146/17
forensically [2] 55/3
74/15
forensics [2] 54/25
114/4
forever [2] 47/24
48/23
forget [1] 8/3
forgetting [1] 62/17
forgot [2] 59/17 129/6
form [1] 158/9
formalism [1] 70/18
formally [1] 132/6
formula [3] 59/2 62/6
137/13
formulas [1] 63/4
Fort [2] 1/21 1/25

**F**

forum [2] 95/21 114/6
forward [5] 4/4 5/13 58/20 58/25 129/14
forwarded [1] 118/9
forwarding [1] 123/6
found [3] 77/21 83/6 172/13
Founding [1] 8/1
four [10] 14/25 15/1 62/16 73/15 86/14 132/5 143/12 146/9 146/12 174/12
Fowler [9] 164/21 165/12 165/15 165/20 165/24 166/14 166/15 167/4 167/18
Fowler's [1] 166/5
fraction [1] 54/5
frame [1] 110/14
frank [1] 12/4
free [10] 19/16 19/23 20/3 22/18 23/19 25/6 122/8 155/10 157/25 160/5
friendly [1] 22/12
friends [4] 23/24 24/1 24/25 67/20
front [13] 5/19 38/18 141/16 144/23 146/25 147/1 147/17 148/16 149/22 153/20 153/25 163/19 165/10
fulcrum [1] 171/4
full [8] 5/15 6/7 7/15 94/12 94/16 129/16 146/7 146/17
full-time [1] 146/7
fully [2] 62/25 68/6
function [2] 104/23 106/4
functions [2] 26/9 29/9
fundamental [1] 12/25
furniture [1] 123/21
further [7] 24/11 24/16 30/4 70/22 126/8 161/1 173/15

**G**

G-R-A-C-E [1] 141/2
gain [1] 17/13
gait [1] 153/1
gallery [1] 46/9
garage [3] 147/16 147/18 147/21
gathering [1] 108/23
general [23] 24/12 24/17 24/19 25/11 25/13 26/4 26/17 28/1 35/6 35/13 35/22 41/4 41/7 41/24 48/15 49/4 51/8 63/19 65/23 84/7 87/20 90/16 125/5
generally [7] 14/13 14/13 19/8 34/21

41/17 85/17 124/22
generation [2] 61/3 61/7
gentlemen [1] 3/18
germane [1] 151/2
getting [4] 31/20 115/9 164/14 173/3
GitHub [6] 20/6 20/7 22/5 27/3 27/3 27/6
give [30] 21/3 31/12 38/23 39/5 40/4 61/17 63/14 65/7 65/10 65/12 65/15 67/2 67/13 67/14 67/15 73/9 94/16 95/17 96/4 101/24 108/25 112/8 123/21 123/23 124/7 127/1 128/11 128/13 153/15 160/7
giveaway [1] 79/5
given [13] 35/7 37/22 38/9 57/14 57/24 61/14 66/16 77/12 77/12 77/14 96/14 111/1 159/7
gives [6] 22/19 34/5 39/22 63/16 70/10 105/3
giving [1] 77/2
glazed [1] 42/1
Gnutella [7] 23/22 30/6 30/9 85/4 85/5 85/14 85/20
go [63] 4/20 6/9 16/24 17/15 17/15 18/12 20/8 22/4 22/7 24/8 26/10 29/12 30/17 31/24 33/2 35/9 35/25 36/16 37/19 38/2 38/19 40/5 40/21 40/22 42/22 44/2 45/23 45/25 47/24 48/17 48/19 48/21 48/23 48/24 49/5 50/25 53/15 56/19 59/6 68/7 69/12 73/5 78/24 79/14 83/3 100/15 108/24 109/25 110/6 110/12 111/25 112/10 112/12 112/18 113/2 128/13 135/14 135/16 140/19 150/13 161/16 166/22 168/1
goal [3] 92/21 92/24 103/2
goals [5] 48/9 49/6 102/23 102/24 107/8
goes [12] 18/4 37/5 37/17 44/11 47/21 47/22 47/25 47/25 78/21 93/14 124/4 170/7
going [64] 3/9 4/7 5/5 13/6 13/8 13/17 14/20 18/15 19/6 21/8 21/16 21/17 24/13 25/18

29/1 30/20 37/23 38/4 38/7 38/20 39/10 41/13 41/14 48/8 49/3 51/23 60/21 61/5 65/8 65/21 66/11 67/6 67/12 68/14 80/18 80/22 89/25 92/6 92/18 97/10 99/3 103/5 103/18 106/1 115/19 121/21 123/22 124/17 127/18 127/22 127/25 128/3 128/5 128/9 134/2 142/16 150/18 161/1 161/1 163/18 163/25 164/2 171/11 174/16
good [27] 3/2 3/7 3/15 3/18 3/20 3/23 5/24 6/5 6/6 6/19 8/3 9/15 15/9 19/13 40/12 40/15 40/16 47/15 66/6 82/9 82/10 128/22 129/23 129/24 131/5 160/17 174/18
Google [8] 17/14 17/15 17/15 19/16 21/8 29/23 88/17 89/2
gory [1] 123/23
gotta [1] 172/9
gotten [1] 37/22
government [17] 1/17 3/13 5/6 5/12 21/20 89/24 100/7 128/24 129/7 129/11 129/12 147/8 148/9 155/20 160/15 163/11 173/25
Government's [63] 2/9 2/9 2/10 2/10 2/11 2/11 2/12 2/12 2/13 2/13 5/14 10/2 10/7 10/21 13/19 13/24 13/25 14/3 21/16 21/22 21/24 24/9 42/9 42/13 42/16 63/3 129/15 132/11 132/18 134/20 137/21 139/1 141/16 142/1 142/3 142/6 142/9 147/5 147/6 147/9 147/12 153/19 156/9 156/11 156/12 156/13 156/13 156/15 156/19 158/9 158/11 158/14 159/10 160/16 160/19 162/16 163/7 163/15 167/1 171/11 171/19 171/21
grab [1] 105/11
Grace [1] 141/2
grad [1] 11/14
grads [1] 8/23
graduate [1] 8/25
graduates [1] 8/20
graphic [1] 44/4
great [8] 4/17 10/19 70/4 74/11 74/11 81/8

174/1 175/4
head [3] 7/9 15/20 145/11
heads [1] 49/15
healthy [1] 153/2
hear [1] 7/10
heard [1] 136/9
hearing [15] 1/12 3/8 3/25 4/22 4/25 5/1 13/5 84/21 88/2 90/11 123/12 131/9 156/22 160/6 175/5
Heaven [1] 44/4
heavily [1] 42/18
hedge [2] 72/3 119/3
hedges [2] 111/11 113/1
hedging [2] 112/25 117/5
help [9] 12/23 22/12 36/8 67/18 99/1 113/23 152/23 153/9 167/6
helped [5] 55/7 55/17 84/15 114/9 114/9
helpful [3] 57/13 117/22 123/16
helps [1] 111/15
hem [1] 149/10
hesitating [1] 89/20
hey [2] 145/6 149/10
hidden [1] 150/25
hide [1] 91/2
hides [1] 91/9
high [19] 11/20 17/4 23/13 24/5 24/13 24/22 29/14 30/19 30/23 31/9 56/4 58/13 63/19 64/21 74/14 103/24 122/3 123/7 124/3
high-level [1] 31/9
higher [4] 81/21 81/23 81/24 125/4
highest [2] 41/13 74/3
highlighted [1] 143/7
highly [2] 11/25 15/12
hint [2] 39/17 40/4
hired [1] 6/22
history [2] 27/2 54/19
hold [2] 7/7 124/17
holder [2] 91/3 93/9
holding [4] 67/25 68/3 91/11 127/6
home [9] 19/17 20/21 39/20 83/3 107/17 109/3 151/4 151/5 151/9
homes [2] 11/21 17/6
Honda [1] 154/11
hone [1] 39/21
honest [1] 127/17
Honor [35] 3/15 3/20 4/16 5/8 7/11 9/21 10/4 10/24 14/1 16/17 42/12 60/6 61/4 73/2 75/4 75/6 82/6 93/5

greater [5] 72/15 90/17 90/20 118/9 124/4
greatest [1] 18/3
green [2] 67/15 100/12
Greg [1] 3/15
GREGORY [1] 1/17
ground [1] 145/25
group [10] 11/18 12/22 14/12 14/17 17/7 17/11 79/17 140/2 140/16 146/15
guarantee [1] 168/13
guard [2] 162/12 164/13
guess [14] 4/19 5/6 40/12 40/15 40/16 44/22 51/25 67/24 92/25 113/21 120/24 122/3 123/3 127/7
guessing [1] 76/3
GUI [2] 78/12 103/15
guide [1] 21/2
guys [2] 163/2 168/23
GVLV2 [1] 22/18

**H**

H-O-P-S [1] 48/5
ha [1] 71/15
half [2] 80/23 174/17
haligin [1] 171/3
hand [8] 33/4 37/20 38/1 46/3 48/17 66/21 67/17 70/2
handcuffed [2] 149/12 151/9
handcuffs [2] 150/9 155/14
handling [1] 4/2
hanging [1] 164/3
happen [10] 17/25 54/14 67/9 77/1 79/6 80/13 126/4 126/5 149/2 170/10
happened [9] 25/18 54/15 70/7 70/19 145/17 149/8 157/4 157/8 167/9
happening [3] 112/23 146/20 146/23
happens [2] 48/15 51/1 70/3 71/2 85/9 85/12 137/6
happy [2] 152/21 152/23
hard [13] 3/11 19/5 19/6 24/15 47/10 49/7 70/14 91/5 98/5 98/7 105/25 114/1 172/14
harder [1] 25/23
hash [2] 91/16 91/23
hashed [1] 52/10
hashes [1] 120/21
Haven [1] 45/10

**H**

**Honor... [17]** 116/21
117/15 117/18 120/4
120/23 121/11 121/19
122/2 126/12 132/15
134/18 134/23 147/7
155/19 156/16 158/12
175/11
**HONORABLE [1]** 1/13
**hoodie [1]** 149/1
**hop [3]** 40/22 40/22
78/22
**hope [1]** 126/11
**hopefully [2]** 128/13
145/10
**hops [16]** 48/1 48/2
48/5 48/17 48/20
48/25 49/21 64/14
66/18 78/3 102/24
103/12 109/25 110/4
110/13 113/13
**horizontally [1]** 143/8
**hour [3]** 80/23 127/3
174/17
**hours [3]** 16/24 76/19
174/12
**house [19]** 144/14
144/20 144/25 146/19
146/25 147/2 147/3
149/11 149/14 150/21
150/22 152/16 153/20
157/10 161/1 163/16
163/22 172/6 173/2
**housekeeping [1]**
126/19
**HTL [12]** 48/20 49/11
58/16 60/19 64/14
78/4 78/18 102/24
103/10 103/20 119/20
119/25
**huh [5]** 38/15 80/4
95/12 106/14 124/2
**human [3]** 45/8 45/8
130/4
**hundred [4]** 41/18
65/15 65/20 65/21
**hybrids [1]** 17/20
**hypothetical [1]** 64/6

**I**

**I'll [26]** 5/9 5/21 12/9
33/18 38/20 47/2 47/2
48/16 48/17 48/18
49/18 63/23 64/11
64/12 64/12 64/13
65/17 110/16 126/17
128/11 134/5 134/24
156/21 157/20 157/21
160/7
**I'm [121]** 6/11 6/13
10/2 11/5 11/5 11/6
13/17 14/19 15/22
16/24 17/16 17/20
21/16 24/13 26/18
27/4 29/7 32/8 36/2
38/20 39/10 39/23

39/25 40/1 40/7 40/11
40/13 41/22 43/12
45/25 47/4 48/16 49/3
49/20 50/8 51/2 51/7
51/12 52/14 52/20
55/7 58/21 60/1 60/6
60/7 60/7 60/21 60/25
62/17 64/8 64/14
64/15 65/8 65/11
65/15 65/21 65/23
66/3 67/12 72/3 73/11
74/17 75/1 76/3 76/4
76/18 77/6 77/16
77/16 77/24 80/6
81/14 81/22 84/14
84/25 86/13 90/8
90/11 92/1 92/1 96/14
97/10 99/3 100/9
104/15 110/6 112/5
112/16 112/16 112/17
114/23 115/7 115/9
115/19 116/22 117/3
121/2 122/8 124/17
125/1 125/1 125/3
125/14 126/2 128/5
130/2 130/3 131/16
132/21 134/12 137/5
137/11 137/21 139/5
142/11 142/15 154/16
158/16 166/9 166/15
171/11
**I've [34]** 4/13 8/9 8/10
8/13 8/15 10/17 10/18
19/4 20/16 31/7 34/25
39/19 44/7 64/2 64/23
66/16 87/7 97/1 97/18
97/18 97/19 100/15
102/3 102/8 102/13
130/5 130/6 132/5
132/6 133/15 135/10
137/14 139/1 171/8
**idea [6]** 52/15 63/15
63/20 68/1 68/17 78/3
**identification [1]**
60/20
**identified [2]** 133/24
136/24
**identify [8]** 54/1 57/15
58/11 61/13 72/14
74/9 105/6 107/8
**ignore [2]** 63/25
111/14
**ignoring [1]** 64/15
**Ikea [1]** 123/20
**illegal [1]** 68/22
**image [2]** 17/22 148/7
**images [6]** 44/9 45/13
46/8 46/9 53/20 71/16
**imagine [2]** 62/20
114/11
**immediate [1]** 153/16
**immediately [2]** 78/18
79/9
**implies [2]** 27/20
114/5
**importance [1]** 122/16

**important [12]** 5/21
59/20 59/24 68/9
68/10 68/13 76/12
80/12 113/5 113/9
142/21 160/9
**importantly [2]** 45/2
68/11
**improve [1]** 23/25
**inception [1]** 8/1
**incident [1]** 145/23
**include [3]** 47/7 105/3
123/14
**included [3]** 90/6
134/19 141/8
**includes [4]** 8/12
81/18 117/8 117/12
**including [1]** 115/20
**incomplete [1]** 94/11
**incorrect [1]** 94/9
**index [2]** 43/11 43/13
**indication [2]** 39/22
153/16
**indirectly [1]** 106/20
**individual [9]** 20/21
45/3 45/13 78/3 102/7
103/12 108/24 124/22
154/17
**individual's [1]**
150/24
**individually [2]** 9/5
59/7
**individuals [8]** 14/17
42/22 51/21 54/12
54/13 136/23 145/6
152/13
**infinite [4]** 88/19
88/21 89/22 89/22
**infirmarian [1]** 104/15
**inform [1]** 114/5
**information [60]** 6/12
8/5 26/22 27/15 28/9
32/21 34/9 45/4 45/8
45/8 46/16 47/16
53/22 53/25 56/15
56/21 57/3 57/12
57/16 57/25 58/9 59/4
59/8 59/10 59/18
60/11 60/12 61/13
61/21 63/16 65/1 85/7
91/12 104/16 104/18
104/23 105/4 105/5
105/6 105/8 105/11
106/5 106/6 107/9
108/10 108/23 130/23
130/25 133/13 136/7
137/9 137/12 138/1
141/10 142/22 142/23
143/24 144/1 144/2
162/22
**initial [2]** 7/24 163/1
**initialization [1]** 36/25
**injuries [1]** 153/12
**inquire [1]** 161/1
**inquired [1]** 162/20
**ins [1]** 145/1
**insert [7]** 29/15 29/19

29/24 30/24 34/24
35/19 112/21
**inserted [31]** 30/13
31/7 31/11 31/16
31/18 31/21 32/3 33/9
33/11 33/11 34/19
34/25 35/23 36/7
37/21 38/23 39/9 41/2
41/11 44/23 45/3 52/5
88/22 88/24 89/4
92/22 94/25 95/2 95/9
112/7 112/8
**inserting [3]** 29/11
29/12 30/17
**inserts [2]** 52/21
113/4
**inside [11]** 101/1
145/6 149/14 150/21
150/24 151/4 151/5
153/22 154/4 154/8
172/13
**install [9]** 19/18 20/25
21/2 22/13 43/3 43/3
73/13 105/24 106/1
**installed [3]** 20/23
42/24 97/13
**installer [1]** 23/1
**instance [1]** 88/9
**instances [1]** 71/20
**instant [1]** 96/3
**institute [4]** 6/14 7/17
7/18 131/1
**institution [1]** 11/10
**institution [1]** 132/6
**intended [1]** 28/12
**intent [1]** 101/20
**intention [1]** 131/23
**intentionally [1]** 91/9
**interact [1]** 17/9
**interacting [1]** 21/9
**interaction [1]** 153/4
**interest [6]** 52/2 64/19
135/24 136/2 142/13
169/21
**interested [2]** 104/25
105/4
**interesting [3]** 11/23
39/16 49/19
**interface [1]** 30/21
**internal [2]** 86/20
86/20
**Internet [28]** 8/12 8/16
8/18 11/24 12/24 13/1
17/10 17/18 18/2
18/10 19/13 21/12
29/19 29/23 31/24
33/15 33/16 37/20
43/17 88/4 88/13
88/14 88/18 88/20
89/2 90/18 108/20
130/14
**Internet-based [1]**
8/18
**interpret [1]** 97/10
**interval [20]** 72/4
72/24 73/1 75/7 81/10

81/12 81/17 81/19
114/7 114/23 115/3
115/6 115/8 115/17
115/21 115/23 116/14
116/14 117/7 117/17
**interval refers [1]**
115/6
**interview [36]** 149/24
150/16 150/21 151/20
152/10 152/12 153/8
153/14 156/8 156/10
156/11 156/13 157/2
157/7 157/14 159/11
159/12 159/13 159/16
160/1 160/23 161/6
163/13 164/1 164/2
164/6 164/4 166/8
166/18 167/9 167/11
167/24 168/6 169/5
169/14 170/5
**interviewing [1]**
169/20
**interviews [13]**
148/11 151/19 151/22
152/6 152/17 153/18
154/25 155/2 155/23
157/1 157/5 159/16
163/18
**intranet [1]** 40/7
**intricacies [1]** 16/25
**introduce [5]** 4/7
68/14 114/21 129/25
150/1
**introduces [1]** 165/17
**introduction [4]** 8/15
123/18 123/23 124/6
**intrusions [1]** 130/19
**inverting [1]** 72/17
**investigate [2]** 86/2
130/17
**investigating [6]**
101/4 130/13 130/18
131/12 135/19 144/25
**investigation [8]** 3/17
54/17 83/5 84/20
104/19 130/3 135/16
138/8
**investigations [4]**
56/13 86/5 86/6 86/8
**investigative [2]**
118/25 130/8
**investigator [10]** 55/4
63/20 64/8 64/19
67/21 68/17 71/20
77/25 79/14 80/13
**investigators [2]**
82/24 114/8
**involved [4]** 36/11
54/10 91/15 114/3
**IP [38]** 28/11 37/9
46/18 47/18 56/16
58/14 60/15 77/12
77/13 107/11 107/13
107/13 107/18 107/21
107/25 108/9 108/12
108/13 108/17 108/20

**I**

**IP... [18]** 108/23
108/25 109/7 109/20
135/17 135/17 135/19
136/4 137/2 137/9
137/14 138/4 138/11
138/14 139/21 140/2
141/11 142/23
**issue [1]** 4/18
**issues [3]** 4/10 75/15
78/2
**it's [192]**
**items [1]** 4/7

**J**

**January [4]** 76/15
111/2 111/2 111/13
**January 1 [1]** 76/15
**Java [2]** 55/21 55/25
**Java's [1]** 55/22
**job [2]** 15/9 105/14
**join [1]** 28/22
**judge [51]** 1/14 4/1
5/11 6/2 9/8 9/19
10/20 13/18 13/23
16/3 16/11 42/8 80/14
80/20 83/3 83/5
124/14 126/7 126/18
129/12 129/20 131/23
132/10 133/9 133/10
133/11 133/14 133/21
134/2 134/9 134/11
134/16 135/3 135/9
137/18 139/6 141/25
147/4 147/10 156/7
156/20 158/8 159/15
163/6 166/25 168/13
171/13 173/3 173/15
174/3 174/20
**judicial [2]** 134/17
135/10
**jumped [1]** 26/7
**June [1]** 100/8
**June 18 [1]** 100/8
**juniors [1]** 8/24
**Justice [2]** 84/5 84/6

**K**

**KAY [14]** 1/20 2/4 3/20
3/23 4/15 9/16 82/5
122/8 127/6 131/19
160/5 173/17 174/8
174/25
**keep [8]** 7/8 7/9 19/6
25/17 71/9 89/20
113/3 117/14
**KEVIN [2]** 1/20 3/21
**key [37]** 38/11 38/22
44/13 46/25 59/5 91/4
91/11 92/7 92/13
92/15 92/16 92/21
93/9 94/20 94/21 95/3
95/7 95/11 95/13
95/22 95/25 96/4
98/18 99/8 99/11
99/13 99/16 102/17

102/22 141/23 169/6
169/7 169/7 169/9
169/12 170/21 171/1
**Keyport [1]** 131/3
**keys [15]** 42/3 42/4
42/10 42/22 44/12
59/13 91/20 92/9
92/19 100/8 100/23
101/11 102/2 102/6
102/14
**kilobytes [1]** 31/2
**kind [29]** 8/8 11/3 12/2
12/8 26/7 28/14 31/19
41/25 46/8 55/11 59/9
78/5 105/22 112/20
112/21 116/23 145/8
152/2 152/2 153/12
153/17 155/1 155/4
162/3 162/21 162/24
170/17 171/1 174/4
**kinds [1]** 19/25
**knew [5]** 54/23 103/20
133/14 169/17 169/17
**knock [5]** 145/15
145/17 146/20 146/23
148/19
**knock-and-announce
[3]** 146/20 146/23
148/19
**knocked [3]** 144/23
145/13 149/22
**knocking [1]** 145/6
**know [126]** 9/8 13/10
14/24 19/18 20/18
21/1 23/4 23/7 23/7
24/25 34/16 34/23
35/3 37/18 39/23 43/1
45/19 46/24 47/2 47/4
47/18 47/18 47/20
50/10 52/9 52/10
52/11 53/3 53/12
53/13 55/23 57/9
62/22 64/21 66/6 66/7
66/8 66/9 66/9 66/10
66/13 66/23 66/25
67/5 67/6 67/13 67/14
67/15 67/18 69/10
69/23 69/25 71/18
71/24 74/17 74/20
75/4 75/20 76/19
77/10 77/14 77/14
77/18 78/11 78/22
79/2 79/6 79/12 82/19
84/17 84/19 86/20
90/4 90/22 91/17 92/4
95/6 97/17 98/5 98/9
100/16 100/19 101/10
101/13 103/14 104/21
105/17 106/19 108/21
109/11 110/1 114/3
114/11 114/21 120/21
122/17 122/18 122/19
122/21 122/25 123/17
125/18 126/4 130/1
142/8 142/20 145/9
145/25 147/25 152/8

152/13 155/1 161/6
164/3 170/25 171/1
171/9 173/3 173/6
173/9 173/10 173/18
174/15 174/20 174/25
175/1
**knowledge [8]** 52/16
54/10 61/18 75/23
79/22 86/6 134/13
152/11
**known [15]** 19/4
52/13 53/20 53/21
59/12 59/14 64/18
71/16 74/19 99/12
101/11 132/5 136/24
138/7 151/6
**knows [1]** 92/5
**KULIK [5]** 1/20 3/21
3/23 9/16 174/25

**L**

**L-E-V-I-N-E [2]** 5/16
6/8
**L-I-V-E [1]** 48/5
**lab [1]** 125/7
**labeled [1]** 102/21
**lack [1]** 138/5
**laid [1]** 75/10
**language [3]** 55/22
55/25 56/3
**languages [2]** 56/5
56/6
**laptop [1]** 9/12
**large [7]** 31/4 52/19
60/9 67/3 121/24
154/6 154/13
**largely [4]** 9/1 11/7
67/16 120/12
**larger [4]** 62/24 119/7
123/4 124/18
**lasted [1]** 166/23
**late [2]** 11/19 11/20
**Lauderdale [2]** 1/21
1/25
**law [118]** 52/17 53/6
53/15 53/23 53/25
54/11 54/15 54/19
55/8 55/13 56/8 56/25
57/7 57/14 57/21 58/5
58/9 58/10 58/25 59/4
59/9 59/14 59/14
59/21 60/8 61/2 61/14
61/17 62/18 63/16
64/6 64/12 65/16
65/17 65/18 66/4
66/14 66/21 68/2 68/8
68/17 71/5 71/9 71/15
72/13 75/21 75/25
76/14 77/5 77/13
77/16 79/13 79/22
82/14 83/14 83/23
84/9 86/1 93/14
101/10 101/15 101/18
101/21 104/5 104/7
104/11 104/24 105/3
106/11 106/24 107/8

107/10 108/10 108/14
108/22 109/14 110/18
110/23 112/22 113/5
113/23 113/23 114/8
118/11 120/7 120/18
120/19 121/15 122/17
136/6 136/8 136/10
136/11 136/16 136/24
137/6 137/10 138/2
138/6 138/7 142/23
143/15 143/19 144/2
144/14 144/24 145/10
145/19 146/18 148/2
148/3 149/11 149/14
150/22 151/11 151/13
151/23 152/22
**lawyer [6]** 84/14
169/21 170/3 170/3
170/8 170/11
**LE [2]** 143/11 143/14
**lead [2]** 108/25 137/8
**leads [1]** 51/17
**learn [1]** 56/3
**learned [1]** 39/21
**learning [1]** 8/14
**leave [9]** 39/11 47/12
110/16 126/17 155/10
157/25 160/24 161/4
162/7
**leaves [1]** 164/16
**led [2]** 11/4 109/1
**left [4]** 23/12 23/17
43/10 147/23
**legal [4]** 23/20 82/18
157/19 167/23
**legally [1]** 83/17
**length [2]** 151/18
166/21
**lengthy [1]** 151/23
**lets [1]** 113/1
**letter [2]** 107/17
107/18
**letters [3]** 44/17 45/2
143/11
**letting [2]** 113/2
129/25
**level [17]** 8/25 17/4
24/13 26/15 29/14
30/19 30/23 31/9
41/13 58/13 61/15
63/19 74/3 103/24
122/3 123/7 124/3
**levels [2]** 56/22 56/23
**Levine [31]** 4/3 5/6
5/12 5/13 5/14 5/16
5/17 5/21 6/8 6/17
6/18 7/7 10/2 16/23
81/7 82/9 82/11
115/22 119/13 126/9
126/11 131/11 131/17
131/19 132/4 132/5
134/10 134/19 136/9
143/3 144/5
**Levine's [3]** 10/24
80/23 81/5
**life [5]** 69/24 70/3 70/4

70/9 70/7
**likes [2]** 17/23 73/11
**LimeWire [3]** 85/3
85/13 85/19
**limit [1]** 89/5
**limited [4]** 37/18
40/22 48/1 71/7
**line [7]** 22/15 59/8
112/10 112/12 143/8
159/3 159/4
**lines [2]** 141/17
141/20
**link [2]** 22/19 108/13
**linked [1]** 43/2
**linked as [1]** 43/2
**links [2]** 108/17
108/19
**list [4]** 31/15 39/8
43/16 44/15 44/16
59/12 94/24 94/25
95/2 95/9 100/8 102/6
109/16 135/24
**listed [15]** 10/25 15/1
24/18 39/2 39/3 44/22
93/10 139/19 140/6
141/1 141/6 142/24
143/1 143/21 143/25
**listen [4]** 159/23 160/2
160/6 160/8
**listened [2]** 159/19
159/24
**lists [2]** 135/17 158/20
**lit [1]** 77/12
**literally [2]** 47/4 67/3
**little [38]** 5/19 14/19
14/20 22/3 23/5 25/14
25/22 26/3 26/7 34/18
35/14 35/15 37/24
38/2 39/17 40/3 43/22
45/19 48/2 49/7 49/12
56/14 67/5 72/2 79/4
85/1 112/6 119/16
126/19 128/12 130/5
130/6 135/22 144/19
145/3 150/15 155/18
172/24
**live [22]** 23/19 25/6
48/2 48/5 48/20 48/25
49/21 64/14 71/19
72/9 72/20 73/5 74/23
78/4 102/24 103/13
109/25 110/4 110/13
113/13 117/25 172/9
**living [1]** 136/4
**local [2]** 146/6 146/11
**locally [7]** 21/9 21/15
25/14 26/17 26/18
30/7 34/19
**located [4]** 19/16
20/23 108/16 130/9
**location [11]** 17/17
20/10 31/18 40/7 40/8
40/8 108/14 108/19
109/21 109/23 169/8
**locked [1]** 164/11
**log [21]** 56/12 56/16

**L**

log... [19] 56/21 56/23
57/3 57/8 58/13 58/14
58/14 58/15 104/8
104/8 104/11 104/16
104/24 105/10 105/12
105/19 106/6 107/10
144/3
logged [4] 60/12
60/15 61/21 118/25
logging [3] 57/1 57/20
105/13
logs [6] 56/15 57/12
108/11 109/14 110/20
110/21
Lolita [2] 45/18
100/20
Lolita's [2] 44/4 45/9
long [15] 6/20 20/13
20/16 39/4 44/17
50/23 88/12 127/2
130/1 151/16 160/17
161/16 166/20 166/22
174/15
longer [1] 118/7
look [31] 22/14 35/2
37/1 37/1 39/1 40/10
40/11 44/11 49/13
52/4 54/24 59/5 61/15
64/1 65/25 66/15 67/7
69/21 70/2 70/18 72/9
73/24 78/6 100/23
108/24 109/1 111/23
115/23 139/3 142/15
165/23
looked [3] 85/25
89/24 100/7
looking [21] 12/19
12/22 21/25 22/24
24/9 25/24 27/14 36/2
36/23 38/1 40/7 40/13
41/1 47/20 48/18 59/7
65/23 66/8 100/18
147/14 163/20
looks [10] 15/8 23/4
23/6 44/3 44/17 73/11
78/17 119/17 125/13
165/23
lookup [1] 115/14
lost [4] 52/14 105/7
112/10 112/12
lot [18] 8/18 13/1 17/9
24/12 24/15 31/8 32/5
41/12 43/12 52/2
54/19 56/4 63/4 89/11
94/22 102/3 104/23
105/24
lots [1] 126/5
loudly [1] 5/23
Louis [1] 87/1
loving [1] 139/14
low [16] 23/12 23/15
24/21 25/2 25/5 25/9
25/11 25/24 26/2
26/14 26/21 27/9 74/7
80/2 80/10 90/12

**M**

machine [1] 8/14
machine learning [1]
8/14
magistrate [2] 1/14
133/9
main [6] 18/7 20/7
20/7 36/25 121/12
142/8
maintained [1] 7/13
major [4] 17/10 17/21
26/9 130/9
majority [3] 4/7 128/1
130/12
making [7] 48/13 49/7
52/12 70/24 88/1
90/21 170/5
male [1] 153/2
manifest [67] 31/12
31/14 31/15 31/17
31/19 33/10 34/6 35/1
39/3 39/7 39/8 39/12
40/10 45/6 46/23 52/8
52/13 59/5 66/8 91/4
91/11 91/18 91/20
91/25 92/2 92/4 92/5
92/7 93/2 93/9 93/11
94/18 94/20 94/20
94/21 95/2 95/6 95/7
95/7 95/8 95/11 95/13
95/22 95/25 96/4
99/15 99/16 99/17
102/2 102/6 110/12
111/19 119/20 120/3
120/11 120/15 121/2
121/6 121/13 121/14
121/17 121/19 121/22
121/24 122/1 122/12
141/23
manifests [3] 53/10
59/13 120/22
manipulated [1] 36/18
manner [3] 57/23
106/12 150/11
March [2] 76/16 111/3
March 1 [1] 76/16
margin [4] 81/11
116/9 116/11 116/13
marked [2] 135/1
146/11
Maryland [3] 15/25
16/2 130/10
Mass [4] 8/5 9/2 12/19
61/16
Massachusetts [5]
6/12 6/21 11/6 12/19
54/10
massage [1] 102/10
master [1] 171/1
master's [3] 9/3 11/9
130/25

material [3] 68/19
121/5 133/12
materials [1] 70/25
math [4] 11/11 62/12
72/5 115/19
mathematical [7] 59/2
63/4 69/20 70/1 70/9
70/18 74/8
mathematically [2]
63/15 70/14
Matt [2] 164/21 165/23
165/24
matter [1] 175/20
matters [9] 3/24 79/13
88/19 89/9 89/16 97/6
130/17 130/18 132/8
MATTHEW [1] 1/7
maximum [2] 25/5
26/6
May 15th [1] 144/9
May 17 [2] 144/11
158/17
May 2017 [1] 62/3
mean [43] 10/16 14/7
28/16 29/22 30/8 35/1
37/18 39/20 40/5 47/4
50/2 51/10 52/9 56/22
66/22 71/1 79/3 84/4
88/22 91/2 92/21
95/20 95/21 97/11
100/3 101/2 103/8
104/17 105/14 105/17
105/22 109/18 109/19
110/9 111/17 113/25
114/1 116/24 118/18
126/5 150/11 159/21
167/18
means [5] 14/23 23/8
105/23 107/21 110/25
meant [4] 83/13
103/11 103/22 104/16
measure [2] 121/20
121/21
measures [1] 145/19
measuring [1] 69/13
mechanism [1]
156/22
mechanisms [1]
101/9
medication [6] 152/2
152/4 152/7 152/8
153/8 153/12
medications [1]
152/14
medicine [2] 172/17
172/24
medium [1] 89/3
meeting [1] 107/4
member [2] 15/7
145/15
memory [4] 115/9
117/4 125/2 125/15
mention [2] 12/13
13/6 59/17
mentioned [19] 7/16
19/9 19/24 22/6 36/13

423/4 56/6 52/4 52/23
75/18 76/11 104/12
125/13 129/1 138/22
153/7 153/14 155/16
162/15
mentions [1] 139/13
merely [4] 93/24 94/9
94/14 123/6
Merit [1] 175/17
message [19] 33/15
33/16 33/20 33/21
34/12 40/18 52/25
53/1 53/7 53/8 92/18
96/8 100/20 100/24
100/25 101/1 101/9
101/25 102/5
messaging [1] 96/3
method [12] 49/12
55/2 77/22 103/2
109/20 111/9 113/1
114/10 114/15 118/10
120/13 122/18
methods [3] 54/17
74/21 170/25
metrics [1] 68/23
metro [1] 165/4
Miami [3] 130/4
164/22 175/1
microphone [2] 5/20
5/24
middle [4] 23/12
143/7 143/8 175/7
min [1] 142/17
mind [2] 71/9 89/18
mine [2] 64/9 127/9
minivan [7] 154/2
154/9 161/10 161/12
161/14 163/15 163/16
minor [1] 46/9
minors [2] 43/24
44/10
minus [4] 81/17
115/12 115/18 116/19
minute [5] 28/7 29/17
34/2 48/13 63/14
minutes [7] 37/12
127/5 128/11 161/16
166/20 166/23 173/18
Miranda [5] 157/15
158/2 158/5 158/9
158/16
misleading [2] 133/13
133/18
misremembering [1]
117/12
Missouri [1] 15/23
misunderstood [1]
82/18
mixture [1] 30/20
MJ [1] 134/18
mobile [1] 8/16
mod [1] 78/20
mode [29] 23/12
23/13 24/18 24/19
24/21 24/23 24/24
25/10 25/11 25/13

25/9 25/22 27/9
27/16 28/25 51/5
51/19 57/1 57/10
75/18 75/19 75/20
80/2 80/3 80/10 80/11
90/12 90/13 106/2
model [4] 70/1 70/1
70/9 70/12
modem [2] 11/22
108/17
moderate [1] 23/23
moderately [1] 92/20
modes [4] 24/11
24/17 26/2 56/21
modification [1]
61/14
modified [17] 55/7
55/16 56/7 56/9 56/12
57/11 58/1 58/5 79/23
104/4 104/7 104/13
105/2 106/4 110/23
136/10 136/16
modify [9] 20/12 58/2
78/9 78/19 79/1 79/9
103/15 106/13 113/15
moment [4] 28/13
80/14 124/8 132/22
moments [1] 90/2
Monday [4] 132/22
174/12 174/23 175/5
monitor [1] 25/8
monitored [1] 90/13
monitoring [2] 25/5
26/6
monitors [1] 9/9
month [2] 111/13
112/14
morning [18] 3/2 3/4
3/7 3/7 3/15 3/18 3/20
3/23 6/5 6/6 18/23
82/9 82/10 143/3
144/18 146/5 152/17
173/19
Moscow [2] 140/21
140/22
Moscow-10-1 [1]
140/21
motion [9] 3/9 4/4
38/13 75/16 76/4 78/3
82/16 159/17 174/21
motions [3] 3/8
127/11 127/18
motivation [1] 79/4
move [10] 4/4 13/23
14/20 42/8 42/19
132/10 142/1 147/4
158/8 171/13
moved [2] 10/20
166/25
movies [1] 89/2
mow [1] 24/16
MR [5] 2/3 2/5 124/13
131/16 174/25
Mr. [27] 3/23 3/25 4/17
4/18 4/22 6/1 7/8 9/16
82/12 83/9 84/21

## M

**Mr....** [16]  126/15
127/24 128/4 128/25
148/12 149/17 150/18
153/22 153/24 155/2
155/4 155/23 157/8
158/22 160/14 175/8
**Mr. Kulik** [2]  3/23 9/16
**Mr. Schiller** [8]  3/25
4/17 6/1 7/8 126/15
128/25 160/14 175/8
**Mr. Sigouin** [15]  4/18
4/22 84/21 127/24
128/4 148/12 149/17
150/18 153/22 153/24
155/2 155/4 155/23
157/8 158/22
**Mr. Sigouin's** [2]
82/12 83/9
**MS** [15]  2/4 9/1 67/11
67/12 67/15 67/17
67/19 67/20 67/22
67/23 68/4 82/5
123/14 131/19 174/25
**Ms.** [8]  3/23 4/15 9/16
122/8 127/6 160/5
173/17 174/8
**Ms. Kay** [8]  3/23 4/15
9/16 122/8 127/6
160/5 173/17 174/8
**multicast** [2]  12/3
12/8
**multiple** [8]  45/17
119/2 119/18 119/18
119/19 119/24 120/10
141/13
**music** [1]  89/3

## N

**name** [25]  5/15 6/7 6/8
6/10 13/6 13/7 14/24
32/10 32/12 32/20
45/24 46/21 47/20
58/17 89/8 91/17
91/17 91/23 92/21
129/16 129/17 130/2
139/13 141/2 141/20
**named** [3]  53/2 53/3
91/16
**names** [6]  14/24 35/2
39/15 39/17 40/4 53/2
**narrative** [2]  156/4
156/12
**NAT** [2]  108/7 108/8
**national** [1]  130/19
**nature** [7]  130/19
145/8 150/19 152/16
157/10 162/5 164/4
**Navel** [1]  131/3
**near** [1]  117/10
**necessarily** [9]  69/6
92/7 92/9 99/12 102/1
102/3 102/11 105/7
108/12
**necessary** [3]  51/7
57/5 93/3

**need** [33]  4/20 17/22
26/1 35/16 35/17 37/4
38/5 38/21 41/1 47/24
63/13 64/11 64/24
65/13 67/4 95/21
97/24 99/8 99/15
104/24 122/18 122/21
122/23 122/24 126/25
129/2 129/4 135/5
152/6 153/17 160/1
174/13 174/22
**needed** [5]  41/5 69/14
152/2 153/8 171/7
**needing** [1]  122/19
**needs** [4]  95/10 98/13
122/17 126/21
**negative** [2]  75/24
119/4
**neighbor** [30]  37/12
47/23 48/19 52/4 55/1
55/5 58/14 58/15
59/23 60/5 60/15
60/19 61/3 61/5 63/22
64/9 66/2 77/12 78/15
91/6 91/7 91/14 94/7
94/8 100/2 100/4
113/19 119/19 119/24
120/14
**neighbor's** [3]  94/8
121/7 121/8
**neighborhood** [1]
145/1
**neighbors** [47]  27/23
27/25 28/2 28/2 28/2
35/25 36/1 37/1 37/10
37/11 37/23 38/2 38/3
39/1 40/6 40/8 40/11
40/21 41/3 41/16
47/11 47/12 56/17
59/18 60/3 61/1 61/2
61/3 61/6 61/8 63/21
65/5 65/7 65/12 65/25
67/1 73/13 73/14
73/16 73/17 73/20
77/11 96/11 96/16
99/1 113/20 125/16
**NEIL** [3]  5/14 5/16 6/8
**net** [22]  24/18 24/19
24/21 24/22 24/24
25/10 25/11 27/9
27/16 27/17 27/19
28/25 31/25 32/1 32/2
32/13 65/5 73/20
78/10 80/3 80/11 88/9
**network** [212]
**Network's** [1]  143/16
**Network,'** [1]  101/2
**networking** [16]  8/16
12/7 12/17 12/20
12/23 13/3 16/14
16/14 16/15 16/19
16/24 16/25 17/3 17/4
17/19 87/14
**networks** [13]  18/4
18/18 19/3 30/5 35/13
85/2 85/3 85/6 85/19

**E108/4** 130/22 131/4
131/6
**never** [11]  44/7 49/18
49/19 64/16 82/16
102/13 103/5 103/18
107/3 112/13 113/12
**new** [9]  11/12 12/24
13/1 14/18 14/18 97/8
97/10 130/11 164/1
**node** [24]  47/1 48/24
49/2 60/8 60/12 61/2
61/3 64/7 65/17 65/18
66/5 71/8 77/6 93/19
125/3 136/8 137/10
137/15 138/2 138/10
142/23 143/20 143/22
143/24
**nodes** [17]  18/12 25/1
37/14 46/14 53/20
54/5 70/22 70/23 71/3
71/4 71/6 71/10 71/11
77/11 125/7 136/7
143/15
**nodes'** [1]  34/15
**non** [4]  62/22 104/13
106/4 151/20
**non-contraband** [1]
62/22
**non-modified** [2]
104/13 106/4
**non-recorded** [1]
151/20
**noon** [2]  77/18 77/19
**normal** [24]  25/2 25/6
25/9 25/11 25/13
25/19 25/22 26/3
26/15 26/21 27/9 47/9
55/25 56/24 57/16
78/17 80/2 80/11
90/12 90/24 106/4
112/5 112/16 145/2
**northern** [3]  15/22
15/25 16/5
**note** [4]  64/12 64/13
112/23 143/6
**noted** [3]  53/8 86/24
113/21
**notes** [4]  60/21
110/19 119/14 125/3
**notice** [4]  34/18
134/17 135/10 141/17
**noticed** [2]  51/25
64/16
**notion** [2]  48/12
103/25
**novel** [1]  14/21
**nuance** [1]  51/4
**nude** [1]  43/24
**number** [87]  3/4 33/9
34/20 39/3 39/20
39/21 39/24 40/9
47/11 48/1 54/15
58/14 59/18 59/23
60/2 60/3 60/18 61/1
61/1 61/2 61/6 61/7
63/21 64/21 64/22

**E66/4** 66/5 66/5 66/16
66/17 66/22 66/24
67/16 67/22 69/16
73/14 75/3 76/25 78/6
81/14 97/4 97/5 97/5
98/6 98/8 98/8 99/12
109/14 109/18 109/24
110/2 110/9 110/9
110/11 111/9 112/14
113/8 113/17 113/19
113/20 115/12 116/11
116/14 116/16 116/22
116/25 118/9 119/2
119/2 119/11 119/25
121/1 121/12 121/14
122/11 122/13 122/19
122/20 122/21 122/25
124/22 125/10 134/18
143/12 143/12 150/24
170/25
**numbers** [7]  44/17
72/11 72/18 73/12
117/11 137/4 143/14
**numerical** [1]  107/14
**numerous** [1]  132/7

## O

**o'clock** [2]  128/11
128/12
**oath** [1]  81/6
**obfuscate** [3]  90/25
91/1 92/23
**obfuscated** [1]  45/1
**objection** [33]  10/6
10/22 13/25 14/2
16/16 21/21 32/14
32/16 42/11 42/14
108/1 131/19 131/21
132/14 132/17 132/24
134/22 135/11 142/2
142/4 142/5 147/6
147/8 156/15 156/17
157/19 157/21 158/11
158/13 171/15 171/16
171/17 172/7
**obnoxiously** [1]  62/17
**observations** [2]  37/5
124/24
**observe** [2]  50/17
65/6
**observed** [17]  72/6
76/15 76/16 76/16
97/1 97/2 97/18 97/18
97/19 100/15 102/3
102/13 109/2 116/15
136/21 136/22 142/23
**obtain** [5]  9/5 19/15
91/3 93/8 101/10
**obtained** [1]  136/7
**obvious** [1]  92/1
**obviously** [5]  5/3
99/22 105/18 156/21
175/8
**occasion** [2]  71/6
71/15 71/20
**occasionally** [4]  71/2

**E112/12** 112/18 112/19
**occur** [1]  25/19
**occurred** [3]  15/3
118/1 137/8
**October** [3]  76/16
111/3 111/13
**October 1** [1]  76/16
**off-brand** [1]  171/2
**off-line** [2]  112/10
112/12
**offense** [1]  43/13
**offensive** [1]  44/1
**offer** [3]  152/9 152/11
161/4
**offered** [2]  152/5
153/7
**offering** [1]  139/5
**offers** [1]  24/12
**officer** [2]  58/10 83/5
**officers** [10]  79/23
83/3 136/6 146/6
146/6 146/12 146/18
149/15 150/22 151/13
**Official** [1]  1/24
**oh** [9]  45/21 48/17
58/21 59/6 76/6 84/6
92/16 127/14 132/23
**okay** [221]
**old** [1]  149/4
**once** [8]  20/23 21/5
31/11 37/25 53/11
57/22 97/25 106/11
**one-on-one** [1]  9/5
**one-third** [1]  53/20
**ones** [4]  77/7 77/24
139/23 140/1
**online** [1]  98/4
**open** [20]  20/5 20/11
22/18 24/18 24/21
24/24 25/10 25/11
27/9 27/16 27/17
27/19 28/25 29/1
55/18 80/3 80/11
160/18 163/9 171/4
**opened** [4]  169/18
171/23 171/24 172/11
**operate** [3]  18/6 114/8
136/7
**operates** [4]  26/9
56/10 70/15 136/20
**operating** [4]  46/20
108/8 113/14 143/16
**operation** [5]  25/16
47/9 93/3 112/5
112/16
**operations** [1]  17/15
**opinion** [5]  15/11 26/4
104/25 111/3 113/5
**opportunity** [4]  54/21
63/17 151/16 156/25
**opposed** [1]  121/8
**option** [7]  23/13 23/20
24/2 25/2 36/14 36/18
90/1
**options** [2]  23/11
24/20

**O**

order [18] 3/1 5/5 5/10
9/22 17/17 42/7 65/8
67/3 81/3 95/10 99/2
99/3 99/7 107/10
128/21 145/25 174/21
174/22
organized [1] 14/17
original [35] 30/16
48/16 49/20 57/15
58/12 61/13 63/17
65/2 66/10 66/17
66/20 66/24 68/18
69/12 72/14 74/9
76/12 79/7 91/2 103/5
103/18 107/9 108/11
108/13 108/15 113/10
113/12 113/15 125/9
136/5 137/3 138/14
138/18 141/12 143/1
originally [1] 41/10
originator [1] 91/7
outside [14] 57/15
100/25 101/2 101/5
108/1 145/7 145/23
149/12 149/13 149/25
150/15 151/8 157/8
162/12
overall [5] 121/2
121/6 121/8 121/22
143/10

**P**

p.m [2] 128/20 175/14
P2P [2] 23/21 23/22
packets [4] 57/19
57/19 107/19 107/19
page [23] 2/2 21/24
22/7 22/14 22/24 24/9
24/20 35/11 42/9
42/18 43/8 44/2 44/3
44/14 45/22 45/23
46/1 90/1 92/10 95/4
100/15 135/16 140/20
Page 11 [1] 140/20
Page 2 [3] 22/7 45/22
45/23
Page 3 [1] 22/24
Page 4 [1] 24/9
pains [2] 90/17 90/20
Palm [2] 1/8 1/19
paper [53] 14/23 15/5
15/7 15/8 19/1 19/10
20/15 20/18 51/24
53/17 61/20 61/23
62/1 62/4 62/16 62/24
63/3 63/10 68/6 70/20
70/21 72/6 72/19
73/15 75/10 77/1
79/11 81/14 86/15
86/17 86/18 87/3
101/18 101/22 106/21
111/10 117/9 117/11
122/4 123/10 123/14
123/14 123/20 124/1
124/3 124/4 124/7

123/11 125/14 125/23
126/2 134/10 134/19
papers [4] 14/18
14/21 15/3 86/21
paragraph [9] 135/23
135/23 135/23 139/13
140/20 141/1 168/7
168/22 170/7
Paragraph 26 [3]
135/23 135/23 139/13
Paragraph 27 [1]
140/20
Paragraph 28 [1]
141/1
Paragraphs [2]
139/10 140/6
Paragraphs 26 [1]
139/10
Paragraphs 27 [1]
140/6
parameters [9] 69/21
69/22 69/24 70/4 73/9
111/9 111/10 121/12
121/21
parenthesis [2]
140/21 140/22
parents [3] 148/22
150/16 151/6
parked [1] 148/5
part [35] 12/5 19/19
28/16 35/4 35/21
39/24 39/25 44/25
45/8 46/20 47/9 59/17
59/18 90/9 90/25
91/25 92/2 92/10
92/15 92/16 92/21
98/23 101/7 112/16
118/25 119/3 120/5
120/5 120/14 120/25
128/3 134/20 135/4
140/1 141/23
participants [1] 71/1
participated [1]
146/10
particular [53] 13/5
13/14 14/10 14/10
14/15 14/22 18/18
26/3 27/24 29/22 30/2
44/11 44/12 45/15
46/9 51/4 52/7 52/12
55/1 55/4 56/9 66/8
73/19 73/20 75/14
78/14 84/18 87/18
90/6 90/18 91/16 98/6
98/25 101/1 107/21
109/19 110/10 110/12
111/7 111/18 112/17
115/14 121/13 123/4
125/12 135/15 135/17
137/2 137/9 137/16
139/18 141/23 142/13
particularly [1] 79/11
particulars [1] 27/18
parties [2] 3/11 160/7
parts [1] 168/6
pass [10] 35/24 47/23

96/15 142/18 143/19
143/25 171/24
pass-fail [1] 143/19
passed [7] 54/5 100/2
100/3 142/24 143/2
165/6 166/17
passenger [3] 153/24
153/25 165/10
passive [5] 71/1 71/3
71/5 71/8 71/11
password [4] 31/20
107/24 107/24 108/8
paste [1] 46/7
path [1] 40/24
pause [6] 32/4 40/14
48/4 53/22 64/4
155/20
pay [1] 19/22
payment [1] 108/21
PBSO [1] 146/22
peacefully [1] 145/4
145/23
peer [101] 12/6 12/6
12/14 12/14 12/16
12/16 12/20 12/20
12/23 12/23 13/2 13/2
14/5 14/8 14/9 16/14
16/14 16/15 16/15
16/19 16/19 16/23
16/23 16/25 16/25
17/3 17/3 17/4 17/4
17/19 17/19 18/3 18/3
18/10 18/10 18/18
18/18 19/1 19/3 19/3
19/10 23/21 23/21
27/19 27/19 28/15
28/15 30/5 30/5 33/8
35/13 35/13 53/11
53/17 59/19 70/20
70/21 72/6 73/15
74/19 84/23 84/23
85/2 85/2 85/2 85/2
85/6 85/6 85/13 85/13
85/15 85/19 85/19
86/11 86/18 86/21
87/3 87/14 87/14
87/18 87/18 93/19
93/23 93/23 94/9
94/14 94/16 104/6
104/10 105/23 105/23
106/21 117/15 118/3
118/4 119/7 119/8
123/10 124/24 125/11
125/12
peer's [3] 93/24 94/10
94/14
peer-review [1] 14/9
peer-reviewed [18]
14/5 14/8 19/1 19/10
53/17 70/20 70/21
72/6 73/15 74/19
86/11 86/18 86/21
87/3 106/21 117/15
123/10 125/11
peer-to-peer [32] 12/6

12/14 12/16 12/20
16/15 16/19 16/23
16/25 17/3 17/4 17/19
18/3 18/10 18/18 19/3
23/21 27/19 28/15
30/5 35/13 84/23 85/2
85/2 85/6 85/13 85/19
87/14 87/18 105/23
118/4 122/25 124/24
124/25 125/4 125/14
125/15 125/21
Pennsylvania [1]
15/20
people [41] 11/20
11/22 14/13 14/13
14/25 15/1 17/5 17/21
19/7 19/12 20/4 20/7
21/1 28/15 29/25
30/12 33/14 33/25
34/19 37/6 45/11
47/17 51/16 52/25
62/14 78/20 78/23
92/3 92/3 97/21 104/9
107/3 112/12 113/2
145/9 145/9 145/25
146/17 154/6 161/17
164/3
percent [39] 53/18
69/3 72/9 72/10 72/15
72/16 72/20 72/22
73/1 74/7 75/5 75/6
75/7 81/10 81/10
81/11 81/14 81/17
97/21 114/17 114/23
115/3 115/6 115/7
115/16 115/20 115/21
115/22 115/25 116/1
116/4 116/5 116/13
116/16 117/7 117/17
117/18 124/24 142/17
percentage [4] 54/6
54/6 121/8 121/24
performance [4]
17/25 18/8 25/6 26/6
performance-wise [2]
17/25 18/8
period [4] 118/1 118/2
119/21 161/9
permission [2] 32/12
109/6
person [14] 5/22
49/23 67/25 68/3
91/10 93/14 96/23
98/17 106/19 107/14
107/9 120/17 121/23

person's [1] 108/13
personal [3] 15/11
150/19 157/10
personally [4] 9/1
79/5 140/9 145/5
personnel [2] 146/9
163/21
Ph.D [8] 6/16 9/1 9/3
9/4 9/5 9/6 11/7 69/2
Ph.D.s [2] 14/13 14/14
Philadelphia [1] 87/1
phone [8] 39/20 39/21
39/24 40/9 95/24
109/4 167/19 167/21
photo [1] 43/24
photograph [3] 147/5
163/15 171/21
phrase [1] 100/5
phrasing [1] 16/10
pick [3] 67/14 67/15
73/14
picture [1] 123/22
piece [4] 18/9 27/24
37/10 123/21
pieces [8] 9/10 118/3
122/11 122/12 122/20
122/21 123/5 142/21
pinned [1] 67/10
place [13] 20/7 27/6
27/7 42/23 62/23
98/24 107/15 109/11
148/11 149/25 153/19
155/2 155/23
placed [1] 85/14
places [1] 43/6
plain [1] 91/19
Plaintiff [1] 1/5
plan [1] 4/2
platform [1] 55/20
play [8] 78/5 160/1
160/2 160/4 160/5
160/5 160/6 160/10
played [2] 160/18
163/9
please [21] 3/3 3/14
5/13 6/7 20/12 22/7
22/23 23/15 24/8
30/15 35/9 36/12
42/19 44/2 44/16
80/15 128/23 129/14
129/16 129/25 131/25
pleasure [1] 126/16
plots [1] 125/19
plug [1] 45/15
plus [4] 10/25 81/17
115/17 116/19
point [39] 10/25 16/12
22/25 28/9 28/20 30/4
30/24 33/13 43/1 43/2
47/25 49/24 63/22
79/16 83/14 108/6
108/6 108/18 117/17
118/19 120/12 135/15
142/9 143/5 149/9
149/14 151/8 151/14

**P**

point... [11] 153/13 153/15 155/18 160/10 164/16 165/19 166/21 169/2 169/16 170/13 174/5

points [2] 128/6 173/11

police [3] 83/5 146/6 146/11

policy [3] 167/22 167/22 167/23

pop [1] 171/4

pops [1] 145/11

popular [2] 36/5 56/2

porch [1] 150/17

porn [1] 43/20 100/19 100/20

pornography [2] 52/3 52/18 54/12 54/13 59/6 59/11 136/25 172/15

portion [3] 44/20 119/8 123/4

positioning [1] 153/22

positive [32] 68/15 68/16 68/16 68/19 68/21 69/13 69/17 69/22 70/10 70/16 71/22 71/23 71/25 72/4 72/8 72/10 72/19 72/21 74/6 74/18 74/21 75/2 81/9 111/12 113/1 113/3 115/2 116/1 117/3 117/10 119/5 126/5

positives [1] 68/12 69/7 69/10 111/16

possessed [1] 86/7

possesses [1] 85/21

possibilities [1] 126/6

possibility [1] 111/15 125/21

possible [6] 56/14 102/22 103/12 111/12 125/25 137/11

possibly [3] 37/4 57/4 82/15

post [4] 33/15 33/24 52/22 52/25

posted [4] 34/12 42/5 42/10 53/8

potential [1] 111/15

potentially [1] 168/10

pragmatic [1] 93/1

precise [1] 91/21

prefer [1] 6/17

prefix [1] 40/2

preliminary [1] 3/24

prepare [2] 82/11 84/15

prepares [1] 32/21

preparing [4] 82/14 82/24 84/21 90/5

presence [2] 158/24

present [3] 127/23 145/17 146/5

presentation [1] 44/8

presented [4] 78/12 83/4 90/8 137/11

presumably [12] 29/14 45/17 59/9 85/20 108/22 127/12 129/7 166/11 167/18 172/22 172/23 174/16

presuming [1] 88/3

pretty [14] 17/6 26/5 26/9 31/22 33/17 41/22 55/23 55/25 78/13 79/1 88/8 91/19 92/10 98/9

prevent [1] 170/8

preventing [1] 164/13

previous [2] 24/20 45/20

previously [11] 30/1 36/7 38/22 38/23 44/23 52/5 98/21 99/2 106/9 136/24 159/19

primary [2] 55/15 130/15

printout [1] 137/25

prior [8] 130/7 130/10 130/21 131/2 151/22 162/1 167/24 173/2

prison [1] 168/10

privacy [4] 14/16 90/17 90/23 150/15

private [1] 96/2

probably [9] 8/17 46/7 50/1 56/4 57/4 62/16 72/16 113/2 166/23

probe [1] 57/19

problem [2] 49/6 59/23

problems [1] 153/16

proceed [8] 4/13 6/1 56/13 129/19 131/17 131/25 159/22 159/22

proceedings [2] 175/14 175/19

process [15] 4/14 14/9 15/5 15/12 21/3 30/16 33/3 34/1 39/4 43/4 53/16 62/22 67/3 98/23 137/8

produces [1] 174/4

professional [1] 20/8

professor [26] 4/2 5/6 5/12 6/11 6/17 6/19 6/22 7/4 7/5 7/13 10/24 11/3 11/5 16/23 21/24 39/12 42/18 69/2 124/21 131/11 132/4 134/10 134/19 136/9 143/3 144/5

Professor Levine [3] 132/4 134/10 144/5

professors [1] 14/12

proffered [1] 157/12

program [13] 7/25 14/11 15/2 15/8 21/5 21/10 21/11 21/13 22/13 23/1 23/9 70/15 89/13

programming [2] 55/22 55/25

programs [1] 19/25

project [2] 22/2 27/3

prominent [1] 56/5

promise [1] 159/23

promises [2] 168/14 170/6

promoted [1] 7/4

promotion [1] 7/3

propagated [1] 48/22

properly [2] 69/11 76/22

properties [1] 68/13

proportion [4] 115/5 115/17 117/16 121/1

prosecutor [6] 82/21 82/21 98/11 107/7 113/21 127/8

protect [1] 90/17

protocol [2] 18/9 70/23

provide [2] 17/8 162/22

provided [8] 58/10 102/2 134/11 136/11 143/3 152/15 169/8 170/13

Provider [1] 108/20

providers [1] 17/10

provides [2] 17/14 104/23

providing [2] 133/11 169/21

public [10] 27/5 29/1 53/6 62/1 62/2 89/12 91/25 92/2 92/5 95/21 95/18

publically [2] 58/11 91/18

publication [1] 163/10

publications [2] 10/12 14/14

publicly [10] 34/9 85/15 89/14 91/17 92/20 94/18 95/14 95/15 95/18 95/19

publish [2] 15/10 163/6

published [11] 12/16 13/2 15/4 19/1 20/15 53/13 57/17 70/21 89/12 89/14 92/20

publishing [1] 160/14

purported [1] 169/8

purporting [1] 144/25

purpose [1] 82/16

purposes [9] 4/21 4/21 4/24 6/18 17/20 123/12 134/6 143/19 159/25

put [25] 4/3 7/18 14/9 17/10 18/9 32/2 44/21 48/12 56/24 57/2 58/22 59/2 61/21 61/23 62/14 76/17 82/20 86/17 100/9 141/17 150/9 155/14 160/7 160/8 171/4

puts [1] 145/9

putting [2] 79/10 158/17

**Q**

qualifications [2] 10/24 16/12

qualified [5] 16/7 16/9 16/10 87/13 87/19

quantity [1] 115/18

question [28] 8/3 30/2 30/9 30/16 47/15 52/14 57/18 64/11 66/3 66/13 69/12 81/7 83/1 91/14 93/1 110/8 120/25 122/9 124/14 124/19 137/15 142/11 142/24 168/20 169/3 169/25 170/1 172/8

questioned [1] 124/22

questions [7] 21/3 80/21 122/9 124/10 150/18 157/9 157/12

quickly [1] 12/21

quite [4] 12/4 92/23 98/24 154/13

quote [5] 36/22 75/3 168/23 168/23 169/18

quote/unquote [1] 36/22

quoted [1] 74/7

quoting [1] 81/14

**R**

raining [2] 150/15 155/16

raise [1] 145/24

raised [3] 4/10 75/16 78/2

ram [2] 145/20 171/3

ran [10] 73/6 73/15 73/25 74/3 75/2 115/25 116/4 125/2 139/21 141/13

randomization [1] 78/4

randomized [3] 67/3 67/4 67/4

randomly [4] 29/2 29/4 33/6 63/21

ranging [1] 107/23

ranging [1] 74/23

rar [2] 45/11 46/8

rate [23] 36/15 69/17 69/22 70/11 70/16 71/23 71/25 72/4 72/8 72/10 72/19 72/21 74/6 74/18 74/22 75/2

169/4

**T**

tisp [1] 115/3 115/2 116/2 117/3 117/10

rates [1] 81/9

reach [1] 121/22

read [5] 23/15 69/13 157/14 158/2 159/8

readable [3] 45/8 85/22 100/1

readily [1] 12/4

reads [1] 62/4

ready [4] 15/10 82/5 113/22 129/19

real [10] 69/17 69/24 70/3 70/4 70/5 70/5 70/7 125/25 126/3 126/6

real-word [1] 125/25

reality [2] 70/17 114/2

realize [1] 66/25

really [34] 8/24 11/20 11/23 12/24 17/20 18/15 20/17 20/18 26/21 29/8 33/19 33/20 36/8 40/19 51/19 55/2 55/6 56/12 56/19 60/22 63/7 66/13 66/22 67/4 79/4 79/16 79/19 85/9 99/22 103/24 125/4 127/15 128/10 163/25

Realtime [1] 175/18

reason [16] 12/5 25/25 26/1 27/20 31/13 34/23 36/4 51/25 61/20 61/21 79/3 105/15 105/15 111/6 167/16 167/16

reasonable [5] 17/6 19/17 67/7 76/19 110/14

reasonably [4] 77/2 111/1 111/4 119/21

reasons [2] 93/1 106/2

reassemble [6] 39/9 41/2 41/8 65/9 65/11 65/14

recall [12] 19/3 39/8 148/3 149/20 149/23 152/14 152/20 153/13 161/15 162/20 166/2 169/2

receipt [1] 31/20

receive [18] 7/1 34/20 38/11 49/25 50/1 50/6 50/11 57/22 63/23 63/24 64/1 66/22 71/7 109/25 134/13 137/9 168/8 168/10

received [40] 2/8 7/2 10/7 11/8 11/9 11/11 14/3 21/22 42/16 49/11 50/2 50/3 53/23 58/15 58/16 60/19 64/2 64/23 66/16

**R**

**received... [21]** 66/19
76/25 77/13 109/15
109/16 109/18 109/24
110/2 110/5 113/19
119/1 120/14 122/20
132/3 132/18 136/14
142/6 147/9 156/19
158/14 171/19

**receiving [6]** 50/7
50/7 66/14 66/14
110/13 118/16

**recess [7]** 80/25 81/2
128/19 128/20 174/23
175/4 175/13

**recipients [1]** 28/12

**recognize [2]** 16/13
137/21

**recollect [1]** 87/16

**recollection [6]** 18/25
27/2 27/5 57/7 114/1
161/17

**recommend [5]** 79/5
118/12 118/15 118/19
118/21

**reconcile [1]** 119/14

**reconvene [2]** 129/2
129/4

**record [12]** 6/7 17/2
108/25 129/17 131/17
133/23 134/16 134/25
135/7 160/4 167/24
175/19

**recorded [7]** 149/24
151/19 151/20 152/5
153/13 167/12 167/20

**reorder [3]** 162/22
167/15 167/17

**recording [9]** 156/8
156/9 156/10 156/11
161/22 161/23 161/25
162/15 169/7

**recover [1]** 52/3 61/15
112/17

**recovered [1]** 4/23

**rectangle [1]** 45/1

**red [2]** 67/14 148/25

**redact [6]** 32/12 32/17
32/21 32/23 32/24
141/20

**redacted [4]** 37/9
42/18 44/9 132/11

**redated [1]** 13/8

**redirect [1]** 124/13

**reduce [1]** 112/25

**reduced [1]** 168/10

**reduces [1]** 119/1

**reduction [1]** 168/12

**refer [5]** 13/8 31/22
95/1 114/25 123/20

**reference [4]** 32/19
51/6 95/7 168/23

**referenced [5]** 51/24
138/1 139/16 141/5
141/14

**references [1]** 138/5

**referred [7]** 6/1 7/3
19/25 38/21 38/22
72/7 72/20 115/15

**referring [19]** 13/10
18/19 29/7 32/6 43/25
58/1 64/14 68/16 72/3
73/11 76/5 103/16
104/3 111/25 112/3
113/4 114/24 117/14
125/1

**refers [6]** 15/6 17/4
32/12 114/23 115/6
115/16

**reflects [4]** 69/24
121/2 126/5 126/6

**regarding [2]** 15/16
75/14

**regardless [2]** 51/9
162/24

**regards [3]** 4/10 13/14
75/23

**regenerate [1]** 45/16

**Registered [1]** 175/17

**regular [7]** 31/24
33/15 33/16 88/20
101/6 104/12 170/20

**regularly [1]** 90/19

**REINHART [7]** 1/2
1/13 133/10 133/11
134/9 134/11 173/3

**reinitiate [1]** 162/17

**reinsert [1]** 112/19

**related [13]** 11/11
45/17 52/25 53/14
53/21 54/1 54/3 54/18
66/7 68/19 130/14
132/7 162/5

**relates [1]** 47/15

**relation [3]** 12/16 13/2
102/24

**relatively [5]** 23/19
25/6 31/1 64/22
170/18

**relay [2]** 71/3 94/6

**relaying [5]** 64/25
91/6 91/6 94/6 119/9

**release [2]** 20/8 34/24

**Relevance [1]** 172/7

**relevant [2]** 51/19
104/18

**relied [1]** 143/21

**rely [2]** 37/23 79/11

**relying [1]** 143/20

**remain [2]** 154/22
161/14

**remained [2]** 161/9
161/12

**remaining [1]** 131/19

**remains [2]** 50/22
50/23

**remember [6]** 16/4
84/3 90/2 117/9
154/14 169/23

**remote [1]** 21/9

**remove [1]** 111/15

**rephrase [4]** 30/8

**replace [1]** 164/18

**replaced [3]** 12/4 12/6
165/12

**replacing [1]** 12/21

**replicated [1]** 98/22

**reply [1]** 36/1

**report [5]** 125/22
167/1 167/4 167/6
174/4

**reporter [7]** 1/23 1/24
5/22 32/11 32/20
175/17 175/18

**reporting [1]** 116/22

**reports [1]** 86/20

**repository [1]** 26/11

**represent [3]** 140/14
143/14 143/15

**representative [1]**
10/18

**representing [1]**
142/12

**request [92]** 35/22
35/23 35/24 35/25
35/25 40/18 46/16
47/7 47/19 47/21
47/22 47/24 47/25
48/1 48/13 48/15
48/16 48/21 49/1 49/8
49/9 49/11 49/20
49/21 50/6 50/14
50/16 50/19 50/20
51/11 51/12 51/14
51/18 52/6 52/12 55/4
58/16 58/16 58/21
58/22 58/22 58/23
59/5 59/11 59/18
60/16 60/19 60/20
60/22 60/22 61/5 71/3
76/10 76/15 76/16
77/2 78/24 79/13
91/14 91/15 91/19
92/1 93/24 94/1 94/7
94/10 94/14 94/15
95/10 96/10 96/14
96/14 99/3 99/7 100/4
110/12 110/19 111/18
111/23 112/2 112/9
112/21 112/21 118/4
118/16 119/9 121/2
121/7 121/9 121/16
123/6 152/4

**requested [18]** 36/4
40/23 50/18 50/19
50/20 58/17 60/21
96/15 98/21 109/7
110/11 118/3 120/8
122/19 138/10 140/2
140/11 140/16

**requesting [29]** 29/9
35/3 46/25 47/2 47/17
48/10 53/13 53/14
66/7 71/2 90/25 91/1
92/1 92/2 93/8 93/10
93/13 98/15 98/17
102/25 104/6 113/2

**replace... [continued]**
55/12 110/8 157/20
197 126/16 121/23
123/4 136/23 137/15
139/21

**requestor [52]** 47/16
48/16 49/11 49/20
50/2 50/8 50/12 57/15
60/3 61/14 63/18
64/16 65/2 65/22
66/10 66/21 66/24
68/18 71/9 72/14
76/12 77/6 77/22 78/6
79/2 79/7 79/15 80/10
91/2 91/10 103/5
103/19 108/12 108/13
108/15 110/16 112/6
113/8 113/10 113/12
113/15 113/20 121/25
122/1 125/9 136/5
137/3 138/15 138/17
138/18 141/12 143/1

**requestors [4]** 58/12
74/10 79/18 107/9

**requests [72]** 38/1
41/6 41/6 48/24 51/8
53/19 53/19 53/20
54/2 54/5 55/1 58/15
59/22 60/18 63/24
63/24 64/1 64/2 64/13
64/17 64/20 64/23
65/8 65/13 65/14
65/15 65/21 66/1 66/4
66/5 66/10 66/14
66/15 66/15 66/16
70/24 71/7 76/11
76/17 76/19 76/23
76/25 77/13 77/15
77/17 77/19 77/20
77/23 91/6 91/7 91/8
94/6 109/15 109/16
109/18 109/24 110/1
110/1 110/2 112/17
112/24 113/17 113/19
118/9 118/23 118/24
119/1 119/19 119/24
120/13 120/21 122/20

**require [1]** 120/19

**required [5]** 36/6 39/9
94/25 122/13 122/22

**requires [1]** 109/20

**research [6]** 7/22
14/14 14/18 14/18
14/21 14/21

**reserve [1]** 173/19

**residence [26]** 83/6
107/15 107/21 107/22
107/23 107/23 109/1
109/10 111/8 144/22
144/23 145/14 145/20
147/16 147/24 148/15
148/17 148/20 149/15
149/25 150/17 150/23
150/24 170/9 172/3
173/4

**residents [7]** 144/25
145/4 145/22 145/25
148/4 148/21 149/14

**resiliency [1]** 18/8

**resiliency-wise [1]**
18/8

**resourced [1]** 11/25

**resources [4]** 23/23
36/10 105/18 105/19

**respect [1]** 140/18

**respond [1]** 165/24

**responded [2]** 145/22
169/19

**responding [1]** 15/9

**response [4]** 36/4
150/4 159/17 166/5

**responsibility [1]**
168/11

**rest [1]** 29/22

**restores [1]** 27/4

**restriction [1]** 88/24

**result [8]** 70/10 74/5
74/6 116/22 117/8
117/15 118/8 118/22

**results [1]** 137/14

**resume [1]** 87/7

**retrieve [10]** 30/1 32/2
36/7 37/21 39/7 39/15
45/5 46/7 51/11 51/15

**return [2]** 40/24 44/7

**returned [4]** 31/19
33/11 33/24 95/3

**revealing [1]** 28/3

**review [6]** 14/9 15/2
133/5 133/25 135/1
156/25

**reviewed [24]** 14/5
14/8 14/24 15/12 19/1
19/10 53/17 70/20
70/21 72/6 73/15
74/19 86/11 86/18
86/21 87/3 106/21
117/15 123/10 125/11
133/15 134/14 140/9
167/4

**reviewers [1]** 15/10

**reviewing [1]** 82/15

**revised [1]** 15/8

**revision [1]** 86/17

**revisions [1]** 27/4

**right [108]** 3/24 5/1
6/20 7/24 8/6 8/7 9/8
9/14 10/5 12/3 13/17
13/23 15/18 16/18
20/20 22/7 22/17
22/19 22/20 23/13
24/6 24/8 25/3 26/1
28/13 29/6 29/8 30/7
36/10 39/2 39/14 42/6
42/24 43/3 43/10
43/15 44/2 44/5 44/14
46/3 47/4 48/4 51/4
58/3 62/8 66/18 70/1
75/25 79/3 79/6 79/18
80/12 81/5 84/22 85/8
92/12 95/23 96/2
100/11 104/20 116/4
119/10 119/18 119/22
121/1 121/11 121/18

**R**

right... [41] 123/2
127/11 127/20 128/16
128/17 128/18 129/11
131/8 132/9 133/17
134/24 135/9 141/3
141/18 142/5 144/3
144/9 144/20 145/14
146/25 148/7 151/20
153/9 154/2 158/18
159/5 161/7 163/5
163/8 165/6 166/11
167/20 170/16 170/19
171/11 172/2 172/15
173/14 173/17 173/21
175/12
right-hand [1] 46/3
rights [6] 157/15
158/2 158/6 158/16
158/20 159/7
rigorous [1] 74/18
RMR [2] 1/23 175/23
robberies [1] 145/1
roll [3] 9/9 62/23 74/2
room [4] 5/22 168/24
169/4 170/17
roomy [1] 154/5
root [1] 115/12
ROSENBERG [2] 1/2
174/21
roughly [2] 30/25
119/25
router [1] 108/17
routing [5] 93/24 94/9
94/12 94/14 94/15
row [2] 67/17 67/19
rows [1] 67/25
rule [1] 159/23
run [24] 11/25 18/1
19/19 23/1 23/25
29/25 32/1 35/15 37/6
55/23 71/17 71/21
73/6 73/8 73/8 106/2
107/3 118/12 121/15
125/16 125/17 125/20
138/16 139/24
running [39] 17/5
21/5 21/15 23/9 23/19
25/17 27/21 28/18
28/18 29/21 31/6
31/25 33/8 36/24
37/10 38/18 38/24
39/5 39/6 43/4 43/5
50/10 70/23 71/19
71/24 72/13 75/19
75/19 78/15 103/4
103/8 103/17 103/21
106/13 108/6 125/6
137/4 140/15 143/8
runs [4] 18/10 21/6
104/5 105/24
ruse [1] 145/3

**S**

safe [19] 123/25
168/24 169/1 169/4

169/17 169/18 169/19
169/22 170/14 170/16
170/17 170/18 170/22
171/2 171/8 171/9
171/22 172/11 172/13
safer [4] 23/21 23/21
145/11 150/25
safety [2] 145/5 145/5
sake [1] 160/2
Santa [1] 11/8
Santa Cruz [1] 11/8
sat [1] 107/4
satisfactory [2] 57/23
106/12
saved [3] 139/22
139/24 141/15
saw [14] 24/20 44/19
46/18 52/24 56/16
56/17 80/2 82/16 92/9
92/12 95/4 101/24
163/15 174/20
saying [13] 40/19
60/11 61/1 83/8 95/13
98/14 99/18 99/19
104/15 111/17 122/11
142/22 145/6
says [25] 15/8 22/15
22/17 23/7 23/16
24/24 25/5 25/6 26/1
26/5 29/5 29/6 35/11
43/12 43/20 44/1 44/4
45/2 45/9 77/21
142/17 165/23 168/7
169/16 170/9
scenario [6] 66/20
70/6 72/13 117/2
117/5 126/3
scenarios [3] 65/3
67/8 125/23
scenes [2] 30/21
31/12
scheduled [1] 129/10
SCHILLER [14] 1/17
2/3 2/5 3/16 3/25 4/17
6/1 7/8 124/13 126/15
128/25 131/16 160/14
175/8
school [2] 11/14 56/4
science [4] 11/12 56/3
74/21 114/5
Sciences [2] 6/13 8/5
scientific [2] 14/9
54/22
scientifically [2]
114/7 114/13
scientist [1] 114/4
scientists [1] 14/12
scope [1] 108/1
screen [10] 21/24
22/12 23/5 37/8 42/18
139/4 139/10 139/11
147/12 158/17
screens [1] 21/2
scroll [3] 43/22 44/14
45/19
sealed [1] 134/25

search [45] 17/13
17/18 26/20 38/12
38/19 45/15 46/13
82/12 82/19 83/2
83/13 84/10 88/17
97/24 98/13 98/14
99/2 127/10 127/18
132/12 132/12 133/8
133/11 133/13 134/9
134/20 138/4 138/11
138/22 139/11 140/11
140/19 141/8 141/14
144/8 144/13 144/21
145/3 146/10 170/9
172/2 172/3 172/5
173/12 173/12
searches [2] 46/11
97/24
searching [7] 27/25
28/4 28/10 38/14
46/22 52/2 98/12
seat [9] 3/2 5/17 81/4
128/22 153/24 153/25
154/1 165/10 165/13
seated [2] 148/25
153/24
seating [1] 154/8
second [27] 7/7 32/4
39/24 40/14 48/11
53/22 57/25 61/7
76/16 80/19 119/16
141/6 155/20 156/2
156/9 156/11 159/4
160/3 161/25 162/15
163/13 164/1 164/6
166/4 166/7 166/17
168/7
secret [1] 46/24
secrete [1] 62/5
section [3] 8/24 8/25
130/9
secured [7] 8/10 8/11
80/11 146/8 150/23
173/6 173/7
securely [1] 8/13
security [30] 6/14
7/16 7/20 7/21 8/16
16/14 16/16 16/20
17/25 23/12 23/13
23/14 23/15 23/25
24/5 24/11 24/22
26/15 27/10 80/2 80/3
80/10 87/15 87/19
87/22 90/1 90/12
90/13 130/19 131/1
security-wise [1]
17/25
see [59] 9/14 9/16
12/20 22/8 22/10
22/12 22/14 23/3 23/3
24/18 24/21 26/5
26/24 35/11 37/9
37/11 39/1 43/10
43/15 43/19 43/23
44/5 44/21 45/2 45/7
45/24 46/2 47/3 50/1

64/12 65/6 78/6 89/21
89/24 92/13 102/20
105/11 115/24 118/19
119/14 120/9 120/16
120/25 132/21 133/12
135/16 135/18 139/11
139/14 140/22 142/16
143/7 144/1 147/12
147/18 148/6 148/23
149/2 175/13
seeing [2] 68/7 68/11
seek [2] 26/10 26/12
seeking [3] 27/11
27/14 27/18
seen [4] 21/1 102/8
137/14 163/21
seized [1] 163/24
select [1] 36/15
selected [1] 111/11
selecting [1] 90/1
seminar [1] 8/14
send [27] 40/18 40/18
47/19 47/22 48/18
49/8 49/17 49/21
49/23 50/4 50/14
50/15 51/8 51/11
51/12 51/14 51/17
52/6 57/19 57/19
65/20 66/2 77/17
77/19 96/2 107/19
118/4
sending [2] 53/12
60/15
seniors [1] 8/24
sense [16] 33/18
34/17 54/4 66/6 68/20
69/18 76/14 77/21
85/2 92/23 99/18
106/8 118/17 125/9
126/22 173/23
sent [8] 47/5 48/12
77/23 77/25 118/9
118/23 118/24 119/7
sentence [2] 168/11
169/17
sentenced [1] 168/10
sentencing [1] 168/13
separate [10] 8/25
113/24 113/25 114/1
114/2 117/9 120/20
120/22 142/9 155/22
separately [1] 19/6
September [1] 6/23
sequence [1] 44/17
series [17] 21/2 40/10
46/8 59/22 63/24 64/2
64/20 72/7 74/2 77/7
77/19 77/20 78/25
112/18 125/18 126/4
145/1
server [5] 17/12 17/12
17/14 17/17 18/14
server-based [2]
17/14 18/14
servers [2] 11/25
17/10

service [4] 7/23 17/8
17/13 108/20
services [1] 13/1
set [7] 48/16 69/24
70/22 73/18 73/24
78/14 174/11
sets [1] 78/18
setting [3] 23/10 24/2
36/13
settings [1] 56/20
setup [2] 36/18 36/21
seven [4] 138/13
139/20 140/16 141/11
share [14] 29/20 30/9
33/13 33/14 34/5
38/10 38/11 41/5
52/24 65/8 92/22
92/24 102/17 142/17
shared [4] 85/7 85/15
86/8 102/15
sharing [9] 19/3 26/22
27/15 28/9 46/16
46/21 47/16 85/23
92/24
sheet [1] 139/1
Shepherding [2] 15/6
15/6
sheriff's [1] 162/12
ship [2] 7/14 31/15
short [3] 127/19
128/12 160/3
shortly [3] 144/16
161/25 162/23
show [8] 13/17 21/16
44/13 109/7 109/9
111/6 151/13 171/11
showing [5] 10/2 49/1
51/21 137/21 171/21
shown [3] 77/6 77/25
139/1
shows [4] 44/12 72/19
87/7 125/19
shut [3] 18/5 28/20
28/20
sic [1] 167/4
side [5] 43/15 46/3
69/19 70/9 148/7
sign [3] 83/3 158/5
159/8
signal [3] 40/19 47/5
52/6
signals [2] 100/2
100/3
signatures [1] 159/1
signed [7] 133/8
133/9 144/8 158/9
158/22 158/24 173/3
significance [3] 164/5
165/18 166/2
significant [1] 130/17
signing [2] 134/1
134/1
SIGOUIN [25] 1/7 3/5
3/21 4/18 4/22 84/21
127/24 128/4 144/15
148/12 149/17 150/18

**S**

**SIGOUIN... [13]** 153/22 153/24 155/2 155/4 155/23 157/8 158/22 168/7 168/9 168/15 168/22 170/7 170/13

**Sigouin's [2]** 82/12 83/9

**similar [5]** 11/25 88/6 88/13 99/8 123/17

**Similarly [1]** 50/6

**simple [1]** 74/2

**simulation [4]** 70/13 73/10 73/24 125/20

**simulations [11]** 73/6 73/6 73/8 74/1 74/1 74/4 74/23 75/2 117/10 125/11 125/16

**single [5]** 17/11 17/12 63/14 111/14 119/19

**sir [9]** 3/6 6/5 16/21 23/18 33/2 129/24 135/12 160/12 166/16

**site [18]** 20/6 20/6 20/7 21/9 22/6 43/20 44/7 44/8 44/11 44/22 92/1 92/12 100/19 100/21 100/21 100/22 101/24 146/8

**sites [10]** 43/16 43/17 43/17 43/23 52/24 101/9 102/1 102/5 102/10 102/11

**sitting [14]** 5/22 20/21 38/17 63/23 68/3 149/3 150/13 153/25 154/1 154/5 154/20 163/14 165/7 165/7

**situations [1]** 171/6

**six [7]** 7/2 38/2 46/15 138/13 139/20 140/16 141/11

**sixth [1]** 37/12

**size [2]** 35/11 36/2

**sized [3]** 77/2 111/1 111/4

**sizes [1]** 73/25

**skilled [1]** 78/13

**skip [1]** 41/25

**skipping [1]** 43/12

**slide [13]** 22/7 22/23 24/8 29/6 35/9 36/12 36/20 36/23 37/8 44/19 45/1 45/20 100/12

**slides [1]** 80/2

**slightly [2]** 73/18 155/16

**slows [2]** 26/5 57/4

**Slurred [1]** 152/24

**small [12]** 31/1 52/19 64/22 66/22 66/23 73/21 73/23 76/19 121/7 125/13 154/11 170/18

**smaller [1]** 168/23

**smoother [1]** 35/16

**software [59]** 18/9 19/15 19/18 20/23 22/18 23/22 25/17 27/11 27/21 28/19 28/20 29/21 30/21 30/24 33/4 33/5 33/8 35/10 36/25 37/2 37/3 37/6 37/10 38/24 39/6 42/24 43/5 46/7 46/21 47/9 50/10 56/11 56/19 56/20 56/24 57/5 57/10 60/2 73/13 78/16 78/19 78/23 79/2 79/5 91/9 97/13 98/5 98/6 103/4 103/9 103/17 103/21 105/17 105/19 105/21 113/14 120/7 136/20 143/16

**solicit [3]** 14/18 14/18 14/21

**somebody [6]** 44/11 46/24 53/14 62/2 66/4 75/19

**someone's [2]** 35/3 109/3

**something's [2]** 14/7 36/4

**somewhat [1]** 67/2

**soon [1]** 12/18

**sorry [35]** 14/19 15/22 22/3 26/18 27/4 32/8 41/22 45/20 51/12 52/14 52/20 55/12 58/21 60/1 60/6 65/16 75/1 77/6 80/6 81/22 90/11 110/6 111/25 115/7 115/11 117/20 122/8 128/11 131/16 132/21 139/5 142/11 145/15 166/9 166/15

**sort [9]** 12/25 54/17 63/25 86/1 112/1 112/25 113/1 117/5 120/9

**sound [3]** 54/25 55/3 74/15

**soundness [2]** 74/12 74/15

**sounds [2]** 83/7 144/10

**source [14]** 20/1 20/3 20/5 20/10 20/11 22/5 22/18 22/19 55/17 55/20 78/10 78/16 78/17 103/15

**sourcing [1]** 105/23

**SOUTHERN [3]** 1/1 15/17 83/23

**spacing [1]** 154/4

**speak [11]** 4/20 5/23 24/13 63/1 149/20 150/2 151/16 152/21 153/5 169/21 170/10

**speaking [13]** 29/14

**start [16]** 3/12 3/13 3/24 16/23 30/19 49/9 51/12 64/20 97/23 97/25 98/2 128/9 168/4 173/19 173/22

**started [15]** 7/2 11/20 12/18 12/19 12/22 9/19 50/9 54/24 54/25 71/19 97/11 150/16 155/18 164/2 166/3

**starting [2]** 17/2 79/16

**starts [2]** 168/1 168/4

**state [11]** 5/15 6/7 11/12 39/25 40/1 72/17 84/1 84/3 84/4 129/16 130/24

**stated [5]** 97/4 99/7 114/16 123/12 168/22

**statement [14]** 4/10 94/2 94/4 94/11 94/12 94/13 94/16 106/7 127/23 127/24 128/4 128/10 162/16 163/1

**statements [1]** 128/3

**states [7]** 1/1 1/4 1/18 3/5 3/16 16/5 39/24

**stating [1]** 83/5

**Stationed [1]** 146/25

**statistic [1]** 69/2

**statistical [4]** 68/23 69/5 74/20 142/25

**statistically [1]** 82/3

**statistics [2]** 74/16 97/20

**stay [1]** 28/17

**stayed [1]** 146/12

**stays [2]** 50/15 51/2

**Steinmetz [20]** 126/21 128/2 128/15 148/10 149/21 150/3 150/6 154/1 157/12 159/3 161/12 161/19 161/24 162/2 163/14 164/16 165/12 166/11 169/3 173/25

**step [12]** 35/1 35/8 42/1 70/11 70/12 70/12 70/17 70/22 76/25 95/5 112/6 161/19

**step towards [1]** 70/11

**stepped [2]** 112/1 161/15

**stepping [3]** 32/3 33/3 63/19

**steps [1]** 36/25

**stipulated [4]** 4/6 10/3 13/19 21/18

**stop [4]** 3/11 12/10 45/23 173/18

**stopping [1]** 54/13

**storage [1]** 35/18

**store [2]** 33/10 92/3

**stored [10]** 25/20 29/20 29/24 30/1 30/6 31/19 34/15 34/16 34/19 35/5

**stores [3]** 25/14 26/8 27/4

**storing [1]** 20/10 26/15 26/17 26/18 29/9 40/20 92/4

**straight [1]** 163/20

**stranger [1]** 29/5

**strangers [3]** 24/25 37/2 90/22

**strike [2]** 156/10 165/6

**strong [3]** 88/4 88/12 88/14

**student [2]** 67/14 67/15

**students [9]** 8/21 9/1 9/3 9/3 9/4 9/6 56/3 67/18 67/19

**studies [1]** 20/17

**study [2]** 19/8 52/1

**studying [1]** 20/13

**stuff [1]** 43/20

**sua [1]** 134/19

**subject [6]** 48/3 64/8 88/19 89/9 89/16 138/8

**submitted [5]** 14/23 75/11 82/25 134/8 135/2

**subsequently [1]** 30/12

**substance [1]** 150/1

**substantially [1]** 154/5

**successfully [1]** 38/19

**suffering [1]** 153/12

**suffice [1]** 72/5

**sufficiently [1]** 121/23

**suggest [4]** 111/14 118/11 121/9 122/1

**suggested [2]** 151/24 153/4

**suggestion [1]** 111/16

**suggests [1]** 121/24

**Suite [1]** 1/18

**sum [1]** 57/11

**summarized [1]** 144/2

**summarizing [1]** 167/2

**summary [3]** 4/1 4/12 124/18

**summation [1]** 35/14

**superpower [1]** 57/14

**supervisor [1]** 168/2

**supervisory [1]** 164/25

**supplied [1]** 159/16

**support [5]** 11/17 12/8 12/22 136/3 146/17

**supporting [1]** 133/3

**supportive [1]** 132/22

**supports [1]** 33/21

**suppose [1]** 18/3

**suppress [5]** 3/8 3/9 4/4 38/13 75/16

**SUPPRESSION [1]** 1/12

**S**

sure [26]  4/5 9/11 16/24 48/4 50/10 51/2 51/7 52/9 55/2 60/7 60/25 68/11 82/23 84/19 84/25 87/14 88/1 105/17 106/8 119/15 119/18 129/10 131/22 132/1 132/23 154/16
surgery [1]  153/15
surreptitiously [2]  167/19 167/24
survive [4]  18/11 18/11 18/13 78/22
sustain [1]  157/21
Sustained [2]  172/8 172/9
SW [1]  1/21
sweatshirt [1]  149/1
switched [1]  65/16
sworn [3]  5/14 83/4 129/15
synonymous [1]  98/15
synonyms [1]  93/22
system [2]  27/22 90/16
systems [3]  8/10 8/11 105/22

**T**

tab [1]  22/9
table [4]  31/13 115/15 148/25 172/24
tablet [1]  109/4
tabs [1]  43/4
tabulated [1]  53/23
tails [1]  49/15
take [39]  5/5 25/13 31/9 33/25 38/4 42/1 43/13 45/14 59/10 64/19 64/20 66/1 69/10 70/17 80/18 80/24 89/15 92/6 97/15 98/4 105/19 111/12 112/9 112/24 115/10 115/17 121/16 127/23 134/17 137/12 139/3 142/15 145/2 148/11 152/4 152/6 153/8 156/21 174/16
taken [5]  23/1 78/5 78/7 135/10 152/13
takes [8]  63/16 67/19 90/16 90/20 105/18 105/24 111/18 112/22
talk [29]  20/20 22/3 28/13 29/12 38/5 38/6 38/16 38/25 41/14 47/13 48/13 54/9 55/16 59/1 67/1 76/10 97/17 102/16 114/24 136/9 144/13 147/3 153/18 161/16 166/18 170/2 170/3 170/16

talked [16]  35/21 52/20 73/13 73/19 74/23 82/21 90/12 102/14 102/23 107/3 107/4 113/9 118/3 120/6 122/24 123/25
talking [19]  23/8 23/9 89/1 93/15 95/3 100/12 101/3 101/5 101/8 103/23 103/24 114/16 122/3 124/3 162/3 164/4 166/7 168/1 168/4
talks [5]  36/21 62/8 77/1 122/4 125/11
tape [1]  32/23
taped [3]  155/25 156/2 159/16
target [4]  83/6 111/7 137/11 139/21
targeted [1]  138/6
task [3]  130/4 130/5 146/6
taught [8]  8/9 8/10 8/13 8/15 8/23 106/19 106/21 106/22
teach [6]  7/23 8/4 8/8 8/11 8/20 8/22
teaches [1]  56/4
teaching [5]  6/20 6/24 9/2 9/3 10/12
team [6]  54/9 56/8 62/12 62/13 62/24 145/15
technical [3]  14/11 15/7 63/8
technique [5]  54/25 55/3 67/5 76/15 118/25
techniques [3]  54/20 74/19 74/20
technology [1]  12/6 12/21 130/23 131/2
teen [3]  43/20 100/19 100/20
tell [25]  5/21 11/3 23/6 39/12 39/20 39/21 39/25 40/1 40/2 41/3 44/24 45/14 47/11 47/11 61/5 65/1 83/19 95/21 96/4 123/23 139/18 143/14 148/8 149/7 152/23
telling [1]  35/12
tells [3]  39/14 39/14 162/24
tempered [1]  155/8
template [7]  82/20 82/22 82/22 83/15 84/9 84/15 84/17
ten [15]  28/15 40/11 41/2 41/16 46/15 65/5 65/12 65/25 66/2 67/1 67/14 67/20 130/6 130/12 166/23

tenth [4]  65/13 68/2 67/2 67/17
tenure [3]  7/1 7/3 7/14
tenure-ship [1]  7/14
term [6]  56/22 82/18 87/22 88/8 114/21 138/6
terms [7]  25/12 56/9 90/13 94/22 94/23 107/7 174/6
test [21]  62/21 70/6 71/6 71/11 71/13 71/14 71/17 71/19 72/20 73/5 74/18 74/23 115/5 115/5 115/25 117/17 117/12 117/14 118/12 120/19 126/1
testified [16]  10/12 15/16 81/8 86/24 87/2 87/7 87/8 95/19 96/10 96/12 96/18 96/23 98/11 99/19 101/25 106/11
testifies [1]  129/8
testify [7]  4/9 126/18 126/22 127/11 127/22 128/3 174/1
testifying [4]  80/23 126/2 127/10 131/24
testimony [10]  100/10 123/9 126/23 127/2 127/17 128/9 129/3 131/11 131/20 175/9
testing [2]  125/21 125/24
tests [14]  70/8 71/25 72/7 72/9 74/22 81/13 114/25 115/12 116/25 117/25 117/25 126/6 126/4 142/25
text [1]  53/1
text-based [1]  53/1
textbooks [1]  115/15
thank [50]  5/11 5/18 6/2 6/9 7/13 9/12 9/25 10/19 10/23 11/14 16/3 16/21 32/22 42/15 42/19 61/10 64/10 72/23 75/9 77/4 80/20 81/20 81/24 82/6 93/6 110/18 117/19 117/22 124/10 124/12 126/7 126/12 126/13 128/18 129/12 129/20 132/24 132/25 137/17 144/7 147/10 156/20 160/12 163/8 166/9 173/16 175/12
theoretically [1]  95/24
thesis [1]  12/2
thing [22]  18/15 29/17 31/22 39/6 50/9 50/13 59/17 60/25 64/11 66/25 68/9 78/9 80/12

194/20 99/16 103/22 104/17 105/16 107/11 116/5 163/25 164/5
things [77]  4/2 4/8 9/21 10/13 10/17 11/22 11/23 12/1 12/9 12/25 17/18 17/22 23/3 25/23 26/4 27/15 28/6 28/10 28/11 29/19 29/24 30/1 31/9 35/15 35/16 35/17 36/25 37/25 41/8 43/4 48/8 50/4 50/9 50/17 50/17 51/24 55/6 56/12 60/15 62/23 65/5 65/14 69/16 69/20 70/13 70/19 75/25 86/20 92/22 103/3 104/8 104/9 104/9 104/14 105/19 105/25 112/14 112/15 114/2 114/4 114/7 114/11 119/17 122/5 123/10 123/19 130/22 132/9 145/8 146/3 151/1 152/16 162/3 162/5 163/22 164/4 172/5
think [87]  4/1 4/12 4/13 8/3 11/9 11/21 14/25 17/8 19/7 20/17 20/18 31/13 31/14 31/20 33/18 34/11 37/16 51/19 54/7 54/8 55/21 57/4 58/19 60/14 61/23 62/16 64/24 65/1 65/4 65/16 67/10 69/8 77/21 80/1 83/12 83/13 87/1 87/10 88/9 89/5 89/11 90/20 90/22 94/11 94/12 94/22 94/24 99/5 99/6 99/19 100/4 102/23 103/3 103/23 104/12 104/21 105/1 106/1 106/3 106/4 106/11 107/6 110/6 110/25 111/20 113/22 114/15 114/16 116/12 119/23 120/8 123/14 125/14 125/22 127/2 133/24 135/5 143/6 145/7 149/10 159/25 160/1 160/9 169/7 173/23 174/12 174/17
thinking [1]  121/2
third [14]  22/15 44/14 53/18 53/20 76/17 141/4 141/5 153/14 156/4 156/13 157/1 159/16 166/8 170/5
thirty [1]  46/15
thought [4]  87/24 145/11 150/19 169/20
thousand [10]  31/5 31/5 41/15 65/11

65/9 65/21 68/12 67/12 112/8 121/6
threaten [1]  150/11
threatened [1]  151/11
three [27]  40/1 42/9 76/17 86/24 87/2 110/15 130/7 130/24 135/24 138/5 138/7 138/12 138/22 138/25 139/19 139/24 140/15 141/13 141/15 142/9 142/12 142/12 146/12 148/21 155/22 156/17 167/11
three-page [1]  42/9
thumb [1]  172/13
tighter [1]  121/9
time [75]  19/5 19/7 20/16 23/1 37/6 37/20 40/22 43/6 47/15 58/15 59/19 60/19 61/6 64/3 64/23 71/22 73/22 74/13 77/14 77/20 80/7 89/13 89/15 92/6 97/13 97/15 97/22 97/23 97/25 98/3 98/5 110/14 110/19 110/20 110/21 111/17 111/17 116/1 116/16 118/15 118/17 119/21 119/25 120/18 121/9 121/25 128/13 129/10 130/18 141/25 144/14 146/7 146/18 148/9 149/5 153/15 155/10 155/19 156/7 161/9 161/14 161/18 161/20 163/6 163/13 165/6 166/17 166/21 168/1 169/2 173/16 174/10 174/13 175/6 175/6
timed [1]  159/5
times [12]  38/4 86/25 87/2 107/6 110/9 110/25 115/12 115/13 115/25 116/5 116/5 116/10 170/4
timing [6]  76/10 76/11 76/13 76/13 76/18 76/21
title [2]  22/11 140/20
titles [2]  6/9 7/6
today [23]  3/10 4/2 4/5 6/18 11/4 12/25 18/19 23/5 24/13 63/1 88/2 90/8 96/12 96/19 101/5 101/8 103/23 123/9 123/25 125/3 126/20 143/19 148/24
today's [1]  13/5
Toddler [1]  53/3
told [9]  3/10 37/13 71/9 149/10 151/7 152/20 168/20 169/11 170/3

**T**

**tools [1]** 171/2
**top [9]** 22/11 23/7
42/19 43/10 43/19
44/5 44/19 45/20
142/24
**topic [1]** 89/19
**topics [3]** 8/12 89/22
107/6
**topologies [1]** 73/16
**topology [9]** 73/11
73/16 73/17 73/18
73/21 73/21 73/23
73/24 125/13
**total [4]** 112/24
119/10 122/13 122/21
**totals [1]** 143/10
**touch [4]** 7/21 7/21
74/25 75/14
**touched [2]** 28/14
80/1
**Toyota [1]** 154/12
**trace [3]** 23/23 116/25
117/1
**traces [1]** 70/18
**track [3]** 25/17 120/2
121/16
**tracks [3]** 60/2 120/7
120/8
**traditional [2]** 23/21
23/22
**traffic [5]** 36/6 48/11
48/14 48/22 53/12
**Trafficking [1]** 130/4
**trained [1]** 83/17
**training [12]** 57/22
57/23 106/12 106/16
106/19 106/20 106/23
106/23 106/24 132/3
140/17 151/24
**transcript [4]** 1/12
32/21 32/24 175/19
**transfer [2]** 36/15
164/24
**transferred [1]** 57/16
**transmission [1]**
135/4
**transmitted [1]** 91/10
**travel [1]** 49/1
**trial [1]** 90/9
**tried [2]** 125/24
134/25
**tries [2]** 36/8 101/10
**trip [1]** 77/20
**trivial [1]** 49/10
**true [7]** 43/2 71/12
92/3 97/20 113/1
133/15 155/1
**try [13]** 21/3 39/10
40/25 52/5 54/17
54/21 58/11 61/13
70/7 85/16 100/14
123/2 169/25
**trying [18]** 37/15
37/20 38/2 52/2 54/11
60/7 65/11 66/3 66/5

68/2 72/14 81/3 91/5
93/8 94/3 107/7
112/17 145/7
**turn [10]** 4/19 9/9
49/10 49/22 57/10
65/24 67/18 75/20
167/15 167/17
**turned [1]** 162/22
**turning [2]** 7/8 7/9
**turns [1]** 18/14
**two [38]** 16/19 18/1
24/17 24/20 26/9 29/8
43/23 48/8 55/6 55/15
64/21 66/18 67/8
67/25 71/24 101/9
118/1 118/2 119/14
120/18 120/20 120/22
125/4 129/1 130/5
130/24 140/6 143/11
143/14 143/15 144/11
146/10 147/18 147/20
163/18 168/6 173/11
174/2
**two-car [1]** 147/18
**two-year [2]** 118/1
118/2
**type [8]** 44/6 58/21
60/21 89/16 96/3
104/19 106/24 111/23
**types [3]** 73/16 85/18
89/9
**typical [2]** 21/2 85/1
**typically [5]** 8/22
14/12 121/18 127/9
158/3
**typing [1]** 99/25

**U**

**U.S [1]** 1/14
**Uh [5]** 38/15 80/4
95/12 106/14 124/2
**Uh-huh [5]** 38/15 80/4
95/12 106/14 124/2
**Uhm [4]** 10/16 86/16
132/5 148/21
**ultimate [2]** 114/5
120/10
**un [1]** 106/1
**un-install [1]** 106/1
**unarmed [1]** 146/9
**unaware [1]** 90/6
**unclear [2]** 48/10
102/25
**uncomfortable [1]** 7/9
**uncovered [1]** 136/2
**undergo [1]** 106/25
**undergrad [1]** 8/25
**undergrads [2]** 8/22
9/4
**undergraduates [1]**
8/20
**underlined [1]** 22/11
**underlying [1]** 134/10
**Undersea [1]** 131/3
**understand [15]** 3/9
57/18 63/17 81/16

82/25 91/1 93/1
114/14 115/22 119/15
120/24 133/23 139/3
175/10 175/11
**understanding [4]**
38/9 46/10 62/25
115/24
**understood [10]**
18/18 30/22 74/25
78/2 82/4 84/15 87/9
99/4 117/19 122/6
**unique [1]** 91/23
**Unit [2]** 130/9 165/1
**UNITED [6]** 1/1 1/4
1/18 3/5 3/16 39/24
**units [1]** 146/11
**University [8]** 6/11
6/21 11/6 11/8 11/12
12/18 54/10 130/24
**unknowns [1]** 150/24
**unleash [1]** 68/8
113/22
**unlocked [2]** 154/23
162/10
**unmodified [3]** 78/16
78/23 113/14
**unquote [1]** 36/22
**unrecorded [1]** 163/3
**unrelated [4]** 87/8
132/8 162/2 162/4
**untrusted [2]** 36/22
37/2
**up-to-date [2]** 10/15
10/16
**upload [3]** 30/6 34/4
89/15
**uploaded [1]** 89/6
**uploader [1]** 112/20
**uploads [1]** 42/4
**upper [2]** 81/25 82/1
**URL [21]** 31/23 32/2
33/11 33/13 33/24
33/25 34/5 34/25 35/4
37/21 38/22 38/23
39/5 39/6 44/6 44/20
45/9 45/15 46/3 95/8
99/8
**URLs [11]** 42/4 42/10
44/22 44/24 45/3 46/6
46/23 46/24 53/8 54/3
59/13
**use [26]** 19/4 19/21
20/12 27/11 35/10
36/5 38/16 38/20
46/12 49/12 55/8
61/22 75/15 75/21
76/14 77/5 78/23
79/22 84/10 105/15
115/5 145/3 145/19
151/13 167/21 171/2
**user [43]** 19/6 27/10
27/14 27/17 33/11
33/13 34/11 34/18
35/10 35/12 36/13
36/18 38/17 39/2
41/10 42/4 45/14 46/6

46/10 46/11 46/12
56/18 56/21 57/9
85/20 85/21 85/23
86/7 90/18 90/20 93/8
93/10 93/18 98/21
102/17 104/6 105/20
109/19 113/18 122/21
122/25 123/3 123/4
**user's [3]** 26/10 26/20
86/9
**user-manipulated [1]**
36/18
**users [12]** 18/5 26/10
28/22 34/4 38/10 44/7
46/17 46/19 57/16
86/2 102/15 126/6
**users' [1]** 34/15
**uses [2]** 25/1 90/16
**USK [1]** 45/2
**usually [2]** 116/10
127/9

**V**

**vague [1]** 88/8
**validate [1]** 62/18
**value [7]** 107/14
110/13 115/10 115/13
115/14 115/15 119/20
**values [1]** 115/19
**van [7]** 148/5 148/6
148/8 148/14 150/13
150/14 153/18
**variety [5]** 8/9 8/12
12/23 89/16 89/19
**various [3]** 12/9 25/17
45/4
**varying [1]** 38/4
**vehicle [8]** 148/9
151/9 153/23 153/25
154/6 154/13 154/14
154/22
**vehicles [6]** 145/8
146/13 146/24 148/2
148/3 149/11
**venue [1]** 74/19
**verbose [1]** 57/2
**verbosity [1]** 56/22
**verify [2]** 137/13
137/14
**versed [1]** 62/25
**version [21]** 33/22
45/12 55/7 56/8 56/25
57/8 57/14 57/24 58/1
58/9 104/4 104/8
104/13 105/2 106/13
110/23 112/22 120/7
132/11 136/10 136/16
**versus [4]** 3/5 55/16
89/19 90/12
**view [2]** 17/1 55/6
**violation [4]** 167/22
167/23 167/23 167/23
**Violent [1]** 130/8
**Virginia [1]** 165/3
**visit [1]** 33/22
**visited [3]** 44/7 46/4

**voices [1]** 145/24

**W**

**waiting [2]** 25/19
131/24
**walk [1]** 153/3
**walked [1]** 153/1
**want [52]** 4/5 25/5
25/21 26/6 30/6 32/4
38/16 40/11 41/25
42/1 46/12 48/4 52/22
59/13 60/25 68/11
68/20 68/21 69/18
69/19 70/2 72/2 74/25
75/14 76/14 79/1
87/13 89/18 95/17
105/6 113/25 115/23
119/14 119/14 119/18
123/21 127/1 127/15
128/8 131/17 132/9
135/8 135/15 155/1
159/15 159/22 160/5
160/8 160/13 168/6
173/19 173/19
**wanted [12]** 9/9 25/25
29/18 55/3 129/9
130/20 131/22 162/7
164/9 167/17 170/2
170/11
**wants [3]** 27/11 78/24
160/5
**Warfare [1]** 131/3
**warn [1]** 90/20
**warning [4]** 43/7 43/8
43/9 43/25
**warnings [3]** 26/24
27/6 90/24
**warrant [33]** 82/12
82/19 83/2 83/13
84/10 84/14 127/10
127/18 132/12 132/12
133/8 133/11 133/13
134/1 134/9 134/21
138/4 138/11 138/22
139/11 140/11 140/19
141/8 141/14 144/8
144/13 144/21 145/3
170/9 172/2 172/5
173/2 173/12
**washed [1]** 23/5
**Washington [3]** 131/3
165/2 165/4
**watch [1]** 89/2
**water [1]** 152/15
**way [63]** 4/1 4/2 4/12
4/12 11/23 12/25 17/8
19/1 21/6 24/5 31/17
32/1 33/14 35/13 37/3
39/16 41/9 42/19
44/16 44/24 49/8
49/16 49/17 51/17
54/22 56/12 56/13
57/5 57/9 57/13 58/22
67/10 69/20 69/24
72/17 73/18 73/20

195

**W**

way... **[26]** 78/16 78/19 82/11 92/3 95/22 96/5 99/5 100/3 100/23 104/8 104/10 104/11 105/22 111/11 112/25 113/14 115/23 116/15 120/6 122/12 123/13 124/4 124/6 151/11 170/20 170/20
way the **[2]** 104/10 116/15
ways **[7]** 12/9 12/23 16/9 17/9 31/21 99/12 101/10
we've **[15]** 5/4 29/8 41/25 51/6 71/9 71/24 71/25 72/9 95/3 100/7 112/10 115/16 124/3 124/4 166/25
weapons **[3]** 150/25 151/3 151/5
wearing **[2]** 148/25 152/20
weather **[1]** 162/5
web **[5]** 88/7 88/8 88/9 92/10 95/4
website **[8]** 22/2 22/4 22/19 44/15 62/2 62/2 96/8 100/21
websites **[2]** 33/19 33/22
weeds **[1]** 63/7
week **[4]** 129/2 129/8 173/20 175/13
well **[85]** 4/5 6/25 7/20 8/11 9/3 10/25 11/5 12/4 12/5 13/15 15/1 18/11 20/10 20/16 20/23 20/24 23/4 27/17 28/18 30/8 30/25 32/17 33/17 33/18 35/23 38/7 39/14 39/20 39/22 43/10 43/11 46/18 47/9 47/13 49/9 52/4 52/24 56/4 56/4 56/9 61/20 62/16 65/4 73/8 74/19 76/4 76/13 77/9 78/1 78/15 82/17 87/8 87/14 87/22 88/8 91/17 92/11 96/14 97/10 98/2 98/19 105/13 109/16 110/16 112/10 113/4 114/11 115/2 116/23 118/17 119/11 124/18 125/10 129/9 131/25 140/9 143/19 151/25 153/5 157/1 165/6 167/21 171/3 172/18 174/25
well-established **[1]** 20/10
went **[5]** 15/5 107/6 140/18 143/23 154/22
West **[2]** 1/8 1/19

whatever's **[1]** 45/17
white **[1]** 45/1
Wi **[5]** 107/24 108/6 108/6 108/18 173/6
Wi-Fi **[5]** 107/24 108/6 108/6 108/18 173/6
wide **[1]** 89/16
willing **[2]** 112/9 150/2
window **[9]** 64/3 64/22 64/22 71/7 76/18 77/3 77/23 111/1 111/4
windows **[1]** 22/15
wise **[5]** 17/25 17/25 17/25 18/8 18/8
wish **[1]** 83/19
withdraw **[1]** 159/14
Withdrawn **[1]** 157/20
witness **[19]** 2/2 3/10 5/7 5/14 9/19 9/23 32/19 126/14 126/15 126/20 128/24 129/5 129/11 129/15 133/21 137/18 159/3 159/4 174/16
witness's **[1]** 16/12
witnessed **[1]** 159/1
witnesses **[4]** 5/5 129/1 174/2 174/9
wizard **[2]** 20/25
word **[8]** 22/15 31/14 32/17 74/17 104/21 125/25 140/21 142/18
words **[7]** 15/13 92/15 92/21 93/21 154/17 162/20 168/16
work **[27]** 7/20 10/11 10/18 31/11 35/13 37/13 37/24 52/1 53/13 54/19 62/18 62/19 76/21 82/23 83/14 86/1 98/7 101/15 105/22 123/19 126/24 130/1 131/12 144/6 146/17 154/10 171/3
worked **[4]** 62/14 84/6 131/3 146/7
working **[6]** 12/18 17/7 53/15 54/20 131/2 164/22
works **[12]** 37/22 39/16 49/8 59/2 62/9 63/8 68/7 68/11 69/11 75/24 80/9 98/5
workshop **[3]** 14/11 14/15 14/16
world **[4]** 52/22 73/21 73/23 125/13
worried **[1]** 145/9
worst **[6]** 72/13 116/23 117/2 117/5 117/8 117/13
worst-case **[4]** 72/13 116/23 117/2 117/5
write **[3]** 70/14 84/14

143/6
writes **[1]** 57/8
writing **[2]** 101/21 123/20
written **[9]** 13/14 19/25 20/14 32/24 56/23 101/18 101/18 134/10 134/19
wrong **[4]** 68/20 75/25 94/4 115/10
wrote **[6]** 13/21 15/2 53/16 72/6 86/11 156/4

**Y**

yeah **[27]** 6/25 10/17 28/12 34/13 37/18 41/19 44/5 46/2 47/18 50/23 51/18 54/2 55/15 58/24 59/6 64/8 79/8 79/18 89/18 91/5 92/19 101/5 111/22 113/20 116/3 116/18 125/1
year **[6]** 83/20 83/21 83/22 111/14 118/1 118/2
years **[18]** 6/24 6/25 7/2 7/3 7/4 8/9 8/15 54/15 71/24 130/6 130/6 130/7 130/10 130/12 130/15 130/16 132/5 149/4
yell **[1]** 145/24
yellow **[1]** 143/7
yep **[1]** 59/10
York **[2]** 11/12 130/11

**Z**

zero **[4]** 48/21 52/10 110/2 117/10
zip **[2]** 45/12 45/16
zoom **[1]** 142/16